**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ENVISION HEALTHCARE CORPORATION, | ) |
| *et al.*,[1] | ) Case No. 23-90342 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION**
**OF PAUL KEGLEVIC,**
**CHIEF RESTRUCTURING OFFICER**
**OF ENVISION HEALTHCARE CORPORATION,**
**IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS**

I, Paul Keglevic, declare as follows under penalty of perjury that if called to testify, I would testify competently to the facts and opinions set forth in this declaration:

1.     I am over the age of 18 and I am authorized to submit this declaration on behalf of the Debtors.

2.     As a leading national medical group, Envision's core mission and focus is helping physicians deliver critical clinical care to patients in need.[2]  Envision provides physician services to hospitals and health systems and serves as an operator of ambulatory surgical centers in partnership with physicians and other healthcare providers across the United States.  Envision employs or partners with more than 21,000 clinicians, providing care to patients with nearly 30

---

[1]   A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision.  The Debtor's service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

[2]   Envision Healthcare Corporation, a corporation organized under the laws of Delaware, is the parent company of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with Envision Healthcare Corporation's direct and indirect non-Debtor subsidiaries, the "Company" or "Envision").

million patient visits each year.  Envision's physicians and advanced practice providers deliver care in settings where patients have the most acute and life-changing needs—emergency departments, surgical suites, intensive care units, and birthing suites across the United States.

3.      Despite, or in some cases because of, its crucial role in the United States' healthcare system, Envision has faced a series of intense and extraordinary challenges to its business and operations over the past three-plus years.  As described below, the Envision management team— all of whom were newly installed in 2020—have been confronted with a whiplash-inducing onslaught of obstacles and complications since assuming their roles.  Despite these challenges, however, the Debtors are filing these chapter 11 cases with $655 million in cash on hand.  The Debtors' cash position obviates the need for a DIP facility and is a testament to the stewardship provided by the Envision management team and the Company's board of directors.  Further, the decision to file these chapter 11 cases now, while the Debtors have ample cash on hand, will ensure that the Company can continue to provide patients with the high-quality care they require.  And the path out of chapter 11 is clear, with initial, widespread consensus of more than 80% of the Debtors' funded debt, inclusive of Restructuring Support Agreement parties and additional senior secured lenders supporting cash collateral use at the outset these Chapter 11 Cases.

4.      ***COVID-19 pandemic.***  Like many other companies, Envision has had to navigate the hardships and risks associated with the COVID-19 pandemic over the past three-plus years.  COVID-19 caused several direct stresses to the Company's clinical enterprise.  Envision's emergency medicine clinicians and anesthesiologists experienced sharp, overwhelming, and localized surges of COVID-19 patients early in the pandemic—at the height of the pandemic, Envision's clinicians treated approximately 1 in 10 COVID-19 patients.  These surges were characterized by high patient mortality rates, unclear clinical protocols, and unknown infection

risk, all putting incredible stress on the clinical teams.  Simultaneously, outside of emergency medicine, Envision lost 65 to 70% of patient visits—and associated revenue—as the country moved to variations of shelter-in-place policies over several months.  In 2020, the COVID-19 pandemic had a negative impact on revenues of approximately $1.1 billion and reduced EBITDA by approximately $415 million.  COVID-19 continued to impact revenue in 2021, with a negative impact of approximately $380 million.  Envision's need to focus on a response to the COVID-19 pandemic also delayed other operational initiatives, including the transformation and integration of operational infrastructure and other cost rationalization measures.

5.    ***No Surprises Act, Regulatory implementation, and payor response.***  Envision has faced strong and unique regulatory headwinds.  At the end of 2020, just as vaccines were being rolled out and the response to the pandemic became more controlled, Congress passed the No Surprises Act. The No Surprises Act ended the practice of "balance billing"—sometimes referred to as "surprise medical billing"—which is the practice of billing patients directly when health insurers underpay or refuse to pay the full cost of delivering care.  Envision supported the patient protections in the No Surprises Act legislation and had previously ceased the practice of balance billing (before Congress passed the No Surprises Act).  While the legislative policy behind the No Surprises Act is sound, the regulatory implementation of the No Surprises Act has been highly flawed, ultimately shifting the power dynamic in payment disputes too far in the favor of insurance companies (referred to as "payors").  In fact, some payors (including Envision's single largest payor) have used the No Surprises Act and its implementing regulations as an excuse to avoid payment to medical groups like Envision and affiliated entities.  Moreover, payors have aggressively denied, delayed, and reduced payment terms, often below the direct cost of delivering care.  This has left Envision, other medical groups, and healthcare providers to deal with the

negative financial consequences. Although the legislation included an arbitration process intended to provide a forum for providers and payors to settle disputes, the process has proved highly ineffective. Envision has taken steps to mitigate the effects of the flawed implementation of the No Surprises Act on its business—including by negotiating new contracts with certain payors and pursuing various arbitration and litigation-focused strategies—but like other similarly situated providers, Envision continues to suffer from payor tactics and activism in response to the No Surprises Act.

6.     ***Payor Activism.*** Envision's largest payor has been uniquely aggressive in its behavior, reducing their total reimbursement by nearly 60% over the past five years, resulting in a revenue decline of more than $400 million. This payor's behavior is an outlier in the industry and has had a disproportionate impact on the business. They have reduced reimbursement by: (a) arbitrarily and unilaterally changing the terms of a contract by approximately $100 million in 2018; (b) leveraging their market power to extract approximately $100 million in additional rate reductions in 2019; (c) refusing to renew the in-network agreement at commercially reasonable rates and systematically denying payment on more than 35% of emergency medicine claims, resulting in approximately $50 million per year in denied payments since the beginning of 2021; and (d) underpaying on those claims they choose to pay by more than $200 million. Their payments are on average 40-50% below third-party benchmarks and well below the direct cost of delivering care. As evidence of their behavior, Envision was awarded $91 million by an independent arbitration panel for their underpayments in 2018 and is currently winning more than 80% of cases submitted to the federal arbitration panel. The payor is the only health insurer systematically underpaying to this degree, and their behavior impacts not only Envision but the entire healthcare industry.

7.     ***Labor costs and inflationary pressures.***  The COVID-19 pandemic left in its wake a nationwide health care labor shortage directly affecting the healthcare services sector as many part-time and retirement-age clinicians exited the workforce.  This has created significant upward pressure on clinician wages and salaries, along with the general inflationary pressure increasing the cost of equipment and other supplies necessary to run Envision's ambulatory surgery centers. Consistent with Envision's ongoing commitment to high quality patient care and to ensuring access to services, Envision has increased clinician wages to a competitive level in line with the post-COVID "new normal," paying what is necessary to ensure that its facilities had all of the equipment and supplies needed to deliver necessary and life-saving care.  Increases to clinician wages and premium labor spend to ensure all facilities were adequately staffed totaled approximately $330 million annually as compared to 2019 spend.  While overall inflationary pressures have eased, the market for clinician services continues to be extremely competitive as the nationwide clinician shortage continues, including a shortage of anesthesiologists and radiologists.

8.     ***Proactive response.***  Having joined Envision's Board of Directors in mid-2020, I have observed, first-hand, the impacts that the cascade of hardships detailed above have had on Envision's business—including its ability to service its debt.  But I have also been privileged to observe and participate in the Company's extraordinary years-long efforts to confront these challenges.

9.     Envision's talented management team, dedicated clinicians and employees, and the Board—including my fellow disinterested director, Jill Frizzley—have undertaken wide-ranging and proactive efforts to help the Company weather the storm.  These efforts included, but were not limited to:

- more than $300 million in one-time savings efforts;

- divesting three non-strategic assets since early 2020 for approximately $280 million;

- revenue cycle improvements of more than $150 million;

- proactively extending good faith offers, grounded in industry benchmarks and arbitration results, to insurers representing over 90% of Envision's non-contracted volume;

- executing 11 new contracts to move 55% of our non-contracted business (excluding our largest payor) in-network;

- restructuring health system arrangements to share in the risk of payor underpayment, worth more than $300 million in annual incremental revenue;

- submitting 117,000 claims to the federal arbitration process, with a win rate above 80%;

- filing multiple lawsuits to address the most egregious payor behavior;

- advocating with lawmakers and regulatory agencies for more rigorous payor oversight;

- exiting non-core, subscale geographies; and

- achieving approximately $50 million in annual cost reduction.

10.     Through these efforts, Envision was able to navigate the devastating and immediate effects of the pandemic while maintaining high quality patient care.  Further, Envision's equity sponsor, funds and accounts managed by Kohlberg Kravis Roberts & Co, L.P. (the "Consenting Sponsors") have deferred collection of its management fees from Envision since 2020, allowing the Company to invest additional amounts in these efforts.

11.     In late 2021 and early 2022, the Company realized that it required more time and liquidity for its initiatives to mature and for the implementation issues related to the No Surprises Act to resolve in the face of a declining cash balance.  The management team and board of directors remained confident in the long-term value of the business: patient demand was steady, the need

for clinicians to provide care had not changed, and hospitals continued to benefit from Envision's support in providing high quality, efficient clinical and management services.  To afford the Company the runway to continue implementing these important initiatives, the management team and board of directors, working with the Company's advisors, Kirkland & Ellis LLP ("K&E"), PJT Partners LP ("PJT"), and Alvarez & Marsal North America, LLC ("A&M"), began to explore potential liquidity-enhancing and deleveraging transactions in late 2021.

12.    In the following months, Envision, with the assistance of K&E, PJT, and A&M, marketed various potential financing transactions to third parties and existing lenders in an effort to raise additional liquidity.  The transactions considered included financing options, including a carve-out of Envision's ambulatory surgical center business (referred to as "AMSURG"), as well as financing for other portions of the business or the Company as a whole.  Envision was hopeful that it would reach the terms of a consensual deal with existing lenders but was ultimately unable to reach agreement on the terms of a transaction in connection with the April 2022 transactions. In the absence of an agreed transaction, Envision turned to prospective lenders who were primarily interested in funding additional debt secured by the AMSURG segment of the business.  In what would be the first of a series of liquidity-enhancing and deleveraging transactions consummated between April and August 2022, Envision designated entities owning interests in ambulatory surgical centers comprising approximately 83% of the AMSURG business EBITDA, as of fiscal year 2021, as unrestricted subsidiaries.  To remain in strict compliance with the relevant debt documents, AMSURG surgical centers comprising 17% of the AMSURG business (also based on fiscal year 2021 EBITDA) were left behind at Envision Healthcare Corporation.  Envision thereafter raised $1.1 billion in new money first lien indebtedness and completed an exchange of approximately $2.0 billion of existing debt (into approximately $1.4 billion of AMSURG second

lien debt) against those assets, resulting in the capture of approximately $600 million in discount. As a result of the AMSURG second lien exchange transactions, AmSurg, LLC extended a $1.4 billion intercompany term loan to Envision Healthcare Corporation, which remains outstanding today.

13.     Following the AMSURG transaction, Envision Healthcare Corporation subsequently completed a series of financing and uptier transactions against its remaining Envision Healthcare Corporation assets with previously non-participating term lenders.  These transactions resulted in $300 million of additional new money (the new "first out" term loans) and the conversion of $3.7 billion of existing term loans into the "second out" and "third out" tranches. The non-participating loans remained in a "fourth out" tranche.

14.     The following image summarizes Envision's capital structure before and after the 2022 liability management transactions, which effectively created two silos: the AMSURG silo (which includes 83% of AMSURG centers and operations) and the EHC silo (which includes



PRE-TRANSACTION ORG STRUCTURE

POST-TRANSACTION ORG STRUCTURE[2]

(1) Includes $300mm revolving credit facility.
(2) Reflects par balances as of 12/31/22.

Envision's Physician Services business plus the remaining 17% of AMSURG centers and operations).

15.    The 2022 liability management transactions captured over $1 billion in discount, raised approximately $1.4 billion in new money, and extended the maturity on over 97% of the Company's existing revolving and term loans.  The transactions were designed to provide runway to allow health plan revenue to normalize and time to address industry headwinds and continue operations through 2025 without interruption.  And of course, the focus remained on ensuring continuity of high-quality patient care.

16.    Regrettably, despite Envision's initiatives, the lingering impacts from COVID-19 on volume and labor costs, the delays resulting from tactics and recalcitrance by Envision's largest insurance payors, and the ongoing regulatory uncertainty caused by the flawed implementation of the No Surprises Act have proven too much.  The Company, with the assistance of its advisors, has determined that it faces an insurmountable mismatch between its cash generation from operations and its balance sheet and fixed costs.  Faced with this reality, the Company has had no choice but to assess its options and consider a comprehensive deleveraging transaction designed to, among other things, right-size the Company's balance sheet, and rationalize its operations and structure.  Accordingly, in late 2022, Envision reengaged K&E, PJT, and A&M to explore more comprehensive strategic alternatives.

17.    In March 2023, Envision—with the assistance of K&E, PJT, and A&M—initiated discussions and engaged with certain key financial stakeholder groups, including lenders under the AmSurg Second Lien Term Loan (the "AmSurg 2L Group") and an ad hoc group of lenders under the Envision Term Loan Facility (the "Envision Ad Hoc Group").  Envision's equity sponsor, the Consenting Sponsors, which own 99.67 percent of the equity in Debtor Enterprise Parent Holdings,

Inc., were also actively involved in these restructuring discussions. Following the initial engagement with the AmSurg 2L Group and the Envision Ad Hoc Group, Envision and its advisors expanded to include the ABL Facility and AmSurg Revolving Credit Facility agents (respectively, the "ABL Agent" and the "RCF Agent") and certain lenders under the AmSurg First Lien Credit Facilities (the "Ad Hoc Group of First Lien AmSurg Lenders"). Envision has also approximately $938.9 million in unsecured notes. Envision has been in contact with an ad hoc group of noteholders (the "Unsecured Notes Group"), and these conversations will continue. These efforts have resulted in the agreement reflected in a restructuring support agreement executed with certain lenders in the EHC silo, attached hereto as **Exhibit A** ("the EHC Restructuring Support Agreement") and a restructuring support agreement executed with certain lenders in the AMSURG silo, attached hereto as **Exhibit B** (the "AMSURG Restructuring Support Agreement," and, together with the EHC Restructuring Support Agreement, the "Restructuring Support Agreements").

18.     The Restructuring Support Agreements contemplate a comprehensive balance sheet restructuring that will substantially reduce leverage and allow Envision flexibility to navigate the current business and operational environment. Specifically, the Debtors' ultimate parent company, Envision Healthcare Corporation, will sell the 17% of the AMSURG centers in the EHC silo to AMSURG for $300 million plus a waiver of intercompany loans held by AmSurg LLC, resulting in the consolidation of 100% of the AMSURG business and a sufficient influx of cash to fund the go-forward business plan of the Physician Services business. Further, all outstanding indebtedness under the Envision Term Loan Facility will be equitized or cancelled, in addition to equitization of the AmSurg Second Lien Term Loans. Senior revolving and asset-based lending facilities and the AmSurg First Lien Term Loans will be repaid or refinanced at emergence and unsecured

creditors will either be unimpaired or share in new warrants.  Following the restructuring, the AMSURG and Physician Services businesses will be separately owned by the holders of AmSurg Second Lien Term Loans and Envision Term Loans, respectively.  Overall, these transactions will result in a deleveraging of approximately $7.4 billion, including secured intercompany loans.  The Restructuring Support Agreements encompass support across the Debtors' capital structure, including approximately 87% and 83% of the "first out" and "second out" Envision Term Loans, respectively, in addition to approximately 93% of the AmSurg Second Lien Term Loan.  These holders also have significant crossholdings, including approximately 41% and 14% of the "third out" and "fourth out" Envision Term Loans, 45% of the Senior Notes, and approximately 43% of the AmSurg First Lien Term Loan.  Holders of senior secured claims under the ABL Facility, RCF Facility, and AmSurg First Lien Facility will be paid in full or otherwise refinanced under the Restructuring Support Agreements and are supportive of the Debtors' use of cash collateral during these cases.  Inclusive of Restructuring Support Agreement parties and cash collateral support parties, more than 80% of the Debtors' funded debt are supportive of these Chapter 11 Cases.  The Debtors have commenced these chapter 11 cases to implement the restructuring transactions supported by these stakeholders.

19.    In parallel with engaging with key stakeholders, Envision engaged Goldman Sachs & Co. LLC ("Goldman") in January 2023 to explore a potential sale of the AMSURG business. Goldman worked with the Company to identify several potential purchasers and is continuing to advance diligence with certain purchasers still involved in the process.

20.    On May 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  The Debtors chose to

file in this Court because several Debtor entities are incorporated in Texas.  As with our response to the unprecedented challenges faced since 2020, Envision's proactive planning for this filing will enable Envision to maximize value for all of its stakeholders.  Most important, our planning will position Envision to provide continued and uninterrupted support for our affiliated physicians. The Debtors are seeking a range of relief at the outset of these chapter 11 cases to ensure that these functions are not affected in any respect.

21.      Despite the market and regulatory challenges described above, Envision continues to believe in its business and its mission.  The AMSURG business generated over $1.2 billion in revenue in 2022 and continues to create value for all stakeholders, including patients.  Envision's physician services business segments, which primarily provides management services to affiliated medical groups, remain sound, and the services provided by the segment continue to be vital to millions of individuals and numerous medical groups across the United States.  As rates continue to stabilize in the wake of the No Surprises Act, Envision expects its businesses to normalize in the coming years because of its leading clinical outcomes and the stable, but growing, demand for associated services.  Envision expects to move swiftly through these chapter 11 cases, consistent with the milestones in the Restructuring Support Agreements, which contemplate confirmation within 120 days and emergence within 150 days, and emerge as a financially healthier enterprise, while continuing the critical mission of providing high quality patient care when and where it is needed most.

*      *      *      *      *

22.      To familiarize the Court with Envision, its businesses, and the circumstances leading to these chapter 11 cases, this Declaration is organized into five sections:

- **Part I** provides a brief summary of my background and qualifications as a declarant;

12

- **Part II** provides a general overview of Envision's history, corporate structure, and business operations;

- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases;

- **Part IV** describes the Debtors' prepetition capital structure; and

- **Part V** describes the Restructuring Support Agreements and the proposed restructuring transactions.

## I.    Qualifications

23.    I was appointed the Chief Restructuring Officer of Envision Healthcare Corporation on May 14, 2023.  Before my appointment as the Chief Restructuring Officer, I served as the lead disinterested director on the board of Envision (the "Board") since January 6, 2023.  I have been a disinterested director on the Board since May 15, 2020.

24.    I am an experienced independent board member and have chaired audit, nomination, governance, compensation, and special finance committees.  I have substantial turnaround and restructuring experience, including as Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer of Energy Future Holdings Corporation.  I was a senior partner with PriceWaterhouseCoopers and served as a member of the U.S. Leadership Team with responsibility for energy, technology, healthcare, manufacturing, consumer products, entertainment, communications, and utilities industry programs.  I also previously served in various Arthur Andersen partner leadership positions, including a U.S. leadership position and managing the $500 million Western region practice.

25.    I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except where specifically noted, the statements in this Declaration are based on (a) my personal knowledge, (b) information obtained from other members of the Debtors' management team, employees, or advisors, (c) my review of relevant documents and

information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or (d) my opinions based upon my experience and knowledge.

## II.   Overview of Envision's History, Corporate Structure, and Businesses

### A.   Envision's History and Corporate Structure.

26.    Envision was formed as a merger of equals between Envision Healthcare Holdings, Inc. and AmSurg Corp. in 2016.  The combined company was renamed Envision Healthcare Corporation and traded on the New York Stock Exchange under the ticker EVHC.  In October 2018, Envision Healthcare Corporation was acquired by the Consenting Sponsors in a transaction valued at approximately $9.9 billion.

27.    The Consenting Sponsors continue to own Envision today.   In addition to 99.67 percent[3] of the equity in Debtor Enterprise Parent Holdings, Inc., the Consenting Sponsors' investment in Envision is comprised of approximately $146 million in the "second out" and "third out" Envision Term Loans and approximately $253 million of Senior Notes.

28.    Envision presently operates across two segments—Envision Physician Services ("Physician Services"), which provides management services to affiliated medical groups and physician practices (discussed further herein) and AMSURG, the owner and operator of certain ambulatory surgery centers in partnership with physicians and other healthcare providers—providing high-quality care to almost 30 million patients per year across 41 states and the District of Columbia.  More specifically, Physician Services (including its affiliated medical groups) or AMSURG, as applicable, (a) sees approximately 10 percent of all emergency departments' patients in the nation annually, (b) supports the delivery of more than 140,000 babies each year, (c) performed approximately eight million radiology readings in 2022, (d) performed over one

---

[3]    The remainder of the equity in Debtor Enterprise Parent Holdings, Inc. is held by company management.

million colonoscopies in 2022, and (e) is one of the largest anesthesia providers in the United States.

29.     The Physician Services segment was started when EmCare Holdings Inc. ("EmCare") began staffing emergency rooms in Dallas in 1972.  By 2005, EmCare was the largest emergency room outsourcer in the United States, engaged in staffing arrangements with approximately 300 hospitals across 39 states.

30.     EmCare was acquired by Laidlaw International, Inc. in 1997, which then sold EmCare and American Medical Response in 2005, a medical transportation company, to private equity firm Onex Corporation ("Onex").  Onex combined the two companies to form Emergency Medical Services Corporation ("EMSC").  EMSC went public in December 2005 and traded on the New York Stock Exchange until 2011, when it was taken private by private equity firm Clayton, Dubilier, & Rice for approximately $3 billion.  On June 11, 2013, EMSC changed its named to Envision Healthcare and went public in August 2013.

31.     The AMSURG segment was launched in 1992 as a pioneer in the ambulatory surgery center ("ASC") industry, originating a physician partnership model that endures today. ASCs are medical facilities that specialize in outpatient surgical procedures, meaning that patients treated at ASCs do not require admission to a hospital or overnight stays. AMSURG's original focus was endoscopy centers, but was quickly expanded to include ophthalmology, orthopedic, and multi-specialty ASCs.  AMSURG has grown from six partner physician groups in 1992 to a network of approximately 4,400 physicians at more than 250 ASCs across the country with over 25 million procedures performed in AMSURG facilities over the last three decades.  In 2014, AMSURG acquired Sheridan Healthcare Inc. ("Sheridan") for approximately $2.35 billion. Sheridan was a leading provider of multi-specialty outsourced physician services to hospitals,

ambulatory surgery centers and other healthcare facilities, primarily in the areas of anesthesiology, children's services, emergency medicine, and radiology.   Sheridan's anesthesiology division, established in 1953, was the leading anesthesia services provider in the country. The acquisition of Sheridan by AMSURG created a leading surgical center and physician outsourcing company with a diversified, complementary business mix.

32.     Over the past three decades, AMSURG physicians have performed more than 25 million procedures across multiple specialties, from gastroenterology and eye care to the latest in orthopedic care, all in an outpatient setting.   AMSURG was publicly traded on the NASDAQ from 1997 until the 2016 merger with Envision Healthcare Holdings, Inc.

33.     Directly and indirectly through its subsidiaries, Envision owns approximately 1,000 subsidiaries, as well as approximately 1,400 entities in which Envision owns a substantial interest



pursuant to joint venture arrangements. A simplified version of the Company's organization chart is included below, and a comprehensive organizational chart is attached as **Exhibit C**.

### B. Envision's Operations and Key Assets.

34. ***Physician Services.*** The Physician Services segment provides management services in partnership with 139 health systems which offer critical, high-quality care primarily in the specialties of emergency medicine, hospital medicine, radiology, anesthesiology, women's and children's medicine, and office-based medicine. Physician Services, directly or indirectly, employs approximately 17,000 healthcare professionals and delivers services to over 1,200 clinical departments. Top health system partners include HCA, Tenet Healthcare Corporation, Universal Hospital Services, Ardent Health Services, Hackensack Meridian Health, Memorial Health, Northside Hospital, Inc., CommonSpirit Health, Ascension, Baptist Health, and Orlando Health.

35. Envision's health system partnerships take on various forms, including joint ventures and contractual agreements to provide management and other services. In most states, a wholly-owned Physician Services subsidiary contracts with hospitals to provide management services. The Physician Services subsidiary also typically contracts directly with affiliated professional corporations ("PCs") that in turn employ or contract with physicians,[4] with which Envision has management arrangements. While the PC structure is necessary to comply with the applicable laws in states which prohibit the corporate practice of medicine, Envision utilizes this structure in the majority of states where the PCs operate, even when not required by applicable laws, to reinforce the independent clinical decision-making of its clinicians. The Company has exclusive responsibility for the provision of all non-medical services required for the day-to-day operation and management of the PCs. Additionally, the Company provides the PCs with

---

[4]   For the avoidance of doubt, the PCs are not Debtors in these chapter 11 cases.

guidelines for the administrative aspects of employment and compensation of the physicians (*e.g.*, recruitment assistance, background checks, licensure verifications, payroll practices, among other administrative tasks) and other employees of the PCs, which are consistent with the operation of the Company's wholly-owned subsidiaries.

36.    ***AMSURG***.    Envision's AMSURG segment acquires, develops, and manages ambulatory surgery centers ("ASCs") in partnership with physicians nationwide, primarily in the gastroenterology, ophthalmology, and orthopedics specialties.    AMSURG operates and holds ownership in more than 250 ASCs and has approximately 4,400 physician partners and credentialed physicians at its ASCs.

37.    The core asset of the AMSURG business is Envision's ownership stakes in the limited liability companies and limited partnerships (collectively, the "ASC Entities") that own and operate ASCs.[5]    Although the percentage of the Company's ownership interest in the ASC Entities varies, the Company typically holds a majority of the equity in each ASC Entity, with multiple physician partners or health system partners owning the remaining portion.    Majority ownership affords the Company flexibility to consolidate or enter into other types of transactions to ensure access to high quality, lower cost care.

38.    Pursuant to the operating agreements of the ASC Entities, the Company contracts with the ASCs to provide staffing and non-clinical management services to the ASCs.

39.    AMSURG ASCs are typically located near the specialty medical practice of the partnering physician's office to promote accessible care.    Despite headwinds in the healthcare industry generally, the AMSURG segment has seen steady growth given the increasing consumerization of healthcare.    Patients expect to have their needs met where they are, and ASCs

---

[5]    For the avoidance of doubt, the ASC Entities are not Debtors in these Chapter 11 Cases.

provide a less institutionalized atmosphere and simpler admission and discharge procedures than a hospital setting.  ASCs are typically more cost-effective and safer than traditional inpatient hospitals due to lower facility development costs, more efficient staffing and space utilization, and a specialized operating environment focused on clinical excellence and cost containment.  Moreover, new technology and medical advances have significantly advanced the types of surgical procedures that can be performed in ASCs.

###    C.    Payment for Clinical Services.

40.    There are three primary methods by which Envision (or its affiliated PCs) or AMSURG is paid for clinical services: (a) direct reimbursement by a payor (such as health insurance and government programs), (b) billing patients directly consistent with their health insurance plan (for example, co-pays and co-insurance), and (c) subsidies paid out by hospitals at varying rates based on arm's length negotiations and specialty reimbursement rates, patient mix, and required service levels, among other considerations.

41.    Collecting payment for services provided in the medical industry involves numerous parties and is more complex than in most industries.  Revenue cycle management ("RCM") is the process by which healthcare providers track patient care episodes from initial registration and appointment scheduling through the final payment by payors (such as insurance providers, Medicare, or Medicaid) and patients for their potion of co-pays and co-insurance for medical services provided.  The Company sub-contracts to various RCM vendors to manage portions of this process.  The RCM vendors provide services such as:

- collecting information from patients, such as insurance coverage, before the patient arrives for an appointment;

- coding medical procedures and diagnoses;

- determining the appropriate billable charges for medical services provided;

- collection of medical care provided by the Debtors' facilities;

- insurance identification chart abstraction;

- submitting claims to insurance companies;

- collecting and processing the requisite payments from patients; and

- collecting payments from third-party payors.

42.     Generally speaking, after a clinician employed or contracted, directly or indirectly, by the Company provides medical services to a patient, the Company, with the assistance of RCM vendors, works to determine insurance coverage and then bills payors—including insurance companies, Medicare, and Medicaid—and patients for medical services provided.

43.     The Company also receives payment for clinical services in the form of subsidies from healthcare facilities pursuant to contractual arrangements.  The healthcare facility agreements often include a compensation model whereby the healthcare facilities provide subsidies or guarantees to the Company to meet a certain compensation threshold to ensure the availability of the Company's services.  For example, the Company contracts to provide emergency medical services at the certain healthcare facilities twenty-four hours a day, seven days a week.  To ensure around the clock emergency medical care, these healthcare facilities are contractually obligated to subsidize the Company's costs of providing emergency services when the Company's collections for services provided are insufficient to enable the Company to provide such emergency services at fair market value.  To subsidize the Company's costs for the provision of emergency medical services and ensure that the Company can maintain the contractually mandated level of service, the healthcare facilities compensate the Company under compensation models set forth in the healthcare facility agreements.

44.     As a result of the No Surprises Act, the portion of RCM where Envision seeks payment from insurance companies has come under extreme stress.  Payors have relied on the

regulatory implementation of the No Surprises Act to aggressively deny or reduce payment for a given procedure. The No Surprises Act sets forth a methodology for resolving disputes between payors and healthcare providers over the cost of services rendered out-of-network and provides for binding arbitration absent voluntary agreement.

45.     But the implementation of the No Surprises Act has severely compromised Envision's (and other similarly-situated medical groups) ability to defend itself in any subsequent arbitration process. Specifically, an interim final rule promulgated under the No Surprises Act and released on September 30, 2021, established a rebuttable presumption that the qualifying payment amount (the "QPA") constitutes the proper out-of-network rate during an arbitration.[6] Under the interim final rule, the arbitrator could only diverge from this presumption if credible information demonstrated that the QPA was materially different from the appropriate out-of-network rate. Payors were able to, in many instances, leverage this imbalance for their own benefit.

