**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENVISION HEALTHCARE CORPORATION, *et al.*,[1] | ) Case No. 23-90342 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF**
**DENNIS STOGSDILL, MANAGING DIRECTOR**
**OF ALVAREZ & MARSAL NORTH AMERICA, LLC,**
**IN SUPPORT OF (I) THE DEBTORS' FIRST DAY MOTIONS**
**AND (II) THE DEBTORS' _EMERGENCY_ MOTION FOR ENTRY**
**OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS**
**TO USE CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION**
**TO PREPETITION SECURED PARTIES, (C) SCHEDULING A FINAL HEARING,**
**(D) MODIFYING THE AUTOMATIC STAY, AND (E) GRANTING RELATED RELIEF**

I, Dennis Stogsdill, declare as follows under penalty of perjury that if called to testify, I would testify competently to the facts and opinions set forth in this Declaration.

1.     I am over the age of 18 and I am authorized to submit this declaration on behalf of the Debtors.

2.     I submit this declaration in support of the above-captioned debtors' and debtors-in-possession (collectively, the "Debtors", with those Debtors that are direct or indirect subsidiaries of AmSurg Holdco, LLC being the "AmSurg Debtors", and those Debtors that are direct or indirect subsidiaries of Envision Parent Holdings, Inc. and which are not AmSurg Debtors being the "EVPS Debtors") first day motions, including the *Debtors' Emergency Motion for Entry of*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.ra.kroll.com/Envision.  The Debtor's service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

*Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief*, filed contemporaneously herewith.

3.      On May 15, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "Keglevic Declaration").

4.      Unless otherwise indicated, the statements set forth in this declaration (the "Declaration") are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the team at Alvarez & Marsal North America, LLC and its wholly owned subsidiary NACR Services, LLC (together, "A&M") working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional.  I am not being specifically compensated for this testimony other than through payments that are proposed to be received by A&M as a professional retained by the Debtors, subject to this Court's approval.

### Professional Background

5.      I am a Managing Director at A&M, a restructuring advisory services firm and the proposed financial advisor to the Debtors.  A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high-quality, specialized management and restructuring advisory services to debtors and distressed companies.  A&M provides a wide range of turnaround advisory services targeted at stabilizing and improving a

company's financial position, including:  (a) developing or validating forecasts, business plans, and related assessments of strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages.  A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

6.    Since the Debtors engaged A&M in October 2021, A&M has worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information.  I am the senior leader of the A&M team advising the Debtors.

7.    I have worked more than 25 years in financial restructuring and management consulting specializing in bankruptcies, reorganizations, and business restructurings for underperforming companies.  I am experienced in strategic planning, cash management, liquidation analysis, covenant negotiations, and valuation.  I have substantial knowledge and experience serving as either a senior officer or as a restructuring advisor to troubled companies. That experience includes stabilizing a company's financial condition, analyzing its operations, and developing an appropriate business plan to accomplish the necessary restructuring of its operations and finances.  I have served in either a senior management position or as a turnaround consultant for a number of companies in a variety of industries including gaming, retail, and consumer products.  Some of my notable advisory assignments have included Neiman Marcus Group, Sears, PhyMed Healthcare, Sun Healthcare, Revel Hotel & Casino, Fresh & Easy Markets, McClatchy, Lee Enterprises, Oriental Trading, Oneida, Calpine, Star Gas Partners, Exide Technologies,

Samsonite, Forbes, Aladdin Gaming, Verso, Rent-Way, Donnkenny, GEO Specialty Chemicals, and Cendant.

8.      I earned a bachelor's degree in accounting from Rutgers University.  I am a Certified Insolvency and Restructuring Advisor, and a member of the Association of Insolvency & Restructuring Advisors, American Bankruptcy Institute and the Turnaround Management Association.  I have also been qualified as an expert witness in U.S. Bankruptcy Courts and am recognized as an Accredited Valuation Analyst by the National Association of Certified Valuation Analysis.  Further, I have a Certification in Distressed Business Valuation from the Association of Insolvency & Restructuring Advisors.

