**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENVISION HEALTHCARE CORPORATION, *et al.*,[1] | ) | Case No. 23-90342 (CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 15, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on May 15, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]     A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision.   The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including paying certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.      Envision Healthcare Corporation ("EVHC" and together with certain of its Debtor and non-Debtor affiliates and subsidiaries, "Envision" or the "Company") is a leading national medical group that works in collaboration with healthcare partners, payors, and others in the healthcare industry to ensure the delivery of high-quality, accessible, and affordable patient care.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their businesses, including facts and circumstances giving rise to these chapter 11 cases, is set forth in the First Day Declarations,[2] filed contemporaneously with this motion and incorporated by reference herein.

7.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

8.      Envision operates across two business segments:  Envision Physician Services ("Physician Services") and Ambulatory Surgery ("AMSURG").  As of the Petition Date, the Debtors employ approximately 7,682 individuals across their Physician Services and AMSURG business segments, including clinicians and non-clinicians within Physician Services, individuals in corporate roles within AMSURG, and other individuals in corporate roles who perform accounting, finance, legal, human resources, and management-related functions for the Envision enterprise as a whole (collectively, the "Employees").  The Debtors also supplement their

---

[2]     Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in (a) the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "Keglevic First Day Declaration") and (b) the *Declaration of Dennis Stogsdill, Managing Director of Alvarez & Marsal North America, LLC, in Support of (I) the Debtors' First Day Motions and (II) the Debtors'* Emergency *Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Stogsdill First Day Declaration," and together with the Keglevic First Day Declaration, the "First Day Declarations").

workforce from time to time by relying on specialized individuals on a temporary or a project basis (the "Independent Contractors").  The Independent Contractors, who complete discrete projects and fulfill duties similar to the Employee job functions, are a critical and cost-effective supplement to the Employees.

9.      The Debtors' ability to provide quality patient care through both their Physician Services and AMSURG business segments depends on the continued service and morale of the Debtors' Employees and Independent Contractors.  The Employees and Independent Contractors include highly-trained personnel who are not easily replaced.   Without the continued, uninterrupted services of the Employees and Independent Contractors, the Debtors' ability to maintain and administer their estates will be materially impaired.

10.      The vast majority of the Debtors' Employees and Independent Contractors rely on compensation provided by the Debtors to pay their daily living expenses and could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation (and, with respect to Employees, providing health and other benefits) in the ordinary course during these chapter 11 cases.

**I.      Physician Services Workforce.**

11.      As of the Petition Date, the Debtors employ approximately 7,097 physicians, advanced practice providers, and clinical support professionals (the "Physician Services Employees") within the Physician Services segment of the business.  As a supplement to the Physician Services Employees, the Debtors currently have approximately 1,035 active engagements with Independent Contractors (the "Physician Services Independent Contractors"). The Physician Services Employees and Physician Services Independent Contractors perform functions critical to the ordinary-course operations of the physician services segment.  Physician Employees, for example, conduct patient consultations, oversee patient treatment, and prescribe

medication, among numerous other responsibilities that are essential to the provision of patient care.  Advanced practice providers (*i.e.*, physician assistants and nurse practitioners) perform a variety of functions similar to those typically performed by physicians, such as conducting patient examinations and prescribing medication.  Additionally, clinical support professionals manage the operational needs of the Debtors' physician services business, including billing, human resources, legal, and finance functions, among others.

12.    In many instances, the Physician Services Employees and Physician Services Independent Contractors are distinctly familiar with the Debtors' highly differentiated array of clinical solutions, processes, and systems, and possess specialized knowledge, skills, and experience that cannot be easily replaced.

13.    The following is a breakdown of the Physician Services Employees and Physician Services Independent Contractors:

| Physician Services Workforce | |
|---|---|
| **TOTAL Physician Services Employees** | **7,097** |
| *Clinicians* | |
| Full Time | 1,965 |
| Part Time | 249 |
| Per Diem | 925 |
| **Total Clinicians** | **3,139** |
| *Non-Clinicians* | |
| Full Time | 3,551 |
| Part Time | 184 |
| Per Diem | 223 |
| **Total Non-Clinicians** | **3,958** |
| **TOTAL Physician Services Independent Contractors** | **1,035** |
| **TOTAL Physician Services Workforce** | **8,132** |

II.     **AMSURG Workforce.**

14.     The AMSURG segment of the business operates as a management organization that manages the ambulatory surgery centers ("ASCs") in which the Debtors hold an ownership interest.    As of the Petition Date, there are approximately 585 corporate Employees (the "AMSURG Employees") and one Independent Contractor (the "AMSURG Independent Contractor").  The AMSURG Employees and AMSURG Independent Contractor aid in acquiring, developing, and operating ASCs in partnership with credentialed physicians and employees of the non-Debtor ASCs.  The AMSURG Employees and the AMSURG Independent Contractor provide management services to and perform non-clinical, administrative services for the ASCs.

15.     In many instances, the AMSURG Employees and the AMSURG Independent Contractor are distinctly familiar with the Debtors' ASC operations, processes, and systems, and possess specialized knowledge, skills, and/or experience that cannot be easily replaced.  In addition to compensating the AMSURG Employees and the AMSURG Independent Contractor, certain Debtor entities also directly fund routine corporate overhead costs pursuant to management services agreements between the Debtor entities and the applicable non-Debtor ASCs.  These costs include, in most cases, processing payroll for and providing certain benefits to (collectively, the "Non-Debtor Payroll Obligations") the ASC employees and independent contractors as part of the Debtors' management role in the ASCs.  The ASC employees and independent contractors are neither employees of the Debtors nor independent contractors retained by the Debtors.[3]

---

[3]     The Debtors discuss the Non-Debtor Payroll Obligations here solely for the purpose of transparency.  The Debtors are not requesting authority by this motion to continue funding the Non-Debtor Payroll Obligations, but are requesting such relief in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief*, filed contemporaneously herewith (the "Cash Management Motion").

16.     The following is a breakdown of the AMSURG Employees and the AMSURG Independent Contractor:

| AMSURG Workforce | |
|---|---|
| **TOTAL AMSURG Employees** | **585** |
| Full Time | 566 |
| Part Time | 12 |
| Per Diem | 7 |
| **TOTAL AMSURG Independent Contractors** | **1** |
| **TOTAL AMSURG Workforce** | **586** |

**Compensation and Benefits**

17.     The Debtors seek authority to pay and honor certain prepetition claims and continue to honor obligations on a postpetition basis relating to, among other things: Wages; Additional Clinician Compensation; Independent Contractor Obligations; Reimbursable Expenses; Third-Party Professional Agency Fees; Recruiting & Employment Agency Fees; Withholding and Deduction Obligations; Payroll Processing and Related Obligations; Non-Qualified Deferred Compensation Plans; the Non-Insider Incentive and Bonus Programs; the Non-Insider Severance Program; the Non-Employee Director Compensation; the Health and Welfare Programs; and certain other benefits that the Debtors have historically provided in the ordinary course (each as defined herein, and collectively, the "Compensation and Benefits Programs").  The timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary course operations, continue providing quality patient care, and avoid personal financial hardship to their Employees and their Independent Contractors.

