IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENVISION HEALTHCARE CORPORATION, *et al.*,[1] | ) ) ) | Case No. 23-90342 (CML) |
|  | ) |  |
| Debtors. | ) ) | (Joint Administration Requested) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO MAINTAIN AND ADMINISTER THEIR
EXISTING REFUND PROGRAMS AND HONOR CERTAIN PREPETITION
OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 15, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on May 15, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision. The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

1

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:

### Relief Requested

1. The Debtors seek entry of an interim order and a final order, substantially in the form attached hereto (the "Interim Order" and "Final Order," respectively), (a) authorizing the debtors to maintain and administer prepetition refund programs and honor certain prepetition obligations related thereto and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing with respect to the relief requested herein approximately thirty-five days after the Petition Date or as soon thereafter as is convenient for the Court.

### Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules")

### Background

5. Envision Healthcare Corporation ("EVHC" and together with certain of its Debtor and non-Debtor affiliates and subsidiaries, "Envision" or the "Company") is a leading national medical group that works in collaboration with healthcare partners, payors, and others in the healthcare industry to ensure the delivery of high-quality, accessible, and affordable patient care.

6.       On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the Debtors and their businesses, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declarations,[2] filed contemporaneously with this motion and incorporated by reference herein.

7.       The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### Refund Programs

8.       Various contractual obligations, as well as various state and federal laws and administrative rules[3] (such laws and rules, collectively, the "Regulations"), require in certain instances the Debtors to refund patients and other third parties, including healthcare facilities, healthcare insurers (commonly known as payers), and federal health care programs such as

---

[2] Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in (a) the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "Keglevic First Day Declaration") and (b) the *Declaration of Dennis Stogsdill, Managing Director of Alvarez & Marsal North America, LLC, in Support of (I) the Debtors' First Day Motions and (II) the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Stogsdill First Day Declaration," and together with the Keglevic First Day Declaration, the "First Day Declarations").

[3] For instance, a final rule promulgated by the Centers for Medicare & Medicaid Services, an agency within the Department of Health and Human Services, requires providers and suppliers receiving funds under the Medicare program to report and return overpayments by the later of the date that is 60 days after the date an overpayment was identified, or the due date of any corresponding cost report, if applicable. *See* 42 CFR 401 and 42 CFR 402. Health care providers and suppliers are also subject to statutory requirements under the Social Security Act and could face potential False Claims Act liability, Civil Monetary Penalties Law liability, or exclusion from federal health care programs for failure to report and return an overpayment.

3

Medicare and Medicaid (collectively, the "Refund Recipients"). As described further herein, the Debtors may owe refunds to Refund Recipients as a result of overpayment by such parties or pursuant to compensation models in the Debtors' contracts with healthcare facilities. In the ordinary course of business, the Debtors routinely issue refunds or, in lieu of issuing refunds, offset amounts ultimately owed to Refund Recipients resulting from the interaction between the Debtors' contractual obligations, billing procedures, patient medical insurance deductibles, and third-party payments (collectively, the "Refund Programs"). By this motion, the Debtors seek to continue to administer the following Refund Programs:

**I.      Patient Refunds**

9.      In the ordinary course of business, the Debtors bill patients and insurers for medical services provided to patients. After a patient pays the Debtors for medical services, a "credit balance" may occur when the payments and/or adjustments in total exceed the gross charges on a patient account. Once this credit balance has been identified and validated by the Company, the patient is entitled to a credit or refund from the Debtors (the "Patient Refunds").

10.      There are several situations that can result in Patient Refunds, including: (a) duplicate payments being processed, (b) a patient pays an initial out-of-pocket estimate for services, but after the insurance portion of the payment is made, the out-of-pocket amount due from the patient is less than estimated, (c) a patient is billed an inaccurate amount, or (d) there is a change of insurance coverage for the applicable patient (for instance, the Debtors may have been unaware of secondary insurance coverage and the amount due from the patient is adjusted once the secondary insurance coverage is applied to the services).

