**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENVISION HEALTHCARE CORPORATION, *et al.*,[1] | ) | Case No. 23-90342 (CML) |
|  | ) |  |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS'
EMERGENCY MOTION
FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE DEBTORS TO
(A) HONOR AND INCUR OBLIGATIONS
TO PROFESSIONAL CORPORATIONS, (B) OBTAIN
NEW PROFESSIONAL CORPORATION CONTRACTS,
(C) HONOR AND INCUR OBLIGATIONS TO AMBULATORY
SURGERY CENTERS, AND (D) OBTAIN NEW AMBULATORY
SURGERY CENTER CONTRACTS, (II) EXTENDING THE AUTOMATIC STAY
TO AMBULATORY SURGERY CENTERS, AND (III) GRANTING RELATED RELIEF**

**Emergency relief has been requested.  Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 15, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on May 15, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision.  The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

> **your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion:

## **Relief Requested**

1.     The Debtors seek entry of an order, substantially in the forms attached hereto (the "<u>Order</u>"), (i) authorizing the Debtors to (a) honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations incurred in relation to the Professional Corporations, including obligations pursuant to the Existing Professional Corporation Contracts, (b) enter into and honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations related to attracting, seeking, entering into, and maintaining New Professional Corporation Contracts, (c) honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations incurred in relation to the ASC Entities, including obligations pursuant to the Existing ASC Contracts, (d) enter into and honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations related to attracting, seeking, entering into, and maintaining New ASC Contracts, and (e) provide Cash Collateral Equipment Guarantees and ASC Medical Supply Vendor Guarantees to the ASC Entities, in each case in the ordinary course of business, (ii) extending the automatic stay to ASC Entities under the limited circumstances discussed herein; and (iii) granting related relief.

## **Jurisdiction and Venue**

2.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are section(s) 105(a), 363, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rule(s) 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.      Envision Healthcare Corporation ("EVHC" and together with certain of its Debtor and non-Debtor affiliates and subsidiaries, "Envision" or the "Company") is a leading national medical group that works in collaboration with healthcare partners, payors, and others in the healthcare industry to ensure the delivery of high-quality, accessible, and affordable patient care.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their businesses, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declarations,[2] filed contemporaneously with this motion and incorporated by reference herein.

---

[2]      Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in (a) the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "Keglevic First Day Declaration") and (b) the *Declaration of Dennis Stogsdill, Managing Director of Alvarez & Marsal North America, LLC, in Support of (I) the Debtors' First Day Motions and (II) the Debtors'* Emergency *Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Stogsdill First Day Declaration," and together with the Keglevic First Day Declaration, the "First Day Declarations").

7.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### The Professional Corporations

8.      A substantial portion of the Debtors' revenue is derived from providing management and administrative services to various affiliated entities that in turn provide medical services to patients.  Because the Debtors operate nationwide, they are subject to a variety of state laws regulating entities that administratively support medical providers or practice medicine or both.  To comply with the variety of laws regulating their business and contractual arrangements, the Debtors utilize a structure commonly known in the industry as a "friendly physician" structure pursuant to which the Debtors contract with and provide various management and administrative services to professional entities ("Professional Corporations") that are owned exclusively by licensed physicians (the "PC Physicians") in accordance with applicable requirements.   This structure provides the Debtors with certain control over the non-clinical business management and administrative functions of the Professional Corporations, allowing the PC Physicians to focus on providing high-quality medical services to patients rather than managing the non-clinical aspects of the Professional Corporations.  In these friendly physician arrangements, the PC Physicians are either employed directly by the Professional Corporations or are separately employed directly by the Debtors pursuant to typical employment agreements for non-clinical services or both.  As of the Petition Date, the Debtors provide management and administrative services to approximately 1,400 Professional Corporations.  The clinicians working at the Professional Corporations provide

anesthesia, radiology, neonatology, critical care, inpatient, and emergency medical services, among other clinical services, to patients.

**The Professional Corporation Contracts**

9.      The Debtors' relationships with the Professional Corporations are contractual in nature.   In most cases, Debtor entities provide management and other services pursuant to management services agreements entered into with the Professional Corporations (the "PC Management Services Agreements").  The management services provided by the Debtors pursuant to the PC Management Services Agreements typically include, but are not limited to: managing provider enrollment in government and commercial payor programs; managing billing and collection; granting licenses allowing the Professional Corporations to use the Debtors' computer software and hardware; arranging for the purchase of supplies; ordering of requested medical equipment; hiring of non-clinical and administrative personnel; protecting confidential information; assisting with licensing and accreditation; and supporting implementation of policy and procedures, accounting and budgeting, contract negotiation, general legal services and litigation needs, taxes support, marketing and advertising needs, facility and fixture maintenance, quality assurance and compliance, and other day-to-day administrative needs (such services, the "PC Management Services").