46.     While medical groups have challenged the No Surprises Act implementing regulations and received some initial favorable rulings, the No Surprises Act continues to create challenges for Envision in the immediate term. When the No Surprises Act was passed into law, the intent was to not only protect patients, but also create a *workable* arbitration system to resolve disputes between payors and providers. The result has not been as successful as hoped; while it was anticipated that there would likely be approximately 17,000 arbitration submissions as a result of the passage of the No Surprises Act, there have been approximately 335,000 disputes initiated, of which only approximately 107,000 have been closed.

47.     The No Surprises Act has already had a substantial impact on Envision's bottom line, in part because the No Surprises Act incentivizes in-network payors to move providers

---

[6]     Requirement Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980 (Oct. 7, 2021).

out-of-network to remain competitive.  Envision estimates the No Surprises Act has resulted in approximately $180 million in lost revenue in 2022.

## III.   Events Preceding These Chapter 11 Cases.

### A.   Proactive Approach to Addressing Financial Issues.

48.     As described above, Envision has experienced declining profitability since 2019 primarily as a result of the impact of COVID-19, clinical labor costs, and the impact of inflation on the cost of goods and services.  Medical hospital labor expense has risen in excess of 25 percent over the last 3 years due to supply and demand imbalances exacerbated by COVID-19.  The clinical labor shortage, in addition to inflationary pressures, has had a substantial impact on Envision's earnings, increasing costs to provide care by more than $330 million since 2019.  These challenges have been exacerbated by significant changes to the regulatory landscape since the flawed implementation of the No Surprises Act and related payor activism.  But Envision has taken decisive and proactive steps to address the effects of the foregoing pressures on its business.

49.     ***First.*** Envision engaged with health plans on ways to bring down costs while maintaining clinical quality standards, developing an innovative partnership model proposal with a focus on value-based care that provides for transparency of costs.  Ultimately, Envision negotiated 11 new health plan contracts, thereby moving more than approximately 55% of the addressable volume (excluding Envision's largest out-of-network payor) from out-of-network to in-network.  Envision has also become the largest participant in a new Center for Medicare and Medicaid Services program, which is aimed at reducing avoidable transport to emergency departments and unnecessary hospitalizations to lower medical costs while continuing to provide patients with the high-quality care they require.

50.     ***Second.*** The Company's legal team, together with outside counsel, has engaged (and continues to engage) in litigation across multiple jurisdictions and forums to protect the

Company's rights and advance its interest in prompt and complete payment for the crucial care provided by affiliated clinicians.  To address the uncertainty created by the No Surprises Act and aggressive health insurer behavior, the Company has:

- proactively extended good faith offers, grounded in industry benchmarks and arbitration results, to insurers representing 90 percent of its non-contracted commercial volume;

- restructured health system arrangements to share in the risk of underpayment, resulting in approximately $300 million in annual incremental revenue;

- submitted approximately 117,000 IDR items to arbitration (as of May 4, 2023);

- filed litigation to address the most egregious payor behavior;

- advocated with lawmakers and regulatory agencies for more rigorous payor oversight; and

- exited non-core, subscale geographies.

51.     The Company is currently winning approximately 80 percent of its federal arbitration cases and has settled litigation cases for health insurer underpayments, resulting in approximately $80 million in proceeds.  Additionally, the Company was recently awarded more than $90 million in an arbitration case against United Healthcare for underpayments dating back to 2017 and 2018.  Advocacy efforts have contributed to numerous improvements to the federal arbitration cases.

52.     ***Third.***  Envision's management team has invested in Envision's clinical teams and clinical quality programs, while simultaneously reducing administrative costs and implementing general and administrative cost containment measures.  For example, the management team and the Board have: (a) improved governance of clinical compensation decisions; (b) reduced attrition and vacancies by putting in place stability bonuses in key geographies that reward teammate retention; and (c) rolled out programs to improve hospital efficiency, which then improves the Company's own efficiency in its core specialties.

53.    **Fourth.** Envision has divested certain non-core assets and business lines.   For example, the Company sold home health services provider Evolution Health in two separate transactions to FC Compassus, LLC in July of 2020 and Amedisys, Inc. in April 2022.  Envision also sold healthcare staffing provider VISTA Staffing Solutions to Ingenovis Health, Inc. in April 2022.  These strategic transactions increased liquidity by approximately $280 million.

**B.    Negotiations with Key Creditors and Circumstances Leading to These Chapter 11 Cases.**

54.    Given prevailing market conditions and substantial leverage and notwithstanding best efforts to stem all headwinds—a comprehensive restructuring became necessary.  The Debtors and their advisors initiated discussions concerning the potential terms of a consensual transaction with both "sides" of the house, ultimately bringing key parties together to reach a comprehensive and nearly fully consensual agreement.  In simple terms, and subject of course to significant detail, the restructuring includes two standalone plans of reorganization for each of the EHC silo and the AMSURG silo, with the lenders in the EHC silo agreeing to sell their 17% interest in AMSURG for $300 million.

55.    In parallel with ongoing lender discussions, the Company commenced a process for the sale of all or a portion of AMSURG in February 2023.  The Company received one indication of interest on March 3 and one indication of interest on March 10.  The Company and Goldman continued to engage with these parties, resulting in revised indications of interest from two potential bidders with one being a verbal indication of interest.  At this time, these two potential bidders remain in the process.

56.    In light of the potential value offered through the AMSURG sale process, the Company has remained focused on progressing the potential sale in parallel with the ongoing restructuring discussions.  From the start of discussions with the Envision Ad Hoc Group and

AmSurg 2L Group, the Company has made clear that, if more value is available via a sale to a third-party, the option to pursue such a sale must be preserved. As such, if the Company receives a proposal that would provide more value, the Company has the flexibility to pursue such a transaction. But to be clear, the standalone plans will move forward and be effective with retention of jurisdiction post-emergence to effect any sale.

57.    Through all of these discussions, and well before the commencement of the liability management transactions and these current restructuring discussions, the Company ensured implementation of a robust and comprehensive governance process. When Ms. Frizzley and I were first appointed to the Board in 2020, the Company typically held quarterly board meetings, increasing the frequency of such meetings in fall of 2021 to allow for fulsome engagement and discussion among the Board related to the liability management transactions. More recently, the Company holds weekly board meetings, which are also attended by the Company's advisors, including K&E, PJT, and A&M. In addition, as lead director, I participated in several lender meetings and had multiple meetings with advisors to assist in reaching the ultimate terms encompassed in the Restructuring Support Agreement.

58.    In addition to the frequent board meetings, the Company has ensured independent and disinterested representation on the Board. In addition to my role as lead disinterested director, Jill Frizzley also joined the board of directors as a disinterested director in July 2020. Further, the Board has remained attuned to potential intercompany conflicts, and, in recognition of governance best practices, has delegated disinterested directors with the authority to consider and authorize actions on matters related to transactions in which a conflict may exist between the Company or its stakeholders and members of the Board (the "Conflict Matters"). In further recognition of potential Conflict Matters as between Envision and AMSURG, immediately following the initial

liability management transactions that designated a portion of the AMSURG business as unrestricted subsidiaries, in April 2022 Harvey Tepner and Pamela Corrie were appointed as independent directors to the AmSurg Holdco, LLC's and AmSurg, LLC's board of managers.  Mr. Tepner and Ms. Corrie retained Katten Muchin Rosenman LLP as independent counsel to assist in their analysis of, and receive independent advice related to, any inter-silo matters, including the liability management transactions.

59.     Most recently, Gary Begeman joined the Board as a disinterested director in April 2023 and retained independent counsel Haynes & Boone LLP ("H&B").  Mr. Begeman and his independent counsel have been engaged in a review and evaluation of potential claims or causes of action that the Debtors or certain of their stakeholders may possess against third parties (the "Investigation").  The initial conclusions drawn from the Investigation supported the Debtors' entry into the Restructuring Support Agreements.  The Investigation remains ongoing and further detail regarding the Investigation will be provided in connection with confirmation of the Debtors' chapter 11 plan.

**IV.    Envision's Prepetition Capital Structure.**

60.     As described in greater detail below, the Debtors' capital structure is the product of the 2022 liability management transactions, which created two distinct debt silos.  As of the Petition Date, the Debtors had approximately $7.7 billion in aggregate principal amount of funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure:

| Facility | Maturity | Book Value + Accrued Interest (as of 5/14/23) *(MM)* |
|---|---|---|
| **Envision** | | |
| ABL Facility | 10/11/2023 | $440 |
| Envision First Out Term Loan | 03/31/2027 | $302 |
| Envision Second Out Term Loan | 03/31/2027 | $1,959 |
| Envision Third Out Term Loan | 03/31/2027 | $648 |
| Envision Fourth Out Term Loan B | 10/11/2025 | $167 |

| | | |
|---|---|---|
| Envision Fourth Out Incremental Term Loan | 10/11/2025 | $4 |
| **Total Secured Debt (excluding Intercompany Loans)** | | **$3,522** |
| Senior Notes | 10/15/2026 | $987 |
| **Total Envision Debt (excluding Intercompany Loans)** | | **$4,508** |
| | | |
| **AmSurg, LLC** | | |
| AmSurg Revolving Credit Facility | 07/20/2026 | $301 |
| AmSurg First Lien Term Loan | 04/29/2027 | $1,358 |
| AmSurg Second Lien Term Loan | 04/29/2028 | $1,493 |
| **Total AmSurg, LLC Debt** | | **$3,152** |
| **Total Consolidated Debt (excluding Intercompany Loans)** | | **$7,660** |
| | | |
| **Intercompany Loans** | | |
| Long-Term Intercompany Notes | Various | $848 |
| Short-Term Intercompany Notes | 04/27/2024 | $983 |

### A.      Envision First Lien Credit Facilities

61.      On October 11, 2018, Envision Healthcare Corporation, as borrower, Enterprise Intermediate Holdings, Inc., as a guarantor, and certain other subsidiaries of Envision Healthcare Corporation, as guarantors, entered into that certain credit agreement (the "Envision First Lien Credit Agreement") with Credit Suisse AG, as administrative agent and collateral agent, and the lender parties thereto, providing for a senior secured revolving credit facility in an aggregate principal amount of $300 million (the "Envision Revolving Credit Facility") and a senior secured term loan facility in an aggregate principal amount of $5.45 billion (the "Envision Term Loan Facility" and the loans extended thereunder, the "Envision Term Loans").   On April 27, 2020, Envision Healthcare Corporation incurred approximately $394.8 million of incremental term loans under the Envision Term Loan Facility (the "2020 Incremental Term Loan").

62.      On July 22, 2022 (as part of the liability management transactions), the Envision Term Loan Facility was amended into four separate tranches of term loans (such amendment, the "Term Loan Facility Amendment").   The "first out" tranche consists of new money term loans in the aggregate principal amount of $300 million.   The "second out" and "third out" tranches

(collectively, together with the "first out" tranche, the "<u>Extended Term Loans</u>") consist of converted Envision Term Loans participating in the transaction.  Envision Term Loans converting into the "second out" tranche converted at a 17% discount to par, and loans converting into the "third out" tranche converted at par.  The remaining term loans under the Envision Term Loan Facility that did not convert are "fourth out" in right of payment.  In connection with entry into the AmSurg Revolving Credit Facility (defined below) on July 20, 2022, the Company repaid all amounts outstanding and terminated all commitments under the Envision Revolving Credit Facility.

63.    Following the Term Loan Facility Amendment, Envision used proceeds of incremental debt under the AmSurg First Lien Term Loans (as defined below) to repurchase $589 million of the Envision Term Loans under the "second out," "third out" and "fourth out" tranches (the "<u>Additional Repurchases</u>") at a blended 58% discount.  Such repurchased Envision Term Loans were subsequently cancelled.  As of May 14, 2023, the current balance under the "first out" tranche, the "second out" tranche, the "third out" tranche, and the "fourth out" tranche were $302 million, $1.96 billion, $648 million, and $172 million, respectively.  The Extended Term Loans mature on March 31, 2027, and the "fourth out" term loans mature on October 11, 2025.

64.    Envision's obligations under the Envision Term Loan Facility are guaranteed by Enterprise Intermediate Holdings Inc. ("<u>Holdings</u>") and by each of Envision's direct and indirect wholly-owned material domestic restricted subsidiaries, *other than* those who guarantee the AmSurg Facilities (as defined below) (such guarantors of the AmSurg Facilities, collectively, the "<u>AmSurg Entities</u>") and subject to certain customary exceptions.  Envision's obligations and the related guarantees under the Envision Term Loan Facility are secured by a perfected first-priority security interest in substantially all tangible and intangible assets and capital stock of or owned by

Envision or by any guarantor, in each case subject to permitted liens and certain customary exceptions.

**B.    The ABL Facility.**

65.    On October 11, 2018, Envision Healthcare Corporation, as borrower, Enterprise Intermediate Holdings Inc., as a guarantor, and certain other subsidiaries of Envision Healthcare Corporation, as guarantors, entered into that certain credit agreement (the "<u>ABL Credit Agreement</u>") with Citibank, N.A. as administrative agent, collateral agent, lender, letter of credit issuer, and swingline lender, and the lender parties thereto, providing for a five-year asset-based revolving credit facility with aggregate borrowing capacity of up to $550.0 million (the "<u>ABL Facility</u>" and, together with the Envision Term Loan Facility, the "<u>Envision Credit Facilities</u>"), subject to borrowing base availability, which includes letter of credit and swingline sub-facilities. Subject to certain terms and conditions, Envision is entitled to request additional revolving credit commitments under the ABL Facility, which share in the borrowing base, so long as the aggregate amount of ABL Facility commitments does not exceed $1.0 billion.  The current balance of the ABL facility is $440 million, excluding approximately $90.8 million in undrawn issued letters of credit.  The ABL Facility matures on October 11, 2023.

66.    The ABL Facility is subject to the same guarantees and security as the Envision Term Loan Facility, except that the obligations under the ABL Facility are secured on a first-priority basis with respect to the ABL Priority Collateral and on a second lien basis with respect to all other collateral securing the Envision Term Loan Facility.

**C.    AmSurg Revolving Credit Facility.**

67.    On July 20, 2022, AmSurg, LLC, as borrower, AmSurg Holdco, LLC, as a guarantor, and certain other subsidiaries of AmSurg, LLC, as guarantors, entered into a super senior secured revolving credit facility in the aggregate principal amount of $300.0 million

(the "AmSurg Revolving Credit Facility").  The current balance of the AmSurg Revolving Credit Facility is $301 million.  The AmSurg Revolving Credit Facility will mature on July 20, 2026.

68.     The AmSurg Revolving Credit Facility is guaranteed by AmSurg Holdco, LLC and all of its existing and subsequently acquired or organized direct or indirect subsidiaries, other than ASCs and subject to additional customary exclusions.  Further, the AmSurg Revolving Credit Facility is secured by a perfected security interest in substantially all assets of AmSurg, LLC and the guarantors from time to time, subject to customary exceptions.

**D.     AmSurg First Lien Credit Facilities.**

69.     On April 29, 2022, AmSurg, LLC, as borrower, AmSurg Holdco, LLC, as a guarantor and certain other subsidiaries of AmSurg, LLC, as guarantors, entered into the AmSurg First Lien Credit Facilities consisting of a senior secured term loan facility in the aggregate principal amount of $1.1 billion (the "AmSurg First Lien Term Loan") and a committed incremental delayed draw senior secured term loan facility in an aggregate principal amount of $200 million (the "AmSurg First Lien Incremental Loan Facility" and, together with the AmSurg First Lien Term Loan, the "AmSurg First Lien Credit Facilities").  The AmSurg First Lien Credit Facilities also provided for the option of incremental term loans, subject to certain conditions.  In connection with the Additional Repurchases, AmSurg used all remaining incremental term loan capacity and issued an additional $250 million of borrowings under the AmSurg First Lien Term Loan.  The current balance of the AmSurg First Lien Credit Facilities is approximately $1,358 million.  The AmSurg First Lien Credit Facilities mature on April 29, 2027.

70.     The AmSurg First Lien Credit Facilities are guaranteed by each entity that guarantees the AmSurg Revolving Credit Facility and are secured by a perfected security interest in all assets subject to a perfected security interest securing the AmSurg Revolving Credit Facility.  The perfected security interest with respect to the AmSurg First Lien Credit Facilities is

subordinated to the perfected security interest with respect to the AmSurg Revolving Credit Facility pursuant to an intercreditor agreement, which provides for payment subordination of the AmSurg First Lien Facilities relative to the AmSurg Revolving Credit Facility.

71.     To provide security for the new financing, as part of the 2022 liability management transactions, the AmSurg Entities were designated as "Unrestricted Subsidiaries" under the Envision First Lien Credit Facilities, the ABL Facility, and the Senior Notes Indenture (the "Designation").  Upon the Designation, (a) the AmSurg Entities were each automatically released from all obligations under, and liens granted under, the Envision First Lien Credit Facilities, the ABL Facility, and the Senior Notes Indenture, and (b) the Envision parties to the AmSurg First Lien Credit Facilities (*i.e.*, Envision Healthcare Corporation, Enterprise Intermediate Holdings Inc., and their direct and indirect subsidiaries *other than* the AmSurg Entities) were automatically released from all obligations under, and liens granted in connection with the AmSurg First Lien Credit Facilities.

### E.    AmSurg Second Lien Term Loan.

72.     On April 29, 2022, AmSurg, LLC, as borrower, AmSurg Holdco, LLC, as a guarantor, and certain other subsidiaries of AmSurg, LLC, as guarantors, entered into a senior secured term loan facility in the aggregate principal amount of approximately $1.3 billion (the "AmSurg Second Lien Term Loan" and, together with the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities, the "AmSurg Facilities").  In connection with entry into the AmSurg Second Lien Term Loan, the Company repurchased approximately $1.5 billion principal amount of the outstanding Term Loan Facility, approximately $326 million principal amount of the outstanding 2020 Term Loans and approximately $87 million principal amount of the Senior Notes from certain lenders and holders (collectively, together with the entry into the AmSurg First Lien Credit Facilities, the "April 2022 Financing Transactions").  Additionally,

$46.8 million of Term Loans were exchanged into $30.9 million of the AmSurg First Lien Credit Facility. The current balance on the AmSurg Second Lien Term Loan is approximately $1,493 million. The AmSurg Second Lien Term Loan matures on April 28, 2028.

73.    The AmSurg Second Lien Term Loan is guaranteed by each entity that guarantees the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities and is secured by a perfected security interest in all assets subject to a perfected security interest securing the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities. The perfected security interest with respect to the AmSurg Second Lien Term Loan is subordinated to the perfected security interest with respect to the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities pursuant to an intercreditor agreement, which provides for lien subordination of the AmSurg Second Lien Term Loan relative to the AmSurg Revolving Credit Facility but not and the AmSurg First Lien Credit Facilities.

**F.    Intercompany Term Loans.**

74.    Pursuant to that certain Credit Agreement dated April 29, 2022, among Enterprise Intermediate Holdings Inc., as holdings, Envision Healthcare Corporation, as borrower, AmSurg, LLC, as lender, and Wilmington Savings Fund Society, FSB, as the administrative agent and collateral agent (the "Intercompany Credit Agreement"), AmSurg, LLC extended approximately $1.32 billion in term loans, consisting of approximately $821 million in short-term loans (the "Short-Term Intercompany Loans") and approximately $500 million in long-term loans (the "Long-Term Intercompany Loans" and, together with the Short-Term Intercompany Loans, the "Intercompany Term Loans") to Envision Healthcare Corporation. Additionally, Envision Healthcare Corporation incurred approximately $30.9 million of long-term loans to repurchase approximately $46.8 million of Term Loans. Subsequently, Envision Healthcare Corporation used the proceeds of the Intercompany Term Loans to repurchase approximately $589 million of

Envision Term Loans pursuant to open market purchases negotiated with existing Envision Term Loan lenders.

75.    The Intercompany Term Loans bear cash interest at a rate of SOFR plus 5.5% per annum, or PIK interest of 11.0% per annum. The Short-Term Intercompany Loans mature on April 27, 2024, and the Long-Term Intercompany Loans mature on April 29, 2028. As of May 14, 2023, approximately $983 million of Short-Term Intercompany Loans remain outstanding and approximately $848 million of Long-Term Intercompany Loans remain outstanding.

### G.    The Senior Notes.

76.    On October 11, 2018, EVHC as the issuer issued $1.225 billion aggregate principal amount of 8.75% senior unsecured notes due 2026 (the "Senior Notes"), which mature on October 15, 2026. The Senior Notes are unsecured obligations of EVHC and are guaranteed by EVHC's existing and subsequently acquired or organized wholly owned domestic subsidiaries to the extent such subsidiary guarantees the Envision Credit Facilities or certain capital markets indebtedness. The Senior Notes are pari passu in right of payment with all the existing and future senior unsecured debt of the Company, senior to all future subordinated debt of the Company, and are effectively subordinated to all of the Company's secured debt, including the Envision Credit Facilities, to the extent of the collateral securing such secured debt. Interest on the Senior Notes accrues at the rate of 8.75% per annum and is payable semi-annually in arrears on April 15 and October 15, beginning on April 15, 2019.

77.    In April 2020, the Company exchanged approximately $199 million of Senior Notes for 2020 Incremental Term Loans, reducing the Senior Notes outstanding from approximately $1.225 billion to approximately $1.026 billion.

V.      **Restructuring Support Agreements.**

78.      Once the Company and management determined that a more comprehensive restructuring was required to address its liquidity issues and position the Company for success going forward, the Company—with the assistance of K&E, PJT, and A&M—initiated discussions and engaged with its key financial stakeholder groups in March 2023.  Initial discussions involved the AmSurg 2L Group, the Envision Ad Hoc Group, and the Consenting Sponsors.  Following the initial engagement with the AmSurg 2L Group, the Envision Ad Hoc Group, and the Consenting Sponsors, Envision and its advisors expanded to include the ABL Agent, RCF Agent, the Ad Hoc Group of First Lien AmSurg Lenders, and the Unsecured Notes Group.  These efforts were productive and resulted in the agreement reflected in the Restructuring Support Agreements attached as **Exhibit A** and **Exhibit B**.  The Restructuring Support Agreements are supported by the Consenting Sponsors and by more than 60% of Envision's approximately $7.7 billion in funded debt obligations, which includes supermajorities of the AmSurg Second Lien Term Loan and the "first out" and "second out" Envision Term Loans and contemplate the full refinancing or repayment of other senior secured debt claims.  The Restructuring Support Agreements contemplate a comprehensive balance sheet restructuring that will substantially reduce leverage, providing Envision with flexibility to navigate the current business and operational environment. The Debtors intend to implement the proposed restructuring transactions embodied in the Restructuring Support Agreements through these chapter 11 cases.

79.      The agreement reached among the Debtors, the Envision Ad Hoc Group, and the AmSurg 2L Group provides for the consolidation of the AMSURG business segment on a significantly delevered basis and results in a $300 million cash infusion to fund the Physician Services business's ongoing operation and other cash needs.  Most importantly, the Restructuring Support Agreements delever the EHC silo by approximately $4.1 billion (excluding the

Intercompany Loan Claims) and AMSURG by approximately $1.5 billion, resulting in a total reduction of approximately $5.6 billion (excluding the Intercompany Loan Claims), and approximately $7.4 billion when including the Intercompany Loan Claims.[7]   Following the restructuring the AMSURG and Physician Services businesses will be separately owned by their respective lenders.

80.    The Restructuring Support Agreements also set out certain dates and deadlines by which the Debtors must achieve certain milestones in these chapter 11 cases, including:

- entry of the Cash Collateral Orders on an interim basis no later than 5 business days following the Petition Date;

- retention of an operational consultant to assist in the operational separation of AMSURG and Physician Services no later than 25 days following the Petition Date;

- entry of the Cash Collateral Orders on a final basis and an order approving the EHC AmSurg Debtors Termination Fee no later than 35 days following the Petition Date;

- entry of the Disclosure Statement Order no later than 65 days following the Petition Date;

- entry of the Confirmation Order no later than 120 days following the Petition Date; and

- emergence no later than 150 days following the Petition Date.

81.    Other key terms of the Restructuring Support Agreements include:

- repayment or refinancing of the ABL Facility;

- equitization of the Envision First Out Term Loan Claims and Envision Second Out Term Loan Claims;

- issuance of three-year warrants convertible into up to 5% of the new common stock of the reorganized Physician Services, distributed to those holders of EVPS Third-Out, EVPS Fourth-Out, and EVPS Unsecured Notes

---

[7]   Based on the book value and accrued interest as of May 14, 2023.

claims on a pro rata basis to the extent such holder vote to accept the plan of reorganization as a class;

- if holders of EVPS Third-Out, EVPS Fourth-Out, and EVPS Unsecured Notes claims vote to reject the plan of reorganization, such claims will be cancelled, released, and extinguished without any distribution;

- repayment or refinancing of the AmSurg Revolving Credit Facility;

- repayment of the AmSurg First Lien Facility;

- impairment of general unsecured claims at Debtors comprising the AMSURG silo; and

- cancellation of existing equity interest in Envision Healthcare Corporation.

82.     I believe that the Restructuring Support Agreements are the product of good faith, arm's-length negotiations with the Consenting Stakeholders and that the terms thereof provide the best restructuring option currently available to the Debtors and their estates.  The transactions contemplated in the Restructuring Support Agreements will substantially deleverage the Debtors, position the Company to navigate the current business and operational environment, and maximize value for all of the Debtors' stakeholders.

## Conclusion

83.     Despite recent challenges, I am optimistic about the Company's future.  Envision has, in some form, been staffing top clinical talent in hospitals and providing efficient, convenient, and high-quality care at ASCs for the last several decades.  The United States healthcare system is undergoing significant regulatory and consumer changes, but Envision continues to be a vital component in the provision of high-quality medical care to patients across the country.

84.     Given the consensus—both initially and the anticipated increase in support—and clear path to emergence from chapter 11 embodied in the Restructuring Support Agreements, I believe that the proposed restructuring is a monumental achievement given the consensus achieved

and the complexity of the Debtors' operations, and that the contemplated restructuring will maximize value for all stakeholders in these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  May 15, 2023

/s/ *Paul Keglevic*

Paul Keglevic
Chief Restructuring Officer
Envision Healthcare Corporation

## Exhibit A

**EHC Restructuring Support Agreement**

*EXECUTION VERSION*

**THIS EVPS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE EVPS DEBTORS THAT WILL BE EFFECTUATED THROUGH CHAPTER 11 CASES IN THE BANKRUPTCY COURT ON THE TERMS DESCRIBED HEREIN.**

**THIS EVPS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS EVPS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS EVPS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS EVPS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

### *EVPS RESTRUCTURING SUPPORT AGREEMENT*

This EVPS RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of May 14, 2023 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

       i.      Envision Healthcare Corporation, a company incorporated under the Laws of Delaware ("**Envision**"), and each of its affiliates listed on **Exhibit A** to this

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.  the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of funds or accounts in their capacities as holders, of EVPS Term Loan Claims and EVPS Unsecured Notes that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting EVPS Term Loan Lenders**"); and

iii.  the undersigned Entities listed on **Exhibit B** hereto, in their capacity as direct or indirect holders of EVPS Term Loan Claims, EVPS Unsecured Notes, and/or Equity Interests that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Sponsors**" and, together with the Consenting EVPS Term Loan Lenders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit C** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties shall implement the Restructuring Transactions through the commencement by the EVPS Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**");

**WHEREAS**, the EVPS Debtors shall effectuate a sale of their equity interests, directly or indirectly, in the EHC AmSurg Debtors to the Reorganized AmSurg Parent on the Plan Effective Date as set forth in the Restructuring Term Sheet (the "**EHC AmSurg Debtors Sale Transaction**");

**WHEREAS**, each Party and its respective counsel and other advisors (i) have reviewed or have had the opportunity to review this Agreement, including all exhibits, annexes, and schedules hereto (including the Restructuring Term Sheet), and (ii) acknowledge and agree that the Restructuring Term Sheet is a summary of the material terms of the Restructuring Transactions and that implementation of the Restructuring Transactions will require the negotiation and agreement of terms not covered by the Restructuring Term Sheet; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Ad Hoc Advisors</u>**" means (a) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group, (b) Evercore Group L.L.C., as financial advisor to the Ad Hoc Group, (c) AlixPartners LLP, (d) Munsch Hardt Kopf & Harr, as local counsel to the Ad Hoc Group, (e) any consultant selected by the Ad Hoc Group for the purposes of identifying candidates for the New Reorganized Envision Parent Board, and (f) such other professionals as may be retained by or on behalf of the Ad Hoc Group, including, without limitation, an accounting firm or auditor, with the consent of the Company Parties.

"**<u>Ad Hoc Group</u>**" means, collectively, the holders of, or investment advisors, sub advisors, or managers of holders of, the EVPS Term Loans and EVPS Unsecured Notes represented by the Ad Hoc Advisors.

"**<u>Affiliate</u>**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**<u>Agent</u>**" means any administrative agent, collateral agent, or similar Entity under the EVPS ABL Credit Agreement and/or EVPS Term Loan Credit Agreement including any successors thereto.

"**<u>Agents/Trustees</u>**" means, collectively, each of the Agents and the Trustee, in each case including any successors thereto.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Restructuring Term Sheet).

"**<u>Agreement Effective Date</u>**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**<u>Allowed</u>**" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a final order, as applicable.

"**<u>Alternative Restructuring</u>**" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt

investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties, the debt, equity, or other interests in any one or more Company Parties, that is an alternative to one or more of the Restructuring Transactions.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Restructuring.

"**Amended and Restated EVPS ABL Facility**" means an amended and restated EVPS ABL Facility in form and substance acceptable to the EVPS Debtors and the Required Consenting Lenders.