9.      This Declaration sets forth the relevant facts in support of each of the Debtors' first day motions (collectively, the "First Day Motions"), including the Cash Collateral Motion.

## First Day Motions[2]

10.      The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions include the following:

- **Cash Collateral Motion.**  *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral and Renew Letters of Credit, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status and Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Cash Collateral Motion");

- **Joint Administration Motion.**  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

- **Schedules/SOFAs Extension Motion.**  *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules*

---

[2]   Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Keglevic Declaration or the corresponding First Day Motion, as applicable.

*of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, (E) Rule 2015.3 Financial Reports, and (II) Granting Related Relief* (the "Schedules and Statements Extension Motion");

- **Claims, Noticing, and Solicitation Agent Retention.** *Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (the "Notice & Claims Agent Application");

- **Creditor Matrix Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notice of the Commencement, and (III) Granting Related Relief* (the "Creditor Matrix Motion");

- **Patient Matrix Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Implementation of Procedures to Protect Confidential Patient Information* (the "Patient Matrix Motion");

- **Cash Management Motion.** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* (the "Cash Management Motion");

- **Wages Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion");

- **Insurance Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees and Claims Administration Fees, and (D) Maintain the Surety Bond Program and Letters of Credit, and (II) Granting Related Relief* (the "Insurance Motion");

- **NOL Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief* (the "NOL Motion");

- **Taxes Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion");

- **Utilities Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>");

- **Vendors Motion.** *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Patient Care and Safety Vendors, (B) 503(b)(9) Claimants, (C) Lien Claimants, and (D) Critical Vendors and (II) Granting Related Relief* (the "<u>Vendors Motion</u>");

- **Refunds Motion.** *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Refund Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "<u>Refunds Motion</u>"); and

- **PC/ASC Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations to Professional Corporations, (B) Obtain New Professional Corporation Contracts, (C) Honor and Incur Obligations to Ambulatory Surgery Centers, and (D) Obtain New Ambulatory Surgery Center Contracts, (II) Extending the Automatic Stay to Ambulatory Surgery Centers, and (III) Granting Related Relief* (the "<u>PC/ASC Motion</u>").

11.     The First Day Motions seek authority to, among other things, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not disrupted by these chapter 11 cases, and continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible.  I believe the Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief described in the First Day Motions would hinder the Debtors' operations and cause irreparable harm.  It is my view that the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.

12.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtors' successful reorganization, and (c) best serves the Debtors' estates.

I.     **Cash Collateral**

13.     I believe that the Debtors' business requires immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and pursue value-maximizing restructuring transactions as contemplated by the RSA.  I understand that all of the Debtors' available cash constitutes the Prepetition Secured Parties' Cash Collateral, and the Prepetition Secured Parties have security interests in substantially all of the Debtors' assets.  As of the Petition Date, the Debtors have approximately $655 million of cash on hand.

14.     During these chapter 11 cases, the Debtors will need the cash generated from their assets and operations to ensure continuation of high-quality patient care as well as satisfy certain payments that are essential for the continued management, operation, and preservation of the Debtors' businesses.  Without prompt access to Cash Collateral, I do not believe the Debtors will be able to satisfy employee compensation obligations, satisfy trade payables incurred in the ordinary course of business, preserve and maximize the value of their estates, or fund the administration of these chapter 11 cases, which failures would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  I believe the ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of these chapter 11 cases.

15.     I believe that a cessation of the Debtors' access to their Cash Collateral would have severe implications for the Debtors' many patients.  The Debtors rely on Cash Collateral to pay

physicians, non-clinical employees, vendors, and suppliers to manage the ambulatory surgery centers and other healthcare facilities where they provide care to patients.  Without access to Cash Collateral, the Debtors would likely need to cease operations, resulting in cancelled patient appointments, thereby delaying the provision of medical services to the patients who need and expected to receive such services.