18.     The Debtors seek authority to make the following payments related to prepetition amounts accrued and outstanding on account of the Compensation and Benefits Programs (the "Compensation and Benefits Obligations"):

| RELIEF SOUGHT | AMOUNT |
|---|---|
| **Compensation, Withholding, and Related Obligations** | |
| Wages | $44,500,000 |
| Additional Clinician Compensation | $11,500,000 |
| Independent Contractor Obligations | $12,100,000 |
| Reimbursable Expenses | $3,900,000 |
| Third-Party Professional Agency Fees | $24,700,000 |
| Recruiting & Employment Agency Fees | $500,000 |
| Withholding and Deduction Obligations | $20,9000,000 |
| Payroll Processing and Related Obligations | $3,000,000 |
| Non-Employee Director Compensation | N/A |
| NQDC Fees | $30,000 |
| Non-Insider Incentive and Bonus Programs | $13,400,000 |
| Non-Insider Severance Program | $800,000 |
| **Employee Benefits Program** | |
| Health Benefit Programs | $66,330,000 |
| Life and Disability Insurance | $5,700,000 |
| Workers' Compensation Program | $7,000,000 |
| 401(k) Plan | $7,900,000 |
| Paid Time Off Benefits | N/A |
| Supplemental Benefits Programs and Benefit Plan Administrators | $6,800,000 |
| **TOTAL** | $229,060,000 |

19.     The Debtors request the right to modify, change, or discontinue any of their Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further approval by the Court, subject to applicable law.

**I.     Compensation, Withholding, and Related Obligations.**

**A.     <u>Wages</u>**

20.     The Debtors pay Physician Services Employees' wages (the "<u>Physician Services Wages</u>") on a bi-weekly, semi-monthly, or monthly basis.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $70 million per month in Physician

Services Wages obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $41.9 million on account of accrued but unpaid Physician Services Wages.

21.     The Debtors pay AMSURG Employees' wages (the "AMSURG Wages" and, together with the Physician Services Wages, the "Wages") on a bi-weekly, semi-monthly, or monthly basis.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $4.1 million per month in AMSURG Wages obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $2.6 million on account of accrued but unpaid AMSURG Wages.

22.     Any loss of Wages could cause the Employees to experience substantial financial hardship and could result in Employee departures.  The Debtors' ordinary course operations and uninterrupted provision of quality patient care depend on the continued service of the Employees. The Debtors do not believe that they owe any Employees unpaid Wages in excess of the $15,150 priority amount cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  The Debtors request authority to pay their Employees any accrued but unpaid Wages and to continue honoring and paying Wages obligations on a postpetition basis in the ordinary course of business.

          **B.     Additional Clinician Compensation.**

23.     The Debtors pay certain clinician Employees (*i.e.*, physicians and advanced practice providers) through a number of forms of variable compensation (the "Additional Clinician Compensation").  Eligible clinicians receive a portion of their total compensation in the form of Additional Clinician Compensation either on a cadence consistent with their bi-weekly or monthly pay cycles (and, in some cases, recipients are paid one to two months in arrears following the relevant performance period), or on a quarterly or annual basis.  Additional Clinician Compensation payments are calculated using a range of metrics, including services provided and billed, productivity, performance, number of shifts worked, types of shifts worked, and overtime

hours, among numerous others.  Additional Clinician Compensation might take the form of payments for relocating to different work sites as required for a given Employee's position, profit-sharing payments based on the Debtors' yearly financial performance, payments for beginning a term of employment with the Debtors, or awards for referring a candidate for employment who is subsequently hired by the Debtors, among various other things.

24.     In the twelve months before the Petition Date, the Debtors incurred an average of approximately $11.3 million per month on account of Additional Clinician Compensation.  As of the Petition Date, the Debtors estimate that they owe approximately $11.5 million in the aggregate on account of Additional Clinician Compensation.  The Debtors request authority to pay any accrued but unpaid obligations on account of Additional Clinician Compensation and to continue honoring and paying such obligations on a postpetition basis in the ordinary course of business.

### C.     Independent Contractor Obligations.

25.     The Debtors engage Independent Contractors in the ordinary course of business to perform a wide range of services that are critical to the Debtors' operations, including IT, finance, accounting, tax planning, and many of the clinical and administrative functions that the Employees perform.  The terms of a given Independent Contractor's engagement vary based on location:  some Independent Contractors are paid an hourly rate, while others receive shift pay; some Independent Contractors are entitled to compensation based on certain productivity metrics and can earn additional compensation for extra work performed.  Depending on the terms of the engagement of a given Independent Contractor, payment for services rendered may take the form of conventional fee payments or Additional Clinician Compensation, among other kinds of compensation described herein.

26.     As of the Petition Date, the Debtors estimate that they owe approximately $12.1 million on account of accrued but unpaid Independent Contractor compensation

10

(the "Independent Contractor Obligations").  The Independent Contractors are a necessary and cost-effective supplement to the Debtors' Employees, and authority to continue paying the Independent Contractor Obligations is critical to minimizing disruption of the Debtors' continued business operations.  The Debtors request authority to pay any accrued but unpaid Independent Contractor Obligations and to continue honoring and paying the Independent Contractor Obligations on a postpetition basis in the ordinary course of business.

        **D.**    **Reimbursable Expenses.**

27.     In the ordinary course of business, the Debtors reimburse eligible Employees and Independent Contractors for reasonable approved expenses incurred in connection with performing their job functions (the "Reimbursable Expenses").  The Debtors seek authority to continue the Reimbursable Expense programs and to pay amounts relating to Reimbursable Expenses, including unpaid amounts owed to Employees and Independent Contractors on account of (a) the Debtors' Business Expense Reimbursement Account, (b) Employee Personal Cards, and (c) Independent Contractor Reimbursements (each as defined herein).

28.     ***Business Expense Reimbursement Account.***  Eligible Employees may submit their Reimbursable Expenses pursuant to the Debtors' Business Expense Reimbursement Account Policy (the "BERAP") administered by SAP Concur.  The BERAP is intended to provide tax-free reimbursements to eligible Employees for expenses related to their specific lines of work. Permissible Reimbursable Expenses under the BERAP include (a) travel expenses that eligible Employees incur in connection with performing their clinical responsibilities, (b) education expenses that eligible Employees incur in connection with maintaining and furthering their clinical skills, (c) technology expenses that eligible Employees incur in connection with performing their work obligations, (d) medical supplies and equipment expenses that eligible Employees incur in connection with fulfilling their clinical duties, (e) professional dues and membership expenses that

11

eligible Employees incur in connection with maintaining professional certifications, and (f) certain other qualifying business expenses.

29.    ***Employee Personal Cards.***  Employees may elect to use their personal credit cards (the "Employee Personal Cards") to incur Reimbursable Expenses and thereafter seek reimbursement for such expenses from the Debtors.  The Debtors' inability to reimburse Employees on behalf of use of Employee Personal Cards would impose a hardship on such individuals where the obligations were incurred for the Debtors' benefit.

30.    ***Independent Contractor Reimbursements.***  The Debtors reimburse Independent Contractors for certain Reimbursable Expenses incurred in connection with performing their job functions.  These expenses generally stem from business-related travel and are reimbursed through contractual arrangements with each Independent Contractor individually.