**II.     Healthcare Facility Refunds**

11.      In the ordinary course of business, the Debtors provide services to partner healthcare facilities (each a "Healthcare Facility" and collectively, the "Healthcare Facilities")

pursuant to professional service agreements or hospital services agreements (the "Healthcare Facility Agreements").  These Healthcare Facility Agreements may include a compensation model whereby the Healthcare Facilities provide subsidies or guarantees to the Debtors to meet a certain compensation threshold to ensure the availability of the Debtors' services.  For example, under certain Healthcare Facility Agreements, the Debtors contract to provide emergency medical services at the Healthcare Facilities twenty-four hours a day, seven days a week.  To ensure around the clock emergency medical care, the Healthcare Facilities are contractually obligated to subsidize the Debtors' costs of providing emergency services when the Debtors' collections for services provided are insufficient to enable the Debtors to provide such emergency services at fair market value.[4]  To subsidize the Debtors' costs for the provision of emergency medical services and ensure that the Debtors can maintain the contractually mandated level of service, the Healthcare Facilities compensate the Debtors under compensation models set forth in the Healthcare Facility Agreements.  These compensation models are either: (a) cost-based models, pursuant to which the Debtors and Healthcare Facilities make initial projections regarding the amount of the subsidy and then reconcile differences based on total costs and collections during the relevant period, (b) set subsidy models, pursuant to which the Debtors are paid a flat rate in monthly or annual installments, (c) revenue guarantee models, pursuant to which the parties agree to a required collections amount and the Healthcare Facilities provide subsidies to account for any shortfall, or (d) volume-slide models, pursuant to which the subsidy is calculated based upon a scale of annual billable volume by the individual Healthcare Facility.

---

[4]   Pursuant to the Emergency Medical Treatment and Labor Act, hospitals with emergency departments (and the professionals working in those emergency departments) are required to provide necessary emergency and stabilizing services to patients, regardless of those patients' ability to pay for such services.  As a result, collections on account of such services frequently fail to cover the Debtors' costs of providing emergency services, requiring subsidies to maintain open and high-quality emergency departments.

12. The Debtors' collections generated by providing clinical services are periodically reconciled with the payments received from Healthcare Facilities. In some instances, the Debtors may owe amounts to the Healthcare Facilities because the subsidies provided, combined with the actual collections received, ultimately exceeded the relevant compensation threshold agreed to in the underlying Healthcare Facility Agreement.

13. Regardless of the compensation model under which the Healthcare Facilities agree to subsidize the Debtors, when the subsidies provided by the Healthcare Facilities exceed the amounts the Debtors are contractually entitled to, the Healthcare Facilities are entitled to a refund of the excess funds from the Debtors (the "Healthcare Facilities Refunds").

### III. Insurance Refunds.

14. In the ordinary course of business, the Debtors are often paid by healthcare insurers for services provided to patients. Based upon the Debtors' contracts with Medicare, Medicaid, and private insurers, and pursuant to the Regulations, if a healthcare insurer overpays for services rendered to patients, the Debtors are obligated to refund the overpaying party for the excess amounts paid to the Debtors (such refunds, the "Insurance Refunds" and, together with the Patient Refunds and Healthcare Facility Refunds, the "Refunds"). Overpayments resulting in Insurance Refunds have a variety of causes, including: (a) duplicate payments made for the same service, (b) overpayment by an insurer, (c) changes in original charges billed, reducing the amount owed for the service, (d) overpayment of coinsurance, (e) payments made by an insurer for services rendered after termination of coverage, (f) payments made by a secondary insurer after the primary insurer has already paid for the services, and (g) payments received by multiple insurers, potentially due to coordination of benefits issues.

**IV.     Refund Reimbursement**

15.     The Debtors identify, validate, and issue Patient Refunds and Insurance Refunds pursuant to companywide credit balance operating procedures (the "Operating Procedures"). If circumstances arise that suggest an exception to the Operating Procedures is warranted, all exceptions must be approved by the Senior Vice President or Vice President overseeing the relevant service line, either on a case-by-case basis before processing or, for a batch of similar exceptions, within 30 days of such exception being processed.

16.     *Patient Refunds.*  The Debtors reconcile and pay Patient Refunds on a case-by-case basis. If a payment that exceeds the patient balance on an invoice is identified by the Debtors' online billing system, the system generates a task for the credit balance to be reviewed and validated by employees of the Debtors. Once a credit balance has been identified and validated, it is reviewed by employees of the Debtors to determine if the credit balance is the result of an overpayment by the patient or the result of a posting issue.

17.     If the credit balance is the result of overpayment, after the Debtors have clearly established and validated the credit owed to the patient, the Debtors' revenue operations department identifies the appropriate Debtor employee to authorize a refund, and a refund check is issued to the patient. All refund checks are issued within 60 days of the Debtors clearly establishing and validating the credit owed to the patient through this employee review process. If the patient paid by credit card, the Debtors may also process the refund via the appropriate credit card vendor. If the credit balance is the result of a posting issue, the posting issue is corrected by the Debtors within 60 days of identification.