10.      In addition to the PC Management Services Agreements, there are several other contracts that govern the relationships between the Debtors, the PC Physicians, and the Professional Corporations (collectively with the PC Management Services Agreements the "Professional Corporation Contracts"), including:

- ***Employee Lease Agreements.***  Under the Employee Leasing Agreements, the Debtors lease employees to the Professional Corporations to provide administrative support.  The Debtors pay the wages, provide employee benefit programs, and maintain workers' compensation insurance for such leased employees (the "PC Leased Employee Services").

- ***Administrative Employee Agreements.*** PC Physicians enter into administrative employee agreements ("Administrative Employee Agreements") with Professional Corporations that provide that the PC Physician will serve as President and/or Chief Medical Officer of the relevant Professional Corporations. The Debtors are not parties to these agreements. However, the Administrative Employee Agreements typically state that the Physician is prohibited from (a) interfering with certain agreements that Debtor Envision Physician Services, LLC is party to (including agreements to provide services to hospitals and other medical facilities and agreements to employ various individuals as physicians) and (b) advancing the interest of a competitor of Debtor Envision Physician Services, LLC or soliciting any client of Debtor Envision Physician Services, LLC to use the services of a competitor.

- ***Lease Agreements.*** Certain Professional Corporations are parties to real property leases that may contain or be accompanied by guarantees with third party landlords. A Debtor entity may guarantee a Professional Corporations' lease payments pursuant to a real property lease or a lease guarantee (collectively, the "PC Lease Guarantees").

- ***Stock Transfer Agreements.*** The Debtors and the PC Physicians are aligned as parties to certain agreements ("Stock Transfer Agreements") that place restrictions on the transfer of a PC Physician's stock in a Professional Corporation to ensure the streamlined transition of ownership and to maintain compliance with state professional entity requirements in the event of certain transfer events, e.g., death and disability, among other reasons. These restrictions in the Stock Transfer Agreements promote continuity of care, and the continuation of administrative services by the Debtors.

- ***Indemnity Agreements.*** The Debtors also provide corporate-like indemnity to the PC Physicians for liability arising from the PC Physicians' role as a shareholder, director, officer, or fiduciary of the Professional Corporations pursuant to separate indemnity agreements (the "Indemnity Agreements").

## The Debtors' Obligations Under the Professional Corporation Contracts

11.     The Debtors have various ongoing obligations and incur certain costs under the Professional Corporation Contracts. For instance, the Debtors maintain general liability insurance (the "General Insurance Coverage") for liabilities arising from the Debtors' obligations under the PC Management Services Agreements. The Debtors also maintain liability insurance in connection with their indemnification obligations to PC Physicians under the Indemnity

Agreements (the "Directors and Officers Insurance" and, together with the General Insurance Coverage, the "Insurance Coverage").

12.     The Debtors also may be required, pursuant to the PC Management Services Agreements, to pay income taxes ("Income Tax Payments") on behalf of the Professional Corporations on income earned.   Additionally, the Debtors may collect a Professional Corporation's accounts receivable, including from governmental and commercial payors, as permitted, and deposit the collections into such Professional Corporation's bank account (such services, the "Collection Services").

13.     Under the Stock Transfer Agreements, the Debtors have authority to ensure the Professional Corporation is duly licensed and qualified, which may require the Debtors to incur certain legal and operational costs (the "Licensing Costs," together with the PC Management Services, the Insurance Coverage, the Income Tax Payments, the Collection Services, and the PC Leased Employee Services, the "PC Operating Costs").

14.     The Debtors are seeking authority to pay the PC Operating Costs pursuant to the Taxes Motion,[3] Insurance Motion,[4] and the Wages Motion,[5] as applicable.  For the avoidance of doubt, to the extent not authorized by relief requested in those motions, the Debtors seek authority to pay accrued and outstanding PC Operating Costs, to continue to pay all PC Operating Costs as

---

[3]   *See Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion"), filed contemporaneously herewith.

[4]    *See Debtors' Emergency for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees and Claims Administration Fees, and (D) Maintain the Surety Bond Program and Letters of Credit, and (II) Granting Related Relief* (the "Insurance Motion"), filed contemporaneously herewith.

[5]   *See Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion"), filed contemporaneously herewith.

they become due and in the ordinary course of business, and to continue providing the PC Lease Guarantees.

15.     In addition to the PC Operating Costs, the Debtors are also required, pursuant to the PC Management Services Agreements, to pay the Professional Corporation's legal expenses and indemnify the Professional Corporations from certain losses, including, to the extent applicable, losses caused by the Debtors' provision of the management services (together with the Debtors' indemnification obligations to PC Physicians pursuant to the Indemnity Agreements, the "PC Indemnity and Legal Expense Obligations").  The Debtors do not believe that, as of the Petition Date, any prepetition amounts are due and payable on account of the PC Indemnity and Legal Expense Obligations.  The Debtors seek the authority to pay prepetition PC Indemnity and Legal Expense Obligations, continue to honor any PC Indemnity and Legal Expense Obligations in the ordinary course of business and consistent with historical practice, and to honor all PC Indemnity and Legal Expense Obligations related to any new Professional Corporation Contracts (the "New Professional Corporation Contracts") entered into during these chapter 11 cases.