"**AmSurg Cash Collateral Order**" means, individually or collectively (as the context may require), any order or orders entered in the Chapter 11 Cases authorizing the use of cash collateral (whether interim or final) for the AmSurg Debtors.

"**AmSurg Debtors**" means AmSurg Holdco LLC and its direct and indirect subsidiaries that are Debtors in the Chapter 11 Cases.

"**AmSurg Parent**" means AmSurg Holdco, LLC, a limited liability company organized under the Laws of the state of Delaware.

"**AmSurg Plan**" means the joint plan of reorganization filed by the AmSurg Debtors under chapter 11 of the Bankruptcy Code.

"**AmSurg RSA**" means the restructuring support agreement entered into by the AmSurg Debtors, AmSurg Parent and/or AmSurg LLC and certain of their lenders on or about the date hereof, which agreement shall contain provisions requiring the parties thereto to support a plan of reorganization and other documentation incorporating the EHC AmSurg Debtors Sale Transaction on the same terms as set forth herein and in the Restructuring Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Board Selection Committee**" means the five unaffiliated institutions (at a consolidated fund manager level) that are Consenting EVPS Initial Term Loan Lenders that, as of the Voting Record Date, are projected to receive the largest percentage of Reorganized Envision Parent New Common Stock based upon Plan treatment of their EVPS Term Loan Claims.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Orders**" means, collectively, the AmSurg Cash Collateral Order and the EVPS Cash Collateral Order.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, an EVPS Debtor, including the EVPS ABL Claims and EVPS Term Loan Claims, and EVPS Unsecured Notes Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting EVPS Initial Term Loan Lenders**" means holders of EVPS Term Loan Claims that were signatories to the RSA (via Joinder, Transfer Agreement or otherwise) no later than 11:59 p.m. (ET) on the date that is five calendar days following the Petition Date.

"**Consenting EVPS Term Loan Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting First-Out Lender**" means a holder of EVPS First-Out Term Loan Claims that is a signatory to this Agreement.

"**Consenting Second-Out Lender**" means a holder of EVPS Second-Out Term Loan Claims that is a signatory to this Agreement.

"**Consenting Sponsors**" has the meaning set forth in the preamble of this Agreement.

5

"**Consenting Stakeholders**" has the meaning set forth in the preamble of this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Approval Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

"**EHC AmSurg Debtors**" means AmSurg Anesthesia Management Services, LLC, AmSurg Suncoast, Inc., AmSurg EC Washington, Inc., AmSurg KEC, Inc., AmSurg EC Centennial, Inc., AmSurg Miami, Inc., AmSurg Escondido CA, Inc., AmSurg Temecula II, Inc., AmSurg Topeka, Inc., AmSurg Naples, Inc., AmSurg Glendale, Inc., AmSurg Hillmont, Inc., AmSurg Inglewood, Inc., AmSurg Finance, Inc., AmSurg Kissimmee FL, Inc., AmSurg La Jolla, Inc., AmSurg Melbourne, Inc., AmSurg Northwest Florida, Inc., AmSurg Altamonte Springs FL, Inc., Amsurg Fresno Endoscopy, Inc., AmSurg Palmetto, Inc., AmSurg Colton CA, Inc., AmSurg Temecula CA, Inc., AmSurg EC St. Thomas, Inc., Austin NSC, LP, AmSurg EC Beaumont, Inc., AmSurg Crystal River, Inc., AmSurg San Luis Obispo CA, Inc., AmSurg Torrance, Inc., AmSurg San Antonio TX, Inc., AmSurg Scranton PA, Inc., AmSurg Ocala, Inc., AmSurg Maryville, Inc., AmSurg El Paso, Inc., AmSurg EC Santa Fe, Inc., AmSurg Burbank, Inc., AmSurg Arcadia CA, Inc., AmSurg Oakland CA, Inc., AmSurg Abilene, Inc., AmSurg Abilene Eye, Inc., AmSurg Glendora CA, Inc., AmSurg Pottsville PA, LLC, AmSurg Lancaster PA, LLC, Amsurg Main Line PA, LLC, ASDH I, LLC, ASDH II, LLC, or such other Entities comprising the ambulatory surgery centers and associated assets in which the EVPS Debtors had an interest as of May 1, 2023.

"**EHC AmSurg Debtors SPA**" has the meaning given to such term in the Restructuring Term Sheet.

"**EHC AmSurg Debtors Sale Transaction**" has the meaning given to such term in the Restructuring Term Sheet.

"**EHC AmSurg Debtors Sale Documents**" means the EHC AmSurg Debtors SPA, any other definitive documents governing the EHC AmSurg Debtors Sale Transaction, and any ancillary documents required in connection therewith.

"**EHC AmSurg Debtors Termination Fee**" has the meaning given to such term in the Restructuring Term Sheet.

"**Entity**" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, Governmental Body or any agency or political subdivision of any Governmental Body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"**Envision**" has the meaning set forth in the preamble of this Agreement.

"**Envision Parent**" means Enterprise Parent Holdings Inc., a corporation organized under the Laws of the state of Delaware.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**EVPS**" has the meaning given to such term in the Restructuring Term Sheet.

"**EVPS ABL Claim**" means any Claim arising under, in connection with, or on account of the EVPS ABL Credit Agreement.

"**EVPS ABL Credit Agreement**" means that certain ABL credit agreement, dated as of October 11, 2018, among Envision, as borrower, the lenders time to time party thereto, and Citibank, N.A., as administrative agent, collateral agent, lender, letter of credit issuer, and swingline lender (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"**EVPS ABL Loans**" means any loans outstanding under the EVPS ABL Credit Agreement.

"**EVPS Cash Collateral Order**" means, individually or collectively (as the context may require), any order or orders entered in the Chapter 11 Cases authorizing the use of cash collateral (whether interim or final) for the EVPS Debtors.

"**EVPS Credit Agreements**" means the EVPS ABL Credit Agreement and the EVPS Term Loan Credit Agreement.

"**EVPS Debtors**" means each Entity that is a Debtor in the Chapter 11 Cases other than the AmSurg Debtors.

"**EVPS Term Loan Claim**" means any Claim arising under, in connection with, or on account of the EVPS Term Loan Credit Agreement.

"**EVPS Term Loan Credit Agreement**" means that certain credit agreement, dated October 11, 2018 (as amended by that certain Amendment Agreement, dated as of July 22, 2022, and as further amended, restated, supplemented, or otherwise modified from time to time accordance with the terms thereof), between Envision, as borrower, and Ankura Trust Company, LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as agent.

"**EVPS Term Loans**" means any loans outstanding under the EVPS Term Loan Credit Agreement, including:

(a)     the first-out tranche of the EVPS Term Loans issued, in the original aggregate principal amount of $300 million, pursuant to the EVPS Term Loan Credit Agreement (the "**EVPS First-Out Term Loans**," and any Claim arising under, in connection with, or on account of such term loans, an "**EVPS First-Out Term Loan Claim**");

(b)     the second-out tranche of the EVPS Term Loans issued, in the original aggregate principal amount of $2.19 billion, pursuant to the EVPS Term Loan Credit Agreement  (the "**EVPS Second-Out Term Loans**," and any Claim arising under, in connection with, or on account of such term loans, an "**EVPS Second-Out Term Loan Claim**");

(c)     the third-out tranche of the EVPS Term Loans issued, in the original aggregate principal amount of $1.0 billion, pursuant the EVPS Term Loan Credit Agreement (the "**EVPS Third-Out Term Loans**," and any Claim arising under, in connection with, or on account of such term loans, an "**EVPS Third-Out Term Loan Claim**"); and

(d)     the initial term loans originally issued on October 11, 2018 pursuant to the EVPS Term Loan Credit Agreement (the "**EVPS 2018 Initial Term Loans**"), and the incremental term loans issued under the EVPS Term Loan Credit Agreement as of April 27, 2020 (the "**EVPS 2020 Incremental Term Loans**," and any Claim arising under, in connection with, or on account of the EVPS 2018 Initial Term Loans or the EVPS 2020 Incremental Term Loans, an "**EVPS Fourth-Out Term Loan Claim**").

"**EVPS Unsecured Funded Debt Claim**" has the meaning given to such term in the Restructuring Term Sheet.

"**EVPS Unsecured Notes**" means those certain 8.75% senior unsecured notes, due 2026, issued pursuant to the EVPS Unsecured Notes Indenture.

"**EVPS Unsecured Notes Claim**" means any Claim arising under, in connection with, or on account of the EVPS Unsecured Notes.

"**EVPS Unsecured Notes Indenture**" means that certain indenture, dated as of October 11, 2018, by and among Envision, as issuer, and the EVPS Unsecured Notes Trustee, as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**EVPS Unsecured Notes Trustee**" means Wilmington Trust, National Association.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**General Unsecured Claim**" means any Claim against any of the EVPS Debtors that is not: (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim (as defined in the Restructuring Term Sheet); (c) an Other Secured Claim (as defined in the Restructuring Term Sheet); (d) an Other Priority Claim (as defined in the Restructuring Term Sheet); (e) an EVPS ABL Claim; (f) an EVPS First-Out Term Loan Claim (other than the unsecured deficiency portion of such Claim, which shall be a General Unsecured Claim); (g) an EVPS Second-Out Term Loan Claim (other than the unsecured deficiency portion of such Claim, which shall be a General Unsecured Claim); (h) an EVPS Third-Out Term Loan Claim; (i) an EVPS Fourth-Out Term Loan Claim; (j) an Intercompany Loan Claim; (k) an Intercompany Claim; (l) an Intercompany Interest; (m) an Equity Interest; (n) a Section 510(b) Claim; or (o) an EVPS Unsecured Funded Debt Claim.

"**Governmental Body**" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator.

"**Intercompany Claim**" means any Claim against one Company Entity held by another Company Entity that is not an Intercompany Loan Claim.

"**Intercompany Credit Agreement**" means that certain Credit Agreement, dated as of April 29, 2022, among Envision, as borrower, AmSurg, LLC, as lender, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"**Intercompany Loan Claim**" means any claim arising under, in connection with, or on account of the Intercompany Credit Agreement.

"**Intercompany Interest**" means an Interest in a Company Entity held by another Company Entity that is not an Equity Interest in Envision Parent.

"**Joinder**" means an executed form of the joinder agreement providing, among other things, that a signatory thereof is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, advisory opinion or guidance, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority or regulatory body of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Milestones**" has the meaning given to such term in the Restructuring Term Sheet.

"**New Warrants**" has the meaning given to such term in the Restructuring Term Sheet.

"**New Reorganized Envision Parent Organizational Documents**" has the meaning given to such term in the Restructuring Term Sheet.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as by-laws or a partnership agreement, or an operating, limited liability company, or members agreement).

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each Transfer of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Body, or any legal entity or association.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the EVPS Debtors under chapter 11 of the Bankruptcy Code, including all exhibits and schedules thereto, that embodies the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the EVPS Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized AmSurg Parent**" means AmSurg Parent or one of its direct or indirect subsidiaries, or any such Person as reorganized pursuant to the AmSurg Plan, including any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, or one or more new entities.

"**Reorganized AmSurg Debtors**" means Reorganized AmSurg Parent and its direct and indirect subsidiaries that are Debtors in the Chapter 11 Cases, on and after the effective date of the AmSurg Plan.

"**Reorganized Debtors**" means the Reorganized EVPS Debtors.

"**Reorganized Envision Parent**" means Envision Parent or one of its direct or indirect subsidiaries, or any such Person as reorganized pursuant to the Plan, including any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, or one or more new entities, in each case as determined by the Company Parties and the Required Consenting Lenders.

"**Reorganized Envision Parent Management Incentive Plan**" has the meaning given to such term in the Restructuring Term Sheet.

"**Reorganized Envision Parent New Common Stock**" has the meaning given to such term in the Restructuring Term Sheet.

"**Reorganized Envision Parent New Common Stock Documents**" means the documentation governing the Reorganized Envision Parent New Common Stock and the issuance thereof.

"**Reorganized EVPS Debtors**" means Reorganized Envision Parent and its direct and indirect subsidiaries that are Debtors in the Chapter 11 Cases, on and after the Plan Effective Date, other than any Reorganized AmSurg Debtors.

"**Required Consenting First-Out Lenders**" means as of the relevant date, Consenting First-Out Lenders holding at least two-thirds of the aggregate outstanding principal amount of EVPS First-Out Term Loans that are held by Consenting First-Out Lenders.

"**Required Consenting Lenders**" means, as of the relevant date, Consenting EVPS Term Loan Lenders holding at least 50.01% of the aggregate outstanding principal amount of EVPS First-Out Term Loans and EVPS Second-Out Term Loans that are held by Consenting EVPS Term Loan Lenders.

"**Required Consenting Initial Lenders**" means, as of the relevant date, Consenting EVPS Initial Term Loan Lenders holding at least 50.01% of the aggregate outstanding principal amount of EVPS First-Out Term Loans and EVPS Second-Out Term Loans that are held by Consenting EVPS Initial Term Loan Lenders.

"**Required Consenting Second-Out Lenders**" means as of the relevant date, Consenting Second-Out Lenders holding at least 50.01% of the aggregate outstanding principal amount of EVPS Second-Out Term Loans that are held by Consenting Second-Out Lenders.

"**Required Consenting Stakeholders**" means (a) the Required Consenting Initial Lenders, except where any required approval, consent, amendment or waiver adversely affects the economic treatment of the EVPS First-Out Term Loans (as a class) or the EVPS Second-Out Term Loans (as a class) in which event the consent of the Required Consenting First-Out Lenders or the Required Consenting Second-Out Lenders (as applicable) shall additionally be required (for the avoidance of doubt, without limitation, solely as to the parties in this clause (a), any modification or waiver of a Milestone shall materially and adversely affect economic treatment); and (b) the Consenting

Sponsors but only to the extent any required approval, consent, amendment, or waiver (i) materially, directly, and adversely affects their rights, obligations, or treatment (including the treatment of any Company Claims/Interests held by a Consenting Sponsor) under this Agreement, the Plan, or any other Definitive Document or (ii) relates to the release, indemnification, or insurance provisions under this Agreement, the Plan, or any other Definitive Document.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Section 510(b) Claim**" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Secured Claim**" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Solicitation Materials**" means all materials provided in connection with the solicitation of acceptances of votes on the Plan pursuant to Sections 1125 and 1126 of the Bankruptcy Code together with the Disclosure Statement, Disclosure Statement Approval Order, and any cure notices to be sent to counterparties to executory contracts or unexpired leases in connection with the assumption, or assumption and assignment, of such contracts or leases.

"**Supermajority Equityholders**" means Consenting EVPS Initial Term Loan Lenders that, as of the Voting Record Date, are projected to receive at least two-thirds of Reorganized Envision Parent New Common Stock based upon Plan treatment of their EVPS Term Loan Claims.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Transaction Expenses**" means all reasonable and documented fees, costs, and expenses of each of the Ad Hoc Advisors in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, and, to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and each Ad Hoc Advisor on the other hand, with respect to the fees, costs, and expenses of such advisors, in any such case as supplemented or modified by this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the EVPS Unsecured Notes Indenture.

"**Voting Record Date**" means the record date established pursuant to the order approving the Disclosure Statement for determining which holders of Claims are entitled to cast votes in favor of or against the Plan.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.** *Effectiveness of this Agreement*.

2.01.   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)    the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)    holders of at least two thirds of the aggregate outstanding principal amount of EVPS First-Out Term Loans;

(ii)    holders of at least two thirds of the aggregate outstanding principal amount of EVPS Second-Out Term Loans; and

(iii)    the Consenting Sponsors;

(c)    The AmSurg RSA shall have been executed by all required parties and shall be effective pursuant to its terms;

(d)    counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred; and

(e)    The Company Parties shall have paid in full to counsel and financial advisors, including, without limitation, the Ad Hoc Advisors, as applicable, to each of the Consenting EVPS Term Loan Lenders and Consenting Sponsors all fees and expenses for which an invoice has been received by the Company Parties on or before the date that is two (2) Business Days prior to the Agreement Effective Date.

2.02.   Without limiting any provision of Section 9 of this Agreement, following the Agreement Effective Date, additional holders of Company Claims/Equity Interests may become party to this Agreement by executing a Joinder.

**Section 3.**     *Definitive Documents.* The Definitive Documents governing the Restructuring Transactions shall include the following:  (a) the Amended and Restated EVPS ABL Facility (if applicable) and all agreements, documents (including security, collateral, or pledge agreement documents), guarantees, intercreditor agreements, mortgages, or instruments to be executed or delivered in connection with the Amended and Restated EVPS ABL Facility, including all opinions, certificates, filings, and other deliverables required to satisfy the conditions precedent to effectiveness of the foregoing documents and agreements (if applicable); (b) the New Reorganized Envision Parent Organizational Documents; (c) the EVPS Cash Collateral Order and any motion seeking entry by the Bankruptcy Court of the EVPS Cash Collateral Order; (d) the Reorganized Envision Parent Management Incentive Plan; (e) the New Warrant Agreements; (f) the Reorganized Envision Parent New Common Stock Documents; (g) the Plan; (h) the EHC AmSurg Debtors Sale Documents; (i) the Confirmation Order; (j) the Disclosure Statement; (k) the Disclosure Statement Approval Order ; (l) the Solicitation Materials; (m) the First Day Pleadings and all orders sought pursuant thereto; (n) the Plan Supplement; (o) such other definitive documentation as is necessary or desirable to consummate the Restructuring Transactions; and (p) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings and/or agreements relating to any of the foregoing.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date (other than the New Reorganized Envision Parent Organizational Documents and the identities of the members of the New Reorganized Envision Parent Board) shall be in form and substance acceptable to the EVPS Debtors and the Required Consenting Stakeholders.  The New Reorganized Envision Parent Organizational Documents and the identities of the members of the New Reorganized Envision Parent Board shall be in form and substance acceptable to the EVPS Debtors and the Board Selection Committee; *provided* that the Reorganized Envision Parent Organizational Documents, following approval by the Board Selection Committee, shall also be acceptable to the Supermajority Equityholders.

**Section 4.**     *Commitments of the Consenting Stakeholders*.

4.01.   <u>Affirmative Commitments, Forbearances, and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly or jointly and severally, agrees, in respect of all of its Company Claims/Interests, to:

(i)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) including supporting the releases as set forth in the Plan (to the extent consistent with this Agreement and the

Restructuring Term Sheet), in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     enter into and perform its obligations under the EHC AmSurg Debtors Sale Documents, to the extent such Consenting Stakeholder is an EHC AmSurg Debtors Sale Party;

(iii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iv)     use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b);

(v)     give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; *provided* that no Consenting Stakeholder shall be required hereunder to provide such Agents/Trustees, or any other Person with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith; and

(vi)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly or jointly and severally, agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions, including the EHC AmSurg Debtors Sale Transaction;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(iv)     initiate, or direct the initiation of, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests; or

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided* that nothing in this

Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.

4.02.   Commitments with Respect to Chapter 11 Cases.

(a)   During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms severally, and not jointly or jointly and severally, agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)   to the extent that it is permitted to vote, vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)   to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)   not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)   During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests severally, and not jointly or jointly and severally, agrees that it will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5.   *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.**

5.01.   Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a vote to accept a Plan and the releases contemplated therein, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting Stakeholder under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Case, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (e) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (f) constitute a waiver or amendment of any term or provision of (i) the EVPS Credit Agreements or any of the other Loan Documents (as defined in the Credit Agreements), (ii) the EVPS Unsecured Notes Indenture or any of the other Notes Documents (as defined in the Notes Indentures), or (iii) any intercreditor agreement; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or

properties of the Company Parties that secure the obligations under (i) the EVPS Credit Agreements or any of the other Loan Documents (as defined in the Credit Agreements), or (ii) the EVPS Notes Indenture or any of the other Notes Documents (as defined in the Notes Indentures); (h) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder; (i) prevent a Consenting Stakeholder from taking any action that is required to comply with applicable Law; or (j) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions.

**Section 6.**     *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties agrees to do the following and to cause their affiliates to do the following:

(a)     support, act in good faith, and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement and the Restructuring Term Sheet, including (i) subject to Section 7.01, commencing solicitation on the Plan pursuant to the Disclosure Statement and related Solicitation Materials, (ii) using commercially reasonable efforts to consummate the Restructuring Transactions, including the EHC AmSurg Debtors Sale Transaction, and (iii) obtaining entry of the Confirmation Order, approval of the applicable Definitive Documents, and consummation of the Restructuring Transactions pursuant to the Plan, in each case, in accordance with the applicable Milestones unless waived in accordance with the terms hereof;

(b)     to the extent any economic, legal, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps necessary and desirable to address any such impediment, in consultation with the Required Consenting Stakeholders;

(c)     use commercially reasonable efforts to promptly obtain any and all regulatory, governmental, and third-party approvals that are necessary or advisable to effectuate and consummate the Restructuring Transactions, including the EHC AmSurg Debtors Sale Transaction, as determined by the Company Parties in consultation with the Required Consenting Stakeholders;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions, including the EHC AmSurg Debtors Sale Transaction, as contemplated by this Agreement and the Restructuring Term Sheet;

(e)     make commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(f)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)      inform counsel to the Consenting Stakeholder as soon as reasonably practicable (and in any event within three (3) Business Days of such actual knowledge) after becoming aware of: (i) the occurrence, or failure to occur, of any event of which any Company Party has knowledge which the occurrence or failure to occur of any such event would permit any Party to terminate, or would result in the termination of, this Agreement; (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions; (iii) receipt of any written notice from any governmental or regulatory body regarding any approval necessary to consummate the Restructuring Transactions; (iv) any matter or circumstance which any Company Party knows is reasonably likely to be a material impediment to the implementation or consummation of the Restructuring Transactions; and (v) any notice of any commencement of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against any of the Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions;

(h)      to the extent applicable, use commercially reasonable efforts to provide counsel to the Consenting EVPS Term Lenders and counsel to the Consenting Sponsors with a review period of at least two (2) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company Parties intend to file any (i) Definitive Document with the Bankruptcy Court, with the filing of such Definitive Document subject to the consent rights set forth in this Agreement, and (ii) other material pleading with the Bankruptcy Court (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) and consult in good faith with counsel to the Consenting EVPS Term Lenders and counsel to the Consenting Sponsors regarding the form and substance of any such proposed filing;

(i)      provide to the Consenting EVPS Term Lenders and the Consenting Sponsors and their respective advisors upon written request (email being sufficient): (i) reasonable access (without any material disruption to the conduct of the Debtors' businesses) during normal business hours to the books, records, and facilities of the Company Parties, (ii) reasonable access (without any material disruption to the conduct of the Debtors' businesses) to the management of and advisors to the Company Parties for the purpose of evaluating the Company Parties' finances and operations and participating in the planning process with respect to the Restructuring Transactions, (iii) timely updates regarding the Restructuring Transactions, including any material developments or any material conversations with parties in interest, (iv) timely updates regarding the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, and (v) any other reasonable information related to the Restructuring Transaction or the EVPS Debtors' businesses requested by the advisors to the Consenting EVPS Term Lenders (including adequate responses to requests that have already been tendered as of the Agreement Effective Date) and advisors to the Consenting Sponsors in writing (e-mail shall suffice);

(j)      to the extent applicable, oppose and, if necessary, object to any motion filed with the Bankruptcy Court by any Person (i) seeking the entry of an order terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was

granted, would have a material adverse effect on or delay the consummation of the Restructuring Transactions;

(k)     not file any pleading seeking entry of an order, and object to any motion filed with the Bankruptcy Court by any person seeking the entry of an order, (i) directing the appointment of an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that (x) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (y) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions;

(l)     timely oppose any objections filed with respect to the Bankruptcy Court's approval of any of the Definitive Documents; and

(m)     except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to (i) conduct their businesses and operations in the ordinary course in a manner that is materially consistent with past practices as may be limited due to the commencement of the Chapter 11 Cases and (ii) preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course; provided, however, that any actions required to be taken by the Company Parties pursuant to this Agreement to effectuate the Restructuring Transactions in accordance with the terms set forth in this Agreement (including the Restructuring Term Sheet) shall not constitute a breach of the commitment set forth in this Section 6.01(m).

6.02.    Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly do the following and shall cause their affiliates to not directly or indirectly do the following:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     except as contemplated by Section 7.02 of this Agreement, solicit, participate in, negotiate, propose, support or vote for any Alternative Restructuring that the Company Parties or its affiliates intend to, or take any action to, consummate or enter into a binding agreement to consummate, prior to the Consummation of the Restructuring Transactions;

(c)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement, the Restructuring Term Sheet, the Definitive Documents, or the Plan;

(d)     (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that, in whole or in part, is not consistent with this Agreement or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3.02 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any

term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is not consistent with this Agreement (including the Restructuring Term Sheet) or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3.02 hereof;

(e)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(f)      without the prior written consent of the Required Consenting Lenders, with respect to any employee or director qualifying as an insider under the Bankruptcy Code, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any employee, or (y) any contracts, arrangements, or commitments that entitle any current or former director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements);

(g)      grant, agree to grant, or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar agreement or arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any employee or director qualifying as an insider under the Bankruptcy Code without the prior written consent of the Required Consenting Lenders;

(h)      (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Stakeholders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting Stakeholders; (ii) otherwise seek to restrict any rights of any of the Consenting Stakeholders; or (iii) support any Person in connection with any of the acts described the foregoing clauses;

(i)      without the prior written consent of the Required Consenting Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(j)      amend or change, or propose to amend or change, any of their respective Organizational Documents; or

(k)      (i) authorize, create, issue, sell, or grant any additional Equity Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests.

**Section 7.**     *Additional Provisions Regarding Company Parties' Commitments*.

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; *provided* that such determination shall not impede any Party's termination rights.  The Company Parties shall promptly notify each of the Consenting Stakeholders of any such determination within twenty-four (24) hours following such determination.  Notwithstanding anything to the contrary herein, each Consenting Stakeholders reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) continue, on a postpetition basis, to engage with the potential bidders already under nondisclosure agreement as of the Petition Date in the marketing process that the Debtors undertook before the Petition Date to determine the highest and best bona fide offer to consummate a direct or indirect sale of all, substantially all, or a portion of the equity interests in the AmSurg Debtors and/or the EHC AmSurg Debtors; (b) provide access to non-public information concerning any Company Party to any Entity with any Entity that provides an unsolicited Alternative Restructuring Proposal and executes and delivers a reasonable and customary confidentiality or nondisclosure agreement with the Company Parties; (c) receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited Alternative Restructuring Proposals if the board of directors, board of managers, or similar governing body of such Company Party determines in good faith, upon advice of outside counsel, that failure to take such action would be inconsistent with the fiduciary duties of the members of such board or governing body under applicable Law; and (d) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  If any Company Party receives a written proposal or expression of interest regarding any Alternative Restructuring Proposal, as soon as reasonably practicable and no later than two (2) calendar days from the receipt of such Alternative Restructuring Proposal, the Company Party shall notify (with email being sufficient) the Consenting Stakeholders, with a copy of such proposal.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the

Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any non-Affiliated Person unless:

(a)      in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided, however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the

Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.** *Representations and Warranties of Consenting Stakeholders*. Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement:

(a)   it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)   solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 10.** *Mutual Representations, Warranties, and Covenants*. Each of the Parties, severally and not jointly or jointly and severally, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)   it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the documents to effectuate the EHC AmSurg Debtors Sale Transaction, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements (including related to any Alternative Restructuring) with any other party that have not been disclosed to all Parties to this Agreement.

**Section 11.**      *Termination Events*.

11.01.  <u>Consenting EVPS Term Loan Lender Termination Events</u>.  This Agreement may be terminated with respect to the Consenting EVPS Term Loan Lenders, by the Required Consenting Lenders by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party or the Consenting Sponsor of any of the respective representations, warranties, or covenants of the Company Parties or Consenting Sponsor as set forth in this Agreement that (i) is adverse to the Consenting EVPS Term Loan Lenders seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for ten (10) Business Days after the Required Consenting Lenders transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)      any of the Milestones set forth in the Restructuring Term Sheet (as may have been extended with the approval of the Required Consenting Stakeholders) is not achieved, except where such Milestone has been waived by the Required Consenting Stakeholders; <u>provided</u> that the right to terminate this Agreement under this Section 11.01(b) shall not be available if the failure of such Milestone to be achieved is caused by, or results from, the material breach by any terminating party of its covenants, agreements, or other obligations under this Agreement;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)      any Company Party (i) publicly announces, or announces in writing, to any of the Consenting Stakeholders or other holders of Company Claims/Interests (including but not limited to Section 7.01 hereof), its intention not to support or pursue the Restructuring Transactions; (ii) exercises any right pursuant to Section 7.01 that constitutes a material breach pursuant to this Agreement that remains uncured (to the extent curable) for ten (10) Business Days after the Company Party transmits a written notice in accordance with Section 13.10 hereof indicating such determination; or (iii) breaches any of the covenants, agreements or obligations set forth in Section 6.02(b);

(e)      any Company Party files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within two (2) calendar days of receipt by the Company Parties of written notice from the party that such motion or pleading is inconsistent with this Agreement;

(f)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(g)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order is not reversed, stayed, or amended in a manner acceptable to the Required Consenting Lenders, or the Bankruptcy Court does not enter an order confirming a Plan acceptable to the Required Consenting Lenders, in each case, within ten (10) Business Days;

(h)      any Company Party, without the consent of the Required Consenting Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(i)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, or (iv) rejecting this Agreement;

(j)      the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (ii) frustrates the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof (without the consent of the Required Consenting Lenders), unless the order granting such relief has been stayed, modified, or reversed within fourteen (14) days after such terminating party deliver a written notice in accordance with Section 13.10 hereof;

(k)      any Company Party (i) withdraws the Plan; (ii) publicly announces, or announces to any of the Required Consenting Lenders or other holders of Company Claims/Interests, its

intention to withdraw the Plan or not support the Plan; or (iii) moves to voluntarily dismiss any of the Chapter 11 Cases;

(l)      any of the Company Parties (i) files any motion seeking to avoid, invalidate, disallow, subordinate, recharacterize, or limit any Company Claims/Interests, lien, or interest held by any Consenting Lender; or (ii) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action without the prior written consent of the Required Consenting Lenders;

(m)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Consenting Lenders, in a manner inconsistent with this Agreement;

(n)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(o)      termination of the EVPS Debtors' right to use cash collateral under the EVPS Cash Collateral Order;

(p)      termination of the AmSurg Debtors' (i) right to use cash collateral under the AmSurg Cash Collateral Order; or (ii) any debtor in possession financing, in each case approved in the Chapter 11 Cases;

(q)      the occurrence of any termination event (or as such similar term is used) as set forth in the AmSurg RSA (whether or not there is an actual termination of the AmSurg RSA) or a material modification to the AmSurg RSA such that the AmSurg RSA (as amended) no longer requires the parties thereto to support a plan of reorganization or other documentation incorporating the EHC AmSurg Debtors Sale Transaction on the same terms as set forth herein and in the Restructuring Term Sheet;

(r)      subject to the terms of the EVPS Cash Collateral Order and other orders of the Bankruptcy Court, failure of the Company Parties to pay the Transaction Expenses, as and when required by the terms of this Agreement;

(s)      after entry by the Bankruptcy Court of the Confirmation Order or the EVPS Cash Collateral Order, either of the Confirmation Order or the EVPS Cash Collateral Order is (i) reversed, dismissed, or vacated without the prior written consent of the Required Consenting Lenders, or (ii) modified or amended in a manner that is inconsistent with this Agreement without the prior written consent of the Required Consenting Lenders and such modification or amendment remains unchanged for a period of ten (10) days after the terminating party delivers a written notice in accordance with Section 14.10 hereof detailing any such modification or amendment;

(t)     any party that is entitled to have its indemnification reinstated and remain intact under the Restructuring Term Sheet does not obtain a release from each and all of the EVPS Debtors and EVPS Reorganized Debtors; or

(u)     there is a successful Challenge by any party under the Cash Collateral Order.