16.     Against that backdrop, the Debtors negotiated with the Prepetition Secured Parties to develop Budgets, adequate protection packages, and restructuring timeline that would induce the lenders to consent to the use of their Cash Collateral.  The Debtors and the Prepetition Secured Parties agreed that consensual use of Cash Collateral—not a new debtor-in-possession financing facility—was appropriate.  Accordingly, the Debtors reached an agreement with the Prepetition Secured Parties regarding the consensual use of their Cash Collateral on the terms set forth in the proposed Cash Collateral Orders.

17.     I and my team at A&M assisted the Debtors in developing a 13-week cash flow forecast for each Budget for the use of Cash Collateral during these chapter 11 cases.  The Budget contains line items for cash flows anticipated to be received and disbursed during the time period for which the Budget is prepared.  Based on my experience and extensive discussions with the Debtors' management team and advisors, I believe the Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

18.     It is my understanding that the Debtors propose to provide the Prepetition Secured Parties with an adequate protection package including, among other things, adequate protection liens, superpriority claims, and payment of certain fees and expenses, as applicable.  I believe that each form of adequate protection is appropriate under the circumstances and will adequately

protect the Prepetition Secured Parties against any actual diminution in value of their interest in the Cash Collateral.

19.     As part of the provision of adequate protection to the ABL Lenders, the EVPS Prepetition ABL Obligations under or relating to outstanding EVPS L/Cs shall be converted into EVPS L/C Superpriority Claims secured by the EVPS L/C Liens.  I believe that the EVPS L/C Roll-Up reflects the EVPS Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The EVPS Prepetition ABL Lenders and Letter of Credit Issuers would not otherwise consent to the use of their Cash Collateral or the renewal of the EVPS L/Cs without the EVPS L/C Roll-Up.  The EVPS L/C Roll-Up will benefit the EVPS Debtors and their estates because it will enable the EVPS Debtors to maintain access to necessary Cash Collateral and letters of credit critical to administering these chapter 11 cases and funding their operations.

20.     The EVPS Debtors are unable to obtain credit on more favorable terms from sources other than the ABL Secured Parties and are unable to obtain adequate unsecured credit allowable under the Bankruptcy Code as an administrative expense.  The EVPS Debtors are also unable to obtain secured credit allowable under the Bankruptcy Code without granting to the ABL Secured Parties the EVPS L/C Liens and incurring the ABL Adequate Protection Obligations under the terms and conditions as set forth in the EVPS Interim Order.

21.     Absent entry of the Cash Collateral Orders, the Debtors would be unable to generate revenue, operate their businesses, or pay the thousands of individuals who report to work each day. Indeed, without access to sufficient cash, the Debtors would potentially have to suspend operations, materially damaging the Debtors' business reputation and relationships with employees, patients, payers, and healthcare facility partners, and potentially triggering termination events under the Debtors' contracts with ASCs and other healthcare partners, which are the

primary source of income for the business.  In the competitive, complex, and heavily regulated healthcare industry, such a result would be disastrous for the Debtors' business and materially harm the Debtors' efforts to reorganize and preserve the value of their estates for their constituents. For these reasons, I believe the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their creditors, and all other parties in interest.

## II.    Procedural Motions.

### A.  Joint Administration Motion.

22.    The Debtors seek entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.  The Debtors request that one file and one docket be maintained for all of the jointly administered cases under the case of Envision Healthcare Corporation.

23.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Entry of the order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

24.    I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### B.  Schedules and Statements Extension Motion.

25.    The Debtors seek entry of an order: (a) extending the deadline by which the Debtors will file their schedules of assets and liabilities, schedules of current income and expenditures,

schedules of executory contracts and unexpired leases, and statements of financial affairs by an additional 45 days to and including July 12, 2023, for a total of 59 days from the Petition Date; and (b) extending the deadline by which the Debtors must file their initial reports of financial information as set forth in Federal Rule of Bankruptcy Procedure 2015.3 to and including the later of (i) 15 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code or (ii) 59 days after the Petition Date (i.e., July 12, 2023).