31.    In the twelve months before the Petition Date, the Debtors incurred an average of approximately $1.4 million per month on account of Reimbursable Expenses to Employees and Independent Contractors.  As of the Petition Date, the Debtors estimate that they owe approximately $3.9 million in the aggregate on account of Reimbursable Expenses.  The Debtors' inability to pay Reimbursable Expenses could impose hardship on Employees and Independent Contractors where they incurred Reimbursable Expenses with the understanding that such expenses would be reimbursed in a timely manner.  The Debtors request authority to pay accrued but unpaid amounts on account of Reimbursable Expenses and to continue paying Reimbursable Expenses on a postpetition basis in the ordinary course of business.

E.    **Third-Party Professional Agency Fees**

32.    The Debtors regularly utilize the services of temporary workers, locum workers, and third-party clinical practitioners (collectively, the "Third-Party Professionals") who provide a variety of services that are critical to business operations.  The Debtors have historically sourced

such Third-Party Professionals from staffing agencies (such as KForce Inc. and Cynet Health), agencies that source revenue-cycle management professionals (such as Data-Core Systems Inc. and GeBBS Healthcare Solutions, Inc.), locum tenens agencies, and other professional-services providers (collectively, the "Third-Party Professional Agencies").  As of the Petition Date, there are approximately 100 Third-Party Professionals providing services to the Debtors.  The Debtors make payments to the Third-Party Professional Agencies for services performed in sourcing and compensating  Third-Party  Professionals  (the "Third-Party  Professional  Agency  Fees"). Generally, the Debtors make lump-sum payments to the Third-Party Professional Agencies on a monthly basis, and the Third-Party Professional Agencies subsequently pay the Third-Party Professionals for services rendered.

33.     The Third-Party Professional Agencies are invaluable in identifying and engaging qualified Third-Party Professionals.  For example, the Debtors partner with ScribeAmerica, LLC ("ScribeAmerica") to supplement their clinical workforce with off-site scribes (medical professionals who assist clinicians with documenting patient interactions, data entry, and a range of additional administrative functions).  ScribeAmerica recruits, staffs, schedules, credentials, and manages the scribes on behalf of the Debtors and, in exchange, receives fees as set forth in the applicable contract or related statement of work.

34.     The Debtors also leverage locum tenens agencies to engage Third-Party Professionals who meet the Debtors' personnel needs in clinician roles.  The locum tenens agencies contract with licensed and experienced healthcare professionals and make those professionals available to the Debtors on a temporary basis to augment the capacity of the Debtors' clinical workforce.  Similarly, the Debtors partner with professional services providers to meet personnel needs where, for example, the Debtors have entered into a management services agreement with a

hospital partner but do not have adequate internal personnel available to meet the hospital partner's clinical staffing needs under that arrangement.  The professional services providers contract with the Debtors to provide experienced, licensed clinicians to assist in the operation and management of hospital departments pursuant to the Debtors' contractual relationships with hospital systems.

35.    The authority to continue paying the Third-Party Professional Agency Fees is critical to minimize disruption of the Debtors' continued business operations.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $9.2 million per month on account of the Third-Party Professional Agency Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $24.7 million in the aggregate on account of accrued but unpaid Third-Party Professional Agency Fees.  The Debtors request authority to pay any accrued but unpaid Third-Party Professional Agency Fees and to continue honoring and paying Third-Party Professional Agency Fees on a postpetition basis in the ordinary course of business.

F.    **Recruiting & Employment Agency Fees.**

36.    To develop and maintain an industry-leading workforce of physicians, advanced practice providers, and clinical support professionals, the Debtors rely on the services of recruiting agencies including, but not limited to, PeerSource Partners, LLC ("PeerSource"), Vaco LLC ("Vaco"), and ZipRecruiter, Inc. ("ZipRecruiter").  The Debtors also partner with HireRight, LLC ("HireRight") to conduct background checks in connection with sourcing candidates for employment with the Debtors, and Experian PLC ("Experian," and, together with PeerSource, Vaco, ZipRecruiter, and HireRight, the "Recruiting & Employment Agencies") to aid in Form I-9 compliance.  In exchange for monthly or per-hire fees (the "Recruiting & Employment Agency Fees"), the Recruiting & Employment Agencies assist the Debtors in locating and screening potential Employees.  The authority to continue paying the Recruiting & Employment Agency Fees is critical to ensure that the Debtors can maintain adequate staffing and to minimize disruption

of business operations.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $300,000 per month on account of the Recruiting & Employment Agency Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $500,000 in the aggregate on account of accrued but unpaid Recruiting & Employment Agency Fees.  The Debtors request authority to pay any accrued but unpaid Recruiting & Employment Agency Fees and to continue honoring and paying Recruiting & Employment Agency Fees on a postpetition basis in the ordinary course of business.

### G.    Withholding and Deduction Obligations

37.    During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments and similar deductions as required by law.  The Debtors also make other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans, such as an Employee's share of healthcare benefits and insurance premiums (including malpractice insurance coverage for participating clinician Employees), contributions under voluntary benefit programs, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions").

38.    Pursuant to federal and state law, the Debtors are also required to withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Employer Payroll Taxes," and, together with the Employee Payroll Taxes, the "Payroll Taxes").

39.     In the twelve months before the Petition Date, the Debtors incurred an average of approximately $33.2 million per month on account of the Payroll Taxes and the Deductions (together, the "Withholding and Deduction Obligations").  As of the Petition Date, the Debtors estimate that they owe approximately $20.9 million on account of the Withholding and Deduction Obligations.

40.     Any amounts held by the Debtors on account of the Withholding and Deduction Obligations are held in trust by the Debtors and are not property of the Debtors' estates.  The Debtors do not believe they need authorization to remit such payments to the appropriate third parties.  Out of an abundance of caution, however, the Debtors request authorization to remit all outstanding prepetition amounts deducted on account of the Withholding and Deduction Obligations and to continue to deduct and remit the Withholding and Deduction Obligations on a postpetition basis in the ordinary course of business consistent with their prepetition practices.

**H.      Payroll Processing and Related Obligations**

41.     The Debtors use certain human resources information systems to manage the Physician Services and AMSURG workforces and human resources-related functions, including payroll processing, timekeeping, attendance tracking, and leave management (collectively, the "HR Systems").  For example, the Debtors partner with ADP, LLC ("ADP") for payroll-tax processing and related services.  ADP processes the Debtors' payroll and federal W-2 tax forms and to complete payroll tax filings, including federal, state, and local filings.  Additionally, the Debtors leverage valuable timekeeping, attendance management, and leave-management solutions provided by AbsenceSoft, Kronos, Oracle, QGenda, UKG, and Ultipro.  The Debtors pay approximately $3,000 per month in subscription fees to ADP, and approximately $1.5 million per month in subscription fees to Kronos, Oracle, QGenda, UKG, and Ultipro for using their respective

HR Systems (the "<u>HR System Fees</u>").  As of the Petition Date, the Debtors estimate that they owe approximately $3 million in accrued but unpaid HR System Fees.