18.     *Insurance Refunds.*  The process for providing Insurance Refunds differs depending on whether the payer is a federal health care plan (such as Medicare and Medicaid) or a private insurer.

7

19. <u>Private Insurer Reimbursement.</u>  Once the Debtors have identified, quantified, and validated credit balances associated with a private insurance payer that result from overpayments, such credit balances are communicated to the appropriate Refund Recipient for confirmation.  The communication to such Refund Recipient includes: (a) a corrected and/or voided claim, (b) written notification referencing applicable claim and payment information, or (c) a check issuance referencing the claim information.

20. If a notification letter is issued to a private insurance payer and such payer confirms overpayment, a refund of the confirmed amount is processed either as a refund check or recoupment, as preferred by the payer.  If a payer fails to confirm an identified credit balance as an overpayment within a lookback period required by applicable state law, the credit balance will be evaluated to determine if the balance is required to be escheated to the applicable state or held for future offset amounts.

21. <u>Federal Health Care Program Reimbursement.</u>  Once the Debtors clearly identify, quantify, and validate a credit balance payable to a federal health care program due to overpayment, pursuant to the Debtors' Operating Procedures and in compliance with the Regulations, such overpayment is reported and returned to the Refund Recipient at issue within 60 days of identification or as required in the form of a refund check or recoupment, consistent with the requirements of the Refund Recipient.  The 60-day refund period starts from the day when the overpayment by a federal health care program has been clearly identified as an overpayment and validated by employees of the Debtors.

22. ***Healthcare Facility Refunds.***  Because the Healthcare Facility Refunds result from contractual obligations that include a process by which the relevant collections and subsidy

amounts are reconciled, the Debtors administer the Healthcare Facility Refunds on a monthly, quarterly, or annual basis, as described in further detail above.

23. The Debtors seek authority to continue its Refund Programs in the ordinary course consistent with past practice and to honor certain prepetition obligations under such Refund Programs. The failure to do so could materially harm the trust and confidence of the Debtors' patients and other Refund Recipients during these chapter 11 cases. The Debtors' patients, physicians, and Healthcare Facility partners are pivotal to the success of the Debtors' enterprise, and any loss of goodwill among them or termination of insurer agreements/enrollments or Healthcare Facility Agreements could cause significant harm to the Debtors' business to the detriment of all stakeholders and could lead to potential legal challenges. Additionally, the Debtors would suffer reputational damage with service providers and a reduction in the value of their assets and business enterprises, should the Debtors fail to reimburse Refund Recipients for overpayments relating to medical services.

24. The Debtors estimate that the prepetition amount of outstanding Refunds is $51.4 million. At any given time, it is difficult to determine the total amount of outstanding overpayments that have been identified, but for which a refund check has not yet been issued or offsetting has not yet occurred. There is typically a significant lag between when a patient is treated, when the credit balance is identified, quantified, and validated, and when the Refund is ultimately issued to the appropriate Refund Recipient. Moreover, some refund checks issued to Refund Recipients before the Petition Date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system and, accordingly, have not been honored and paid as of the Petition Date. Nonetheless, the Debtors are required, under contract and various laws, to reimburse Refund Recipients as overpayments are identified. Therefore, the

Debtors seek to honor all prepetition obligations related to the Refund Programs and to continue to do so, as necessary, on a postpetition basis in the ordinary course of business.

## Basis for Relief

I. **The Debtors Should Be Authorized to Honor Refund Programs**

    A. **Overpayments Attributable to the Refunds Are Not Property of the Debtors' Estates.**

25. Section 541 of the Bankruptcy Code generally provides that all property in which a debtor has a legal or equitable interest, including any interest in property that a debtor acquires postpetition, becomes property of the estate upon the commencement of a chapter 11 case. 11 U.S.C. § 541(a)(1), (a)(7). Importantly, section 541 of the Bankruptcy Code does not by itself create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"). Indeed, Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367–68 (1977); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less"). Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the case, such property does not become property of the debtor's estate under section 541 of the Bankruptcy Code and the debtor is prohibited from distributing such property to its creditors. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . .

[S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.").

26. Further, courts have interpreted section 541(d) of the Bankruptcy Code to provide "expressly" that "property in which a debtor holds only bare legal title is not property of the estate." *Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006). When a debtor holds legal title to, but does not have equitable interest in, certain property, the debtor must turn such property over to the holders with such equitable interest in the property. *See MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner."). A debtor who holds proceeds attributable to property owned by another holds only bare legal title to such property, and thus must turnover such proceeds to the interest holder of such property. *See, e.g.*, *In re Columbia Pac. Mortg.*, Inc., 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (awarding holder of participation ownership interest proceeds of a property sale because holder was beneficial owner, and debtor only held legal title to the proceeds).