16.     The Debtors' operating revenues are highly dependent on their ability to continue to provide management and administrative services to Professional Corporations during these chapter 11 cases.  As of the Petition Date, the Debtors provide services to approximately 1,400 Professional Corporations and are party to Professional Corporation Contracts under which they are currently performing services or performance is set to commence in the future (collectively, the "Existing Professional Corporation Contracts").  The Debtors' relationships with the PC Physicians and the Professional Corporations generate a substantial amount of revenue and are essential to the Debtors' continued operations.  In the aggregate, the Existing Professional

Corporation Contracts provided the Debtors with approximately $2.4 billion in revenue in 2022 and future collections are dependent on underlying business conditions.

17.     The Debtors' ability to (a) maintain Existing Professional Corporation Contracts in the ordinary course and execute extension options thereto and (b) attract, seek, enter into, and secure New Professional Corporation Contracts is critical to the Debtors' long-term success and viability.  The inability to maintain the existing relationships or develop new relationships with PC Physicians and Professional Corporation would greatly inhibit the Debtors' ability to support the PC Physicians in providing high-quality care to their patients and fulfill their contractual obligations under professional services agreements with hospitals.  The Debtor's provision of services to PC Physicians and Professional Corporations accounts for approximately 46 percent of the Debtors' business in the Envision Physician Services segment.  The expiration, default, termination, or cancellation of Existing Professional Corporation Contracts or the failure to execute New Professional Corporation Contracts would immediately and dramatically reduce revenue and negatively impact the ability of the PC Physicians to provide high-quality patient care. The Debtors are likely to lose the critical relationships they have with the PC Physicians if the Debtors are unable to continue meeting its obligations to both the PC Physicians and the Professional Corporations they own under the Existing Professional Corporation Contracts.  In particular, the Debtors' obligations to indemnify the PC Physicians and make certain payments on behalf of the Professional Corporations pursuant to the Existing Professional Corporation Contracts throughout the duration of these chapter 11 cases is critical to maintaining the Debtors' relationships with the PC Physicians, who are vital to the Debtors' ongoing business of providing medical care.  Even short-term interruptions to the Debtors' performance under the Existing Professional Corporation Contracts could cause PC Physicians to end their relationships with the

Debtors, which would threaten the Debtors' ability to continue operating their businesses, to the detriment of all of their stakeholders.  Further, the harm to the Debtors' reputation that would result from an inability to perform under the Existing Professional Corporation Contracts would likely inhibit the Debtors' ability to obtain New Professional Corporation Contracts, threatening the Debtors' ability to effectuate a successful restructuring.

18.    As of the Petition Date, the Debtors believe that no prepetition amounts are due and payable under the Existing Professional Corporation Contracts.  The Debtors' performance under the Existing Professional Corporation Contracts, including the payment of the PC Operating Costs, among other costs, and honoring the PC Indemnity and Legal Expense Obligations, among other obligations, occur in the ordinary course of business.  Nonetheless, the Debtors file this motion out of an abundance of caution and in an effort to assure the PC Physicians and Professional Corporations of the Debtors' ability to perform all obligations under the Existing Professional Corporation Contracts and enter into New Professional Corporation Contracts in the ordinary course of business consistent with historical practice notwithstanding the commencement of these chapter 11 cases.

**Ambulatory Surgery Centers**

19.    The Debtors also generate a significant portion of their revenue from acquiring, developing, and managing ambulatory surgery centers ("ASCs") and associated anesthesia entities (collectively with the ASCs, the "ASC Entities") in partnership with physicians, healthcare companies, and health system partners (the "ASC Partners").  The ASC Entities are not Debtors in these chapter 11 cases.  The Debtors generally own a majority (but not 100%) interest in the ASC Entities they manage (the "ASC Ownership Interest").  The Debtors also own minority interests in certain ASC Entities in partnership with leading health systems and physicians.  As of the Petition Date, the Debtors operate and hold ownership in more than 250 ASC Entities and have

10

approximately 4,400 physician partners and credentialed physicians at their ASC Entities.  The ASC Entities primarily consist of gastroenterology, ophthalmology, and multispecialty practices.

### The Ambulatory Surgery Center Contracts

20.     The Debtors generally provide management and other services to the ASC Entities pursuant to management services agreements entered into with the ASC Entities (together with the Business Associate Agreement, the "ASC Management Services Agreements").   The ASC Management Services Agreements typically include a business associate agreement ("Business Associate Agreement") pursuant to which the applicable Debtor entity agrees to certain privacy and security requirements and obligations to comply with applicable laws regarding protected health information.   The management services provided by the Debtors to the ASC Entities pursuant to the ASC Management Services Agreements typically include, but are not limited to: implementing policies and procedures, coordinating the procurement and maintenance of licenses and other accreditations, hiring employees, training personnel on operations, administering account procedures and preparing financial records, arranging insurance coverage, preparing budgets, executing marketing and community development, coordinating necessary equipment and supplies purchases and leases, overseeing preparation of annual reports, tax returns, financial statements, billing, accounts receive and accounts payable, and information technology, and supporting other management activities including assisting with financing and obtaining loans required to operate the ASC Entities (such services, the "ASC Management Services").