11.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting EVPS Term Loan Lenders of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting EVPS Term Loan Lender(s) of notice of such breach; *provided, however,* that such termination shall only be effective as against the breaching Consenting EVPS Term Loan Lender(s); *provided, further*, that the Company Parties may terminate this Agreement with respect to all Parties if such termination would result in the Consenting EVPS Term Loan Lenders holding less than two-thirds of the EVPS First-Out Term Loans or EVPS Second-Out Term Loans;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; <u>provided</u>, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; and

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.  <u>Consenting Sponsor Termination Events</u>.  The Consenting Sponsors may terminate this Agreement as to the Consenting Sponsors upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by a Company Party of any of the respective representations, warranties, or covenants of the Company Parties as set forth in this Agreement that (i) is adverse to the Consenting Sponsors seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for ten (10) Business Days after the Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the

consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Consenting Sponsor transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Consenting Sponsor that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or the Bankruptcy Court enters an order denying confirmation of the Plan;

(c)     any of the Company Parties (i) files any motion seeking to avoid, invalidate, disallow, subordinate, recharacterize, or limit any Company Claims/Interests, lien, or interest held by any Consenting Sponsor; or (ii) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action without the prior written consent of the Consenting Sponsors;

(d)     any Company Party, without the consent of the Consenting Sponsors, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(e)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Consenting Sponsors, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, or (iv) rejecting this Agreement;

(f)     the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (ii) frustrates the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof (without the consent of the Consenting Sponsors), unless the order granting such relief has been stayed, modified, or reversed within fourteen (14) days after such terminating party deliver a written notice in accordance with Section 13.10 hereof;

(g)     the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Consenting Sponsors;

(h)     the termination of the AmSurg RSA or a material modification to the AmSurg RSA such that the AmSurg RSA (as amended) no longer requires the parties thereto to support a plan of reorganization or other documentation incorporating the EHC AmSurg Debtors Sale Transaction on the same terms as set forth herein and in the Restructuring Term Sheet;

(i)     the Bankruptcy Court enters an order denying confirmation of the Plan; or

(j)      the Required Consenting Lenders terminate this Agreement pursuant to 11.01 of this Agreement.

11.04.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, and such material breach causes or results in the occurrence of the applicable termination event, except a termination pursuant to Section 11.02(b) or Section 11.01(d).  Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.**     *Amendments and Waivers*.

(a)      This Agreement and any exhibits or schedules hereto (including but not limited to the Restructuring Term Sheet and the Definitive Documents) may not be modified, amended, or

supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting Stakeholders; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a direct, material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 13.     *Miscellaneous*

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring Transactions, the EHC AmSurg Debtors Sale Transaction, and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or appropriate to effectuate the Restructuring Transactions in accordance with this Agreement and the Definitive Documents; *provided* that this Section 13.03 shall not limit the right of any party hereto to exercise

any right or remedy provided for in this Agreement (including the approval rights set forth in Sections 3.01 and 3.02). Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably appropriate or necessary to effectuate the Restructuring Transactions, and shall refrain from taking any action that would frustrate the Restructuring Transactions.

13.04. <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each of the Parties hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that, upon commencement of the Chapter 11 Cases, it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06. <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or

against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Company
Envision Healthcare Corporation
1A Burton Hills Boulevard
Nashville, TN 37215
Attention: Ilene Moore, General Counsel
E-mail address: Ilene.Moore@envisionhealth.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Edward Sassower, P.C.; Joshua A. Sussberg, P.C.; Anne Wallice
E-mail address: esassower@kirkland.com; jsussberg@kirkland.com; anne.wallice@kirkland.com

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  John R. Luze; Annie Dreisbach
E-mail address: john.luze@kirkland.com; annie.dreisbach@kirkland.com

(b)     if to a Consenting EVPS Term Loan Lender, to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Scott J. Greenberg; Jason Zachary Goldstein; Steven A. Domanowski

E-mail address:  sgreenberg@gibsondunn.com;
jgoldstein@gibsondunn.com; SDomanowski@gibsondunn.com

(c)      if to a Consenting Sponsor, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:  Brian S. Hermann; Brian Bolin; Jacob Adlerstein
E-mail address:  bhermann@paulweiss.com;
bbolin@paulweiss.com; jadlerstein@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.  <u>Enforceability of Agreement</u>.  The Parties hereby acknowledge and agree:  (a) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code; (b) that they waive any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.   Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.   Remedies Cumulative.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.   Capacities of Consenting Stakeholders.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19.   Survival.   Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

13.20.   Email Consents.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.21.   Public Disclosure.   The Company Parties shall deliver drafts to the Consenting Stakeholders' advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement, the Term Sheet, the Transactions, or any amendment thereof to the general public (each, a "Public Disclosure") at least one (1) calendar day before making any such disclosure.  Any Public Disclosure shall be reasonably acceptable to the Company Parties and reasonably acceptable to the Required Consenting Lenders.  The Company Parties shall make commercially reasonable efforts to avoid making any public disclosure that would disclose either: (a) the holdings of any Consenting Stakeholder (including on the signature pages of the Consenting Stakeholders, which shall not be publicly disclosed or filed) or (b) the identity of any Consenting Stakeholder, in each case without the prior written consent of such Consenting Stakeholder or an order of a court with competent jurisdiction; provided, however, that notwithstanding the foregoing, the Company Parties shall not be required to keep confidential the aggregate holdings of all Consenting Stakeholders, and each Consenting Stakeholder hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms and contents hereof, to the Agent(s) under the Credit Agreement Documents, and in any filings required by applicable law or regulation or the rules of any applicable stock exchange or regulatory body.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the EVPS Restructuring Support Agreement**


**ENVISION HEALTHCARE CORPORATION**
and each of the other entities listed on **Exhibit A**

By: _____

Name: Paul Keglevic

Authorized Signatory

**Signature Pages Intentionally Omitted**

## EXHIBIT A

### Company Parties

Acute Management, LLC
Affilion, Inc.
All Women's Healthcare Holdings, Inc.
All Women's Healthcare of Dade, Inc.
All Women's Healthcare of Sawgrass, Inc.
All Women's Healthcare of West Broward, Inc.
All Women's Healthcare Services, Inc.
All Women's Healthcare, Inc.
AllegiantMD, Inc.
Alpha Physician Resources, L.L.C.
American Emergency Physicians Management, Inc.
AmSurg Abilene Eye, Inc.
AmSurg Abilene, Inc.
AmSurg Altamonte Springs FL, Inc.
AmSurg Anesthesia Management Services, LLC
AmSurg Arcadia CA, Inc.
AmSurg Burbank, Inc.
AmSurg Colton CA, Inc.
AmSurg Crystal River, Inc.
AmSurg EC Beaumont, Inc.
AmSurg EC Centennial, Inc.
AmSurg EC Santa Fe, Inc.
AmSurg EC St. Thomas, Inc.
AmSurg EC Topeka, Inc.
AmSurg EC Washington, Inc.
AmSurg El Paso, Inc.
AmSurg Escondido CA, Inc.
AmSurg Finance, Inc.
AmSurg Fresno Endoscopy, Inc.
AmSurg Glendale, Inc.
AmSurg Glendora CA, Inc.
AmSurg Hillmont, Inc.
AmSurg Holdco, LLC
AmSurg Holdings, LLC
AmSurg Inglewood, Inc.
AmSurg KEC, Inc.
AmSurg Kissimmee FL, Inc.
AmSurg La Jolla, Inc.
AmSurg Lancaster PA, LLC
AmSurg Main Line PA, LLC
AmSurg Maryville, Inc.
AmSurg Melbourne, Inc.
AmSurg Miami, Inc.

AmSurg Naples, Inc.
AmSurg New Port Richey FL, Inc.
AmSurg Northwest Florida, Inc.
AmSurg Oakland CA, Inc.
AmSurg Ocala, Inc.
AmSurg Palmetto, Inc.
AmSurg Physicians Arizona, LLC
AmSurg Physicians HoldCo, LLC
AmSurg Pottsville PA, LLC
AmSurg San Antonio TX, Inc.
AmSurg San Luis Obispo CA, Inc.
AmSurg Scranton PA, Inc.
AmSurg Suncoast, Inc.
AmSurg Temecula CA, Inc.
AmSurg Temecula II, Inc.
AmSurg Torrance, Inc.
AmSurg, LLC
Anesthesiologists of Greater Orlando, Inc.
Anesthesiology Associates of Tallahassee, Inc.
Apex Acquisition LLC
Arizona Perinatal Care Centers, LLC
ASDH I, LLC
ASDH II, LLC
Austin NSC, LLC
Austin NSC, LP
Bay Area Anesthesia, L.L.C.
BestPractices, Inc.
Bethesda Anesthesia Associates, Inc.
Boca Anesthesia Service, Inc.
Bravo Reimbursement Specialist, L.L.C.
Broad Midwest Anesthesia, LLC
Centennial Emergency Physicians, LLC
Chandler Emergency Medical Group, L.L.C.
Children's Anesthesia Associates, Inc.
Clinical Partners Management Company, LLC
CMORx, LLC
Coastal Anesthesiology Consultants, LLC
Coral Springs NSC, LLC
Davis NSC, LLC
Desert Mountain Consultants in Anesthesia, Inc.
Discovery Clinical Research, Inc.
Doctors Billing Service, Inc.
Drs. Ellis, Rojas, Ross & Debs, Inc.
ED Solutions, LLC
EDIMS, L.L.C.
EHR Management Co.

EmCare Anesthesia Providers, Inc.
EmCare HoldCo, LLC
EmCare Holdings, LLC
EmCare of California, Inc.
EmCare Physician Providers, Inc.
EmCare Physician Services, Inc.
EmCare, LLC
Emergency Medical Services LLC
Emergency Medicine Education Systems, Inc. (EMEDS)
EMS Management LLC
EMSC ServicesCo, LLC
Enterprise Intermediate Holdings Inc.
Enterprise Parent Holdings, Inc.
Envision Anesthesia Services of Delaware, Inc.
Envision Anesthesia Services of Sierra Vista, Inc.
Envision Children's Healthcare Services of North Mississippi, Inc.
Envision Healthcare Clinical Research, Inc.
Envision Healthcare Corporation
Envision Healthcare Scientific Intelligence, Inc.
Envision Physician Services, LLC
Flamingo Anesthesia Associates, Inc.
FM Healthcare Services, Inc.
FMO Healthcare Holdings, LLC
FO Investments II, Inc.
FO Investments III, Inc.
FO Investments, Inc.
Fullerton NSC, LLC
Global Surgical Partners, Inc.
Greater Florida Anesthesiologists, LLC
Hawkeye Holdco LLC
Healthcare Administrative Services, Inc.
Holiday Acquisition Company, Inc.
Illinois NSC, Inc.
Imaging Advantage LLC
Infinity Healthcare, Inc.
iSelect Healthcare LLC
Jacksonville Beaches Anesthesia Associates, Inc.
Jupiter Anesthesia Associates, L.L.C.
Jupiter Healthcare, LLC
Kenwood NSC, LLC
Long Beach NSC, LLC
MedAssociates, LLC
Medi-Bill of North Florida, Inc.
Medical Information Management Solutions, LLC
Millennium Vision Surgical, LLC
MSO Newco, LLC

NAC Properties, LLC
New Generations Babee Bag, Inc.
North Florida Anesthesia Consultants, Inc.
North Florida Perinatal Associates, Inc.
Northwood Anesthesia Associates, L.L.C
NSC Healthcare, Inc.
NSC RBO East, LLC
NSC West Palm, LLC
Parity Healthcare, Inc.
Partners in Medical Billing, Inc.
Phoenix Business Systems, LLC
Phoenix Physicians, LLC
Physician Account Management, Inc.
Physician Office Partners, Inc.
Pinnacle Consultants Mid-Atlantic, L.L.C.
Practice Account Management Services, LLC
Proven Healthcare Solutions of New Jersey, LLC
Provider Account Management, Inc.
QRx Medical Management, LLC
Reimbursement Technologies, Inc.
San Antonio NSC, LLC
Sentinel Healthcare Services, LLC
Sheridan Anesthesia Services of Alabama, Inc.
Sheridan Anesthesia Services of Louisiana, Inc.
Sheridan Anesthesia Services of Virginia, Inc.
APH Laboratory Services, Inc.
Sheridan CADR Solutions, Inc.
Sheridan Children's Healthcare Services of Arizona, Inc.
Sheridan Children's Healthcare Services of Kentucky, Inc.
Sheridan Children's Healthcare Services of Louisiana, Inc.
Sheridan Children's Healthcare Services of New Mexico, Inc.
Sheridan Children's Healthcare Services of Ohio, Inc.
Sheridan Children's Healthcare Services of Virginia, Inc.
Sheridan Children's Healthcare Services, Inc.
Sheridan Children's Services of Alabama, Inc.
Sheridan Emergency Physician Services of Missouri, Inc.
Sheridan Emergency Physician Services of North Missouri, Inc.
Sheridan Emergency Physician Services of South Florida, Inc.
Sheridan Emergency Physician Services, Inc.
Sheridan Healthcare of Louisiana, Inc.
Sheridan Healthcare of Missouri, Inc.
Sheridan Healthcare of Vermont, Inc.
Sheridan Healthcare of Virginia, Inc.
Sheridan Healthcare of West Virginia, Inc.
Sheridan Healthcare, LLC
Sheridan Healthcorp of California, Inc.

Sheridan Healthcorp, Inc.
Sheridan Healthy Hearing Services, Inc.
Sheridan Holdings, LLC
Sheridan Hospitalist Services of Florida, Inc.
Sheridan InvestCo, LLC
Sheridan Leadership Academy, Inc.
Sheridan Radiology Management Services, Inc.
Sheridan Radiology Services, Inc.
Sheridan ROP Services of Alabama, Inc.
Sheridan ROP Services of Florida, Inc.
Sheridan ROP Services of Virginia, Inc.
SHI II, LLC
Southeast Perinatal Associates, Inc.
Spotlight Holdco LLC
St. Lucie Anesthesia Associates, LLC
Streamlined Medical Solutions LLC
Sun Devil Acquisition LLC
Sunbeam Asset LLC
Tampa Bay NSC, LLC
Templeton Readings, LLC
Tennessee Valley Neonatology, Inc.
Tiva Healthcare, Inc.
Torrance NSC, LLC
Towson NSC, LLC
Twin Falls NSC, LLC
Valley Anesthesiology Consultants, Inc.
Valley Clinical Research, Inc.
West Fairview Emergency Physicians, LLC
Weston NSC, LLC
Wilton NSC, LLC
Evolution Mobile Imaging, LLC
Gynecologic Oncology Associates, Inc.
KMAC, Inc.
Radiology Staffing Solutions, Inc.
Radstaffing Management Solutions, Inc.
Rose Radiology, LLC

## EXHIBIT B

### Consenting Sponsors

KKR Enterprise Aggregator L.P.
KKR Enterprise Debt Aggregator A L.P.
Enterprise Co-Invest Debt Holdings A L.P.
Enterprise Co-Invest Debt Holdings B L.P.
Enterprise Debt Holdings A L.P.
Enterprise Debt Holdings B L.P.

## EXHIBIT C

**Restructuring Term Sheet**

*EXECUTION VERSION*

**THIS RESTRUCTURING TERM SHEET (THIS "<u>EVPS RESTRUCTURING TERM SHEET</u>") IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT FOR THE EVPS DEBTORS (THE "<u>EVPS RESTRUCTURING SUPPORT AGREEMENT</u>") ON THE TERMS DESCRIBED HEREIN AND IN THE EVPS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *EVPS RESTRUCTURING TERM SHEET*

### INTRODUCTION

This EVPS Restructuring Term Sheet [1] describes the principal terms of the Restructuring and the Restructuring Transactions of Enterprise Parent Holdings Inc. ("<u>Envision Parent</u>") and its direct and indirect subsidiaries, other than AmSurg Holdco, LLC ("**AmSurg Parent**") and its subsidiaries (collectively with AmSurg Parent, the "**AmSurg Debtors**") (Envision Parent and its direct and indirect subsidiaries other than the AmSurg Debtors, the "<u>EVPS Debtors</u>," and together with the AmSurg Debtors, the "**Debtors**") that will be effectuated through an in-court restructuring and a chapter 11 plan of reorganization. The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring with any modifications to the terms and/or structure to be subject to the consent rights under the EVPS Restructuring Support Agreement. This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This EVPS Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Restructuring, which remain subject to negotiation and completion in accordance with the EVPS Restructuring Support Agreement and applicable bankruptcy law. The Restructuring and Definitive Documents shall be consistent in all respects with this EVPS Restructuring Term Sheet and the EVPS Restructuring Support Agreement, and shall be subject to the consent and approval rights set forth herein and therein. This Restructuring Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

---

[1]     Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings given to such terms in the EVPS Restructuring Support Agreement.

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Implementation** | The EVPS Debtors will commence the Chapter 11 Cases and implement the Restructuring pursuant to the EVPS Restructuring Support Agreement, the Plan, and the Plan Supplement.<br><br>On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of a Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of such Claim or in exchange for such holder's Claim or Interest, except to the extent different treatment is agreed to by the Reorganized EVPS Debtors and the holder of such Allowed Claim or Interest, as applicable.<br><br>Any action required to be taken by the EVPS Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter; *provided, however,* that the EHC AmSurg Debtors Sale Transaction shall be consummated no later than the Plan Effective Date. |
| **EHC AmSurg Debtors Sale Transaction** | On the Plan Effective Date, the EVPS Debtors will consummate a sale of their equity interests, directly or indirectly, in the EHC AmSurg Debtors [2] to Reorganized AmSurg Parent (such sale transaction, the "**EHC AmSurg Debtors Sale Transaction**").  The aggregate consideration for the EHC AmSurg Debtors Sale Transaction shall consist of $300 million in net cash paid on the Plan Effective Date by Reorganized AmSurg Parent. The EHC AmSurg Debtors Sale Transaction will be structured as a sale pursuant to section 1123 of the Bankruptcy Code.<br><br>The proceeds of the EHC AmSurg Debtors Sale Transaction (the "**EHC AmSurg Debtors Sale Proceeds**") shall be used to fund ongoing operating and other cash needs of the Reorganized EVPS Debtors and fund distributions to secured lenders and other disbursements under the Plan.<br><br>Notwithstanding the foregoing, the Debtors, in consultation with the Required Consenting Lenders, may (a) continue, on a postpetition basis, to engage with the potential bidders already under nondisclosure agreement as of the Petition Date in the marketing process that the Debtors undertook before the Petition Date to determine the highest and best bona fide offer to consummate a direct or indirect sale of all, substantially all, or a portion of the equity interest in the AmSurg |

---

[2]     EHC AmSurg Debtors means AmSurg Anesthesia Management Services, LLC, AmSurg Suncoast, Inc., AmSurg EC Washington, Inc., AmSurg KEC, Inc., AmSurg EC Centennial, Inc., AmSurg Miami, Inc., AmSurg Escondido CA, LLC, AmSurg Temecula II, Inc., AmSurg Topeka, Inc., AmSurg Naples, Inc., AmSurg Glendale, Inc., AmSurg Hillmont, Inc., AmSurg Inglewood, Inc., AmSurg Finance, Inc., AmSurg Kissimmee FL, Inc., AmSurg La Jolla, Inc., AmSurg Melbourne, Inc., AmSurg Northwest Florida, Inc., AmSurg Altamonte Springs FL, Inc., Amsurg Fresno Endoscopy, Inc., AmSurg Palmetto, Inc., AmSurg Colton CA, Inc., AmSurg Temecula CA, Inc., AmSurg EC St. Thomas, Inc., Austin NSC, LP, AmSurg EC Beaumont, Inc., AmSurg Crystal River, Inc., AmSurg San Luis Obispo CA, Inc., AmSurg Torrance, Inc., AmSurg San Antonio TX, Inc., AmSurg Scranton PA, Inc., AmSurg Ocala, Inc., AmSurg Maryville, Inc., AmSurg El Paso, Inc., AmSurg EC Santa Fe, Inc., AmSurg Burbank, Inc., AmSurg Arcadia CA, Inc., AmSurg Oakland CA, Inc., AmSurg Abilene, Inc., AmSurg Abilene Eye, Inc., AmSurg Glendora CA, Inc., AmSurg Pottsville PA, LLC, AmSurg Lancaster PA, LLC, Amsurg Main Line PA, LLC, ASDH I, LLC, ASDH II, LLC, or such other Entities comprising the ambulatory surgery centers and associated assets in which the EVPS Debtors had an interest as of May 1, 2023.

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | Debtors and/or the EHC AmSurg Debtors and (b) respond to any unsolicited offer or proposal with respect to a direct or indirect sale of all, substantially all, or a portion of the equity interests in the AmSurg Debtors and/or the EHC AmSurg Debtors and otherwise engage with any parties making such unsolicited offer or proposal, in each case, solely pursuant to and as set forth in the EVPS Restructuring Support Agreement. |
| | The Debtors shall enter into a share purchase agreement related to the EHC AmSurg Debtors Sale Transaction (the "**EHC AmSurg Debtors SPA**") which shall be included in the Plan Supplement, and the EHC AmSurg Sale Transaction shall be approved by the Bankruptcy Court in the Confirmation Order.  The EHC AmSurg Debtors SPA shall provide for a termination fee of $20 million (the "**EHC AmSurg Debtors Termination Fee**") payable by the EVPS Debtors solely in the event that the Debtors consummate a higher and better alternative sale transaction. The Debtors shall separately obtain an order of the Bankruptcy Court approving the EHC AmSurg Debtors Termination Fee. The Debtors and the Required Consenting Lenders agree that any such alternative sale transaction must provide for at least $498.5 million in aggregate net proceeds for the EHC AmSurg Debtors to be considered higher and better. |
| | For the avoidance of doubt, the EHC AmSurg Debtors Sale Transaction and all related structuring and documentation shall be in form and substance acceptable to the EVPS Debtors and the Required Consenting Initial Lenders. |
| **Use of Cash Collateral** | The Required Consenting Lenders shall consent to the use of cash collateral on terms and conditions set forth in interim and final cash collateral orders approved by the Bankruptcy Court (collectively, the **Cash Collateral Order**"), which shall be consistent with the terms of this Restructuring Term Sheet and the EVPS Restructuring Support Agreement and otherwise in form and substance acceptable to the EVPS Debtors and the Required Consenting Lenders. |
| **Reorganized Envision Parent New Common Stock** | On the Plan Effective Date, Reorganized Envision Parent will issue a single class of common interests (the "**Reorganized Envision Parent New Common Stock**"), which will be distributed to holders of Allowed EVPS First-Out Term Loan Claims and Allowed EVPS Second-Out Term Loan Claims, subject to dilution by the Reorganized Envision Parent Management Incentive Plan and the New Warrants. |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **New Warrants** | In the event that holders of EVPS Unsecured Funded Debt Claims vote as a class to accept the Plan, then, on the Plan Effective Date, Reorganized Envision Parent will issue three-year warrants (the "**New Warrants**") convertible into up to 5% of the Reorganized Envision Parent New Common Stock, at a strike price equal to the value at which holders of Allowed EVPS First-Out Term Loan Claims and Allowed EVPS Second-Out Term Loan Claims receive a full recovery on all Allowed EVPS First-Out Term Loan Claims and Allowed EVPS Second-Out Term Loan Claims.  For the avoidance of doubt, the Allowed EVPS First-Out Term Loan Claims shall include the full Prepayment Premium calculated consistent with the EVPS Term Loan Credit Agreement.[3]   The New Warrants shall not include any Black-Scholes protection.  The documentation for the New Warrants will be included in the Plan Supplement and shall be in form and substance acceptable to the Required Consenting Initial Lenders and the Consenting Sponsors. |
| **Cash on Hand** | Cash distributions and other payments required under the Plan shall be made from cash on hand as of the Plan Effective Date in accordance with this Restructuring Term Sheet and the Plan. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Plan Effective Date shall be subject to the rights, obligations, and consent rights set forth in Section 3 of the EVPS Restructuring Support Agreement.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **Milestones** | The Debtors will comply with the following milestones (collectively, the "**Milestones**"): <br><br> • not later than 5 Business Days following the Petition Date, the Bankruptcy Court shall have entered the EVPS Cash Collateral Order on an interim basis; <br><br> • not later than 25 days following the Petition Date, the Debtors shall have retained the Operational Consultant; <br><br> • not later than 35 days following the Petition Date, the Bankruptcy Court shall have entered (a) the Cash Collateral Order on a final basis and (b) an order approving the EHC AmSurg Debtors Termination Fee; <br><br> • not later than 65 days following the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order; <br><br> • not later than 120 days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and <br><br> • not later than 150 days following the Petition Date, the Plan Effective Date shall have occurred. |

---

[3]     The First-Out Prepayment Premium shall be calculated as written in the EVPS Term Loan Credit Agreement (i.e., NC life).

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | | |
| N/A | **EVPS Administrative Claims** | On the Plan Effective Date, each holder of an Allowed EVPS Administrative Claim shall receive payment in full in cash. | N/A |
| N/A | **EVPS Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed EVPS Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims Against and Interests in the Debtors** | | | |
| **Class 1** | **Other EVPS Secured Claims** | On the Plan Effective Date, each holder of an Allowed EVPS Other Secured Claim shall receive, at the EVPS Debtors' option, in consultation with the Required Consenting Lenders: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 2** | **Other EVPS Priority Claims** | Each holder of an Allowed EVPS Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 3** | **EVPS ABL Claims** | Except to the extent that a holder of an EVPS ABL Claim agrees to less favorable treatment of its Allowed Claim, on the Plan Effective Date, each holder of an Allowed EVPS ABL Claim shall receive either: (a) payment in full in cash; or (b) to the extent agreed by such holder its pro rata share of the loans arising under the an amended and restated EVPS ABL Credit Facility in an amount equal to the Allowed EVPS ABL Claims outstanding on the Plan Effective Date (taking into account any repayment or cash distribution occurring on or before the Plan Effective Date) which facility shall be in form and substance acceptable to the EVPS Debtors and the Required Consenting Initial Lenders. | Impaired / Entitled to Vote |

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 4** | **EVPS First-Out Term Loan Claims** | Except to the extent that a holder of an EVPS First-Out Term Loan Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed EVPS First-Out Term Loan Claim, on the Plan Effective Date, each holder of an Allowed EVPS First-Out Term Loan Claim shall receive its pro rata share of (a) cash in an amount to be agreed between the EVPS Debtors, the Required Consenting First-Out Lenders, and the Required Consenting Second-Out Lenders and (b) 100% of the Reorganized Envision Parent New Common Stock, *minus* the Second-Out New Common Stock Amount (as defined below), subject, in the case of subsection (b), to dilution by the Reorganized Envision Parent Management Incentive Plan and the New Warrants (if any); *provided* that, for the avoidance of doubt, holders of *pari passu* Allowed Intercompany Loan Claims waive their right to and shall not receive any such recovery on the Plan Effective Date.  For the avoidance of doubt, the Allowed EVPS First-Out Term Loan Claims shall include the full Prepayment Premium calculated consistent with the EVPS Term Loan Credit Agreement.[4] | Impaired / Entitled to Vote |
| **Class 5** | **EVPS Second-Out Term Loan Claims** | Except to the extent that a holder of an EVPS Second-Out Term Loan Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed EVPS Second-Out Term Loan Claim, on the Plan Effective Date, each holder of an Allowed EVPS Second-Out Term Loan Claim shall receive its pro rata share of a percentage to be agreed between the EVPS Debtors, the Required Consenting First-Out Lenders, and the Required Consenting Second-Out Lenders, of the Reorganized Envision Parent New Common Stock (the "**Second-Out New Common Stock Amount**"), subject to dilution by the Reorganized Envision Parent Management Incentive Plan and the New Warrants (if any); *provided* that, for the avoidance of doubt, holders of *pari passu* Allowed Intercompany Loan Claims waive their right to and shall not receive any such recovery on the Plan Effective Date. | Impaired / Entitled to Vote |

---

[4]    The First-Out Prepayment Premium shall be calculated as written in the EVPS Term Loan Credit Agreement (i.e., NC life).