26.     Ample cause exists to grant the relief requested herein.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the 217 Debtor entities. Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases.  Because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

27.     Further, I believe that extending the deadline to file the initial 2015.3 Reports will provide the Debtors with the necessary time to examine the books and records of their non-debtor subsidiaries that are subject to Bankruptcy Rule 2015.3.  The additional time will also enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

28.     I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**C.  Notice & Claims Agent Application.**

29.     The Debtors seek entry of an order granting their ex parte application to employ Kroll Restructuring Administration LLC ("Kroll") as claims, noticing, and solicitation agent in the Debtors' chapter 11 cases.

30.     The Debtors submit that the appointment of Kroll as Claims and Noticing Agent is in the best interest of the Debtors' estates and their creditors because the distribution of notices and the processing of claims will be expedited.  Moreover, based on all engagement proposals obtained and reviewed, Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.

31.     I believe that the relief requested in the Notice & Claims Agent Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**D.  Creditor Matrix Motion.**

32.     The Debtors seek entry of an order: (a) authorizing the Debtors to redact certain personally identifiable information, (b) approving the form and manner of notice of commencement of these chapter 11 cases, and (c) granting related relief.

33.     Redaction of personally identifiable information is appropriate because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams under section 107(c)(1) of the Bankruptcy Code, and disclosure risks violating relevant law.

34.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### E.  Patient Matrix Motion.

35.     Pursuant to the Patient Information Procedures Motion, the Debtors request that this Court enact procedures to protect confidential information of current and former patients of the Debtors.  Specifically, the Debtors request that Koll Restructuring Administration LLC, the proposed claims agent in these chapter 11 cases be allowed to prepare a separate creditor matrix and separate schedules of claims that may be asserted by and against the Patients.

36.     I believe that the relief requested herein balances the need to maintain confidential patient information under HIPAA with the need for disclosure under the Bankruptcy Code.

37.     I believe that the relief requested in the Patient Information Procedures Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption

### III.   Operational Motions.

### A.  Cash Management Motion.

38.     The Debtors seek entry of interim and final orders to:  (a) operate their cash management system, as described herein and as illustrated on Exhibit A attached to the Cash Management Motion, and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; and (b) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described in the Cash Management Motion.

39.     Given the economic and operational scale of the Debtors' businesses, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of their estates and numerous stakeholders.

40.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**B.  Wages Motion.**

41.     Pursuant to the Wages Motion, the Debtors seek entry of an order authorizing the Debtors to pay prepetition amounts due to employees on account of wages, salaries, other compensation, and reimbursable expenses and to continue employee benefits in the ordinary course, including payment of certain related prepetition obligations.  Without the continued, uninterrupted services of the Debtors' workforce, the ability of the Debtors to provide quality patient care and maintain and administer their estates will be materially impaired, and the Debtors' reorganization efforts will be jeopardized.

42.     The Debtors' ability to provide quality patient care through both their Physician Services and AMSURG business segments depends on the continued service and morale of the Debtors' Employees and Independent Contractors.  The Employees and Independent Contractors include highly-trained personnel who are not easily replaced.  Without the continued, uninterrupted services of the Employees and Independent Contractors, the Debtors' ability to maintain and administer their estates will be materially impaired.  The vast majority of the Debtors' Employees and Independent Contractors rely on compensation provided by the Debtors to pay their daily living expenses and could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation (and, with respect to Employees, providing health and other benefits) in the ordinary course during these chapter 11 cases.

14

43.    I believe that the Debtors' timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary-course operations, continue providing quality patient care, and avoid personal financial hardship to the Employees.

44.    I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### C.  Insurance Motion.

45.    The Debtors seek entry of an order authorizing the Debtors to continue their prepetition insurance coverage and satisfy related prepetition obligations, renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, pay prepetition obligations on account of and continue to pay brokerage fees and claims administration fees, and maintain the surety bond program and letters of credit.