42.    The Debtors' relationships with the providers of the HR Systems allow the Debtors to realize substantial cost savings with respect to the administration of the Compensation and Benefits Programs by not having to employ additional human resources professionals.  The Debtors therefore seek authority to pay any accrued but unpaid prepetition HR System Fees and to continue paying for use of the HR Systems on a postpetition basis in the ordinary course of business.

**I.    <u>Non-Qualified Deferred Compensation Plans</u>**

43.    The Debtors maintain several non-qualified deferred compensation plans (the "<u>NQDC Plans</u>") administered by Newport Retirement Services ("<u>Newport</u>") to attract and retain key Employees by providing participants with an opportunity to defer receipt of a portion of their salary, bonus, and other specified compensation.  The amount that the Debtors pay to recipients under the NQDC Plans each year varies depending on, among other things, the employment status of a given recipient and certain elections made by such recipient.  The Debtors leverage consulting services provided by CapAcuity, LLC ("<u>CapAcuity</u>") to assist in the management of the NQDC Plans and to enhance investment outcomes for recipients.  The Debtors pay fees to both Newport and CapAcuity for their management and advisory services (the "<u>NQDC Fees</u>").  As of the Petition Date, new contributions under the NQDC Plans have been suspended.  The NQDC Plans consist of the following:

| NQDC Plans | Number of Participants | Type of Funding |
|---|---|---|
| Associated Physicians Deferred Compensation Plan ("APDCP") | 413 | Custodial Account |
| Envision Healthcare Physicians Savings Plan ("PSP") | 147 | Rabbi Trust[4] |
| Envision Healthcare Supplemental Executive and Director Retirement Savings Plan ("SERP") | 85 | Rabbi Trust |
| Emergency Medical Services Corporation Deferred Compensation Plan ("EMSDCP") | 28 | Rabbi Trust |
| EmCare, Inc. Supplemental Retirement Plan ("EmCare SERP") | 2 | Rabbi Trust |

44.      ***APDCP***.  The Debtors adopted the APDCP in recognition of indispensable services provided by their physician Employees and in an effort to make additional financial security available to those Employees upon retirement.  The APDCP is an unfunded plan structured to comply with the provisions of section 409A of the Internal Revenue Code.  The Debtors regularly deposit funds in a custodial account to fund the APDCP.  As of the Petition Date, the Debtors believe that they hold approximately $36.8 million in a Custodial Account on account of the APDCP plan.

45.      ***PSP***.  Similar to the APDCP, the Debtors implemented the PSP in recognition of contributions made by their physician Employees and in order to provide those Employees with added financial security in retirement.  The PSP is an unfunded plan structured to comply with the provisions of section 409A of the Internal Revenue Code, and the Debtors set aside funds for the PSP in a rabbi trust.  For the 2023 tax year, participating Employees have the option to elect a cash distribution (to be made in March 2024) in place of a contribution to the PSP in the same amount.

---

[4]    The trust is referred to as a "rabbi trust" because the first IRS letter ruling with respect to this type of trust involved a rabbi whose congregation had made contributions to such a trust for his benefit.  The ruling stated that the rabbi would not be taxed on the funds in the trust until the funds were distributed to the rabbi (or his beneficiary) upon his death, disability, retirement, or termination of employment.

Participating Employees who receive PSP contributions are ineligible to receive matching contributions under the 401(k) Plan.  As of the Petition Date, the Debtors believe that they hold approximately $31.4 million in a rabbi trust on account of the PSP.

46.     ***SERP, EMSDCP, EmCare SERP***.  The Debtors adopted the SERP, the EMSDCP, and the EmCare SERP in order to attract and retain key Employees by allowing them to defer receipt of a portion of their compensation, consistent with section 409A of the Internal Revenue Code, and to enable those Employees to attain an added measure of financial security in retirement. The Debtors deposit funds for the SERP, the EMSDCP, and the EmCare SERP in rabbi trusts.  As of the Petition Date, the Debtors believe that they hold approximately $21.6 million in rabbi trusts on account of the SERP, the EMSDCP, and the EmCare SERP, collectively.

47.     The vast majority of participants in the NQDC Plans are practicing clinician Employees who are essential to the Debtors' continued operations.  These Employees have invested substantial amounts in the NQDC Plans to provide for an added degree of financial security in retirement and, per the terms of the NQDC Plans (which are structured to comply with Internal Revenue Code requirements), are unable to access those funds without first resigning from their positions and creating adverse tax consequences for their investments in the process.

48.     The authority to continue paying the NQDC Fees is critical to ensure that the Debtors can preserve the value of the NQDC Plans.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $10,000 per month on account of the NQDC Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 in the aggregate on account of accrued but unpaid NQDC Fees.

49.     The Debtors seek authority to maintain each of the NQDC Plans pursuant to their terms and to continue administering the NQDC Plans and honoring all obligations related thereto

in the ordinary course of business on a postpetition basis.  The Debtors also request authority to pay any accrued but unpaid NQDC Fees and to continue to honor and pay the NQDC Fees in the ordinary course of business on a postpetition basis.

J.     **Non-Insider Incentive and Bonus Programs**

50.     The Debtors maintain a number of incentive and bonus programs to motivate, reward, and retain certain of their non-insider Employees (such plans, collectively, (the "Non-Insider Incentive and Bonus Programs").  The Non-Insider Incentive and Bonus Programs offer eligible Employees added incentive to meet predefined metrics applicable to their roles and the opportunity to earn bonus payments for outstanding performance.  In some cases, payments made pursuant to the Non-Insider Incentive and Bonus Programs represent a substantial component of the total compensation of individual Employees who participate in these programs.  For example, the Debtors maintain a short-term incentive plan (the "STIP") pursuant to which the Debtors pay benefits to approximately 2,100 non-insider Employees on a quarterly basis (in March, May, August, and November of each year).  The STIP provides eligible Employees with the opportunity to receive a target bonus for achieving certain retention and performance metrics.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the STIP.

51.     Additionally, as part of the Non-Insider Incentive and Bonus Programs, the Boards approved a discretionary bonus pool in October 2022 to support the retention of non-insider Employees across the Company (the "Discretionary Cash Enhancement Pool").  Using funding from this bonus pool, the Debtors implemented a long-term incentive program designed to retain and incentivize improved performance among approximately 150 non-insider Employees at the vice-president level.  Payments under the Discretionary Cash Enhancement Pool are made on a quarterly basis (in March, May, August, and November of each year) and include a retention-based component (75% of the total award) and a performance-based component (25% of the total award).

As of the Petition Date, the Debtors estimate that they owe approximately $6.3 million on account of the Discretionary Cash Enhancement Pool.

52.      In addition to recently implemented, retention-focused Non-Insider Incentive and Bonus Programs, the Debtors maintain various additional Non-Insider Incentive and Bonus Programs related to recruitment efforts, business development, revenue cycle management, educational goals, and a range of performance benchmarks for specific job functions.   The Non-Insider Incentive and Bonus Programs are generally discretionary and, in many cases, the Debtors pay de minimis amounts to eligible Employees under certain of these programs.   The Non-Insider Incentive and Bonus Programs drive Employee performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

53.      As of the Petition Date, the Debtors estimate that they owe approximately $13.4 million on account of the Non-Insider Incentive and Bonus Programs.   The Debtors seek authority to pay all prepetition amounts owed on account of the Non-Insider Incentive and Bonus Programs and to continue the Non-Insider Incentive and Bonus Programs and pay related amounts on a postpetition basis in the ordinary course of business.   The Debtors do not seek authority to pay any obligations arising from the Non-Insider Incentive and Bonus Programs to any Employees that are insiders (as such term is defined in section 101(31) of the Bankruptcy Code).