27. The Debtors do not have equitable title to the overpayments held for the benefit of the Refund Recipients. Instead, holding such overpayments is akin to the Debtors holding funds in trust. The Supreme Court has held that property held by debtors for a third party (such as funds held on account of a resulting trust) is not property of the estate. *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy

estate). Further, courts in this district have held that property over which the debtor is merely exercising some "power . . . solely for the benefit of an entity other than the debtor" is not property of the estate. *In re S.W. Bach & Co.*, 435 B.R. at 878. Thus, any property held by the Debtors on account of the Refund Programs may be not property of the Debtors' estates.

28. Because the Debtors may not have legal or equitable interest in the overpayments, the Debtors should be permitted to honor their obligations under the Refund Programs. Since overpayments are the property of the Refund Recipients and not property of the Debtors' estates, the relief requested in this motion will not prejudice creditors or other parties in interest.

**B.    Payment Is Authorized by Sections 105(a) and 363(b) of the Bankruptcy Code.**

29. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

30. Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so. *See In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien

claimants). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497.

31. In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See* 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization). Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re Ionosphere Clubs*, 98 B.R. at 176.

32. Several courts apply the doctrine of necessity where payment of a prepetition claim (a) is "necessary for the successful reorganization of the debtor," (b) falls within "the sound business judgment of the debtor," and (c) will not "prejudice other unsecured creditors." *In re United Am. Inc.*, 327 B.R. 776, 782 (Bankr. E.D. Va. 2005); *see also In re Ionosphere Clubs*, 98 B.R. at 176. A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 175. That is because the

rehabilitation of a debtor in reorganization cases remains "the paramount policy and goal of Chapter 11." *Id.* at 175–76; *see also In re Just for Feet*, 242 B.R. 821, 826 (D. Del 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization").

33. The relief requested herein is appropriate and warranted under both section 105(a) of the Bankruptcy Code and, assuming, *arguendo*, that the overpayments are property of the Debtors' estate, section 363(b) of the Bankruptcy Code. The Refund Recipients consist of patients, insurers, and Healthcare Facility partners, all of whom are vital to the Debtors' business. If the relationships established by the Debtors with their Refund Recipients are harmed by the Debtor's failure to provide reimbursement for overpayments or pursuant to negotiated contractual arrangements, the Debtors could suffer serious reputational consequences. Without functional relationships with their patients, healthcare insurers, and Healthcare Facility partners, the Debtors have no business. Further, the Debtors may lose the trust of such Refund Recipients and new and existing Refund Recipients alike may be unwilling to engage with the Debtors going forward. If that were to occur, the negative impact on the Debtors' business, their estates, creditors, and patients would be significant and potentially irreversible. Specifically, it would be extremely unfair, especially given the hardship patients go through, if they were not reimbursed for overpayments of services as a result of the Debtors' business practices. It is therefore necessary to the Debtors' reorganization efforts that they be permitted to honor the Refund Programs.

34. Given the dire consequences that would result if the Debtors fail to honor their obligations under the Refund Programs in the ordinary course during these chapter 11 cases, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

**Emergency Consideration**

35.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Failure to receive the relief requested in this motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. The Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

36.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be honored inadvertently. Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions at the Debtors' request to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

37.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to

exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

## Reservation of Rights

38.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

39. The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the RCF Agent; (e) counsel to the Ad Hoc Group of First Lien AmSurg Lenders; (f) counsel to the AmSurg 2L Group; (g) counsel to the Envision Ad Hoc Group; (h) counsel to the Unsecured Notes Group; (i) counsel to the Consenting Sponsors; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d). No other or further notice is needed in light of the nature of the relief requested.

The Debtors request that the Court enter the Interim Order and Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
May 15, 2023

/s/ Vienna Anaya
**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Vienna Anaya (TX Bar No. 24091225)
Javier Gonzalez (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:              rchaikin@jw.com
                       vanaya@jw.com
                       jgonzalez@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:              esassower@kirkland.com
                       jsussberg@kirkland.com
                       ngreenblatt@kirkland.com
                       anne.wallice@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
John R. Luze (*pro hac vice* pending)
Annie L. Dreisbach (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:              john.luze@kirkland.com
                       annie.dreisbach@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Vienna Anaya*
Vienna Anaya

**Certificate of Service**

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Vienna Anaya*
Vienna Anaya