21.     The Debtors also enter into operating agreements and administrative services agreements (collectively, the "ASC Operating Agreements") with their physician partners that govern the management of the ASC Entities and responsibilities of each owner.  Under these ASC Operating Agreements, the applicable Debtor entity provides various operational services, which typically include, but are not limited to: coordinating the procurement and maintenance of licenses

11

and other accreditations; organizing marketing and community development; developing and implementing policies and procedures; negotiating reimbursement rates from third-party payors; developing and administering the charge structure and billing procedures; arranging financing for equipment and capital needs; hiring employees; training personnel on operations; arranging for insurance coverage; administering account procedures and preparing financial records; overseeing preparation of annual reports, tax returns, financial statements, and budgets; and other operational and administrative activities required to operate the ASC Entities (such services, the "ASC Operating Services").

22.     The ASC Operating Agreements also provide that the Debtors may lend working capital to ASC Entities to support the ASC Entities' operations and provide loans or guarantee loans to third parties on behalf of the ASC Entities (collectively, the "ASC Loans and Guarantees"). Such loans are evidenced by a promissory note bearing interest at a fair market rate and containing other terms substantially similar to those in agreements with third party lenders. The Debtors provide the ASC Loans and Guarantees to ASC Entities or third parties, as applicable, in the ordinary course of business and seek to honor and continue to provide the ASC Loans and Guarantees on a post-petition basis.

23.     In addition to the ASC Management Services Agreements and the ASC Operating Agreements, several other contracts govern the relationships between the Debtors, the ASC Partners, and the ASC Entities (collectively with the ASC Management Services Agreements and the ASC Operating Agreements, the "ASC Contracts"), including:

- **Billing Services Agreement.** The Debtors and certain ASC Entities are party to billing services agreements (the "Billing Services Agreements") pursuant to which a Debtor entity provides pre-certifications and pre-authorization support, accounts receivable management and administrative support services, including such services as depositing receipts, billing and collections support, and patient

resource scheduling, and appeals (such services, the "Billing Services") in exchange for a fee.

- *Ambulatory Surgery Center Development Agreement.* The Debtors provide planning and consulting services to certain ASC Entities through development agreements (the "ASC Development Agreements") pursuant to which a Debtor entity provides planning and consulting services to construct and license an ASC Entity (such services, the "Consulting Services"). Such services include procuring an architect to develop a design for the ASC Entity, providing manuals, developing a budget, assisting with negotiation, and arranging operational services, equipment purchases and leases, and licensing and certification.

- *Ancillary Services Agreement.* The Debtors and certain ASC Entities are party to ancillary services agreements (the "Ancillary Service Agreements") pursuant to which a Debtor entity provides ancillary services (such services, the "Ancillary Services") agreed upon by the Debtor entity and their contract counterpart, such as shared information technology systems, payroll, or equipment maintenance, in exchange for a fee.

- *Equipment Agreements.* Certain ASC Entities procure technical equipment for use in the ASC Entities through equipment agreements ("Equipment Agreements") with third party lenders (the "Equipment Lenders"). A Debtor entity may guarantee an ASC Entities' lease of the equipment (the "Equipment Guarantees") pursuant to the terms of the Equipment Agreement.

- *Lease Agreements.* Certain ASC Entities are parties to real property leases that may contain or be accompanied by guarantees with third party landlords. A Debtor entity may guarantee an ASC Entities' lease payments pursuant to a real property lease or a lease guarantee (collectively, the "ASC Lease Guarantees").

- *Third Party Agreements.* In connection with providing the ASC Management Services and the ASC Operating Services, the Debtors also assist with the negotiation, management, and administration of contracts the ASC Entities enter into with third parties. Third Party Agreements include when ASC Entities lease employees from an affiliated practice (the "Employee Leasing Agreement"), when ASC Entities contract to receive anesthesia services and pathology services (the "Anesthesia and Pathology Service Agreements"), and other similar agreements (the "Miscellaneous Agreements" and together with the Employee Leasing Agreement and the Anesthesia and Pathology Service Agreements, the "Third Party Agreements").

**The Debtors' Obligations and Responsibilities Under the ASC Contracts**

24.     The Debtors have various ongoing obligations and incur certain costs under the ASC Contracts (collectively, the "ASC Operating Costs"). The Debtors are seeking authority to

pay the ASC Operating Costs pursuant to the Taxes Motion, Insurance Motion, and the Wages Motion, as applicable. For the avoidance of doubt, to the extent not authorized by relief requested in those motions, the Debtors seek authority to pay accrued and outstanding ASC Operating Costs, to continue to pay all ASC Operating Costs as they become due and payable in the ordinary course of business consistent with historical practice, and to continue providing the Equipment Guarantees and ASC Lease Guarantees.

25.     In addition to the ASC Operating Costs, the ASC Entity also distributes the revenue of the ASC Entity attributed to each owner (the "ASC Distributions") pursuant to the ASC Operating Agreement. These ASC Distributions usually occur on a monthly basis though there may be incidental payments under the ASC Operating Agreements that occur outside of the monthly cycle.