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 6** | **EVPS Unsecured Funded Debt Claims** | Except to the extent that a holder of an Allowed EVPS Third-Out Claim, Allowed EVPS Fourth-Out Claim, or Allowed EVPS Unsecured Notes Claim (collectively, "**Unsecured Funded Debt Claims**") agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Unsecured Funded Debt Claim, on the Plan Effective Date, each holder of an Allowed Unsecured Funded Debt Claim shall receive: *To the extent holders of Allowed Unsecured Funded Debt Claims vote as a class to accept the Plan,* its pro rata share of the New Warrants; *provided* that holders of Allowed Intercompany Loan Claims waive their right to and shall not receive any such recovery on the Plan Effective Date; or *To the extent holders of Allowed Unsecured Funded Debt Claims vote as a class to reject the Plan,* no recovery and such Allowed Unsecured Funded Debt Claims shall be cancelled, released, and extinguished without any distribution. | Impaired / Entitled to Vote |
| **Class 7** | **Intercompany Loan Claims** | On the Plan Effective Date, each holder of an Intercompany Loan Claim shall have such Intercompany Loan Claim cancelled, released, and extinguished without any distribution. | Impaired / Deemed to Reject |
| **Class 8** | **General Unsecured Claims against EVPS Debtors** | Except to the extent that a holder of an Allowed General Unsecured Claim[5] against the EVPS Debtors agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed General Unsecured Claim against the EVPS Debtors, on the Plan Effective Date, each holder of an Allowed General Unsecured Claim against the EVPS Debtors shall receive: *To the extent holders of Allowed General Unsecured Claims against the EVPS Debtors vote as a class to accept the Plan,* its pro rata share of $1,000,000; or *To the extent holders of Allowed General Unsecured Claims against the EVPS Debtors vote as a class to reject the Plan,* no recovery and such Allowed General Unsecured Claim against the EVPS Debtors shall be cancelled, released, and extinguished without any distribution. | Impaired / Entitled to Vote |

---

[5]   Allowed General Unsecured Claims shall include any deficiency claim on behalf of any EVPS First-Out

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 9** | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim reinstated, set off, settled, distributed, contributed, cancelled, and released without any distribution on account of such Intercompany Claims, or such other treatment as is reasonably determined by the EVPS Debtors, at the EVPS Debtors' election with the consent of the Required Consenting Lenders; *provided,* for the avoidance of doubt, that such Allowed Intercompany Claims shall not include the Intercompany Loan Claims. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 10** | **Intercompany Interests** | On the Plan Effective Date, Intercompany Interests shall be reinstated, set off, settled, distributed, contributed, cancelled, and released without any distribution on account of such Intercompany Interests, or such other treatment as is determined by the EVPS Debtors with the consent of the Required Consenting Lenders; *provided,* for the avoidance of doubt, that such Allowed Intercompany Interests shall not include any Equity Interest in AmSurg Parent. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 11** | **Equity Interests in Envision Parent** | On the Plan Effective Date, each holder of an Equity Interest in Envision Parent shall have such Equity Interest cancelled, released, and extinguished without any distribution. | Impaired / Deemed to Reject |
| **Class 12** | **Section 510(b) Claims** | Each Allowed Section 510(b) Claim will be discharged and released and each holder of such Allowed Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Allowed Section 510(b) Claim. | Impaired / Deemed to Reject |

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |

---

Term Loan Claim or EVPS Second-Out Term Loan Claim.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
| --- | --- |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan, as well as the Restructuring Transactions therein.  On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring.<br><br>In addition, the Reorganized EVPS Debtors may raise exit capital at the Plan Effective Date, as determined by the EVPS Debtors and the Required Consenting Initial Lenders, in the form of (i) a new money equity rights offering, (ii) a new money debt rights offering, or (iii) a combination thereof which, in each case, will be offered on a pro rata basis to the Consenting EVPS Initial Term Loan Lenders on the same terms (including fees).  This EVPS Restructuring Term Sheet shall be updated to reflect the foregoing, if applicable.<br><br>Each Consenting EVPS Initial Term Loan Lender that is a Consenting First-Out Lender shall receive its pro rata share of a fee equal to 5% of the Reorganized Envision Parent New Common Stock otherwise reserved for distribution pursuant to the terms hereof to the Consenting First-Out Lenders.<br><br>Each Consenting EVPS Initial Term Loan Lender that is a Consenting Second-Out Lender shall receive its pro rata share of a fee equal to 5% of the Reorganized Envision Parent New Common Stock otherwise reserved for distribution pursuant to the terms hereof to the Consenting Second-Out Lenders. |
| **Operational Separation Consultant** | As soon as is reasonably practicable after the Petition Date, the Debtors will engage advisors acceptable to the Required Consenting Lenders to provide consulting services at the direction of the Debtors to analyze and facilitate the operational separation of the Reorganized AmSurg Debtors and the Reorganized EVPS Debtors on the Plan Effective Date (the "**Operational Consultant**").  For the avoidance of doubt, the structure and terms of the operational separation shall be acceptable to the Reorganized EVPS Debtors and the Required Consenting Lenders. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, as applicable, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected with the consent of the Required Consenting Initial Lenders as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code.  For the avoidance of doubt, the EVPS Debtors shall promptly provide the Ad Hoc Advisors with access to all information reasonably requested with respect to executory contracts and unexpired leases of the EVPS Debtors, and the assumption or rejection of any such contracts or leases shall be subject to the consent of the Required Consenting Lenders. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any intercompany claims that the Debtors resolve or compromise after the Plan Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the EVPS Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the EVPS Debtors have performed prior to the Plan Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Plan Effective Date. |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Releases by the Company Parties** | Except as expressly set forth in this Agreement, effective on the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed released and discharged by each and all of the EVPS Debtors and the Reorganized EVPS Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the EVPS Debtors or the Reorganized EVPS Debtors, which the EVPS Debtors or Reorganized EVPS Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, an EVPS Debtor or Reorganized EVPS Debtors, based on or relating to, or in any manner arising from, in whole or in part, (i) the management, ownership, or operation of an EVPS Debtor, (ii) the purchase, sale, or rescission of any security or debt instrument of the EVPS Debtors, the EVPS Credit Agreements and any other Loan Documents (as defined in the EVPS Credit Agreements), (iii) the subject matter of, or the transactions, events, circumstances, acts, or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including, the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any Company Party and any other Entity, (v) the Company Parties' in- or out-of-court restructuring efforts, (vi) intercompany transactions, (vii) this Agreement, the Definitive Documents, or any Restructuring Transactions, (viii) any contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement, the Definitive Documents or the Restructuring Transactions, including the issuance or distribution of securities pursuant to the Restructuring Transactions, (ix) the distribution of property under the Restructuring Transactions or any other related agreement, or (x) any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations, after the Plan Effective Date, of any party or Entity under the Plan, the Confirmation Order, any Definitive Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Releases by Holders of Claims and Interests** | Except as expressly set forth in this Agreement, effective on the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
| --- | --- |
| | behalf of any of the EVPS Debtors or Reorganized EVPS Debtors which the EVPS Debtors or Reorganized EVPS Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the EVPS Debtors or Reorganized EVPS Debtors, based on or relating to, or in any manner arising from, in whole or in part, (i) the management, ownership, or operation of the EVPS Debtors, (ii) the purchase, sale, or rescission of any security or debt instrument of the EVPS Debtors, the EVPS Credit Agreements and any of the other Loan Documents (as defined in the EVPS Credit Agreements), (iii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including, the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any EVPS Debtors and any other Entity, (v) the EVPS Debtors' in-or our-of-court restructuring efforts, (vi) intercompany transactions, (vii) this Agreement, the Definitive Documents, or any Restructuring Transactions, (viii) any contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement, the Definitive Documents, or the Restructuring Transactions, including the issuance or distribution of securities pursuant to the Restructuring Transactions, (ix) the distribution of property under the Restructuring Transactions or any other related agreement, or (x) any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations, after the Plan Effective Date, of any party or Entity under the Plan, the Confirmation Order, any Definitive Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the EVPS Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan. |
| **Injunction** | Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the EVPS Debtors, the Reorganized EVPS Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |
| **Certain Definitions** | The following definitions shall be applicable to the foregoing release and exculpation provisions: |
| | "*Exculpated Parties*" means, collectively, and in each case in its capacity as such, (a) each of the Debtors, (b) each independent director of any Debtor entity, and (c) any statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as well as each of its members. |
| | "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, |

| | |
|---|---|
| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
| | consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees. |
| | "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the EVPS Debtors; (b) each of the Reorganized EVPS Debtors; (c) each Consenting Stakeholder [6] ; (d) each Agent under a Consenting Lender Credit Agreement, (e) each current and former Affiliate of each Entity in clause (a) through (d); and (f) each Related Party of each Entity in clause (a) through (e); *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the releases contained in the Plan, either by means of (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or in writing, including via electronic mail, as applicable, before Confirmation. |
| | "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized EVPS Debtors; (c) each Consenting Stakeholder; (d) each Agent under a Consenting Lender Credit Agreement; (e) all holders of Claims that vote to accept the Plan; (f) all holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (g) all holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (h) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (l) each Related Party of each Entity in clause (a) through (h) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law. |

---

[6]     As used in the definitions for "Released Parties" and "Releasing Parties", the term "Consenting Stakeholder" shall be as defined both in (a) that certain Restructuring Support Agreement, dated as of May 14, 2023, by and between the Company Parties and certain holders of AmSurg First Lien Term Loan Claims and AmSurg Second Lien Term Loan Claims and (b) that certain Restructuring Support Agreement, dated as of May 14, 2023, by and between the Company Parties and certain holders of EVPS Term Loan Claims, EVPS Unsecured Notes, and Equity Interest in Envision Parent.

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Reorganized Envision Parent Management Incentive Plan** | On the Plan Effective Date, Reorganized Envision Parent may implement a management incentive plan (the "**Reorganized Envision Parent Management Incentive Plan**") the form, terms, allocation and vesting of awards of which shall be determined by the New Reorganized Envision Parent Board. |
| **Reorganized Envision Parent Governance** | The new board of directors of Reorganized Envision Parent (the "**New Reorganized Envision Parent Board**") shall be appointed and the identities of directors on the New Reorganized Envision Parent Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Corporate governance for Reorganized Envision Parent, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "**New Reorganized Envision Parent Organizational Documents**"), the size and determination of the New Reorganized Envision Parent Board, and the material shareholder terms of Reorganized Envision Parent shall be determined in each case by the Board Selection Committee (and, in the case of the material shareholder terms of Reorganized Envision Parent, shall also be acceptable to the Supermajority Equityholders) and shall be consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and shall be disclosed in the Plan Supplement. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan, if applicable, will be exempt from SEC registration under applicable law. |
| **Employment Obligations** | Pursuant to the EVPS Restructuring Support Agreement and this Restructuring Term Sheet, the Parties consent to the continuation of the EVPS Debtors' wages, compensation, and benefits programs according to existing terms and practices and payment in full in cash of all claims arising thereunder or related thereto, including executive compensation programs (but excluding non-ordinary course bonus payments or any other payments other than ordinary course compensation and benefits programs), and any motions in the Bankruptcy Court for approval thereof (provided that payments made by the EVPS Debtors shall be solely for costs attributable to the EVPS Debtors' businesses,[7] and shall not include any payments (including, without limitation, bonus payments) to insiders other than ordinary wages and benefits). On the Plan Effective Date, the EVPS Debtors shall (a) in consultation with the Required Consenting Initial Lenders and solely following diligence reasonably acceptable to the Required Consenting Initial Lenders, assume all employment agreements, existing indemnification agreements (except as otherwise set forth herein), or other agreements with current employees; provided, however that any employment agreements or other agreements, claims, and/or obligations related to insider employees shall not be assumed absent the consent of the Required Consenting Initial Lenders; or (b) enter into new agreements with such employees on terms and conditions acceptable to the EVPS Debtors, such employee, and the Required Consenting Initial Lenders. |

---

[7]     Such allocation to be in compliance with the that certain Shared Services Agreement, dated April 29, 2022 (as amended by that certain First Agreement, dated January 1, 2023, and as further amended, restated,

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Indemnification and Insurance Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EVPS Debtors as of the Petition Date, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EVPS Debtors as of the Petition Date than the indemnification provisions in place prior to the Restructuring Transactions; *provided*, that such reinstatement shall also include indemnification provisions for the benefit of Peter Stavros related to his service as a director during the time period from October 11, 2018 to September 27, 2021; *provided, further*, that no indemnification agreements, claims, or obligations related to the individual defendants in the *In re Envision Healthcare Corporation Securities Litigation*, Civil Action No. 3:17-cv-01112 (the "**Bettis Litigation**") shall be assumed or reinstated by the Reorganized EVPS Debtors, and any such agreements, claims, and/or obligations shall be discharged pursuant to the Plan.  The EVPS Debtors represent that, to the best of their knowledge, no material litigation is pending or has been threatened with respect to the current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EVPS Debtors as of the Petition Date. <br><br> None of the Reorganized EVPS Debtors shall amend and/or restate their respective charters, bylaws, operating agreements, or other organization documents (as applicable) on or after the Plan Effective Date to terminate, reduce, discharge, impair or adversely affect any of the Reorganized EVPS Debtors' obligations referred to in the preceding sentence. <br><br> In addition, after the Plan Effective Date, the Reorganized EVPS Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Plan Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |

supplemented, or otherwise modified from time to time accordance with the terms thereof, the "**Shared Services Agreement**"), by and between AmSurg, LLC and Envision Healthcare Corporation.

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Retained Causes of Action** | The Reorganized EVPS Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the Plan.<br><br>For the avoidance of doubt, any claims and/or causes of action on behalf of any EVPS Debtor that relate to, or are in connection with, any payor, insurer, or any of their respective affiliates, subsidiaries, and/or related parties, including, without limitation, UnitedHealthcare and any of its affiliates, subsidiaries, and/or related parties (collectively, "**Payor Claims**") shall be retained, reserved, and preserved, including, without limitation, all rights to commence, continue, pursue, prosecute, recover, and/or settle such Payor Claims. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date, if applicable (the "**Conditions Precedent**"):<br><br>(a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall:<br><br>    (i)    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;<br><br>    (ii)    provide for the waiver and cancellation of the Intercompany Loan Claims;<br><br>    (iii)    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>    (iv)    authorize the Debtors, as applicable and/or necessary, to: (a) implement the Restructuring Transactions, including the EHC AmSurg Debtors Sale Transaction; (b) distribute the Reorganized Envision Parent New Common Stock and New Warrants (if applicable) pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash, the Reorganized Envision Parent New Common Stock, and the New Warrants; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan;<br><br>    (v)    authorize the implementation of the Plan in accordance with its terms; and<br><br>    (vi)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any |

deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(b)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(c)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the EVPS Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan;

(d)     the EVPS Restructuring Support Agreement and AmSurg Restructuring Support Agreement shall remain in full force and effect;

(e)     all professional fees and expenses of retained professionals that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the approval of such fees and expenses by the Bankruptcy Court;

(f)     the amended and restated ABL Credit Facility, if applicable, shall have been duly executed and delivered by all of the entities that are party thereto and all conditions precedent (other than conditions related to the occurrence of the Plan Effective Date) to the effectiveness of such facilities shall have been satisfied or waived in writing in accordance with the terms of the applicable facility and the closing of each facility shall have occurred;

(g)     the EHC AmSurg Debtors Sale Documents shall have been duly executed and delivered and all conditions precedent (other than conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the EHC AmSurg Debtors Sale Transaction shall have been satisfied or waived in accordance with the terms of the EHC AmSurg Debtors Sale Documents and the EHC AmSurg Debtors Sale Transaction shall have occurred;

(h)     the EVPS Debtors' and/or AmSurg Debtors' use of cash collateral shall not have been terminated;

(i)     none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or shall have been dismissed;

(j)     no trustee or examiner with expanded powers shall have been appointed under any chapter of the Bankruptcy Code with respect to the Debtors;

(k)     all reasonable and documented fees and expenses of the Consenting Lenders, including, without limitation, the fees, costs, and expenses of each of the Ad Hoc Advisors, shall have been paid in full;

(l)     each document or agreement constituting the applicable Definitive Documents shall have been executed and/or effectuated and remain in full force and effect, shall be in form and substance acceptable to the EVPS Debtors, the Required Consenting Stakeholders, and consistent

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| | with the EVPS Restructuring Support Agreement, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived; and<br><br>(m) the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the EVPS Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan. |
| **Waiver of Conditions Precedent** | The EVPS Debtors, with the prior written consent of the Required Consenting Stakeholders, may waive any one or more of the Conditions Precedent. |

# EXHIBIT D

## Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the EVPS Restructuring Support Agreement, dated as of [●], 2023 (the "**Agreement**")[1] by and among Envision Healthcare Corporation, the other Company Parties, and the Consenting Stakeholders and agrees to be bound by the terms and conditions of the Agreement as a Consenting Stakeholder, and shall be deemed a "**Consenting Stakeholder**" and a "**Party**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| EVPS ABL Loans | |
| EVPS Term Loans | |
| EVPS Unsecured Notes | |
| Equity Interests | |

---

[1]   Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT E

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the EVPS Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among [●] and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ""Consenting EVPS Term Loan Lender"  under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| EVPS ABL Loans | |
| EVPS Term Loans | |
| EVPS Unsecured Notes | |
| Equity Interests | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

<u>**Exhibit B**</u>

**AMSURG Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH CHAPTER 11 CASES IN THE BANKRUPTCY COURT ON THE TERMS DESCRIBED HEREIN.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of May 14, 2023, by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Envision Healthcare Corporation, a company incorporated under the Laws of Delaware ("**Envision**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.    the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, AmSurg First Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting AmSurg First Lien Term Lenders**"); and

iii.    the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, AmSurg Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting AmSurg Second Lien Term Lenders**," and, together with the Consenting AmSurg First Lien Term Lenders, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring, recapitalization and sale transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties shall implement the Restructuring Transactions through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**");

**WHEREAS**, the EVPS Debtors shall seek to effectuate a sale of their equity interests, directly or indirectly, in the EHC ASC Debtors to the Reorganized AmSurg Acquirer as set forth in the Restructuring Term Sheet (the "**EHC ASC Debtors Sale Transaction**");

**WHEREAS**, each Party and its respective counsel and other advisors (i) have reviewed or have had the opportunity to review this Agreement, including all exhibits, annexes, and schedules hereto (including the Restructuring Term Sheet), and (ii) acknowledge and agree that the Restructuring Term Sheet is a summary of the material terms of the Restructuring Transactions and that implementation of the Restructuring Transactions will require the negotiation and agreement of terms not covered by the Restructuring Term Sheet; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**ABC Provisions**" has the meaning ascribed to such term in Section 7.04 of this Agreement.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the AmSurg Revolving Credit Agreement, AmSurg First Lien Term Loan Credit Agreement, and AmSurg Second Lien Term Loan Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Restructuring Term Sheet and the other term sheets attached hereto).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Allowed**" means, as to a Claim or an Equity Interest, a Claim or an Equity Interest allowed under a Plan, under the Bankruptcy Code, or by a final order, as applicable.

"**Alternative Restructuring**" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties, the debt, equity, or other interests in any one or more Company Parties, that is an alternative to one or more of the Restructuring Transactions.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Restructuring.

"**Amended and Restated AmSurg RCF Credit Agreement**" means the amended and restated AmSurg Revolving Credit Agreement, as set forth on the terms in the Restructuring Term Sheet.

"**AmSurg Backstop Commitment Agreement**" has the meaning given to such term in the Restructuring Term Sheet.

"**AmSurg Backstop Parties**" has the meaning given to such term in the Restructuring Term Sheet.

"**AmSurg Cash Collateral Order**" means, individually or collectively (as the context may require), any order or orders entered in the Chapter 11 Cases authorizing the use of cash collateral of the AmSurg Debtors (whether interim or final).

"**AmSurg Confirmation Order**" means the confirmation order with respect to the AmSurg Plan.

"**AmSurg Credit Agreements**" means the AmSurg First Lien Term Loan Credit Agreement, the AmSurg Revolving Credit Agreement, and the AmSurg Second Lien Term Loan Credit Agreement.

"**AmSurg Disclosure Statement**" means the related disclosure statement with respect to the AmSurg Plan.

"**AmSurg Disclosure Statement Order**" means the order of the Bankruptcy Court approving the AmSurg Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

"**AmSurg Debtors**" means AmSurg Parent and its direct and indirect subsidiaries that are Debtors in the Chapter 11 Cases.

"**AmSurg Entities**" means AmSurg Holdco, LLC, and its direct and indirect subsidiaries.

"**AmSurg Exit Facilities**" means the AmSurg Exit First Lien Term Loan Credit Facility and the Amended and Restated AmSurg RCF Credit Agreement, each as set forth on the terms in the Restructuring Term Sheet.

"**AmSurg Exit First Lien Term Loan Facility Commitment Letter**" means the commitment letter to be provided by certain Consenting Stakeholders to provide the Committed Exit Facility.

"**AmSurg Exit First Lien Term Loan Credit Facility**" means (a) the Committed Exit Facility or (b) a third-party market exit term facility on terms and conditions reasonably acceptable to the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders.

"**AmSurg First Lien Term Loan Claim**" means any Claim arising under, in connection with, or on account of the AmSurg First Lien Term Loan Credit Agreement.

"**AmSurg First Lien Term Loan Credit Agreement**" means that certain credit agreement, dated April 29, 2022, among AmSurg, LLC, as borrower, the lenders from time to time party thereto, and Alter Domus (US) LLC, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"**AmSurg First Lien Term Loans**" means the loans outstanding under the AmSurg First Lien Term Loan Credit Agreement.

"**AmSurg Intercompany Credit Agreement**" means that certain Credit Agreement, dated as of April 29, 2022, among Enterprise Intermediate Holdings Inc., as Holdings, Envision, as borrower, AmSurg, LLC, as lender, the guarantors from time to time party thereto, and Wilmington Savings Fund Society, FSB, as the administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"**AmSurg Intercompany Loan Claim**" means any claim arising under, in connection with, or on account of the AmSurg Intercompany Credit Agreement.

"**AmSurg Lender Advisors**" means (a) Milbank LLP, as counsel to the AmSurg Lender Group, (b) Ducera Partners LP, as financial advisor to the AmSurg Lender Group, (c) any local retained by the AmSurg Lender Group, (d) McGuireWoods LLP, as special regulatory counsel to the AmSurg Lender Group, and (e) such other professionals as may be retained by or on behalf of the AmSurg Lender Group, with the consent of the Company Parties (such consent not to be unreasonably withheld, conditioned or delayed).

"**AmSurg Lender Group**" means, collectively, the *ad hoc* group or committee of Consenting Stakeholders represented by the AmSurg Lender Advisors.

"**AmSurg Parent**" means AmSurg Holdco, LLC, a limited liability company organized under the Laws of the state of Delaware.

"**AmSurg Plan**" means the joint plan of reorganization filed by the AmSurg Debtors under chapter 11 of the Bankruptcy Code, including all exhibits and schedules thereto, that embodies the AmSurg Restructuring.

"**AmSurg Plan Effective Date**" means the occurrence of the effective date of the AmSurg Plan according to its terms.

"**AmSurg Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the AmSurg Plan that will be filed by the AmSurg Debtors with the Bankruptcy Court.

"**AmSurg RCF Claim**" means any Claim arising under, in connection with, or on account of the AmSurg Revolving Credit Agreement.

"**AmSurg Restructuring**" means the restructuring of the AmSurg Debtors.

"**AmSurg Revolving Credit Agreement**" means that certain revolving credit agreement, dated July 20, 2022, among AmSurg, LLC, as borrower, the lenders from time to time party thereto, and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"**AmSurg Revolving Loans**" means the loans outstanding under the AmSurg Revolving Credit Agreement.

"**AmSurg Rights Offering**" has the meaning given to such term in the Restructuring Term Sheet.

"**AmSurg Rights Offering Documents**" has the meaning given to such term in the Restructuring Term Sheet.

"**AmSurg Second Lien Term Loan Claim**" means any Claim arising under, in connection with, or on account of the AmSurg Second Lien Term Loan Credit Agreement.

"**AmSurg Second Lien Term Loan Credit Agreement**" means that certain credit agreement, dated April 29, 2022, among AmSurg, LLC, as borrower, the lenders from time to time party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"**AmSurg Second Lien Term Loans**" means loans outstanding under the AmSurg Second Lien Term Loan Credit Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Orders**" means the AmSurg Cash Collateral Ordre and the EVPS Cash Collateral Order.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

6

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Committed Exit Facility**" means the $[●] senior secured term loan facility to be provided by certain Consenting Stakeholders and described in the term sheet attached to the AmSurg Exit First Lien Term Loan Facility Commitment Letter.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the AmSurg First Lien Term Loan Claims, AmSurg RCF Claims, and AmSurg Second Lien Term Loan Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Orders**" means the AmSurg Confirmation Order and the EVPS Confirmation Order.

"**Consenting AmSurg First Lien Term Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting AmSurg Second Lien Term Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble of this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**EHC ASC Debtors**" means AmSurg Anesthesia Management Services, LLC, AmSurg Suncoast, Inc., AmSurg EC Washington, Inc., AmSurg KEC, Inc., AmSurg EC Centennial, Inc., AmSurg Miami, Inc., AmSurg Escondido CA, Inc., AmSurg Temecula II, Inc., AmSurg Topeka, Inc., AmSurg Naples, Inc., AmSurg Glendale, Inc., AmSurg Hillmont, Inc., AmSurg Inglewood, Inc., AmSurg Finance, Inc., AmSurg Kissimmee FL, Inc., AmSurg La Jolla, Inc., AmSurg Melbourne, Inc., AmSurg Northwest Florida, Inc., AmSurg Altamonte Springs FL, Inc., Amsurg Fresno Endoscopy, Inc., AmSurg Palmetto, Inc., AmSurg Colton CA, Inc., AmSurg Temecula CA, Inc., AmSurg EC St. Thomas, Inc., Austin NSC, LP, AmSurg EC Beaumont, Inc., AmSurg Crystal River, Inc., AmSurg San Luis Obispo CA, Inc., AmSurg Torrance, Inc., AmSurg San Antonio TX, Inc., AmSurg Scranton PA, Inc., AmSurg Ocala, Inc., AmSurg Maryville, Inc., AmSurg El Paso, Inc., AmSurg EC Santa Fe, Inc., AmSurg Burbank, Inc., AmSurg Arcadia CA, Inc., AmSurg Oakland CA, Inc., AmSurg Abilene, Inc., AmSurg Abilene Eye, Inc., AmSurg Glendora CA, Inc., AmSurg Pottsville PA, LLC, AmSurg Lancaster PA, LLC, Amsurg Main Line PA, LLC, ASDH I, LLC, ASDH II, LLC, or such other Entities comprising the ambulatory surgery centers and associated assets in which the EVPS Debtors had an interest as of May 1, 2023.

"**EHC ASC Debtors SPA**" has the meaning given to such term in the Restructuring Term Sheet.

"**EHC ASC Debtors Sale Parties**" mean the EVPS Debtors, the EHC ASC Debtors, and the Reorganized AmSurg Acquirer.

"**EHC ASC Debtors Sale Transaction**" has the meaning given to such term in the Restructuring Term Sheet.

"**EHC ASC Debtors Sale Documents**" means the EHC ASC Debtors SPA, any definitive documents governing the EHC ASC Debtors Sale Transaction, and any ancillary documents in connection therewith.

"**EHC ASC Debtors Termination Fee**" has the meaning given to such term in the Restructuring Term Sheet.

"**Entity**" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, Governmental Body or any agency or political subdivision of any Governmental Body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"**Envision**" has the meaning set forth in the preamble of this Agreement.

"**Envision Parent**" means Enterprise Parent Holdings Inc., a corporation organized under the Laws of the state of Delaware.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**EVPS Cash Collateral Order**" means, individually or collectively (as the context may require), any order or orders entered in the Chapter 11 Cases authorizing the use of cash collateral of the EVPS Debtors (whether interim or final).

"**EVPS Confirmation Order**" means the confirmation order with respect to the EVPS Plan.

"**EVPS Debtors**" means each Entity that is a Debtor in the Chapter 11 Cases other than the AmSurg Debtors.

"**EVPS Entities**" has the meaning given to such term in the Restructuring Term Sheet.

"**EVPS Plan**" means the joint plan of reorganization filed by the EVPS Debtors under chapter 11 of the Bankruptcy Code, including all exhibits and schedules thereto, that embodies the EVPS Restructuring.

"**EVPS Plan Effective Date**" means the occurrence of the effective date of the EVPS Plan according to its terms.

"**EVPS Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the EVPS Plan that will be filed by the EVPS Debtors with the Bankruptcy Court.

"**EVPS Restructuring**" means the restructuring of the EVPS Debtors.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Governmental Regulatory Authority**" means any federal, state, local, or other governmental regulatory authority, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator, having jurisdiction over any of the AmSurg Entities or the EVPS Entities, or any of their respective licenses, permits or payor agreements or otherwise required to approve or clear any aspect of the Restructuring Transactions.

"**Joinder**" means an executed form of joinder substantially in the form attached hereto as **Exhibit D**.

"**General Unsecured Claim**" means any Claim against any of the Amsurg Debtors that is not: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) an AmSurg RCF Claim; (g) an AmSurg First Lien Term Loan Claim; (h) an AmSurg Second Lien Term Loan Claim; (i) an Intercompany Claim; (j) an Intercompany Interest; (k) an Equity Interest; or (k) a Section 510(b) Claim.