46.    To ensure uninterrupted coverage under the Insurance Policies, I believe it is essential to pay any amounts owed in connection with the Insurance Policies and to continue to honor obligations under the Insurance Policies as they come due on a postpetition basis in the ordinary course of business and consistent with past practice.

47.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### D.  NOL Motion.

48.    Pursuant to the NOL Motion, the Debtors seek entry of an order approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor Enterprise Parent Holdings Inc.'s existing classes of common stock or any Beneficial Ownership therein and directing that any purchase, sale, other transfer of, or declaration

15

of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*.

49.     The Tax Attributes are of significant value to the Debtors and their estates.  An ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes.

50.     For all of these reasons, I believe the relief in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**E.  Taxes Motion.**

51.     Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon Audit or otherwise to be owed for periods prior to, including, or following the Petition Date) and to undertake Tax Planning Activities.

52.     I believe that the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**F.  Utilities Motion.**

53.     Pursuant to the Utilities Motion, the Debtors seek entry of an order approving the proposed Adequate Assurance Deposit for future Utility Services, prohibiting the Utility Providers (as defined herein) from altering, refusing, or discontinuing services, approving the Adequate Assurance Procedures for resolving Adequate Assurance Requests, and authorizing fee payments to Engie and Hastings for services performed.

54.     Uninterrupted Utility Services are essential to the Debtors' ongoing healthcare operations and their ability to provide care to patients.  On any given business day, patients undergo

surgical procedures and receive medical treatments for which sophisticated life-sustaining equipment powered by the Utility Services is essential.  As such, any interruption in Utility Services would not only be detrimental to the Debtors' business but any interruption of the Utility Services, no matter how brief, could be extremely harmful to the patients at the Debtors' facilities.

55.     I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**G. Vendors Motion.**

56.     The Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay, in the ordinary course of business, certain prepetition claims of (i) Patient Care and Safety Vendors, (ii) Lien Claimants, (iii) 503(b)(9) Claimants, and (iv) Critical Vendors; and (b) granting related relief.

57.     As ambulatory surgery center operators and healthcare providers, the Debtors operate in one of the most heavily regulated and closely scrutinized industries in the country.  To operate and maintain its medical facilities, the Debtors rely on a steady flow of supplies and services, including medical supplies, medical equipment, and regular maintenance services.  The Debtors' ability to succeed in the healthcare space relies, among other things, on their business relationships with the Patient Care and Safety Vendors.  In the ordinary course of business, the Debtors incur obligations to their Patient Care and Safety Vendors for such services—the payment of which is necessary to ensure the health, safety, environmental, and regulatory compliance of the Company's operations.  A disruption in the supply of such goods and services could jeopardize the Debtors' ability to safely maintain and operate its medical facilities, compromising the Debtors' ability to maintain their high standards of patient care and safety.  The Patient Care and Safety Vendors are distinguishable from other vendors that are critical to the Debtors' business in

17

that the Patient Care and Safety Vendors have a direct, profound impact on the Debtors' ability to operate medical service facilities and meet regulatory requirements. The extensive, comprehensive regulations and requirements to which the Debtors are subject can only be fulfilled through uninterrupted access to the essential goods and services provided by the Patient Care and Safety Vendors.

58.     Failure to timely pay amounts owed to the Lien Claimants could result in, among other things, Lien Claimants asserting liens against certain of the Debtors' assets under applicable state law, which could disrupt the Debtors' ordinary course operations and delivery of quality patient care

59.     Most of the Critical Vendors are virtually irreplaceable due to the specialized nature of the products and services provided to the Debtors—the process of billing and collecting payment for medical services is more complicated than in most industries, and the debt collection Critical Vendors have specialized knowledge of this process which enables them to effectively collect on account of unpaid balances. It is vital to the continued operation of the Debtors' business and continuity of patient care that the Debtors maintain their relationships with the Critical Vendors.