K.      **Non-Insider Severance Program.**

54.      The Debtors maintain, in their discretion, a severance plan (the "Severance Plan") in the ordinary course of business that provides payments to non-insider Employees who are involuntarily terminated as part of a reduction in workforce (each such payment, a "Severance Payment").   Employees eligible to receive Severance Payments are those that are either (a) classified by an employer as a regular, full-time, non-represented employee,

(b) providing non-clinical services for an employer, (c) ineligible for severance benefits described in any other summary plan description under the Severance Plan, and (d) terminated subject to a qualified terminating event as defined in the Severance Plan. Severance Payments are paid in accordance with normal payroll dates and begin with the payroll date immediately following the date that an eligible Employee satisfies all conditions for receipt of such Severance Payment under the Severance Plan. Severance Payments typically range between four weeks' to fifty-two weeks' weekly base pay. Severance Payments are not due and payable until Employees have signed a severance agreement, which typically includes a release and waiver of all claims.

55.     The Debtors' ability to pay and provide severance amounts has been critical to maintaining Employee morale and loyalty. Instability in the Debtors' workforce will undermine the Debtors' ability to maintain their operations at this critical juncture. Therefore, the Debtors seek authorization to make the Severance Payments as they may become due and consistent with their prepetition practices.

56.     As of the Petition Date, the Debtors believe that they owe approximately $800,000 on account of the Severance Payments to non-insider Employees. Some amounts owed on account of prepetition Severance Payments, however, may be unknown to the Debtors as of the Petition Date, but may become known and therefore due and owing during the course of these chapter 11 cases. The Debtors request authority to pay all outstanding prepetition amounts incurred on account of the severance obligations and to continue to pay such obligations on a postpetition basis in the ordinary course of business consistent with their prepetition practices. The Debtors do not seek permission to pay any obligations arising from the Severance Plan to any Employees that are insiders (as such term is defined in section 101(31) of the Bankruptcy Code).

### L.        **Non-Employee Director Compensation**

57.      Three disinterested directors serve on the board of directors of EVHC
(the "<u>Disinterested Directors</u>").   The Debtors pay each of the Disinterested Directors cash
compensation equal to $420,000 per year, payable monthly in advance.   The Disinterested
Directors are also entitled to reimbursement of all reasonable and documented out-of-pocket
business expenses incurred in connection with their services as Disinterested Directors.

58.      The boards of managers at each of AmSurg HoldCo, LLC and AmSurg, LLC
(together with the board of directors of EVHC, the "<u>Boards</u>") include two disinterested managers
(the "<u>Disinterested Managers</u>," and, together with the Disinterested Directors, the "<u>Disinterested
Board Members</u>").   The Debtors pay the Disinterested Managers cash compensation equal to
$300,000 per year, payable monthly in advance.  The Disinterested Managers are also entitled to
reimbursement of all reasonable and documented out-of-pocket business expenses incurred in
connection with their services as Disinterested Managers.

59.      The Debtors compensate the remaining non-Employee members of the Boards in
advance and reimburse reasonable and documented out-of-pocket expenses incurred by those
directors and managers in the course of discharging their duties to the Debtors (such compensation,
collectively, the "<u>Non-Employee Director Compensation</u>").   The Disinterested Board Members,
and the non-Employee Board members more generally, are a critical component of the Debtors'
governance structure and are vital to ensuring that the Debtors continue to adhere to governance
best practices.

60.      As of the Petition Date, the Debtors do not believe that they owe any prepetition
amounts on account of the Non-Employee Director Compensation.   As such, the Debtors seek
authority to pay any prepetition amounts solely out of an abundance of caution and to continue to

pay Director Compensation postpetition in the ordinary course of business and consistent with their past practices.

## II.     Employee Benefit Programs.

### A.     Health and Welfare Programs.

61.     The Debtors offer a comprehensive health and welfare benefits package to their Employees (collectively, the "Health and Welfare Programs"), including: (a) medical insurance; (b) prescription coverage; (c) healthcare support benefits; (d) telehealth services; (e) surgery planning; (f) dental insurance; (g) vision insurance; (h) health savings account and flexible spending account programs; (i) life and disability insurance (including executive life and disability coverage); (j) workers' compensation; (k) a 401(k) plan; and (l) paid time off benefits.  Certain Health and Welfare Programs are available only to benefit-eligible Employees while others are available to all Employees.

62.     The Debtors leverage health and wellness consulting services provided by Aon, Lockton, and TopGear (collectively, the "H&W Consultants") for assistance with selecting among available benefits and providers and setting Employee rates under various Health and Welfare Programs, among other things.  In the twelve months before the Petition Date, the Debtors paid an average of approximately $50,000 per month in fees to the H&W Consultants in connection with services related to the Health and Welfare Programs.  As of the Petition Date, the Debtors estimate that they owe approximately $110,000 in fees for services provided by the H&W Consultants.

63.     The Health and Welfare Programs are customary for similarly sized companies in the Debtors' industry, and Employees have come to rely on the Health and Welfare Programs. Without the Health and Welfare Programs, Employees would be forced to either forego health benefit coverage completely or obtain potentially expensive out-of-pocket coverage, adversely affecting Employee morale and retention.  Failure to continue the Health and Welfare Programs

could cause Employees to experience severe hardship and make it difficult for the Debtors to retain Employees. The Debtors request authority to pay and remit any outstanding prepetition amounts due under the Health and Welfare Programs and to continue the Health and Welfare Programs in the ordinary course of business on a postpetition basis and consistent with past practices.

### (1)    Health Benefit Programs.

64.    The Debtors offer their Employees the opportunity to participate in a number of health benefit programs, including medical, dental, and vision plans, as well as health savings account and flexible spending account programs (collectively, the "Health Benefit Programs"). In the twelve months before the Petition Date, the Debtors incurred an average of approximately $19.1 million per month on account of the Health Benefit Programs. Failure to continue paying amounts owed pursuant to the Health Benefit Programs (the "Health Benefit Program Obligations") could cause Employees to experience severe hardship and create challenges with respect to retention of the Debtors' workforce. The Debtors believe that they are authorized to continue the Health Benefit Programs in the ordinary course of business. Out of an abundance of caution, however, the Debtors seek authority to continue the Health Benefit Programs in the ordinary course of business on a postpetition basis (including by paying any prepetition amounts that may be outstanding) and consistent with past practices.