26.     Under the ASC Operating Agreements, the Board of Directors of the ASC Entities may request additional capital contributions from the Debtors at their discretion (the "ASC Capital Contributions"). There are currently no outstanding ASC Capital Contributions requests. The Debtors do not believe that, as of the Petition Date, any prepetition amounts are due and payable on account of the ASC Capital Contributions. The Debtors seek the authority to continue to honor any ASC Capital Contributions that are requested by the Board of Directors of ASC Entities postpetition.

27.     The Debtors are also required, pursuant to the Billing Services Agreements and the Ancillary Services Agreements, to indemnify the ASC Entities from certain losses, including, to the extent applicable, losses caused by the Debtors (the "ASC Indemnity Obligations"). Additionally, the Debtors pay the legal expenses associated with defending and settling certain disputes concerning the ASC Management Services Agreements in alignment with their business

judgment (the "ASC Settlement Expenses"). In the twelve months leading up to the Petition Date, the Debtors have not paid any amounts in connection with the ASC Indemnity Obligations. In the twelve months leading up to the Petition Date, the Debtors have paid $7,000 in connection with the ASC Settlement Expenses. The Debtors do not believe that, as of the Petition Date, any prepetition amounts are due and payable on account of the ASC Indemnity Obligations. The Debtors believe that, as of the Petition Date, $229,000 prepetition amounts are due and payable on account of the ASC Settlement Expenses. The Debtors seek the authority to continue to honor any ASC Indemnity Obligations or ASC Settlement Expenses in the ordinary course of business and to honor all ASC Indemnity Obligations related to any new ASC Contracts ("New ASC Contracts") entered into during these chapter 11 cases.

28. Furthermore, the Debtors believe that the ASC Entities may require the Debtors undertake additional responsibilities to ensure the ASC Entities operate normally postpetition. Such additional responsibilities will insulate the ASC Entities from disruption due to the chapter 11 cases, safeguarding the Debtor's important revenue stream and stabilizing the significant relationships between the Debtors and the ASC Entities.

29. *First*, the Debtors anticipate that Equipment Lenders may find a postpetition Equipment Guarantee insufficient to satisfy the terms of the Equipment Agreement and may pursue enforcement remedies pursuant to the Equipment Agreement. Should Equipment Lenders pursue enforcement remedies, the Debtors seek authority to cash collateralize the Equipment Guarantee (the "Cash Collateral Equipment Guarantee"). Absent the Cash Collateral Equipment Guarantee, the ASC Entities risk losing necessary medical equipment as well as financial instability.

30.      **_Second_**, the Debtors anticipate that certain vendors (the "ASC Medical Supply Vendors") that supply necessary medical supplies for patient care (the "ASC Medical Supplies") may require a guarantee from the Debtors to continue supply ASC Medical Supplies to the ASC Entities.  Notwithstanding the relief sought in the Critical Vendors Motion[6], the Debtors seek authority to provide a guarantee (the "ASC Medical Supply Vendor Guarantee") within their business judgment to the ASC Medical Supply Vendors to ensure the continued delivery of medical supplies.

31.      The Debtors' operating revenues are contingent on their ability to continue to provide management and administrative services to the ASC Entities during these chapter 11 cases. As of the Petition Date, the Debtors provide services to more than 250 ASC Entities and are parties to ASC Contracts under which they are currently performing services or performance is set to commence in the future (collectively, the "Existing ASC Contracts").  The Debtors' relationships with the ASC Partners generate a significant amount of revenue and are critical to the Debtors' continued operations.  In the aggregate, the Existing ASC Contracts provided the Debtors with approximately $36.9 million in revenue in 2022 with future revenue dependent on underlying business conditions.

32.      The inability to maintain the existing relationships or develop new relationships with ASC Partners and ASC Entities would greatly harm the Debtors' business.  The Debtors' provision of services to ASC Entities accounts for approximately 8.5 percent of the Debtors' business (and substantially all of the Ambulatory Surgery ("AMSURG") business).  Furthermore, the expiration, default, termination, or cancellation of Existing ASC Contracts or the failure to

---

[6]      *See Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Patient Care and Safety Vendors, (B) 503(B)(9) Claimants, (C) Lien Claimants, and (D) Critical Vendors and (II) Granting Related Relief* (the "Critical Vendors Motion"), filed contemporaneously herewith.

execute New ASC Contracts would immediately and dramatically reduce revenue. The Debtors are likely to lose the important relationships they have with the ASC Partners and leading healthcare providers that hold ownership in the ASC Entities if the Debtors are unable to continue meeting their obligations to both the ASC Partners and the ASC Entities under the ASC Contracts. In particular, the Debtors' obligations to provide certain management services pursuant to the ASC Contracts throughout the duration of these chapter 11 cases is critical to maintaining the Debtors' relationships with the ASC Partners, who are vital to the Debtors' ongoing business of providing medical care. Even short-term interruptions to the Debtors' performance under the ASC Contracts could cause ASC Partners to terminate their relationships with the Debtors, inhibiting the Debtors' ability to continue operating their businesses, to the detriment of all of their stakeholders. Further, failing to perform under the Existing ASC Contracts would damage the Debtors' reputation and likely limit the Debtors' ability to obtain New ASC Contracts, impairing the Debtors' capacity to engage in a successful restructuring.