"**Intercompany Claim**" means any Claim against one Debtor held by another Debtor; provided that the AmSurg Intercompany Loan Claim shall not be an Intercompany Claim.

"**Intercompany Interest**" means an Equity Interest in an AmSurg Debtor held by another AmSurg Debtor that is not an Equity Interest in AmSurg Parent.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, advisory opinion or guidance, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority or regulatory body of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Milestones**" has the meaning given to such term in the Restructuring Term Sheet.

"**New Reorganized AmSurg Parent Organizational Documents**" has the meaning given to such term in the Restructuring Term Sheet.

"**Operational Separation Consultants**" has the meaning given to such term in the Restructuring Term Sheet.

"**Other Secured Claim**" means any Secured Claim against any of the Amsurg Debtors that is not: (a) an Administrative Claim; (b) an Other Priority Claim; (c) an AmSurg RCF Claim; (d) an AmSurg First Lien Term Loan Claim; or (e) an AmSurg Second Lien Term Loan Claim.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plans**" means the AmSurg Plan and the EVPS Plan.

"**Plan Supplements**" means the AmSurg Plan Supplement and the EVPS Plan Supplement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized AmSurg Debtors**" means Reorganized AmSurg Parent and its direct and indirect subsidiaries that are AmSurg Debtors in the Chapter 11 Cases, on and after the AmSurg Plan Effective Date.

"**Reorganized AmSurg Acquirer**" has the meaning given to such term in the Restructuring Term Sheet.

"**Reorganized AmSurg Parent**" means AmSurg Parent or one of its direct or indirect subsidiaries, or any such Person as reorganized pursuant to the AmSurg Plan, including any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, or one or more new entities, in each case as determined by the Company Parties and the Required Consenting AmSurg Second Lien Term Lenders.

"**Reorganized AmSurg Parent New Common Equity**" has the meaning given to such term in the Restructuring Term Sheet.

"**Reorganized AmSurg Parent New Common Equity Documents**" means the documentation governing the Reorganized AmSurg Parent New Common Equity and the issuance thereof.

"**Required Consenting AmSurg First Lien Term Lenders**" means, as of the relevant date, Consenting AmSurg First Lien Term Lenders holding at least 50.01% of the aggregate outstanding principal amount of AmSurg First Lien Term Loans that are held by Consenting AmSurg First Lien Term Lenders.

"**Required Consenting AmSurg Second Lien Term Lenders**" means, as of the relevant date, Consenting AmSurg Second Lien Term Lenders holding at least 50.01% of the aggregate outstanding principal amount of AmSurg Second Lien Term Loans that are held by Consenting AmSurg Second Lien Term Lenders; provided that Required Consenting AmSurg Second Lien Term Lenders shall include each of (A) Pacific Investment Management Company LLC and its Affiliates that are Consenting Stakeholders and (B) Partners Group and its Affiliates that are Consenting Stakeholders.

"**Required Consenting Lenders**" means the Required Consenting AmSurg First Lien Term Lenders and the Required Consenting AmSurg Second Lien Term Lenders.

"**Reorganized Debtors**" means the Reorganized AmSurg Debtors and the Reorganized EVPS Debtors.

"**Reorganized EVPS Debtors**" means the EVPS Debtors, on and after the AmSurg Plan Effective Date.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Section 510(b) Claim**" means any Claim or Equity Interest against an AmSurg Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract, and shall include any Claims arising (directly or indirectly) from the class action lawsuit captioned In re Envision Healthcare Corporate Securities Litigation, pending in the United States District Court for the Middle District of Tennessee in consolidated docket number 3:17-cv-01112 or from the facts alleged therein.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Secured Claim**" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Shared Services Agreement**" has the meaning given to such term in the Restructuring Term Sheet.

"**Specific Diligence Areas**" means any and all matters relating to licenses, permits, third-party payors, accreditations, and all pending, threatened or suspected liabilities or investigations involving and/or related to healthcare fraud and abuse, false claims under 31 U.S.C. §§3729-3731, any qui tam action brought pursuant to 31 U.S.C. § 3729 et seq. or any analogous state law.

"**Specified Material AmSurg Actions**" has the mean set forth in Section 6.02(k);

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 11.06.

"**Transaction Expenses**" means all reasonable and documented fees, costs, and expenses of each of the AmSurg Lender Advisors in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, and, to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and each AmSurg Lender Advisor, on the other hand, with respect to the fees, costs, and expenses of such AmSurg Lender Advisor.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized

terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.**     *Effectiveness of this Agreement*.

2.01.   <u>Effectiveness of this Agreement</u>.   This Agreement shall become effective and binding upon each of the Parties upon the satisfaction or waiver of each of the following conditions:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     holders of at least two-thirds of the aggregate outstanding principal amount of AmSurg Second Lien Term Loans shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred.

2.02.   <u>Joinder of Consenting Stakeholders</u>.   Without limiting any provision of Section 8 of this Agreement, following the Agreement Effective Date, additional holders of Company Claims/Equity Interests may become party to this Agreement with the consent of the Company Parties and the Required Consenting AmSurg Second Lien Term Lenders by executing a Joinder.

**Section 3.**     *Definitive Documents*.

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following:

(a)       (1) the AmSurg Exit Facilities, the AmSurg Exit First Lien Term Loan Facility Commitment Letter, and all agreements, documents (including security, collateral, or pledge agreement documents), guarantees, intercreditor agreements, mortgages, or instruments to be executed or delivered in connection with the AmSurg Exit Facilities, including all opinions, certificates, filings, and other deliverables required to satisfy the conditions precedent to effectiveness of the foregoing documents and agreements; (2) the New Reorganized AmSurg Parent Organizational Documents; and (3) the Reorganized AmSurg Parent New Common Equity and any definitive documentation related thereto;

(b)       (1) the AmSurg Backstop Commitment Agreement, (2) the AmSurg Rights Offering Documents; (3) the EHC ASC Debtors Sale Documents; (4) each of the orders approving the Debtors' entry into (x) EHC ASC Debtors SPA, (y) the AmSurg Backstop Commitment Agreement, and (z) the AmSurg Exit First Lien Term Loan Facility Commitment Letter; (5) the AmSurg Plan (and any and all exhibits, annexes and schedules thereto); (6) the AmSurg Disclosure Statement and the other materials with respect to the solicitation of the AmSurg Plan; (7) the order of the Bankruptcy Court approving the AmSurg Disclosure Statement and the other materials with respect to the solicitation of the AmSurg Plan; (8) the AmSurg Plan Supplement; (9) the AmSurg Confirmation Order; (10) all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related order), including the First Day Pleadings and all orders sought pursuant thereto; (11) the AmSurg Cash Collateral Order; and (12) any and all other deeds, agreements, regulatory filings, regulatory consents and approvals, filings, notifications, pleadings, orders, certificates, letters, instruments and such other definitive documentation as is necessary or desirable to consummate and document the transactions contemplated by this Agreement or the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements from time to time).

(c)       solely with respect to the provisions thereof that impact or relate to (1) the AmSurg Intercompany Loan Claim, the treatment thereof, the economic entitlements with respect thereto, (2) the EHC ASC Debtors Sale Transaction, or (3) the release of the AmSurg Debtors, the Reorganized AmSurg Debtors or the Consenting Stakeholders, the EVPS Confirmation Order, the EVPS Plan, and the EVPS Cash Collateral Order.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting AmSurg Second Lien Term Lenders; *provided* that the Definitive Documents set forth in Section 3.01(a) shall be acceptable to the Required Consenting AmSurg Second Lien Term Lenders and reasonably acceptable to the Company Parties; *provided further* that the Definitive Documents set forth in Sections 3.01(b)(8), (9) and (11) shall be

reasonably acceptable to the Company Parties, the Required Consenting AmSurg Second Lien Term Lenders and, solely with respect to economic entitlements or economic treatment of holders of AmSurg First Lien Term Loan Claims, the Required Consenting AmSurg First Lien Term Lenders.

**Section 4.** ***Commitments of the Consenting Stakeholders***.

4.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)   <u>Affirmative Commitments</u>. During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, subject to Section 5.01, in respect of all of its Company Claims/Interests, to:

(i)   use commercially reasonable efforts to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)   use commercially reasonable efforts to cooperate with the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)   use commercially reasonable efforts to oppose any party or person from, directly or indirectly, objecting to, delaying, impeding, or taking any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement;

(iv)   give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; *provided* that no Consenting Stakeholder shall be required hereunder to provide such Agents, or any other Person with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith;

(v)   negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party in a manner consistent with this Agreement; and

(vi)   cooperate and coordinate with the Company Parties and to use commercially reasonable efforts to execute any document and give any notice, order, instruction or direction necessary or desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions, including, for the avoidance of doubt, using commercially reasonable efforts to obtain any necessary international, federal state and local regulatory approvals necessary to consummate the Restructuring Transactions.

(b)   <u>Negative Commitments</u>. During the Agreement Effective Period, each Consenting Stakeholder agrees, severally and not jointly, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions, including the EHC ASC Debtors Sale Transaction;

(ii)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the AmSurg Plan;

(iv)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Company Claims/Interests; or

(vi)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided* that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.

4.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)      During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the AmSurg Plan pursuant to its terms agrees, severally and not jointly, that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the materials with respect to the solicitation of the AmSurg Plan:

(i)      vote each of its Company Claims/Interests to accept the AmSurg Plan by delivering its duly executed and completed ballot accepting the AmSurg Plan on a timely basis following the commencement of the solicitation of the AmSurg Plan and its actual receipt of the materials with respect to the solicitation of the AmSurg Plan and the ballot;

(ii)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Plans, elect not to opt out of the releases set forth in the Plans by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; <u>provided</u>, that nothing in this Agreement shall prevent any Consenting Stakeholder from changing, withholding, amending, or revoking (or causing the same) its vote, election, or consent with respect to the Plans if this Agreement has been terminated as in accordance with its terms.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5.**      *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.

5.01.   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting Stakeholder under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (e) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (f) constitute a waiver or amendment of any term or provision of (i) the AmSurg Credit Agreements, (ii) the AmSurg Intercompany Credit Agreement; or (iii) any intercreditor agreement; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under (i) the AmSurg Credit Agreements, (ii) the AmSurg Intercompany Credit Agreement; or (iii) any intercreditor agreement; (h) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder; (i) prevent a Consenting Stakeholder from taking any action that is required to comply with applicable Law; (j) prohibit any Consenting Stakeholder from taking any action to prepare, commence, or support any action or other legal proceeding that seeks to establish, or defend from challenge, liens or encumbrances securing, or priority of any Company Claim/Interest of any Consenting Stakeholder; or (k) prohibit any Consenting Stakeholder from taking any other action that is not inconsistent with this Agreement or the Restructuring Transactions.

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each Company Party, jointly and severally, agrees to:

(a)    support, act in good faith, and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement and the Restructuring Term sheet, including (i) commencing the solicitation of the AmSurg Plan pursuant to the AmSurg Disclosure Statement and related materials with respect to the solicitation of the AmSurg Plan, (ii) using commercially reasonable efforts to consummate the Restructuring

Transactions, including the EHC ASC Debtors Sale Transaction, and (iii) obtaining entry of the AmSurg Confirmation Order, approval of the applicable Definitive Documents, and consummation of the Restructuring Transactions pursuant to the Plans, in each case, in accordance with the applicable Milestones unless waived in accordance with the terms hereof;

(b)     enter into and perform its obligations under the EHC ASC Debtors Sale Documents, to the extent such Company Party is an EHC ASC Debtors Sale Party;

(c)     support, act in good faith, and take all steps reasonably necessary or desirable to obtain entry of the AmSurg Cash Collateral Order, the AmSurg Disclosure Statement Order, AmSurg Confirmation Order and the orders approving assumption of the AmSurg Backstop Commitment Agreement, the AmSurg Exit First Lien Term Loan Facility Commitment Letter, and EHC ASC Debtors SPA;

(d)     to the extent any economic, legal, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps necessary or desirable to address any such impediment, in each case, in consultation with the Required Consenting AmSurg Second Lien Term Lenders;

(e)     use commercially reasonable efforts to promptly obtain any and all regulatory, governmental, and third-party approvals that are necessary or advisable to effectuate and consummate the Restructuring Transactions, including the EHC ASC Debtors Sale Transaction, as determined by the Company Parties in consultation with the Required Consenting AmSurg Second Lien Term Lenders;

(f)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions, including the EHC ASC Debtors Sale Transaction, as contemplated by this Agreement;

(g)     make commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(h)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(i)     pay in full and in cash all accrued Transaction Expenses and continue to pay such amounts as they come due and seek to pay such ongoing fees, costs and expenses in connection with the AmSurg Cash Collateral Order or other such appropriate order;

(j)     inform counsel to the AmSurg Lender Group as soon as reasonably practicable (and in any event within three (3) Business Days of such actual knowledge) after becoming aware of: (i) the occurrence, or failure to occur, of any event of which any Company Party has knowledge which the occurrence or failure to occur of any such event would permit any Party to terminate, or would result in the termination of, this Agreement, including a breach of this Agreement or any of the Definitive Documents; (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions; (iii) receipt of any written notice from any governmental or

regulatory body regarding any approval necessary to consummate the Restructuring Transactions; (iv) any matter or circumstance which any Company Party knows is reasonably likely to be a material impediment to the implementation or consummation of the Restructuring Transactions; and (v) any notice of any commencement of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against any of the Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions;

(k)     to the extent applicable, use commercially reasonable efforts to provide counsel to the AmSurg Lender Group with a review period of at least two (2) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company Parties intend to file (i) any Definitive Document with the Bankruptcy Court, with the filing of such Definitive Document subject to the consent rights set forth in this Agreement, and (ii) any other material pleading with the Bankruptcy Court (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) and consult in good faith with counsel to the AmSurg Lender Group regarding the form and substance of any such proposed filing;

(l)     provide to the Consenting Stakeholders and their respective advisors upon written request: (i) reasonable access (without any material disruption to the conduct of the Debtors' businesses) during normal business hours to the books, records, and facilities of the Company Parties, (ii) reasonable access (without any material disruption to the conduct of the Debtors' businesses) to the management of and advisors to the Company Parties for the purpose of evaluating the Company Parties' finances and operations and participating in the planning process with respect to the Restructuring Transactions, (iii) timely updates regarding the Restructuring Transactions, including any material developments or any material conversations with parties in interest, (iv) timely updates regarding the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, and (v) any other reasonable information related to the Restructuring Transaction reasonably requested by any of the Consenting Stakeholders in writing (e-mail shall suffice);

(m)     reasonably consult with the Required Consenting AmSurg Second Lien Term Lenders regarding the assumption or rejection of any executory contracts or unexpired leases;

(n)     to the extent applicable, oppose and, if necessary, object to any motion filed with the Bankruptcy Court by any Person (i) seeking the entry of an order terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was granted, would have a material adverse effect on or delay the consummation of the Restructuring Transactions;

(o)     not file any pleading seeking entry of an order, and object to any motion filed with the Bankruptcy Court by any person seeking the entry of an order, (i) directing the appointment of an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that (x) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (y) would

reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions;

(p)     promptly notify counsel to the AmSurg Lender Group of any material governmental or third party complaints, litigations, subpoenas, civil investigative demands, inquiries, orders to show cause, cease and desist orders, notices of violation, notice of apparent liability, orders of forfeiture, investigations, or hearings (or communications indicating that any of the foregoing is contemplated or threatened) (the parties acknowledge and agree that any written filings by, before, or with any Governmental Regulatory Authority in which the AmSurg Entities or the EHC ASC Debtors are seeking regulatory approval to emerge from bankruptcy is deemed material for purposes of this Section 6.01(p));

(q)     inform and keep the AmSurg Lender Advisors apprised of the status of obtaining any and all required government, regulatory third-party payor and/or other third-party approvals necessary to the occurrence of the AmSurg Plan Effective Date or the closing of the EHC ASC Debtors Sale Transaction, including, without limitation notice of any delay or deficiency impacting any such approval;

(r)     shall provide on a timely basis any books, records (including work papers, schedules, memoranda and other documents), agreements, supporting data or other information that are reasonably requested by any Consenting Stakeholder in connection with such Consenting Stakeholder's diligence review the Specific Diligence Areas, in each case, to the extent such documents exist and are available to any Company Party (provided, that such Company Party may provide any such information on a "professional eyes only" basis as necessary to address reasonable attorney-client or other privilege or confidentiality concerns);

(s)     enter into an agreement to engage the Operational Separation Consultants in accordance with the Milestones;

(t)     timely oppose any objections filed with respect to the Bankruptcy Court's approval of any of the Definitive Documents; and

(u)     except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to (i) conduct their businesses and operations in the ordinary course in a manner that is materially consistent with past practices as may be limited due to the commencement of the Chapter 11 Cases and (ii) preserve intact their business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, customers, third-party payors, Governmental Regulatory Authority, joint venture partners, and physicians) and employees and other service providers in the ordinary course; *provided, however,* that any actions required to be taken by the Company Parties pursuant to this Agreement to effectuate the Restructuring Transactions in accordance with the terms set forth in this Agreement (including the Restructuring Term Sheet) shall not constitute a breach of the commitment set forth in this Section 6.01(u).

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each Company Party agrees, jointly and severally, that it shall not, directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      solicit proposals for any Alternative Restructuring;

(c)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the AmSurg Plan;

(d)      modify the Plans, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(e)      (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that, in whole or in part, is not consistent with this Agreement or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3.02 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is not consistent with this Agreement (including the Restructuring Term Sheet) or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3.02 hereof;

(f)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including in accordance with the terms set forth in Section 3.02 hereof), the Restructuring Term Sheet, or the AmSurg Plan;

(g)      (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Stakeholders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting Stakeholders; (ii) otherwise seek to restrict any rights of any of the Consenting Stakeholders; or (iii) support any Person in connection with any of the acts described the foregoing clauses;

(h)      without the prior written consent of the Required Consenting AmSurg Second Lien Term Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(i)      consummate any sales (other than as expressly contemplated by the EHC ASC Debtor SPA) of any equity interests in any EHC ASC Debtors or any AmSurg Entities or any of the EHC ASC Debtors' or AmSurg Entities' respective subsidiaries, or material assets without the consent of the Required Consenting AmSurg Second Lien Term Lenders;

(j)    with respect to any AmSurg Entity, any EHC ASC Debtor or any of their subsidiaries, (i) amend, change or terminate, or propose to amend, change or terminate, any respective organizational documents (including any joint venture agreement or management services agreement); (ii) take, adopt, or implement a material change with respect to the business operations or its joint venture partners;

(k)    other than in the ordinary course consistent with past practice, (i) sell (including any sale leaseback transaction), lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise transfer, any material properties or material assets, including any Equity Interests, other than sales or disposals of properties or assets; (ii) purchase, lease, or otherwise acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any materials assets or material properties; (iii) enter into any merger with or into, or consolidation or amalgamation with, any other Person, (iv) permit any other Person to enter into any merger with or into, or consolidation or amalgamation with, it, (v) enter into any joint venture, partnership, sharing of profits or other similar arrangement involving co-investment with any other Person;

(l)    take any action or provide any consent or fail to take any action in its capacity as a holder of, or otherwise related to, the AmSurg Intercompany Loan Claim, in any way that is inconsistent with this Agreement, the Restructuring Term Sheet, or implementation of the Restructuring Transactions without the consent of the Required Consenting AmSurg Second Lien Term Lenders;

(m)    take, adopt, or implement a material change with respect to the AmSurg Debtors' business operations; or

(n)    (i) authorize, create, issue, sell, or grant any additional Equity Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests.

**Section 7.**    ***Additional Provisions Regarding Company Parties' Commitments***.

7.01.    Notwithstanding anything to the contrary in this Agreement (but subject to compliance with the notice requirement in the penultimate sentence of this Section 7.01), nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; *provided* that such determination shall not impede any Party's termination rights.  The Company Parties shall promptly notify each of the Consenting Stakeholders of any such determination within twenty-four (24) hours following such determination.  Notwithstanding anything to the contrary herein, each Consenting Stakeholders reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01 and the requirements of the last sentence of this Section 7.02), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) continue, on a postpetition basis,

to engage with the potential bidders (identified to counsel to the Required Consenting AmSurg Second Lien Lenders prior to the date hereof) already under nondisclosure agreement as of the Petition Date in the marketing process that the Debtors undertook before the Petition Date to determine the highest and best bona fide offer to consummate a direct or indirect sale of all, substantially all, or a portion of the equity interest in the AmSurg Debtors and/or the EHC ASC Debtors; (b) provide access to non-public information concerning any Company Party to any Entity that provides an unsolicited Alternative Restructuring Proposal and executes and delivers a reasonable and customary confidentiality or nondisclosure agreement with the Company Parties; (c) receive, respond to, and maintain and continue discussions or negotiations with respect to such unsolicited Alternative Restructuring Proposals if the board of directors, board of managers, or similar governing body of such Company Party determines in good faith, upon advice of outside counsel, that failure to take such action would be inconsistent with the fiduciary duties of the members of such board or governing body under applicable Law; (d) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder) with respect such holders Claims or Equity Interests; and (e) provide information to any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or any Alternative Restructuring Proposals. If any Company Party receives a written proposal or expression of interest regarding any Alternative Restructuring Proposal, as soon as reasonably practicable and no later than two (2) Business Days from the receipt of such Alternative Restructuring Proposal, the Company Party shall notify (with email being sufficient) the Consenting Stakeholders. Notwithstanding the foregoing, the Debtors shall not solicit, initiate, or knowingly encourage any Competing EHC ASC Proposal (as defined in the Restructuring Term Sheet) or participate in any negotiation or discussion regarding, or provide any more information with respect to or in connection with, a Competing EHC ASC Proposal, in each case, other than in strict accordance with the provisions related thereto in the Restructuring Term Sheet.

7.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.   Each Company Party agrees, jointly and severally, to comply with the covenants, and make the representation and warranties set forth on **Exhibit E** hereto (the "**ABC Provisions**").

**Section 8.    *Transfer of Equity Interests and Claims*.**

8.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder;

23

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties and to counsel to the AmSurg Lender Group, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties within five (5) Business Days of such acquisition;

(c)      to the extent required, such Consenting Stakeholder (or the applicable Company Party, as necessary) obtains any and all required regulatory and/or third-party approvals with respect to the Transfer and in accordance with applicable Laws; and

(d)      such Transfer is made prior to entry of the AmSurg Confirmation Order.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights and be released from its obligations under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests, and the transferee shall thereafter be deemed a "Consenting Stakeholder" for all purposes hereunder. Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a otherwise permitted under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the

Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.   During the Agreement Effective Period, no AmSurg Backstop Party shall Transfer any of their commitments under the AmSurg Backstop Commitment Agreement unless the transferee is an AmSurg Backstop Party and the transferee provides notice of such Transfer (including the amount of such commitment) to counsel to the Company Parties within five (5) Business Days of such acquisition.

**Section 9.**      ***Representations and Warranties of Consenting Stakeholders***.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the AmSurg Plan Effective Date:

(a)      it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**      ***Mutual Representations, Warranties, and Covenants***.  Each of (x) the Consenting Stakeholders, severally and not jointly, and (y) the Company Parties, jointly and severally, in each

case, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the AmSurg Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the AmSurg Plan, the AmSurg Backstop Commitment Agreement, and the EHC ASC Debtors SPA, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements (including related to any Alternative Restructuring) with any other party that have not been disclosed to all Parties to this Agreement.

**Section 11.    *Termination Events*.**

11.01.  <u>Consenting Second Lien Lender Termination Events</u>.   This Agreement may be terminated by the Required Consenting AmSurg Second Lien Term Lenders by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by a Company Party of any of the respective representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for ten (10) Business Days after such terminating Consenting Stakeholder transmits a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)      any of the Milestones set forth in the Restructuring Term Sheet (as may have been extended with the approval of the Required Consenting AmSurg Second Lien Term Lenders) is not achieved, except where such Milestone has been waived by the Required Consenting AmSurg Second Lien Term Lenders; *provided* that the right to terminate this Agreement under this Section 11.01(b) shall not be available if the failure of such Milestone to be achieved is caused by, or

results from, the material breach by any terminating party of its covenants, agreements, or other obligations under this Agreement;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) calendar days; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)    any Company Party publicly announces, or announces in writing, to any of the Consenting Stakeholders or other holders of Company Claims/Interests, its intention not to support or pursue the Restructuring Transactions, including the EHC ASC Debtors Sale Transaction;

(e)    any Company Party files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within two (2) calendar days of receipt by the Company Parties of written notice from the party that such motion or pleading is inconsistent with this Agreement;

(f)    the Bankruptcy Court enters an order denying confirmation of a Plan and such order is not reversed, stayed, or amended in a manner acceptable to the Required Consenting AmSurg Second Lien Term Lenders or the Bankruptcy Court does not enter an order confirming a Plan acceptable to the Required Consenting AmSurg Second Lien Term Lenders, in each case, within ten (10) Business Days;

(g)    any Company Party, without the consent of the Required Consenting AmSurg Second Lien Term Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(h)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting AmSurg Second Lien Term Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, or (iv) rejecting this Agreement;

(i)    the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (ii) frustrates the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof (without the consent of the Required Consenting AmSurg Second Lien

Term Lenders), unless the order granting such relief has been stayed, modified, or reversed within fourteen (14) calendar days;

(j)      any Company Party (i) withdraws a Plan; (ii) publicly announces, or announces to any of the Consenting Stakeholders or other holders of Company Claims/Interests, its intention to withdraw a Plan or not support a Plan; or (iii) moves to voluntarily dismiss any of the Chapter 11 Cases;

(k)      any of the Company Parties (i) files any motion seeking to avoid, invalidate, disallow, subordinate, recharacterize, or limit any Company Claims/Interests, lien, or interest held by any Consenting Stakeholder; or (ii) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action without the prior written consent of the Required Consenting AmSurg Second Lien Term Lenders;

(l)      the governing body of any Company Party determines (i) that proceeding with any of the Restructuring Transactions is inconsistent with the exercise of its fiduciary duties or (ii) in the exercise of its fiduciary duties, to enter into any Alternative Restructuring Proposal;

(m)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Consenting Stakeholders;

(n)      the Debtors' right to use cash collateral under either Cash Collateral Order as contemplated under this Agreement is terminated;

(o)      following entry of the order approving the Debtors' entry into the AmSurg Backstop Commitment Agreement, the AmSurg Backstop Commitment Agreement is terminated (other than as a result of a breach by the AmSurg Backstop Parties);

(p)      subject to the terms of any applicable Cash Collateral Order and other orders of the Bankruptcy Court, failure of the Company Parties to pay the Transaction Expenses, as and when required by the terms of this Agreement; or

(q)      after entry by the Bankruptcy Court of a Confirmation Order or a Cash Collateral Order, a Confirmation Order or a Cash Collateral Order is (i) reversed, dismissed, or vacated without the prior written consent of the Required Consenting AmSurg Second Lien Term Lenders, or (ii) modified or amended in a manner that is inconsistent with this Agreement without the prior written consent of the Required Consenting AmSurg Second Lien Term Lenders and such modification or amendment remains unchanged for a period of ten (10) calendar days.

11.02.  Company Party Termination Events. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      (i) the breach in any material respect by one or more of the Consenting Stakeholder of any of the representations, warranties, covenants, or other obligations set forth in this Agreement

that remains uncured for a period of ten (10) Business Days, which with respect to such breach or termination would result in non-breaching or non-terminating Consenting Stakeholders holding less than 50.01% of the aggregate outstanding principal amount of AmSurg Second Lien Term Loan Claims held by all Consenting Stakeholders immediately prior to such breach or termination;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters an order denying confirmation of the AmSurg Plan.

11.03.  Consenting Stakeholder Termination Events.   This Agreement may be terminated by a Consenting Stakeholder by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof in the event that a Definitive Document materially and adversely affects the economic entitlements or economic treatment of such Consenting Stakeholder compared with the treatment provided for such Consenting Stakeholder in the Restructuring Term Sheet (as of the date hereof).

11.04.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting AmSurg Second Lien Term Lenders; and (b) each Company Party.

11.05.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of both the AmSurg Plan Effective Date and the EVPS Plan Effective Date.

11.06.  Effect of Termination.  This Agreement shall terminate for (i) all Parties, immediately upon the delivery of a notice by the Required Consenting AmSurg Second Lien Term Lenders pursuant to Section 11.01, (ii) all Parties, immediately upon the delivery of a notice by a Company Parties pursuant to Section 11.02, and (iii) a Consenting Stakeholder, immediately upon the delivery of a notice by such Consenting Stakeholder pursuant to Section 11.03, (iv) all Parties, upon the date specified in the notice set forth in Section 11.04 and (v) all Parties, immediately upon the occurrence of the event set forth in Section 11.05.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether

with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the applicable Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, waivers, forbearances, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b).  Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.**   *Amendments and Waivers*.