60.     I understand that the Debtors' trade relationships with their Patient and Safety Care Vendors, Lien Claimants, 503(b)(9) Claimants, and Critical Vendors generally are not governed by long-term contracts, and the Debtors believe those trade relationships may materially deteriorate, causing disruption to the Debtors' operations if the Debtors are unable to make payments to the Trade Claimants. The Debtors believe payment of the Trade Claims is essential to avoid costly disturbances to the Debtors' business during these chapter 11 cases at this critical juncture.

61.     I believe that the relief requested in the Vendors Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**H.  PC/ASC Motion.**

62.     The Debtors seek entry of an order authorizing the Debtors to continue to honor obligations to and enter into new contracts with the Professional Corporations and Ambulatory Surgery Centers and extending the automatic stay to Ambulatory Surgery Centers.

63.     The Debtors' operating revenues are highly dependent on their ability to continue to provide management and administrative services to Professional Corporations during these chapter 11 cases and to enter into new Professional Corporation Contracts in the ordinary course of business.   Even short-term interruptions to the Debtors' performance under Professional Corporation Contracts could cause PC Physicians to end their relationships with the Debtors, which would threaten the Debtors' ability to continue operating their businesses, to the detriment of all of their stakeholders.   Given the importance of the Debtors' relationships with the Professional Corporations and the PC Physicians that own these entities, the Debtors request authority to continue to provide all management and administrative services currently being provided to the Professional Corporations and to enter into new Professional Corporation Contracts during these chapter 11 cases.

64.     In addition to the Professional Corporations, the Debtors also provide management and administrative services to ambulatory service centers in which the Debtors own an interest. The Debtors provide management and other services to the ASCs pursuant to the ASC Management Services Agreements, which include management services such as financing and obtaining loans required to operate the ASCs.

65.     The Debtors also enter into operating agreements and administrative services agreements with their physician partners that govern the management of the ASCs and responsibilities of each owner.  In connection with these responsibilities, certain Debtor entities guarantee equipment loans and real property leases entered into by the ASCs.  The Debtors seek authority to cash collateralize the equipment guarantees as needed should equipment lenders pursue enforcement remedies, as well as authority to provide a guarantee, as needed in the Debtors' business judgment, to vendors that supply critical medical supplies to ASCs.  The Debtors also seek an extension of the automatic stay to the ASCs.

66.     The Debtors' provision of management and other services to the Professional Corporations and the ASCs is fundamental to the Debtors' business.  Without these relationships, the Debtors have no business.  Further, these relationships generate substantial revenue for the Debtors, to the benefit of all of the Debtors' stakeholders.

67.     I believe that the relief requested in the PC/ASC Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**I.     Refunds Motion.**

68.     The Debtors seek entry of an interim order and a final order authorizing the Debtors to maintain and administer prepetition refund programs and honor certain prepetition obligations related thereto and granting related relief.  The failure to do so could materially harm the trust and confidence of the Debtors' patients and other Refund Recipients during these chapter 11 cases.  The Debtors are also required, under contract and various laws, to reimburse Refund Recipients as overpayments are identified.

69.     The Refund Recipients consist of patients, insurers, and Healthcare Facility partners, all of whom are vital to the Debtors' business.  If the relationships established by the

Debtors with their Refund Recipients are harmed by the Debtor's failure to provide reimbursement for overpayments or pursuant to negotiated contractual arrangements, the Debtors could suffer serious reputational consequences.  Without functional relationships with their patients, healthcare insurers, and Healthcare Facility partners, the Debtors have no business.  Further, the Debtors may lose the trust of such Refund Recipients and new and existing Refund Recipients alike may be unwilling to engage with the Debtors going forward.  If that were to occur, the negative impact on the Debtors' business, their estates, and creditors would be significant and potentially irreversible. It is therefore necessary for the successful reorganization of the Debtors that they be permitted to honor the Refund Programs.

70.     I believe that the relief requested in the Refunds Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  May 15, 2023

/s/ *Dennis Stogsdill*

Dennis Stogsdill
Managing Director
Alvarez & Marsal North America LLC