### i.    Medical Plans.

65.    ***Physician Services Medical Insurance Program.***  The Debtors offer medical insurance and prescription medication coverage to benefit-eligible Physician Services Employees (the "Physician Services Medical Insurance Program"). The Physician Services Medical Insurance Program is a self-insured program administered by AmeriBen, which utilizes the national Anthem BlueCross BlueShield network. The Debtors offer five medical plan options under the Physician Services Medical Insurance Program: (a) a PPO select plan, (b) a PPO primary

plan, (c) an HSA select plan; (d) an HSA primary plan; and (e) an HSA base plan.  Each Physician Services Employee contributes approximately between 45 to 82 percent of the cost for the Physician Services Medical Insurance Program, depending on the type of coverage the Employee selects, whether the Employee opts for in-network or out-of-network coverage, the Employee's salary level, and the applicable laws of the jurisdiction in which the Employee lives.  AmeriBen adjudicates and pays claims to healthcare providers, pharmacies, or Physician Services Employees, as applicable.

66.     The Debtors reimburse AmeriBen for in-network claims and out-of-network claims on a weekly basis and reimburse Express Scripts—AmeriBen's pharmaceutical partner—twice per month for prescription coverage.  The Debtors pay administrative fees in connection with services provided by AmeriBen and Express Scripts on a monthly basis.  In the twelve months before the Petition Date, the Debtors paid an average of approximately $15.4 million per month on account of the Physician Services Medical Insurance Program, including reimbursement payments and administrative fees.  As of the Petition Date, the Debtors estimate that they owe approximately $56.9 million on account of the Physician Services Medical Insurance Program.

67.     ***AMSURG Medical Insurance Program.***  The Debtors offer medical insurance and prescription medication coverage to benefit-eligible AMSURG Employees and to the employees of the AMSURG-managed ASCs that elect to have medical insurance provided through AMSURG (the "AMSURG Medical Insurance Program").  The AMSURG Medical Insurance Program is a fully insured program administered by Cigna.  The Debtors offer three medical plan options: (a) Cigna PPO, (b) Cigna HSA Primary Plan, and (c) Cigna HSA Base Plan.  Each AMSURG Employee contributes approximately 50 to 60 percent of the cost for the AMSURG Medical Insurance Program, depending on the type of coverage the AMSURG Employee selects, the

AMSURG Employee's salary level, and the applicable laws of the jurisdiction in which the AMSURG Employee lives.  Cigna adjudicates and pays claims to healthcare providers, pharmacies, or AMSURG Employees, as applicable.  The Debtors maintain an imprest balance in a bank account that Cigna draws funds from to cover medical and prescription claims, and the Debtors true up amounts in this account on a monthly basis.  The Debtors also pay administrative fees in connection with services provided by Cigna on a monthly basis.  In the twelve months before the Petition Date, the Debtors paid an average of approximately $2.2 million per month on account of the AMSURG Medical Insurance Program, including reimbursement payments and administrative fees owed to Cigna.  As of the Petition Date, the Debtors estimate that they owe approximately $5.3 million on account of the AMSURG Medical Insurance Program, including claim reimbursement payments and administrative fees owed to Cigna.

68.     ***COBRA.***  The Debtors are required to offer former Employees certain health benefits following their departure.  Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees of the Debtors (the "COBRA Employees") may continue insurance coverage under the Medical Plans, Dental Plans, and Vision Plans (the "COBRA Benefits").  COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to eighteen months, and in some instances up to thirty-six months, following termination of employment.

69.     COBRA Employees are responsible for paying all costs associated with the COBRA Benefits.  The Debtors provide for COBRA Benefits as part of their usual expenditure on account of the Medical Plans and accordingly do not believe that they owe any prepetition amounts on account of COBRA Benefits.  The Debtors seek authority (a) to pay any prepetition amounts outstanding on account of the COBRA Benefits solely out of an abundance of caution, (b) to

27

continue to offer the COBRA Benefits, including to those Employees who may be terminated after the Petition Date, and honor all postpetition obligations related thereto in the ordinary course of business and consistent with past practices, and (c) to continue to pay fees related to the COBRA Benefits postpetition in the ordinary course of business and consistent with past practices.

### ii.    Dental Plans.

70.    ***Physician Services Dental Insurance.***    The Debtors offer dental insurance to benefit-eligible Physician Services Employees through several Employee-funded plans (the "Physician Services Dental Plans") administered by Delta Dental ("Delta").  The Debtors offer three Delta dental plan options: (a) a DHMO plan, (b) a PPO base plan, and (c) a PPO buy-up plan.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $800,000 per month in premiums on account of the Physician Services Dental Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $1.9 million on account of the Physician Services Dental Plans, including claim reimbursement payments and administrative fees.

71.    ***AMSURG Dental Insurance.***    The Debtors offer dental insurance through several dental plans to benefit-eligible AMSURG Employees and to the employees of the AMSURG-managed ASCs that elect to have dental insurance provided through AMSURG (the "AMSURG Dental Plans").  The AMSURG Dental Plans are administered by Cigna Dental.  The Debtors offer three dental plan options: (a) a DHMO plan, (b) a PPO base plan, and (c) a PPO buy-up plan.  The Debtors pay a portion of the premiums for the AMSURG Dental Plans on a monthly basis as they become due and owing.  As of the Petition Date, approximately 2,600 AMSURG Employees are enrolled in one of the AMSURG Dental Plans.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $160,000 per month in premiums on account of the AMSURG Dental Plans.  As of the Petition Date, the Debtors

estimate that they owe approximately $370,000 on account of the AMSURG Dental Plans, including claim reimbursement payments and administrative fees.

### iii.    Vision Plans.

72.    ***Physician Services Vision Insurance.***    The Debtors offer vision insurance to benefit-eligible Physician Services Employees through Employee-funded plans (the "<u>Physician Services Vision Plan</u>") administered by EyeMed Vision ("<u>EyeMed</u>").    The Debtors offer two vision plan options:  (a) the Standard Plan, and (b) the Premier Plan.  The Vision Plan is an opt-in program in which Physician Services Employees pay the full amount of the coverage premium. In the twelve months before the Petition Date, the Debtors incurred an average of approximately $200,000 per month in premiums on account of the Physician Services Vision Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $400,000 on account of the Physician Services Vision Plan, including claim reimbursement payments and administrative fees.

73.    ***AMSURG   Vision   Insurance.***    The Debtors offer vision insurance to benefit-eligible Employees and to the employees of the AMSURG-managed ASCs that elect to have medical insurance provided through AMSURG through a fully insured plan (the "<u>AMSURG Vision Plan</u>") administered by EyeMed.  The Debtors offer two vision plan options:  (a) the Base Plan, and (b) the Buy-Up Plan.  The Debtors pay the premium on a monthly basis.  The AMSURG Vision Plan is an opt-in program in which AMSURG Employees pay a portion of the coverage premium, with the Debtors paying the remaining amount.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $30,000 per month in premiums on account of the AMSURG Vision Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $70,000 on account of the AMSURG Vision Plan, including claim reimbursement payments and administrative fees.