33.     As of the Petition Date, the Debtors believe the Debtors are owed $4.9 million under the Existing ASC Contracts. The Debtors' performance under the ASC Contracts, including the payment of the ASC Operating Costs, among other costs, and honoring the ASC Indemnity Obligations, among other obligations, occur in the ordinary course of business. Nonetheless, the Debtors file this motion out of an abundance of caution and to assure the ASC Partners and ASC Entities of the Debtors' ability to perform all obligations under the Existing ASC Contracts and enter into New ASC Contracts in the ordinary course of business notwithstanding the commencement of these chapter 11 cases. Additionally, the Debtors seek authority to undertake additional responsibilities with respect to the ASC Entities to ensure the ASC Entities operate normally during the course of these chapter 11 cases.

17

34.     As noted above, in addition to the contracts the ASC Entities enter into with the Debtors, the ASC Entities contract with and depend on various third parties, including vendors and lenders, to obtain highly specialized supplies for patients, secure adequate funding for medical equipment, and lease real property for the center facilities.  Such contracts ensure that the ASC Entities can operate in the ordinary course of business and provide high quality patient care.  The potential loss of these critical goods and services would not only be value destructive to the ASC Entities, and by extension the Debtors, but would also be a detriment to the provision of high-quality patient care.  Out of an abundance of caution, the Debtors seek to extend the automatic stay to the ASC Entities on a limited basis, solely with respect to actions against the ASC Entities that may be triggered as a result of the commencement of these chapter 11 cases, to ensure that the ASC Entities will not be harmed by contract counterparties refusing to honor their obligations under their contracts with ASC Entities due to the Debtors' chapter 11 bankruptcy proceedings.

### Basis for Relief

I.     **The Court Should Authorize the Debtors to Honor Prepetition and Postpetition Obligations in Connection with Existing Professional Corporation Contracts and ASC Contracts and to Attract and Enter into New Professional Corporation Contracts and New ASC Contracts.**

35.     Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate in the ordinary course of business without notice or a hearing.  11 U.S.C. § 363(c).  The Debtors believe their activities in connection with Professional Corporations and the ASC Entities—related to both honoring existing obligations and entry into New Professional Corporation Contracts and New ASC Contracts—are ordinary course transactions authorized by section 363(c) of the Bankruptcy Code.  Out of an abundance of caution, however, the Debtors request the relief described herein, seeking to clarify rights and obligations to all PC Physicians, Professional Corporations, ASC Entities, and ASC Partners.

18

36.     Courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to pay certain prepetition claims); *see also  In re Windstream Holdings Inc.*, 614 B.R. 441, 456–57 (S.D.N.Y. 2020) (same); *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks.").

37.     The Court may also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a), bankruptcy courts may "authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor." *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999).  Specifically, a bankruptcy court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See Ionosphere*, 98 B.R. at 175-76 ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

38.     Courts have long recognized the "doctrine of necessity" or the "necessity of payment" rule.  *See id*.  Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor's reorganization case—is "the paramount policy and goal of [c]hapter 11." *Id.* at 176; *see also Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade

vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately").

39.     This flexible approach is particularly critical where prepetition creditors—here, the Physicians, Professional Corporations, ASC Entities, and ASC Partners—are vital to the survival of a debtor's business.  In *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the court stated that "a bankruptcy court may exercise its equity powers under section 105(a) [of the Bankruptcy Code] to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'" *Id.* (quoting *Chateaugay*, 80 B.R. at 287)*.  The court explained that "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code."  *Id.* at 932.

40.     The Debtors are seeking authority to honor any prepetition obligations and perform existing obligations to Physicians, Professional Corporations, ASC Entities, and ASC Partners under the Existing Professional Corporation Contracts and Existing ASC Contracts or otherwise, to ensure that their operations continue without interruption during the pendency of these chapter 11 cases.  The Debtors' estates and their creditors will significantly benefit by the Debtors' continued ability to honor their obligations to the Professional Corporations and ASC Entities, but the Debtors' failure to honor such obligations could lead to the loss of satisfaction and goodwill,

resulting in potential efforts to terminate the Existing Professional Corporation Contracts or Existing ASC Contracts for a breach of such contracts or the Debtors' inability to secure New Professional Corporation Contracts or New ASC Contracts on favorable terms in the future. *See In re Coserv, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing instances where the debtor in possession "can only . . . fulfill[]" its fiduciary duty by "pre-plan satisfaction of prepetition claims" of "customers which, if not honored, could so harm the debtor's good will as to destroy its going concern value"); *see also In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (noting that the continuance of even insignificant customer business transactions can be "critical to the survival of the business," and failure to continue such transactions risks eroding the business's customer base and going concern value).