(a)   This Agreement and any exhibits or schedules hereto (including but not limited to the Restructuring Term Sheet and the Definitive Documents) may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)   This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting AmSurg Second Lien Term Lenders; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any individual Consenting Stakeholder, as compared to similarly situated Consenting Stakeholders, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)   Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)   The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other

or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**     *Miscellaneous*

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring Transactions and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or appropriate to effectuate the Restructuring Transactions in accordance with this Agreement and the Definitive Documents; *provided* that this Section 13.03 shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 3.02).  Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably appropriate or necessary to effectuate the Restructuring Transactions, and shall refrain from taking any action that would frustrate the Restructuring Transactions

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out

of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each of the Parties hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that, upon commencement of the Chapter 11 Cases, it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Envision Healthcare Corporation
1A Burton Hills Boulevard
Nashville, TN 37215
Attention: Ilene Moore, General Counsel
E-mail address: Ilene.Moore@envisionhealth.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Edward Sassower, P.C.; Joshua A. Sussberg, P.C.; Anne
Wallice
E-mail address: esassower@kirkland.com; jsussberg@kirkland.com;
anne.wallice@kirkland.com

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  John R. Luze; Annie Dreisbach
E-mail address: john.luze@kirkland.com;
annie.dreisbach@kirkland.com

(b)    if to a Consenting AmSurg Second Lien Term Lender, to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Dennis Dunne; Samuel Khalil; Michael Price
E-mail address: ddunne@milbank.com; skhalil@milbank.com;
mprice@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.  <u>Enforceability of Agreement</u>.  The Parties hereby acknowledge and agree:  (a) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code; (b) that they waive any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

33

13.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

13.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting AmSurg First Lien Term Lenders or the Required Consenting AmSurg Second Lien Term Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or

34

waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.21.   <u>Public Disclosure</u>.  The Company Parties shall deliver drafts to the AmSurg Lender Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement, the Term Sheet, the Restructuring Transactions, or any amendment thereof to the general public (each, a "**Public Disclosure**") at least one (1) calendar day before making any such disclosure.   Any Public Disclosure shall be reasonably acceptable to the Company Parties and reasonably acceptable to the Required Consenting AmSurg Second Lien Term Lenders.  The Company Parties shall make commercially reasonable efforts to avoid making any public disclosure that would disclose either:  (a) the holdings of any Consenting Stakeholder (including on the signature pages of the Consenting Stakeholders, which shall not be publicly disclosed or filed) or (b) the identity of any Consenting Stakeholder, in each case without the prior written consent of such Consenting Stakeholder or an order of a court with competent jurisdiction; *provided*, *however*, that notwithstanding the foregoing, the Company Parties shall not be required to keep confidential the aggregate holdings of all Consenting Stakeholders, and each Consenting Stakeholder hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms and contents hereof, to the Agent(s) under the AmSurg Credit Agreements, and in any filings required by applicable law or regulation or the rules of any applicable stock exchange or regulatory body.  Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

13.22.   <u>Relationship Among Consenting Stakeholders and the Company Parties</u>.  None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties, or any of the Company Parties' creditors or other stakeholders, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders.  It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company Parties or any other Consenting Stakeholder, subject to applicable securities laws and this Agreement, including Section 8 hereof.  No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company Parties shall in any way affect or negate this understanding and agreement.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ENVISION HEALTHCARE CORPORATION**
and each of the other entities listed on **Exhibit A**

By: _____

Name: Paul Keglevic

Authorized Signatory

**Signature Pages Intentionally Omitted**

## EXHIBIT A

### Company Parties

Acute Management, LLC
Affilion, Inc.
All Women's Healthcare Holdings, Inc.
All Women's Healthcare of Dade, Inc.
All Women's Healthcare of Sawgrass, Inc.
All Women's Healthcare of West Broward, Inc.
All Women's Healthcare Services, Inc.
All Women's Healthcare, Inc.
AllegiantMD, Inc.
Alpha Physician Resources, L.L.C.
American Emergency Physicians Management, Inc.
AmSurg Abilene Eye, Inc.
AmSurg Abilene, Inc.
AmSurg Altamonte Springs FL, Inc.
AmSurg Anesthesia Management Services, LLC
AmSurg Arcadia CA, Inc.
AmSurg Burbank, Inc.
AmSurg Colton CA, Inc.
AmSurg Crystal River, Inc.
AmSurg EC Beaumont, Inc.
AmSurg EC Centennial, Inc.
AmSurg EC Santa Fe, Inc.
AmSurg EC St. Thomas, Inc.
AmSurg EC Topeka, Inc.
AmSurg EC Washington, Inc.
AmSurg El Paso, Inc.
AmSurg Escondido CA, Inc.
AmSurg Finance, Inc.
AmSurg Fresno Endoscopy, Inc.
AmSurg Glendale, Inc.
AmSurg Glendora CA, Inc.
AmSurg Hillmont, Inc.
AmSurg Holdco, LLC
AmSurg Holdings, LLC
AmSurg Inglewood, Inc.
AmSurg KEC, Inc.
AmSurg Kissimmee FL, Inc.
AmSurg La Jolla, Inc.
AmSurg Lancaster PA, LLC
AmSurg Main Line PA, LLC
AmSurg Maryville, Inc.
AmSurg Melbourne, Inc.
AmSurg Miami, Inc.

AmSurg Naples, Inc.
AmSurg New Port Richey FL, Inc.
AmSurg Northwest Florida, Inc.
AmSurg Oakland CA, Inc.
AmSurg Ocala, Inc.
AmSurg Palmetto, Inc.
AmSurg Physicians Arizona, LLC
AmSurg Physicians HoldCo, LLC
AmSurg Pottsville PA, LLC
AmSurg San Antonio TX, Inc.
AmSurg San Luis Obispo CA, Inc.
AmSurg Scranton PA, Inc.
AmSurg Suncoast, Inc.
AmSurg Temecula CA, Inc.
AmSurg Temecula II, Inc.
AmSurg Torrance, Inc.
AmSurg, LLC
Anesthesiologists of Greater Orlando, Inc.
Anesthesiology Associates of Tallahassee, Inc.
Apex Acquisition LLC
Arizona Perinatal Care Centers, LLC
ASDH I, LLC
ASDH II, LLC
Austin NSC, LLC
Austin NSC, LP
Bay Area Anesthesia, L.L.C.
BestPractices, Inc.
Bethesda Anesthesia Associates, Inc.
Boca Anesthesia Service, Inc.
Bravo Reimbursement Specialist, L.L.C.
Broad Midwest Anesthesia, LLC
Centennial Emergency Physicians, LLC
Chandler Emergency Medical Group, L.L.C.
Children's Anesthesia Associates, Inc.
Clinical Partners Management Company, LLC
CMORx, LLC
Coastal Anesthesiology Consultants, LLC
Coral Springs NSC, LLC
Davis NSC, LLC
Desert Mountain Consultants in Anesthesia, Inc.
Discovery Clinical Research, Inc.
Doctors Billing Service, Inc.
Drs. Ellis, Rojas, Ross & Debs, Inc.
ED Solutions, LLC
EDIMS, L.L.C.
EHR Management Co.

EmCare Anesthesia Providers, Inc.
EmCare HoldCo, LLC
EmCare Holdings, LLC
EmCare of California, Inc.
EmCare Physician Providers, Inc.
EmCare Physician Services, Inc.
EmCare, LLC
Emergency Medical Services LLC
Emergency Medicine Education Systems, Inc. (EMEDS)
EMS Management LLC
EMSC ServicesCo, LLC
Enterprise Intermediate Holdings Inc.
Enterprise Parent Holdings, Inc.
Envision Anesthesia Services of Delaware, Inc.
Envision Anesthesia Services of Sierra Vista, Inc.
Envision Children's Healthcare Services of North Mississippi, Inc.
Envision Healthcare Clinical Research, Inc.
Envision Healthcare Corporation
Envision Healthcare Scientific Intelligence, Inc.
Envision Physician Services, LLC
Flamingo Anesthesia Associates, Inc.
FM Healthcare Services, Inc.
FMO Healthcare Holdings, LLC
FO Investments II, Inc.
FO Investments III, Inc.
FO Investments, Inc.
Fullerton NSC, LLC
Global Surgical Partners, Inc.
Greater Florida Anesthesiologists, LLC
Hawkeye Holdco LLC
Healthcare Administrative Services, Inc.
Holiday Acquisition Company, Inc.
Illinois NSC, Inc.
Imaging Advantage LLC
Infinity Healthcare, Inc.
iSelect Healthcare LLC
Jacksonville Beaches Anesthesia Associates, Inc.
Jupiter Anesthesia Associates, L.L.C.
Jupiter Healthcare, LLC
Kenwood NSC, LLC
Long Beach NSC, LLC
MedAssociates, LLC
Medi-Bill of North Florida, Inc.
Medical Information Management Solutions, LLC
Millennium Vision Surgical, LLC
MSO Newco, LLC

NAC Properties, LLC
New Generations Babee Bag, Inc.
North Florida Anesthesia Consultants, Inc.
North Florida Perinatal Associates, Inc.
Northwood Anesthesia Associates, L.L.C
NSC Healthcare, Inc.
NSC RBO East, LLC
NSC West Palm, LLC
Parity Healthcare, Inc.
Partners in Medical Billing, Inc.
Phoenix Business Systems, LLC
Phoenix Physicians, LLC
Physician Account Management, Inc.
Physician Office Partners, Inc.
Pinnacle Consultants Mid-Atlantic, L.L.C.
Practice Account Management Services, LLC
Proven Healthcare Solutions of New Jersey, LLC
Provider Account Management, Inc.
QRx Medical Management, LLC
Reimbursement Technologies, Inc.
San Antonio NSC, LLC
Sentinel Healthcare Services, LLC
Sheridan Anesthesia Services of Alabama, Inc.
Sheridan Anesthesia Services of Louisiana, Inc.
Sheridan Anesthesia Services of Virginia, Inc.
APH Laboratory Services, Inc.
Sheridan CADR Solutions, Inc.
Sheridan Children's Healthcare Services of Arizona, Inc.
Sheridan Children's Healthcare Services of Kentucky, Inc.
Sheridan Children's Healthcare Services of Louisiana, Inc.
Sheridan Children's Healthcare Services of New Mexico, Inc.
Sheridan Children's Healthcare Services of Ohio, Inc.
Sheridan Children's Healthcare Services of Virginia, Inc.
Sheridan Children's Healthcare Services, Inc.
Sheridan Children's Services of Alabama, Inc.
Sheridan Emergency Physician Services of Missouri, Inc.
Sheridan Emergency Physician Services of North Missouri, Inc.
Sheridan Emergency Physician Services of South Florida, Inc.
Sheridan Emergency Physician Services, Inc.
Sheridan Healthcare of Louisiana, Inc.
Sheridan Healthcare of Missouri, Inc.
Sheridan Healthcare of Vermont, Inc.
Sheridan Healthcare of Virginia, Inc.
Sheridan Healthcare of West Virginia, Inc.
Sheridan Healthcare, LLC
Sheridan Healthcorp of California, Inc.

Sheridan Healthcorp, Inc.
Sheridan Healthy Hearing Services, Inc.
Sheridan Holdings, LLC
Sheridan Hospitalist Services of Florida, Inc.
Sheridan InvestCo, LLC
Sheridan Leadership Academy, Inc.
Sheridan Radiology Management Services, Inc.
Sheridan Radiology Services, Inc.
Sheridan ROP Services of Alabama, Inc.
Sheridan ROP Services of Florida, Inc.
Sheridan ROP Services of Virginia, Inc.
SHI II, LLC
Southeast Perinatal Associates, Inc.
Spotlight Holdco LLC
St. Lucie Anesthesia Associates, LLC
Streamlined Medical Solutions LLC
Sun Devil Acquisition LLC
Sunbeam Asset LLC
Tampa Bay NSC, LLC
Templeton Readings, LLC
Tennessee Valley Neonatology, Inc.
Tiva Healthcare, Inc.
Torrance NSC, LLC
Towson NSC, LLC
Twin Falls NSC, LLC
Valley Anesthesiology Consultants, Inc.
Valley Clinical Research, Inc.
West Fairview Emergency Physicians, LLC
Weston NSC, LLC
Wilton NSC, LLC
Evolution Mobile Imaging, LLC
Gynecologic Oncology Associates, Inc.
KMAC, Inc.
Radiology Staffing Solutions, Inc.
Radstaffing Management Solutions, Inc.
Rose Radiology, LLC

# EXHIBIT B

**Restructuring Term Sheet**

*EXECUTION VERSION*

**THIS RESTRUCTURING TERM SHEET (THIS "<u>RESTRUCTURING TERM SHEET</u>") IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

*RESTRUCTURING TERM SHEET*

**INTRODUCTION**

This Restructuring Term Sheet [1] describes the principal terms of a restructuring (the "<u>**AmSurg Restructuring**</u>") of AmSurg Holdco, LLC ("<u>**AmSurg Parent**</u>") and its direct and indirect subsidiaries (collectively, with AmSurg Parent, the "<u>**AmSurg Entities**</u>") and related transactions (collectively with the AmSurg Restructuring, the "<u>**Restructuring Transactions**</u>") involving Enterprise Parent Holdings Inc. ("<u>**Envision Parent**</u>") and its direct and indirect subsidiaries (collectively, with Envision Parent but excluding the AmSurg Entities, the "<u>**EVPS Entities**</u>") that will be effectuated as set forth herein.  The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring Transactions have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transactions.  This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions.  Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Restructuring Transactions, which remain subject to negotiation and completion in accordance with the AmSurg Restructuring Support Agreement and applicable bankruptcy law.  The Restructuring Transactions and Definitive Documents shall be consistent in all respects with this Restructuring Term Sheet and the AmSurg Restructuring Support Agreement, and shall be subject to the consent and approval rights set forth herein and therein.  This Restructuring Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| <u>GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS</u> | |
| --- | --- |
| **Implementation** | The Debtors will commence the Chapter 11 Cases and implement the Restructuring Transactions pursuant to the Plans, the Plan Supplements and the other Definitive Documents, as contemplated under the AmSurg Restructuring Support Agreement.<br><br>On the AmSurg Plan Effective Date, or as soon as is reasonably practicable |

---

[1]     Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings given to such terms in the Restructuring Support Agreement to which this Restructuring Term Sheet is attached as Exhibit B (the "<u>**AmSurg Restructuring Support Agreement**</u>").

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** ||
|---|---|
| | thereafter, each holder of a Claim or Equity Interest, as applicable, shall receive under the AmSurg Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Claim or Equity Interest, except to the extent different treatment is agreed to by the Reorganized AmSurg Debtors and the holder of such Allowed Claim or Equity Interest, as applicable, with the consent of the Required Consenting AmSurg Second Lien Term Lenders.  The AmSurg Plan Effective Date may occur prior to, and shall not be conditioned upon, the EVPS Plan Effective Date or the consummation of the EHC ASC Debtors Sale Transaction. |
| | In addition, as further described herein, the Restructuring Transactions contemplate two scenarios: |
| | (a) **Acquisition Scenario**[2]:  On or before the EVPS Plan Effective Date (such date, the "**EHC ASC Acquisition Closing Date**"), Reorganized AmSurg Parent (or a designee thereof) ("**Reorganized AmSurg Acquirer**") shall acquire the equity interests, directly or indirectly, in the EHC ASC Debtors pursuant to the AmSurg Restructuring Support Agreement and the EHC ASC Debtors Sale Transaction; and |
| | (b) **Non-Acquisition Scenario**[3]:  The Reorganized AmSurg Debtors shall have received the EHC ASC Debtors Termination Fee (as defined below) in accordance with the EHC ASC Debtors SPA and the EHC ASC Debtors SPA Approval Order (as each is defined below).  The AmSurg Intercompany Loan Claim shall be entitled to, and shall receive, *pari passu* ratable treatment with the EVPS First Lien Claims in all respects in the EVPS Chapter 11 Cases and the EVPS Plan, including its ratable share of all payments and distributions and right to participate in any opportunities that are made available to any holder of an EVPS First Lien Claim.  The treatment of the AmSurg Intercompany Loan Claim pursuant to the EVPS Plan shall be consistent with the AmSurg Restructuring Support Agreement.  It is understood and agreed that, in the event of the Non-Acquisition Scenario, the AmSurg Intercompany Loan Claim shall be fully preserved and shall not be subject to compromise, subordination, waiver, or other treatment that is not equivalent to the EVPS First Lien Claims. |
| **EHC ASC Debtors Sale Transaction** | In the Acquisition Scenario, on the EHC ASC Acquisition Closing Date, the EVPS Debtors will consummate a sale of their equity interests in the EHC ASC Debtors to Reorganized AmSurg Acquirer (such sale transaction, the "**EHC ASC Debtors Sale Transaction**").  The aggregate cash consideration for the EHC ASC Debtors Sale Transaction shall equal $300 million in cash paid on the EHC ASC Acquisition Closing Date by or on behalf of Reorganized AmSurg Acquirer from cash on hand (including proceeds of the AmSurg Rights Offering).  In addition, subject to consummation of the EHC ASC Debtors Sale Transaction, the holder of |

---

[2]     The "Acquisition Scenario" means a scenario in which the EHC ASC Debtors Sale Transaction closes on terms consistent with the AmSurg Restructuring Support Agreement and this Restructuring Term Sheet.

[3]     The "Non-Acquisition Scenario" means a scenario in which the EHC ASC Debtors Sale Transaction does not close, whether because of the termination of the EHC ASC Debtors SPA or otherwise.

| | |
|---|---|
| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |

the AmSurg Intercompany Loan Claims shall agree not to participate in, or receive, any recovery on account thereof in the EVPS Plan, and the AmSurg Intercompany Loan Claims shall be discharged in accordance therewith.

The proceeds of the EHC ASC Debtors Sale Transaction (the "**EHC ASC Debtors Sale Proceeds**") shall be used to fund ongoing operating and other cash needs of the EVPS Debtors or the Reorganized EVPS Debtors, as applicable, and fund distributions to secured lenders under the EVPS Plan.

The Debtors shall not solicit, initiate, knowingly facilitate or encourage any proposal to acquire a direct or indirect sale of all, substantially all, or a portion of the equity interest in the EHC ASC Debtors (a "**Competing EHC ASC Proposal**"), or participate in any negotiation or discussions regarding, or provide any information with respect to or in connection with, a Competing EHC ASC Proposal. Notwithstanding the foregoing, the Debtors, in consultation with the Required Consenting AmSurg Second Lien Term Lenders, may (a) continue, on a postpetition basis, to engage with the potential bidders (identified to the counsel to the AmSurg Lender Group prior to the date hereof) already under nondisclosure agreement as of the Petition Date and in the marketing process that the Debtors undertook before the Petition Date and (b) respond to any bona fide unsolicited written offer or proposal with respect to a Competing EHC ASC Proposal that the Debtors determine in good faith, after consultation with their financial advisors, would reasonable be expected to result in a direct or indirect sale of all or substantially all of the equity interests in the EHC ASC Debtors that is more favorable to the Debtors from a financial point of view than the EHC ASC Debtors Sale Transaction and provides for at least $498.5 million in net proceeds (after transaction costs) to the EVPS Debtors on account of the EHC ASC Debtors (a "**Superior Proposal**").

The share purchase agreement for the EHC ASC Debtors Sale Transaction (the "**EHC ASC Debtors SPA**"), which shall be in form and substance satisfactory to the EVPS Debtors, the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders, shall provide:

- the Required Consenting AmSurg Second Lien Term Lenders with corresponding consent rights over actions taken by the Reorganized AmSurg Purchaser, in its capacity as such;

- for a termination fee of $20 million (the "**EHC ASC Debtors Termination Fee**"), which shall be payable by the EVPS Debtors to AmSurg Parent in the event that (i) the EHC ASC Debtors SPA is terminated, (ii) the equity interests in (or assets of ) the EHC ASC Debtors are sold to a party other than the Reorganized AmSurg Acquirer or (iii) any EVPS Debtor proposes or consummates a chapter 11 plan that is not conditioned on the Acquisition Scenario occurring on or before the consummation of such chapter 11 plan;

- for the acquisition of the equity interests in the EHC ASC Debtors, which shall convey to the Reorganized AmSurg Acquirer the Debtors' interests in all ambulatory surgery centers and associated assets in which the EVPS Debtors had an interest as of May 1, 2023;

**GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS**

|  |  |
|---|---|
|  | <ul><li>for any adjustments to the cash consideration or assets conveyed or to be received shall require the written consent of the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders;</li><li>that the Debtors shall not consummate any sales (other than as expressly contemplated by the EHC ASC Debtor SPA) of any equity interests in any EHC ASC Debtors or any AmSurg Entities or any of the EHC ASC Debtors' or AmSurg Entities' respective subsidiaries, or material assets without the consent of the Required Consenting AmSurg Second Lien Term Lenders;</li><li>provide a release from the EVPS Debtors of all claims (including derivative claims) and causes of action against the AmSurg Debtors, any Reorganized AmSurg Debtor, their respective creditors, any future equityholder of Reorganized AmSurg Parent and their respective Related Parties (other than the EVPS Entities or any of their Related Parties, each in their respective capacity as such), and</li><li>that no EVPS Debtor may terminate the EHC ASC SPA for a Competing EHC ASC Proposal other than a Superior Proposal and shall provide the Reorganized AmSurg Purchaser with a right to outbid any such Superior Proposal before any such termination.</li></ul>The EHC ASC Debtor Termination Fee will be an allowed administrative expense of each of the EVPS Debtors and shall be approved by the Bankruptcy Court no later than the Key AmSurg Definitive Documents Milestone Date. |
| **Use of Cash Collateral** | The Required Consenting Lenders shall consent to the use of cash collateral by the AmSurg Debtors on terms and conditions set forth in the AmSurg Cash Collateral Order, which shall be consistent with the terms of this Restructuring Term Sheet and the AmSurg Restructuring Support Agreement and otherwise in form and substance acceptable to the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders.  Any proposed use of cash collateral or debtor-in-possession financing order by the EVPS Debtors will be reasonably acceptable to the Required Consenting AmSurg Second Lien Term Lenders and the rights of the AmSurg Debtors and the Consenting Stakeholders with respect to the use of cash collateral or any debtor-in-possession financing with respect to the EVPS Debtors are preserved. |
| **AmSurg Rights Offering; AmSurg Backstop Commitment Agreement** | On the AmSurg Plan Effective Date, Reorganized AmSurg Parent will consummate one or more new money equity rights offerings (collectively, the "**AmSurg Rights Offering**") in an aggregate amount of $300 million, provided, that, if the EHC ASC Debtors SPA has terminated prior to the AmSurg Plan Effective Date, such rights offering shall be reduced to $200 million.  The AmSurg Rights Offering will be backstopped by certain holders of AmSurg Second Lien Term Loan Claims (the "**AmSurg Backstop Parties**"), subject to the terms and conditions of a backstop commitment agreement to be included in the AmSurg Plan Supplement and which shall otherwise be in form and substance satisfactory to the AmSurg Debtors and the "**AmSurg Backstop Commitment Agreement**") (and shall also provide that the AmSurg Backstop Commitment Agreement shall be approved by the Bankruptcy Court no |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | later than the Key AmSurg Definitive Documents Milestone Date and shall contain customary interim operating covenants and requirements for the provision of customary due diligence, including with respect to the Specific Diligence Areas). |
| | The AmSurg Rights Offering will provide for the purchase of Reorganized AmSurg Parent New Common Equity (as defined below) that will be issued and outstanding as of the AmSurg Plan Effective Date (such equity, the "**AmSurg Rights Offering Equity**") at a 30% discount to plan equity value of the Reorganized AmSurg Debtors prior to giving effect to the EHC ASC Debtors Sale Transaction and the receipt of the proceeds of the rights offering ("**AmSurg Plan Equity Value**").  Each holder of AmSurg Second Lien Term Loan Claims shall receive its *pro rata* share of subscription rights to purchase the Reorganized AmSurg Parent New Common Equity (such rights, the "**AmSurg Subscription Rights**"), in accordance with the procedures governing the AmSurg Rights Offering (the "**AmSurg Rights Offering Documents**").  The AmSurg Subscription Rights will be exempt from SEC registration and will be non-transferrable. |
| | In consideration for their agreement to backstop the AmSurg Rights Offering, each AmSurg Backstop Party will receive its pro rata share of a premium equal to $30 million, which will be satisfied by issuance of Reorganized AmSurg Parent New Common Equity at a 30% discount to AmSurg Plan Equity Value (such equity, the "**AmSurg Backstop Premium Equity**") (provided, that if the AmSurg Restructuring is not consummated in accordance with the terms herein, for any reason other than a breach of the AmSurg Backstop Parties, as specified in the AmSurg Backstop Commitment Agreement, the AmSurg Backstop Premium will be payable in cash by the AmSurg Debtors). |
| **Amended and Restated AmSurg RCF Credit Agreement** | On the AmSurg Plan Effective Date, the Reorganized AmSurg Debtors will enter into a new or amended credit agreement with the holders of the AmSurg RCF Claim on the terms set forth below or as otherwise agreed with such holders and otherwise in form and substance acceptable to the Required Consenting AmSurg Second Lien Term Lenders. <ul><li>Maximum Availability:  $300 million ($200 million drawn on AmSurg Plan Effective Date after $100 million paydown)</li><li>Interest:  S + 375 (1.0 SOFR floor)</li><li>Maturity:  July 20, 2026 (same as existing facility)</li><li>Precedent Documents:  Definitive documentation will be based on the Credit Documents (as defined in the AmSurg Revolving Credit Agreement), as the same has been amended, restated, supplemented, and otherwise modified from time to time, and will contain the terms set forth herein and otherwise include customary terms (including conditions precedent, representations and warranties, affirmative covenants, negative covenants, and events of default)</li></ul> |
| **Reorganized  AmSurg** | On the AmSurg Plan Effective Date, Reorganized AmSurg Parent will issue a |

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS | |
|---|---|
| **Parent New Common Equity** | single class of common interests (the "**Reorganized AmSurg Parent New Common Equity**"), which will be distributed to holders of Allowed AmSurg Second Lien Term Loan Claims (or their designees), subject to dilution by the AmSurg Rights Offering Equity, the AmSurg Backstop Premium Equity, and the Reorganized AmSurg Parent Management Incentive Plan. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in Section 3 of the AmSurg Restructuring Support Agreement. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **Milestones** | The Debtors will comply with the following milestones (collectively, the "**Milestones**"):<br><br>• no later than 1 Business Day following the Agreement Effective Date, the Petition Date shall have occurred;<br><br>• not later than 5 Business Days following the Petition Date, the Bankruptcy Court shall have entered the AmSurg Cash Collateral Order and the EVPS Cash Collateral Order, in each case on an interim basis and in form and substance reasonably acceptable to the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders;<br><br>• not later than 15 calendar days following the Petition Date, the AmSurg Debtors shall have filed motions seeking approval of each of the (a) EHC ASC Debtors SPA (including EHC ASC Debtors Termination Fee), (b) AmSurg Backstop Commitment Agreement (including the AmSurg Backstop Premium Equity), and (c) AmSurg Exit First Lien Term Loan Facility Commitment Letter (including all commitment and other fees contemplated therein);<br><br>• not later than 25 calendar days following the Petition Date, the AmSurg Debtors shall have retained the Operational Separation Consultants (as defined below);<br><br>• not later than 25 calendar days after the Petition Date, the AmSurg Debtors shall have filed with the Bankruptcy Court the AmSurg Plan, the AmSurg Disclosure Statement and the motion for approval of the AmSurg Disclosure Statement;<br><br>• not later than 35 calendar days following the Petition Date (the "**Key AmSurg Definitive Documents Milestone Date**"), the Bankruptcy Court shall have entered<br><br>    • (a) the AmSurg Cash Collateral Order and the EVPS Cash Collateral Order, in each case on a final basis and in form and substance reasonably acceptable to the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders,<br><br>    • (b) an order (the "SPA Order") approving entry into the EHC ASC Debtors SPA and approving the EHC ASC Debtors Termination Fee (each |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | of such order and the EHC ASC Debtors SPA being in form and substance acceptable to the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders), |
| | • (c) an order approving entry into the AmSurg Backstop Commitment Agreement and approving the AmSurg Backstop Premium Equity (each of such order and the AmSurg Backstop Commitment Agreement being in form and substance acceptable to the AmSurg Debtors, the Required Consenting AmSurg Second Lien Term Lenders, and the AmSurg Backstop Parties), and |
| | • (d) an order approving entry into the AmSurg Exit First Lien Term Loan Facility Commitment Letter and approving all commitment and other fees contemplated therein (each of such order and the AmSurg Exit First Lien Term Loan Facility Commitment Letter being in form and substance acceptable to the AmSurg Debtors and the Required Consenting AmSurg Second Lien Term Lenders), shall have been approved by the Bankruptcy Court and shall remain in full force and effect; |
| | • not later than 65 calendar days following the Petition Date, the Bankruptcy Court shall have entered the AmSurg Disclosure Statement Order; |
| | • not later than 120 calendar days following the Petition Date, the Bankruptcy Court shall have entered the AmSurg Confirmation Order; |
| | • not later than 5 calendar days after the entry of the AmSurg Confirmation Order, or such earlier date that such filing, application or notice is required to be made, the AmSurg Debtors shall have filed any and all applications and notifications that are necessary or required in connection with obtaining the applicable approvals from the Governmental Regulatory Authorities with respect to the Restructuring Transactions; and |
| | • not later than 150 calendar days following the Petition Date, the AmSurg Plan Effective Date shall have occurred. |

| **TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE AMSURG PLAN** | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment / Voting |
| **Unclassified Non-Voting Claims** | | | |
| N/A | **Administrative Claims Against AmSurg Debtors** | Except to the extent that a holder of an Administrative Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Administrative Claim, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | N/A |

| TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE AMSURG PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **N/A** | **Priority Tax Claims Against AmSurg Debtors** | On the AmSurg Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims Against and Equity Interests in the AmSurg Debtors** | | | |
| **Class 1** | **Other Secured Claims Against AmSurg Debtors** | Except to the extent that a holder of an Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each holder of an Allowed Other Secured Claim shall receive, at the AmSurg Debtors' option, in consultation, with the consent of the Required Consenting AmSurg Second Lien Term Lenders: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 2** | **Other Priority Claims Against AmSurg Debtors** | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 3** | **AmSurg RCF Claims** | Except to the extent that a holder of an AmSurg RCF Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed AmSurg RCF Claim, on the AmSurg Plan Effective Date, each holder of an Allowed AmSurg RCF Claim shall receive its pro rata share of: (a) the loans arising under the Amended and Restated AmSurg RCF Credit Agreement in an amount equal to the Allowed AmSurg RCF Claims outstanding on the AmSurg Plan Effective Date (taking into account any repayment or cash distribution occurring on or before the AmSurg Plan Effective Date) and (b) cash in an amount equal to $100 million. | Impaired / Entitled to Vote |
| **Class 4** | **AmSurg First Lien Term Loan Claims** | Except to the extent that a holder of an AmSurg First Lien Term Loan Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed AmSurg First Lien Term Loan Claim, on the AmSurg Plan Effective Date, each holder of an Allowed AmSurg First Lien Term Loan Claim shall receive payment in full in cash from proceeds of the Committed Exit Facility. | Impaired / Entitled to Vote |

| | TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE AMSURG PLAN | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 5** | **AmSurg Second Lien Term Loan Claims** | Except to the extent that a holder of an AmSurg Second Lien Term Loan Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed AmSurg Second Lien Term Loan Claim, on the AmSurg Plan Effective Date, each holder of an Allowed AmSurg Second Lien Term Loan Claim (or its designee) shall receive its *pro rata* share of: (a) 100% of the Reorganized AmSurg Parent New Common Equity, subject to dilution on account of the AmSurg Rights Offering, the AmSurg Backstop Premium Equity, and the Reorganized AmSurg Parent Management Incentive Plan; and (b) the AmSurg Subscription Rights. | Impaired / Entitled to Vote |
| **Class 6** | **General Unsecured Claims against AmSurg Debtors** | It is expected that all ordinary course trade claims will be satisfied during the Chapter 11 Cases.<br><br>To the extent not already satisfied during the Chapter 11 Cases, except to the extent that a holder of an Allowed General Unsecured Claim against the AmSurg Debtors agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed General Unsecured Claim against the AmSurg Debtors, on the AmSurg Plan Effective Date, each holder of an Allowed General Unsecured Claim against the AmSurg Debtors shall receive their pro rata share of cash in an amount equal to $1,500,000; *provided,* that if the aggregate amount of Allowed General Unsecured Claims against the AmSurg Debtors is less than $1,500,000, then each holder of an Allowed General Unsecured Claim against the AmSurg Debtors shall receive, at the option of the Reorganized AmSurg Debtors, with the consent of the Required Consenting AmSurg Second Lien Term Lenders: (a) payment in full in cash, (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (c) such other treatment rendering such Claim unimpaired. | Impaired / Entitled to Vote |
| **Class 7** | **Intercompany Claims against AmSurg Debtors** | On the AmSurg Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim reinstated, set off, settled, distributed, contributed, cancelled and released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined, in each case at the election of the AmSurg Debtors, with the consent of the Required Consenting AmSurg Second Lien Term Loan Lenders. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |

| | TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE AMSURG PLAN | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Class 8** | **Intercompany Interests in AmSurg Debtors** | On the AmSurg Plan Effective Date, Intercompany Interests shall be reinstated, set off, settled, distributed, contributed, cancelled, and released without any distribution on account of such Intercompany Interests, or such other treatment as is determined by the AmSurg Debtors in consultation with the Required Consenting AmSurg Second Lien Term Lenders. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 9** | **Equity Interests in AmSurg Parent** | On the AmSurg Plan Effective Date, each holder of an Equity Interest in AmSurg Parent shall have such Equity Interest cancelled, released, and extinguished without any distribution. | Impaired / Deemed to Reject |
| **Class 10** | **Section 510(b) Claims** | Each Allowed Section 510(b) Claim will be discharged and released and each holder of such Allowed Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Allowed Section 510(b) Claim. | Impaired / Deemed to Reject |

| | GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS |
|---|---|
| **Subordination** | The classification and treatment of Claims under the AmSurg Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the AmSurg Plan. |
| **Restructuring Transactions** | The Confirmation Orders shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plans, as well as the Restructuring Transactions. On the applicable Plan Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Operational Separation Consultants** | As soon as is reasonably practicable after the Petition Date, the Debtors will engage advisors (the "**Operational Separation Consultants**") reasonably acceptable to the Required Consenting AmSurg Second Lien Term Lenders to provide consulting services at the direction of the AmSurg Debtors to analyze and facilitate the operational separation of the Reorganized AmSurg Debtors and the EVPS Debtors or Reorganized EVPS Debtors, as applicable, and the development of capabilities of the AmSurg Entities to operate separate from the EVPS Debtors on and after the AmSurg Plan Effective Date. The Operational Separation Consultants shall designate one senior person to act as a liaison between the Required Consenting AmSurg Second Lien Term Lenders (or their representatives) and the Operational Separation Consultants. This liaison shall provide regular updates to the Required Consenting AmSurg Second Lien Term Lenders (or their representatives), including at least once weekly calls, respond to reasonable diligence requests and convey the Required Consenting AmSurg Second Lien Term Lenders' input (or their representatives' input) to the Operational Separation Consultants. If such designated liaison is not complying with the foregoing, in the Required Consenting AmSurg Second Lien Term Lenders' reasonable determination, the Required Consenting AmSurg Second Lien Term Lenders may direct the AmSurg Debtors' to retain an alternative liaison reasonably acceptable to the AmSurg Debtors at the AmSurg Debtors' expense to perform the role of the liaison who must be reasonably acceptable to the AmSurg Debtors.<br><br>The AmSurg Debtors and the Operational Separation Consultants shall consult with the Required Consenting Second Lien Term Lenders with respect to the implementation of the Restructuring Transactions. |
| **Shared Services** | Prior to the AmSurg Plan Effective Date, that certain Shared Services Agreement, dated April 29, 2022 (as amended by that certain First Agreement, dated January 1, 2023, and as further amended, restated, supplemented, or otherwise modified from time to time accordance with the terms thereof, the "**Shared Services Agreement**"), by and between AmSurg, LLC and Envision Healthcare Corporation shall remain in full force and effect without amendment, supplement, or modification thereto except for any amendments, supplements, or modifications to the services provided thereunder in accordance therewith, and the parties thereto shall continue to perform thereunder.<br><br>On the AmSurg Plan Effective Date, the Shared Services Agreement shall be terminated and shall be of no further force and effect, and, as of the AmSurg Plan Effective Date, to the extent necessary or appropriate in connection with implementing the Restructuring Transactions, shall be replaced by a transition services agreement (the "**TSA**") between reorganized AmSurg, LLC (or a designee) and Envision Healthcare Corporation (or a designee reasonably satisfactory to the Reorganized AmSurg Parent) which TSA shall be on arm's-length market terms, shall be in form and substance reasonably acceptable to the AmSurg Debtors, the EVPS Debtors, and the Required Consenting AmSurg Second Lien Term |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | Lenders, in consultation with the Operational Separation Consultants. Pursuant to the TSA, as applicable, the parties thereto shall provide transition services, including certain shared services that had been provided pursuant to the Shared Services Agreement, for a period of up to two years. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the AmSurg Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the AmSurg Plan, as applicable, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests, including credit agreements and indentures, shall be canceled, and the AmSurg Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Executory Contracts and Unexpired Leases** | The AmSurg Plan will provide that the executory contracts and unexpired leases that are not rejected as of the AmSurg Plan Effective Date (either pursuant to the AmSurg Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The AmSurg Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Discharge of Claims and Termination of Equity Interests** | Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the AmSurg Plan, or in any contract, instrument, or other agreement or document created pursuant to the AmSurg Plan, the distributions, rights, and treatment that are provided in the AmSurg Plan shall be in complete satisfaction, discharge, and release, effective as of the AmSurg Plan Effective Date, of Claims (including any intercompany claims that the AmSurg Debtors resolve or compromise after the AmSurg Plan Effective Date), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Equity Interests in the AmSurg Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the AmSurg Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the AmSurg Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Plan Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the AmSurg Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | to section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Equity Interest has accepted the AmSurg Plan.  The AmSurg Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the AmSurg Plan Effective Date.  Notwithstanding anything to the contrary, nothing in the AmSurg Plan will release, modify, or otherwise impair the AmSurg Intercompany Loan Claims, any claims arising from the Shared Services Agreement, or any claims or obligations arising under the TSA, the EHC ASC Debtors SPA, the Restructuring Support Agreement, or any agreement or order entered in connection therewith. |
| **Releases by the Company Parties** | Except as expressly set forth in this Agreement, effective on the AmSurg Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed released and discharged by each and all of the AmSurg Debtors and the Reorganized AmSurg Debtors, in each case on behalf of themselves, their estates and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the AmSurg Debtors, which the AmSurg Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, an AmSurg Debtor, based on or relating to, or in any manner arising from, in whole or in part, (i) the management, ownership, or operation of the AmSurg Debtor, (ii) the purchase, sale, or rescission of any security of the AmSurg Debtors, (iii) the subject matter of, or the transactions,  events, circumstances, acts or omissions  giving rise to, any Claim or Equity Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any AmSurg Debtor and any other Entity, (v) the AmSurg Debtors' in- or out-of-court restructuring efforts, (vi) this Agreement, the Definitive Documents, or any Restructuring Transactions, (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement, the Definitive Documents,  or the Restructuring Transactions, including the issuance or distribution of securities pursuant to the Restructuring Transactions, (viii) the distribution of property under the Restructuring Transactions or any other related agreement, or (ix) any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the AmSurg Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations, after the AmSurg Plan Effective Date, of any party or Entity under the AmSurg Plan, the AmSurg Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the AmSurg Plan Supplement) executed to implement the AmSurg Plan. |

| | **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** |
|---|---|
| | Notwithstanding anything to the contrary, nothing in the AmSurg Plan will release, discharge, modify, or otherwise impair the AmSurg Intercompany Loan Claims or any claims arising from the Shared Services Agreement, or any claims or obligations arising under the TSA, the EHC ASC Debtors SPA, the Restructuring Support Agreement, or any agreement or order entered in connection therewith, or any assumed contracts or other obligations or arrangements that are expressly contemplated to be preserved under the AmSurg Plan. |
| **Releases by Holders of Claims and Equity Interests** | Except as expressly set forth in this Agreement, effective on the AmSurg Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the AmSurg Debtors or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, an AmSurg Debtor, based on or relating to, or in any manner arising from, in whole or in part, in whole or in part, (i) the management, ownership, or operation of the AmSurg Debtor, (ii) the purchase, sale, or rescission of any security of the AmSurg Debtors, (iii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Equity Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any AmSurg Debtor and any other Entity, (v) the AmSurg Debtors' in- or out-of-court restructuring efforts, (vi) this Agreement, the Definitive Documents, or any Restructuring Transactions, (vii) any contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement, the Definitive Documents, or the Restructuring Transactions, including the issuance or distribution of securities pursuant to the Restructuring Transactions, (viii) the distribution of property under the Restructuring Transactions or any other related agreement, or (ix) any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the AmSurg Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations, after the AmSurg Plan Effective Date, of any party or Entity under the AmSurg Plan, the AmSurg Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the AmSurg Plan Supplement) executed to implement the AmSurg Plan. Notwithstanding anything to the contrary, nothing in the AmSurg Plan will release, discharge, modify, or otherwise impair the AmSurg Intercompany Loan Claims or any claims arising from the Shared Services Agreement, or any claims or obligations arising under the TSA, the EHC ASC Debtors |

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | SPA, the Restructuring Support Agreement, or any agreement or order entered in connection therewith, or any assumed contracts or other obligations or arrangements that are expressly contemplated to be preserved under the AmSurg Plan. |
| **Exculpation** | Except as otherwise specifically provided in the AmSurg Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the AmSurg Disclosure Statement, the AmSurg Plan, or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the AmSurg Disclosure Statement or the AmSurg Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the AmSurg Plan, the pursuit of consummation of the AmSurg Plan, the administration and implementation of the AmSurg Plan, including the issuance of securities pursuant to the AmSurg Plan, or the distribution of property under the AmSurg Plan, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud,  gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the AmSurg Plan.  The Exculpated Parties have, and upon completion of the AmSurg Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the AmSurg Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the AmSurg Plan, or such distributions made pursuant to the AmSurg Plan. |
| **Injunction** | Except as otherwise expressly provided in the AmSurg Plan, or for obligations issued or required to be paid pursuant to the AmSurg Plan or the AmSurg Confirmation Order, all Entities who have held, hold, or may hold claims or equity interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the AmSurg Plan Effective Date, from taking any of the following actions against, as applicable, the AmSurg Debtors, the Reorganized AmSurg Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or equity interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or equity interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or equity interests; |

15

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or equity interests unless such holder has filed a motion requesting the right to perform such setoff on or before the AmSurg Plan Effective Date, and notwithstanding an indication of a claim or equity interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or equity interests released or settled pursuant to the AmSurg Plan. |
| **Certain Definitions** | The following definitions shall be applicable to the foregoing release and exculpation provisions: |
| | "*Exculpated Parties*" means, collectively, and in each case in its capacity as such, (a) each of the AmSurg Debtors, (b) each independent director of any AmSurg Debtor, and (c) any statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as well as each of its member. |
| | "*Related Party*" means each of, an in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees. |
| | "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each of the AmSurg Debtors; (b) each of the Reorganized AmSurg Debtors; (c) each Consenting Stakeholder;[4] (d) each Agent; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through clause (e); *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the release contained in the AmSurg Plan; or (y) timely objects to the releases contained in the AmSurg Plan, either by means of (i) a formal objection filed on the docket of the Chapter 11 Cases or (ii) an |

---

[4]     As used in the definitions for "Released Parties" and "Releasing Parties", the term "Consenting Stakeholder" shall be defined to include all parties that are "Consenting Stakeholders" under and as defined in (a) the Restructuring Support Agreement and (b) that certain Restructuring Support Agreement, dated as of May 14, 2023, by and between the Company Parties and certain holders of EVPS Term Loan Claims, EVPS Unsecured Notes, and Equity Interest in Envision Parent.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | informal objection provided to the Debtors in writing, including by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or, in writing, including via electronic mail, as applicable, before Confirmation; *provided further* that none of the EVPS Entities, any of their Related Parties, or any creditor or stakeholder of an EVPS Entity, each in their respective capacity as such, shall be a Released Party until the effective date of an EVPS Plan that is consistent with this Agreement. |
| | "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Consenting Stakeholder; (b) each Agent; (c) all holders of Claims that vote to accept the AmSurg Plan; (d) all holders of Claims that are deemed to accept the AmSurg Plan who do not affirmatively opt out of the releases provided by the AmSurg Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the AmSurg Plan; (e) all holders of Claims that abstain from voting on the AmSurg Plan and who do not affirmatively opt out of the releases provided by the AmSurg Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the AmSurg Plan; (f) all holders of Claims or Equity Interests that vote to reject the AmSurg Plan or are deemed to reject the AmSurg Plan and who do not affirmatively opt out of the releases provided by the AmSurg Plan by checking the box on the applicable ballot or notice of non-voting Status indicating that they opt not to grant the releases provided in the AmSurg Plan; (g) each current and former Affiliate of each Entity in clause (a) through (f); and (h) each Related Party of each Entity in clause (a) through (g) for which such Entity is legally entitled to bind such Related Party to the releases contained in the AmSurg Plan under applicable law. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Reorganized AmSurg Parent Management Incentive Plan** | On or after the AmSurg Plan Effective Date, Reorganized AmSurg Parent may implement a management incentive plan (the "**Reorganized AmSurg Parent Management Incentive Plan**"), the form, terms, allocation and vesting of awards of which shall be determined by the New Reorganized AmSurg Parent Board. |
| **Reorganized AmSurg Parent Governance and Shareholder Rights** | The new board of directors of Reorganized AmSurg Parent (the "**New Reorganized AmSurg Parent Board**") shall be appointed and the identities of the directors on the New Reorganized AmSurg Parent Board shall be set forth in the AmSurg Plan Supplement to the extent known at the time of filing.  Corporate governance for Reorganized AmSurg Parent, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "**New Reorganized AmSurg Parent Organizational Documents**"), the size and determination of the New Reorganized AmSurg Parent Board, and the material shareholder terms of Reorganized AmSurg Parent shall be determined by the Required Consenting AmSurg Second Lien Term Lenders and shall be consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and shall be |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | disclosed in the AmSurg Plan Supplement. |
| **Exemption from SEC Registration** | The issuance of all securities under the AmSurg Plan, if applicable, will be exempt from SEC registration under applicable law. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Parties consent to the continuation of the Debtors' wages, compensation, and benefits programs according to existing terms and practices and payment in full in cash of all claims arising thereunder or related thereto, including executive compensation programs (but excluding non-ordinary course bonus payments or any other payments other than ordinary course compensation and benefits programs), and any motions in the Bankruptcy Court for approval thereof (provided that payments made by the AmSurg Debtors shall be solely for costs attributable to the AmSurg Debtors' businesses, [5] and shall not include any payments (including, without limitation, bonus payments) to insiders other than ordinary wages and benefits).  On the AmSurg Plan Effective Date, the Debtors shall (a) in consultation with the Required Consenting AmSurg Second Lien Term Lenders and solely following diligence reasonably acceptable to the Required Consenting AmSurg Second Lien Term Lenders, assume all employment agreements, existing indemnification agreements (except as otherwise set forth herein), or other agreements with current employees; provided, however that any employment agreements or other agreements, claims, and/or obligations related to insider employees shall not be assumed absent the consent of the Required Consenting AmSurg Second Lien Term Lenders; or (b) enter into new agreements with such employees on terms and conditions acceptable to the AmSurg Debtors, such employee, and the Required Consenting AmSurg Second Lien Term Lenders. |
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the AmSurg Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the AmSurg Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the AmSurg Restructuring on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the AmSurg Debtors than the indemnification provisions in place prior to the AmSurg Restructuring, except for any obligations to indemnify for the conduct of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EVPS Debtors, in their capacities as such. |

---

[5] Such allocation to be in compliance with the that certain Shared Services Agreement.

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| **Retained Causes of Action** | The Reorganized AmSurg Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the AmSurg Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the AmSurg Plan. |
| **Conditions Precedent to the AmSurg Restructuring** | The following shall be conditions to the AmSurg Plan Effective Date, if applicable (the "**Conditions Precedent**"):<br><br>(a)  The Bankruptcy Court shall have entered the AmSurg Confirmation Order, which shall:<br><br> (i)   authorize the AmSurg Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the AmSurg Plan;<br><br> (ii)  decree that the provisions in the AmSurg Confirmation Order and the AmSurg Plan are nonseverable and mutually dependent;<br><br> (iii) authorize the AmSurg Debtors, as applicable and/or necessary, to:  (a) implement the AmSurg Restructuring; (b) distribute the Reorganized AmSurg Parent New Common Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the AmSurg Plan, including cash and the Reorganized AmSurg Parent New Common Equity; and (d) enter into any agreements, transactions, and sales of property as set forth in the AmSurg Plan Supplement;<br><br> (iv)  authorize the implementation of the AmSurg Plan in accordance with its terms; and<br><br> (v)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the AmSurg Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the AmSurg Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;<br><br>(b)  the AmSurg Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the AmSurg Plan;<br><br>(c)  the final version of the AmSurg Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been |

19

|  | | filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Restructuring Term Sheet, and the AmSurg Plan; |
|  | (d) | the AmSurg Restructuring Support Agreement shall remain in full force and effect; |
|  | (e) | the AmSurg Backstop Commitment Agreement, including the AmSurg Backstop Premium Equity (as an administrative expense of the AmSurg Debtors), shall have been approved by the Bankruptcy Court and shall remain in full force and effect; |
|  | (f) | the SPA Order shall have bene entered by the Bankruptcy Court and shall remain in full force and effect; |
|  | (g) | the AmSurg Exit First Lien Term Loan Facility Commitment Letter, including all commitment and other fees contemplated therein, shall have been approved by the Bankruptcy Court and shall remain in full force and effect; |
|  | (h) | subject to the AmSurg Cash Collateral Order, including the budget and allocation provisions therein, all professional fees and expenses of retained professionals of the AmSurg Debtors that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the AmSurg Plan Effective Date shall have been placed in a professional fee escrow account pending the approval of such fees and expenses by the Bankruptcy Court; |
|  | (i) | the AmSurg Exit Facilities shall have been duly executed and delivered by all of the entities that are party thereto and all conditions precedent (other than conditions related to the occurrence of the AmSurg Plan Effective Date) to the effectiveness of such facilities shall have been satisfied or waived in writing in accordance with the terms of the applicable facility and the closing of each facility shall have occurred; |
|  | (j) | the AmSurg Intercompany Loan Claim has not been disallowed and is not subject to a Challenge (as defined in the EVPS Cash Collateral Order); |
|  | (k) | each of the applicable Definitive Documents shall have been duly executed and delivered, in each case consistent in all respects with the Restructuring Term Sheet and the AmSurg Restructuring Support Agreement, and all conditions precedent (other than conditions related to the occurrence of the AmSurg Plan Effective Date) to the effectiveness of each such Definitive Document shall have been satisfied or waived in accordance with the terms thereof; |
|  | (l) | each of the AmSurg Rights Offering Documents shall have been executed and delivered, in each case consistent in all respects with this Restructuring Term Sheet, the AmSurg Restructuring Support Agreement, and the AmSurg Backstop Commitment Agreement, and all conditions precedent (other than conditions related to the occurrence of the AmSurg Plan Effective Date) to the effectiveness of |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS** | |
|---|---|
| | each such transaction documents and each such AmSurg Rights Offering Document shall have been satisfied or waived in accordance with the terms thereof; |
| | (m) the AmSurg Debtors' use of cash collateral shall not have been terminated; |
| | (n) all aspects of the separation of the Reorganized AmSurg Debtors and the EHC ASC Debtors from the other Company Parties, as applicable, shall be effectuated on terms and in a manner acceptable to the Required Consenting AmSurg Second Lien Term Lenders; |
| | (o) none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or shall have been dismissed; |
| | (p) no trustee or examiner with expanded powers shall have been appointed under any chapter of the Bankruptcy Code with respect to the Debtors; |
| | (q) the reasonable and documented fees and expenses of the Required Consenting AmSurg Second Lien Term Loan Lenders shall have been paid; and |
| | (r) the AmSurg Debtors shall have implemented the AmSurg Restructuring and all transactions contemplated in this Restructuring Term Sheet (other than the EHC ASC Debtors Sale Transaction) in a manner consistent with the AmSurg Restructuring Support Agreement, this Restructuring Term Sheet, and the AmSurg Plan. |
| **Waiver of Conditions Precedent** | The AmSurg Debtors, with the prior written consent of the Required Consenting AmSurg Second Lien Term Lenders, may waive any one or more of the Conditions Precedent. |
| **Restructuring Transactions Structuring** | The parties will negotiate in good faith regarding the structuring of the Restructuring Transactions, including with regard to the tax implications thereof and who bears any such tax consequences and such structuring shall be acceptable to the Debtors and the Required Consenting AmSurg Second Lien Term Lenders. |

## <u>EXHIBIT C</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[2] by and among [●] and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting AmSurg First Lien Term Lender," or "Consenting AmSurg Second Lien Term Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| AmSurg Revolving Loans | |
| AmSurg First Lien Term Loans | |
| AmSurg Second Lien Term Loans | |
| Equity Interests | |
| EVPS ABL Loans | |
| EVPS Term Loans | |
| EVPS Unsecured Notes | |
| EVPS Equity Interests | |

---

[2]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT D

## Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2023 (the "**Agreement**")[3] by and among Envision Healthcare Corporation, the other Company Parties, and the Consenting Stakeholders and agrees to be bound by the terms and conditions of the Agreement as a Consenting Stakeholder, and shall be deemed a "**Consenting Stakeholder**" and a "**Party**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

_____

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| AmSurg Revolving Loans | |
| AmSurg First Lien Term Loans | |
| AmSurg Second Lien Term Loans | |
| Equity Interests | |
| EVPS ABL Loans | |
| EVPS Term Loans | |
| EVPS Unsecured Notes | |
| EVPS Equity Interests | |

---

[3]    Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT E

### ABC Provisions

*Definitions*

"<u>Anti-Corruption Laws</u>" means, collectively, (a) the U.S. Foreign Corrupt Practices Act; (b) the UK Bribery Act 2010; and (c) any other applicable laws related to combatting bribery or corruption.

"<u>Anti-Money Laundering Laws</u>" means all applicable laws, rules, or regulations relating to terrorism, financial crime or money laundering, including without limitation the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, the United States Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957), the Anti-Money Laundering Act of 2020, the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 as amended including pursuant to the Money Laundering and Terrorist Financing (Amendment) Regulations 2019, Proceeds of Crime Act 2002, as amended and the rules and regulations (including those issued by any governmental or regulatory authority) thereunder.

"<u>Restricted Party</u>" means any Person (a) included on one or more of the Restricted Party Lists; (b) located, organized, or ordinarily resident in a jurisdiction that is the subject of country- or territory-wide sanctions (currently, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk People's Republic, Luhansk People's Republic, Kherson and Zaporizhzhia regions of Ukraine; each a "<u>Sanctioned Jurisdiction</u>"); (c) owned or controlled by, or acting on behalf of, any of the foregoing; (d) with whom a U.S., EU, or UK Person is otherwise prohibited from dealing under Sanctions and Export Control Laws; or (e) with whom the Company is otherwise prohibited from dealing under applicable Sanctions and Export Control Laws.

"<u>Restricted Party Lists</u>" means lists of sanctioned or restricted parties maintained by the United Nations, the United Kingdom, the United States, or the European Union, and any other relevant jurisdiction following lists:  the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, and the Sectoral Sanctions Identifications List, and any other lists administered by OFAC, as amended from time to time; the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce; the Non-SDN Chinese Military-Industrial Complex Companies List; the consolidated list of Persons, Groups and Entities Subject to EU Financial Sanctions, as implemented by the EU Common Foreign & Security Policy; and similar lists of restricted parties maintained by other relevant governmental authorities.

"<u>Sanctions and Export Control Laws</u>" means any applicable law related to (a) import and export controls, including the U.S. Export Administration Regulations; (b) economic sanctions, including those administered by the United States (including the Office of Foreign Assets Control of the U.S. Department of the Treasury ("<u>OFAC</u>")) the European Union, any European Union Member State, the United Nations, His Majesty's Treasury of the United Kingdom, or any other jurisdiction applicable to the Company; or (c) anti-boycott measures.

*Representations and Warranties*

To the knowledge of the directors and officers of the Company Parties, neither the Company Parties nor any director, officer, employee, or other Person acting on behalf of the Company Parties:

    a.  has violated any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws;

    b.  is or has been a Restricted Party; nor

    c.  has engaged in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party.

To the knowledge of the directors and officers of the Company Parties, there is no past, pending, or threatened action, suit, proceeding, or investigation relating to the Company Parties, nor any director, officer, employee, or other Person acting on behalf of the Company that relates to a violation of Sanctions and Export Control Laws, Anti-Corruption Laws, or Anti-Money Laundering Laws.

*Covenants*

During the Agreement Effective Period, each Company Party shall, jointly and severally, cooperate with reasonable requests from Required Consenting AmSurg Second Lien Term Lenders for information or documentation relating to the Company Parties' compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions and Export Control Laws and the Company's associated compliance policies, procedures, and controls.

During the Agreement Effective Period, each Company Party shall, jointly and severally, terminate (a) all contracts, agreements, and other arrangements pursuant to which such Company Party is committed to provide or receive any goods, services, or technologies to or from any Restricted Party; (b) all investments or operations in or with any Sanctioned Jurisdiction or Restricted Party; (c) all dealings with persons or entities that would cause such Company Party or the Required Consenting AmSurg Second Lien Term Lenders to violate Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

During the Agreement Effective Period, each Company Parties shall, jointly and severally, adopt and maintain policies, procedures, and controls reasonably designed to prevent, detect, and deter violations of Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions and Export Control Laws.[4]

Each Company Party further shall, jointly and severally:

    a.  not offer, promise, provide, or authorize the provision of any money, property, or other thing of value, directly or indirectly, to any Person to improperly influence official action or secure an improper advantage, or to encourage the recipient to breach a duty of good faith or loyalty or the policies of his/her employer, or otherwise violate any Anti-Corruption Law;

---

[4]    Note to PIMCO: Please provide your preferred form for these policies.

b. not violate any Anti-Money Laundering Law;

c. not engage in any dealings or transactions (directly or knowingly indirectly) with or for the benefit of any Restricted Party, or otherwise violate any Sanctions and Export Control Laws or cause the Required Consenting AmSurg Second Lien Term Lenders to violate any Sanctions and Export Control Laws;

d. promptly notify the Required Consenting AmSurg Second Lien Term Lenders of any potential material violations by such Company Party relating to any Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws;

e. promptly notify the Required Consenting AmSurg Second Lien Term Lenders of any action, suit or investigation by any Governmental Entity against such Company Party in relation to alleged or potential violations of Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws;

f. comply with reasonable inquiries by the Consenting Stakeholders to confirm compliance with the foregoing provisions; and

g. cooperate in good faith with the reasonable efforts of the Required Consenting AmSurg Second Lien Term Lenders to address and/or remediate any potential gaps in policies and procedures or violations by such Company Party of Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions and Export Control Laws.

## Exhibit C

**Corporate Organizational and Capital Structure Chart**

Envision
HEALTHCARE

**Key**

*Legal Entity Type*

- Corporation
- Limited Liability Company
- Limited Partnership, Other Entities
- Varies
- Captive Insurance Company

*Funded Indebtedness*

Envision:

- ABL / Revolver / Term Loans / Interco Notes Borrower
- ABL / Revolver / Term Loans / Interco Notes Guarantor
- Unsecured Notes Issuer
- Unsecured Notes Guarantor
- Pledged Entity Under the ABL / Revolver / Term Loans / Interco Notes

AmSurg Credit Facility Silo:

- AmSurg Borrower / Interco Notes Lender
- AmSurg Guarantor
- AmSurg Pledged Entity

*Primary Business Units*

- Corporate (EHC Silo)
- AMSURG (AMSURG Silo)
- Envision Physician Services (EHC Silo)
- Evolution Health (EHC Silo)
- AMSURG (EHC Silo)