### iv.    Additional Health Benefit Programs.

74.    ***HSAs and FSAs.***  The Debtors provide eligible Employees with access to a health savings account ("HSA") program administered by Fidelity Brokerage Services LLC ("Fidelity") and a flexible spending account ("FSA") program administered by Businessolver, Inc. (d/b/a/ MyChoice Accounts) ("MyChoice").  All Employees in a high deductible health plan may contribute to an HSA, but only certain health plans and Employees qualify for Debtor-made contributions to an HSA.  The FSA program is made available to Employees enrolled in PPO medical plans, and Employees with high-deductible, high-premium medical plans may elect to open a limited-purpose FSA.  Under the HSA and FSA programs, eligible Employees may contribute part of their compensation (on a pre-tax basis) to a dedicated savings account and then use such funds to pay qualified expenses such as healthcare costs.[5]  The Debtors remit Employees' HSA and FSA contributions to Fidelity Investments and MyChoice and, in some cases, make matching contributions to Employees' HSAs, depending on the terms of a given HSA plan. Employees may pay qualified expenses from their HSA or FSA (as applicable) at the point of service using a dedicated debit card or manually submit claims for reimbursement to MyChoice (under the FSA program) or to Fidelity Investments (under the HSA program).  Additionally, the Debtors pay monthly administrative fees to Fidelity Investments and MyChoice in connection with the HSA and FSA programs.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $300,000 per month on account of the HSA and FSA programs and the associated administrative fees.  As of the Petition Date, the Debtors estimate that they owe approximately $800,000 on account of the HSA and FSA programs.

---

[5]    HSA program accounts and FSA program accounts differ in several ways, including participation eligibility criteria, applicable annual contribution limits, and the Employee's ability to roll over account funds from year to year.

75.     ***Stop-Loss Insurance.***  The Debtors maintain stop-loss insurance (the "Stop-Loss Insurance") through Voya Financial that provides coverage in the event that any Employee exceeds a $1.5 million deductible.  Pursuant to the terms of the Stop-Loss Insurance plan, Voya Financial reimburses the Debtors for any payments made above the deductible, subject to the policy limits. The fees paid to maintain the Stop-Loss Insurance are included in the fees paid to AmeriBen to maintain the Physician Services Medical Insurance Program, and average approximately $80,000 per month.  The Debtors seek authority to pay any unpaid prepetition amounts on account of Stop-Loss Insurance and to continue Stop-Loss Insurance on a postpetition basis in the ordinary course of business.

76.     ***Miscellaneous Health Benefit Programs.***  The Debtors also offer employee assistance programs (the "EAPs") administered by LifeWorks (US) Ltd. ("LifeWorks") and LifeSpeak Inc. ("LifeSpeak") to all Employees.  The EAPs provide confidential counseling through outside professionals to assist in resolving personal problems.  In the twelve months before the Petition Date, the Debtors paid an average of approximately $200,000 per month to LifeWorks and LifeSpeak on account of the EAPs.  As of the Petition Date, the Debtors estimate that they owe approximately $480,000 on account of the EAPs.

### (2)     Life and Disability Insurance.

77.     The Debtors provide basic term life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance Program") to benefit-eligible Employees through New York Life Insurance Company ("New York Life").  The Basic Life and AD&D Insurance Program provides the applicable Employee's annual Wages in the event of such Employee's death or serious injury.  The Debtors fund the total cost of the Basic Life and AD&D Insurance Program, which totals approximately $28.2 million per year.  Employees may arrange for payroll deductions

to fund purchases of supplemental coverage on an as-needed basis.  In the twelve months before the Petition Date, the Debtors incurred an average of approximately $2.4 million per month on account of the Basic Life and AD&D Insurance Program.  As of the Petition Date, the Debtors estimate that they owe approximately $5.7 million on account of the Basic Life and AD&D Insurance Program.

78.     Eligible Employees also have the option to purchase supplemental life and accidental death and dismemberment insurance for themselves, their spouses, or their dependents (the "Supplemental Life and AD&D Insurance"), short-term disability insurance ("STD Insurance"), and long-term disability insurance ("LTD Insurance").  The Supplemental Life and AD&D Insurance, STD Insurance, and LTD Insurance are provided by New York Life.  The Debtors also provide Company-paid core STD Insurance coverage to eligible Employees. Employees who opt to purchase Supplemental Life and AD&D Insurance or LTD Insurance pay the full amount of the applicable premium(s) through payroll deductions.

### (3)     Workers' Compensation Program.

79.     The Debtors maintain workers' compensation programs and workers' compensation insurance at the levels required by law in the states in which the Debtors have Employees and, where applicable, make payments on account of workers' compensation claims (the "Workers' Compensation Program").  The Debtors maintain coverage under the Workers Compensation Program through The Travelers Indemnity Company.  In the twelve months before the Petition Date, the Debtors paid approximately $3.7 million in fees and premiums under the Workers' Compensation Program.  As of the Petition Date, the Debtors estimate that they owe approximately $7 million on account of the Workers' Compensation Program.

80.    The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities arose before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[6]  To the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to permit the Employees to proceed with their claims under the Workers' Compensation Program.  This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

### (4)    401(k) Plan.

81.    The Debtors maintain a retirement savings plan for Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"), which is administered by Fidelity Investments ("Fidelity").  As of the Petition Date, 7,510 Employees participate in the 401(k) Plan.  The Debtors partner with Mercer LLC ("Mercer") to assist in the governance and administration of the 401(k) Plan and to provide related advisory services.  In the twelve months before the Petition Date, the Debtors paid an average of approximately $2.4 million per month in 401(k) Plan matching costs and in fees to Fidelity and Mercer for services related to the administration of the 401(k) Plan (the "401(k) Fees").  As of the Petition Date, the Debtors estimate that they owe approximately $7.9 million in accrued and unpaid 401(k) Fees.

82.    Many Employees' retirement savings consist primarily of their 401(k) Plan.  A disruption in or discontinuation of the 401(k) Plan could violate the terms of an Employee's

---

[6]    The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  The Debtors request authority to make any changes to current policy and practices that become necessary.

employment.  If the Debtors did not offer the 401(k) Plan and match Employee contributions, the Debtors would be less competitive in attracting a strong workforce.  Continuing the 401(k) Plan and the matching contributions are essential to maintaining Employee morale and recruiting and retaining Employees.  The Debtors therefore seek authority to pay any prepetition 401(k) Fees and to continue the 401(k) Plan and pay any related amounts (including matching costs) in the ordinary course of business on a postpetition basis consistent with past practices.

### (5)      Paid Time Off Benefits.

83.      The Debtors offer certain PTO benefits to certain eligible Employees, the specific terms of which vary across the Debtors' business segments.  The accrual of PTO Benefits is determined by the duration of an Employee's employment with the Debtors.  Employees with longer tenures accrue PTO at a higher rate and have a higher maximum PTO hours balance, subject to an annual accrual cap.  For example, for non-clinical Employees, the annual accrual cap is 80 hours.  PTO Benefits are paid at the Employee's base rate at the time the Employee uses or "cashes out" the PTO, and terminated Employees are paid for accrued and unused PTO at their base rate as of the termination date.  The PTO Benefits also include paid time off for bereavement leave and jury duty.  As of the Petition Date, the Debtors owe approximately $17.3 million in obligations on account of PTO Benefits.  For the avoidance of doubt, this amount is not a current cash payment obligation.