41.     The Debtors' ability to reorganize and implement their restructuring is dependent upon the continued relationship with the PC Physicians, Professional Corporations, ASC Partners, and ASC Entities.  These relationships are at the core of the Debtors' business, and any interruption in the Debtors' ability to continue meeting their obligations to such parties in the ordinary course would jeopardize the continued viability of the Debtors' business and their ability to successfully restructure through these chapter 11 cases, as well as the PC Physicians' and ASC Partners' continued ability to provide high-quality care to patients.  The expiration, termination, or cancellation of Existing Professional Corporation Contracts or Existing ASC Contracts or the failure to execute New Professional Corporation Contracts or New ASC Contracts would immediately and dramatically reduce revenue.  Even short-term interruptions to the Debtors' performance under Existing Professional Corporation Contracts or Existing ASC Contracts could leave the Debtors with lost revenue or give rise to termination of the Existing Professional Corporation Contracts or Existing ASC Contracts and related damages, thereby threatening the

Debtors' ability to afford current and future businesses expenses.  Further, the harm to the Debtors'
reputation that would result from an inability to perform under the Existing Professional
Corporation Contracts or Existing ASC Contracts would likely inhibit the Debtors' ability to obtain
New Professional Corporation Contracts or New ASC Contracts, threatening the Debtors' ability
to effectuate a successful restructuring.  The Debtors submit that the relief requested herein is
necessary and appropriate under the circumstances.

## II.    The Debtors' ASC Ownership Interests are Property of the Estate Pursuant to Section 541 of the Bankruptcy Code and the ASC Contracts and Organizational Documents are Governed By Section 365(e) of the Bankruptcy Code.

42.    The Debtors' bankruptcy estate consists of "all legal or equitable interests of the
debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  The Debtors
clearly have equitable interests in the ASC Entities.  As discussed, the Debtors generally own a
majority interest in the approximately 250 ASC Entities they manage.  The Debtors entered into
certain purchase agreements (the "Purchase Agreements") with certain of the ASC Partners.  Such
Purchase Agreements grant the Debtors good and valid title to those purchased ASC Ownership
Interests.  Additionally, the Debtors entered into LLC or LP Agreements (the "LLC and LP
Agreements") with certain of the ASC Partners.  Such LLC and LP Agreements grant the Debtors
an ASC Ownership Interest in certain of the ASC Entities.  ASC Ownership Interests established
pursuant to the Purchase Agreements or the LLC and LP Agreements are property of the Debtors'
estate "notwithstanding any provision in an agreement, transfer instrument, or applicable
nonbankruptcy law…that is conditioned on the insolvency or financial condition of the debtor, on
the commencement of a case under [the Bankruptcy Code][.]"

43.    The ASC Contracts and the organizational documents of the ASC Entities are
"executory contracts," governed by section 365 of the Bankruptcy Code.  Under section 365(e) of
the Bankruptcy Code, a clause in a debtor's executory contract that would result in the termination

of an agreement due to the declaration of bankruptcy (otherwise known as an *ipso facto* clause) is

unenforceable. 11 U.S.C. § 365(e).  The purpose of section 365(e)(1) "is to protect the bankruptcy

estate, primarily against the loss of contractual rights that the estate might choose to assume and

reaffirm." *Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 417 F.3d 193, 199 (1st Cir. 2005) (citing

S. Rep. No. 95–989 at 59 (1978); H.R. Rep. No. 95–595 at 348 (1978)).  This accords with the

statutory text, which provides that "an executory contract or unexpired lease of the debtor may not

be terminated or modified, and any right or obligation under such contract or lease may not be

terminated or modified, at any time after the commencement of the case solely because of a

provision in such contract or lease that is conditioned on – (A) the insolvency or financial condition

of the debtor at any time before the closing of the case; (B) the commencement of a case under

this title[.]"  11 U.S.C. § 365(e)(1).

44.     The term "executory contract" is not defined in the Bankruptcy Code.  However,

per the *Countryman* definition, an executory contract is "a contract under which the obligation of

both the bankrupt and the other party to the contract are so far unperformed that the failure of either

to complete performance would constitute a material breach excusing performance of the other."

*Vern Countryman*, "Executory Contracts in Bankruptcy: Part 1," 57 Minn. L. Rev. 439, 450

(1973).  The ASC Contracts and the organizational agreements provide for a continuing role of the

Debtors in the management of the applicable ASC Entity and the accompanying ASC Contracts

specify a detailed list of the duties of both parties.  *See In re DeLuca*, 194 B.R. 65, 77 (Bankr. E.D.

Va. 1996) (finding that an LLC agreement was an executory contract where it provided for

continuing, unperformed duties by both parties).

45.     Here, the Debtors, the ASC Entities, and the ASC Partners each have continuing

obligations under the ASC Contracts and organizational documents, as applicable.  As discussed

above, the Debtors have various ongoing obligations under the ASC Contracts, including with respect to billing and consulting services and performance or payment guarantees. Under the ASC Entities' organizational documents, the Debtors have ongoing obligations, including with respect to capital contributions and other administrative tasks like attending meetings.