84.      The continuation of the PTO Benefits is essential to maintain Employee morale during these chapter 11 cases.  Employees depend on the PTO Benefits, and the Debtors anticipate that Employees will continue to make use of the PTO Benefits.  The PTO Benefits do not create any material cash flow requirements beyond the Debtors' normal payroll obligations except where an eligible Employee's employment is terminated.  The Debtors seek authority to pay any

prepetition amounts owed in connection with the PTO Benefits and to continue to honor obligations under the PTO Benefits in the ordinary course of business on a postpetition basis consistent with past practices.

**B.      Supplemental Benefits Programs and Benefit Plan Administrators.[7]**

85.      The Debtors also provide eligible Employees the opportunity to participate in supplemental benefits, some of which are administered by the Debtors, including (a) commuter incentive plans, (b) supplemental medical benefits programs, (c) the tuition assistance program; (d) stipends for various programs, (e) identity theft protection, (f) critical illness, accident, hospital indemnity, and legal cost coverage provided by MetLife, and (g) other forms of leave (collectively, the "Supplemental Benefits Programs").

86.      The Debtors utilize certain vendors to secure, administer, and manage these Supplemental Benefits Programs offered to Employees (collectively, the "Benefit Plan Administrators"). In the last twelve months, the Debtors have paid approximately $9.8 million per month on account of the Supplemental Benefits Programs and the Benefit Plan Administrators. As of the Petition Date, the Debtors estimate that approximately $6.8 million is accrued and outstanding on account of the Supplemental Benefits Programs and the Benefit Plan Administrators. Many Employees have come to rely on the Supplemental Benefits Programs and maintaining these benefits is critical to Employee retention and morale. The Debtors seek authority to pay their Employees and Benefit Plan Administrators any prepetition amounts due

---

[7]   The Benefit Plan Administrators include, but are not limited to, AmeriBen, Anthem BlueCross BlueShield, Cigna, Hawaii Medical Service Association, Express Scripts, Delta Dental, Cigna Dental, Eyemed, Combined Insurance Co. of America, HealthAdvocate, Amino, LiveHealth Online, 2nd.MD, HealthJoy, SurgeryPlus, New York Life Company, MetLife, Allstate Identity Protection, Fidelity, Wex Discovery Benefits, Fidelity Investments, LifeWorks, LifeSpeak, SAP Concur, Newport Retirement Services, Voya Financial, Unum, Provident Life, Businessolver, Inc. (d/b/a MyChoice), AbsenceSoft, AdvanceEDU, Lloyds of London, and Berkshire Hathaway, the Travelers Indemnity Company and Guardian Life.

pursuant to the Supplemental Benefits Programs consistent with past practice and to continue paying amounts due pursuant to the Supplemental Benefits Programs on a postpetition basis in the ordinary course of business.

<u>**Basis for Relief**</u>

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations**.

A.    **Certain Compensation and Benefits Obligations Are Entitled to Priority Treatment**.

87.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain Compensation and Benefits Obligations to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  11 U.S.C. § 1129(a)(9)(B).  Granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors.  Payment of the Compensation and Benefits Obligations at this time enhances value for the benefit of all interested parties.  *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense.  Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

B.    **Payment of Certain Compensation and Benefits Obligations Is Required by Law**.

88.    The Debtors seek authority to pay the applicable Withholding and Deduction Obligations to the appropriate third-party entities.  These amounts principally represent Employee earnings that governments, employees, and judicial authorities have designated for deduction from the Employees paychecks.  Certain Withholding and Deduction Obligations are not property of

the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d); *see also Equalnet*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

89.     Federal and state laws require the Debtors to withhold certain tax payments from Employees wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes). Because the Withholding and Deduction Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding and Deduction Obligations to the proper parties in the ordinary course of business.

90.     State laws also require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states and impose other penalties. Payment of all obligations related to the Workers' Compensation Program is crucial to the Debtors' continued operations and provision of patient care.

## II.     Payment of the Compensation and Benefits Obligations and the Relief Sought Herein Is Proper Under Section 363(b) of the Bankruptcy Code.

91.     Payment of prepetition obligations is appropriate where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition

claims pursuant to the "doctrine of necessity"). Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims.

92.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor's payment of prepetition claims where supported by an appropriate business justification). Under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty . . . to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497). Under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The above-referenced sections of the Bankruptcy Code thus authorize the postpetition payment of prepetition claims where the payments are critical to preserving the estate's going-concern value, as is the case here.

93.     The ability to maintain ordinary course operations and continue providing quality patient care depends on the continued service of the Debtors' workforce. The Debtors' failure to timely pay Compensation and Benefits Obligations would expose Employees and Independent Contractors to financial and other hardship.

94.     The Debtors believe that absent the payment of the Compensation and Benefits owed to their Employees and Independent Contractors, the Debtors may experience workforce turnover and instability. The Debtors' workforce cannot be replaced without significant effort

especially given the highly specialized nature of the healthcare industry and the technical expertise required to fill certain roles.  Workforce departures also risk disrupting patient care.

95.     Payment of the prepetition obligations with respect to the Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will provide the Debtors with the greatest likelihood of retention of their Employees and Independent Contractors.

**III.   A Limited Waiver of the Automatic Stay for the Debtors' Workers' Compensation Program Is Appropriate in this Case.**

96.     Section 362(a)(1) of the Bankruptcy Code operates to stay the following:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

97.     Cause exists to modify the automatic stay to permit Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum.  Absent such relief, Employees will have to either wait until the conclusion of these chapter 11 cases to pursue their workers' compensation claims or file their own motions seeking relief from the automatic stay.  If Employees must wait until the conclusion of these chapter 11 cases to continue pursuing their workers' compensation claims, this could adversely affect the financial well-being and morale of the Employees and lead to Employee departures and resulting operational disruptions.  If Employees were required to file their own stay relief motions, the Debtors would then need to divert time and resources to addressing these motions, which would unnecessarily deplete estate value.

39

98.     In addition, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  The automatic stay under section 362(d) of the Bankruptcy Code should be lifted to the extent necessary for Employees to proceed with their claims under the Workers' Compensation Program.

## Emergency Consideration

99.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Failure to receive the relief requested in this Motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  The Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested in this motion on an emergency basis.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

100.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be honored inadvertently.  Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions at the Debtors' request to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## Reservation of Rights

101.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any

claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

102.   The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

## Notice

103.     The Debtors will provide notice of this motion to the following:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the RCF Agent; (e) counsel to the Ad Hoc Group of First Lien AmSurg Lenders; (f) counsel to the AmSurg 2L Group; (g) counsel to the Envision Ad Hoc Group; (h) counsel to the Unsecured Notes Group; (i) counsel to the Consenting Sponsors; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

The Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
May 15, 2023

*/s/ Vienna Anaya*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Vienna Anaya (TX Bar No. 24091225)
Javier Gonzalez (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:             rchaikin@jw.com
                        vanaya@jw.com
                        jgonzalez@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:             esassower@kirkland.com
                        jsussberg@kirkland.com
                        ngreenblatt@kirkland.com
                        anne.wallice@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
John R. Luze (*pro hac vice* pending)
Annie L. Dreisbach (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:             john.luze@kirkland.com
                        annie.dreisbach@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Vienna Anaya*
Vienna Anaya

**<u>Certificate of Service</u>**

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Vienna Anaya*
Vienna Anaya