46.     As such, ASC Contracts and organizational documents are executory contracts subject to section 365(e) of the Bankruptcy Code, and any clause in such agreements that is an *ipso facto* clause is unenforceable. Because an *ipso facto* clause operates to remove property from the bankruptcy estate in the form of an executory contract, the Fifth Circuit has concluded that any violation of the bar on *ipso facto* clauses contained in section 365(e) of the Bankruptcy Code is first and foremost a violation of the automatic stay. *In re Mirant Corp.*, 440 F.3d at 252 ("the automatic stay must precede any termination permitted by an ipso facto clause"). As a consequence, any action taken to enforce an *ipso facto* clause is voidable. *In re Abusaad*, 309 B.R. 898 (Bankr. N.D. Tex. 2004); *see also Sikes v. Global Marine, Inc.*, 881 F.2d 176 (5th Cir. 1989).

### III. The Automatic Stay Should Be Extended to the ASC Entities Pursuant to Section 105 of the Bankruptcy Code.

47.     Pursuant to section 362 of the Bankruptcy Code, the automatic stay enjoins all persons from, among other things, taking any action to obtain possession of property of the estate or to exercise control over property of the estate. *See* 11 U.S.C. § 362(a)(3). Though the automatic stay usually only applies to the debtors, the Fifth Circuit has recognized that "an exception to this general rule does exist, and a bankruptcy court may invoke § 362 to stay proceedings against non-bankrupt co-defendants where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (quoting *A.H.*

24

*Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)).  Courts have extended § 362 to non-debtors through the equitable powers of § 105.  *See A.H. Robins Co.*, 788 F.2d at 1003.

48.     The Fifth Circuit has also recognized that extending the automatic stay is appropriate when the non-debtor co-defendants are indemnified by the debtor.  *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001).  Furthermore, the automatic stay can be extended when "actions against non-debtors . . . involve property of the estate or would have a significant impact on the debtor's ability to reorganize."  *Carway v. Progressive Cnty. Mut. Ins. Co.*, 183 B.R. 769, 775 (S.D. Tex. 1995) (citing *In re Kelton Motors Inc.*, 121 B.R. 166, 193 (Bankr. D. Vt. 1990)).  Such "party's interest must be so intertwined that it is considered to be the real party in interest."  *Id.* (quoting *A.H. Robins Co.*, 788 F.2d at 1001).

49.     The Debtors are seeking to extend the automatic stay to the ASC Entities on a limited basis solely with respect to actions against the ASC Entities that may be triggered under the ASC Contracts or organizational documents as a result of the commencement of these chapter 11 cases.  As discussed above, the Debtors maintain an interest in the ASC Entities, and the ASC Contracts or organizational documents are executory contracts that are subject to section 365(e) of the Bankruptcy Code.  Creditor interference with the functioning of the ASC Entity would thus implicate the property of the estate.  Furthermore, the ASC Entities compose a significant part of the Debtors' business.  The Debtors rely on the revenue stream pursuant to the Debtors' ownership interests in the ASC Entities.  The ability of the ASC Entities to operate normally without the threat of creditor intrusion is critical to the reorganization efforts of the Debtors.  Limitations on the ASC Entities' normal operations would have an outsized impact on the property of the estate and the Debtors' ability to reorganize.

50.     The Debtors also seek this relief due to the indemnification obligations owed by the Debtors to certain ASC Entities and to preserve the value of the estate.  The Debtors both owe formal ASC Indemnity Obligations to certain of the ASC Entities and also frequently defend and settle certain disputes arising from the ASC Management Services Agreements pursuant to their business judgment.  Such indemnification obligations effectively render the Debtors the defendant in these disputes.  Thus, a judgment against the ASC Entity becomes a judgment against the Debtors.  Extending the automatic stay in this limited circumstance is also appropriate in light of the Debtors' indemnification obligations to the ASC Entities.

**Emergency Consideration**

51.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Failure to receive the relief requested in this motion will during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. The Debtors have satisfied the "immediate and irreparable" harm standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

52.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be honored inadvertently.  Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions at the Debtors' request to receive,

process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

__Waiver of Bankruptcy Rule 6004(a) and 6004(h)__

53.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

__Reservation of Rights__

54.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

55.     The Debtors will provide notice of this motion to the following:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the RCF Agent; (e) counsel to the Ad Hoc Group of First Lien AmSurg Lenders; (f) counsel to the AmSurg 2L Agent; (g) counsel to the Envision Ad Hoc Group; (h) counsel to the Unsecured Notes Group; (i) counsel to the Consenting Sponsors; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; (n) the Professional Corporations; (o) the ASC Entities; (p) the ASC Partners; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

The Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
May 15, 2023

*/s/ Rebecca Blake Chaikin*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Vienna Anaya (TX Bar No. 24091225)
Javier Gonzalez (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          rchaikin@jw.com
                vanaya@jw.com
                jgonzalez@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          esassower@kirkland.com
                jsussberg@kirkland.com
                ngreenblatt@kirkland.com
                anne.wallice@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
John R. Luze (*pro hac vice* pending)
Annie L. Dreisbach (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com
                annie.dreisbach@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

### Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin

### Certificate of Service

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin