IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENVISION HEALTHCARE CORPORATION, *et al.*[1] | ) | Case No. 23-90342 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO PAY
CERTAIN PREPETITION CLAIMS OF (A) PATIENT CARE AND
SAFETY VENDORS, (B) 503(B)(9) CLAIMANTS, (C) LIEN CLAIMANTS,
AND (D) CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 15, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on May 15, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision. The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:

## Relief Requested

1.     The Debtors seek entry of an interim order and a final order, substantially in the forms attached hereto (the "Interim Order" and "Final Order," respectively), (a) authorizing the Debtors to pay, in the ordinary course of business, certain prepetition claims of (i) Patient Care and Safety Vendors, (ii) Lien Claimants, (iii) 503(b)(9) Claimants, and (iv) Critical Vendors; and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing with respect to the relief requested herein approximately thirty-five days after the Petition Date or as soon thereafter as is convenient for the Court.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 363, 503(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.     Envision Healthcare Corporation ("EVHC" and together with certain of its Debtor and non-Debtor affiliates and subsidiaries, "Envision" or the "Company") is a leading national

medical group that works in collaboration with healthcare partners, payors, and others in the healthcare industry to ensure the delivery of high-quality, accessible, and affordable patient care.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their businesses, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declarations,[2] filed contemporaneously with this motion and incorporated by reference herein.

7.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Overview of the Debtors' Vendors and Related Claims

8.      The Debtors' vendors and suppliers are a critical component of the Debtors' ability to manage safe medical facilities and provide high-quality care to patients.  For instance, the Debtors' physicians and ambulatory surgery centers require a steady supply of goods and services from Patient Care and Safety Vendors (as defined below) to provide essential healthcare services and to maintain safe medical facilities.  Any disruption in the provision of these critical goods and

---

[2]    Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in (a) the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "Keglevic First Day Declaration") and (b) the *Declaration of Dennis Stogsdill, Managing Director of Alvarez & Marsal North America, LLC, in Support of (I) the Debtors' First Day Motions and (II) the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Stogsdill First Day Declaration," and together with the Keglevic First Day Declaration, the "First Day Declarations").

services would have a far-reaching and adverse economic and operational impact on the Debtors' business.

9.       The Debtors contract with service providers to, among other things, repair medical equipment and comply with medical waste disposal and environmental regulations.  In many cases, these goods and services are highly specialized and technologically complex, and in some cases may give rise to mechanic's, possessory, or other liens.  In most cases, the ability to find replacement vendors for these goods and services would be difficult if not impossible.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another could irreparably harm the Debtors' business and ultimately harm the Debtors' patients. In addition, suppliers of certain goods utilized by or provided to the Debtors may have delivered goods within the twenty days immediately preceding the Petition Date, giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code.  Finally, the Debtors have obligations to various vendors utilized by the Debtors in the ordinary course that are highly critical to the Debtors' business operations and could not be replaced without causing irreparable harm to the Debtors' business.

10.       The Debtors request authorization to pay certain outstanding prepetition claims of the Patient Care and Safety Vendors, the 503(b)(9) Claimants, the Lien Claimants, and the Critical Vendors (each as defined below, and collectively, the "Trade Claimants" and such claims, collectively, the "Trade Claims"), subject to the limitations set forth in the Interim Order and the Final Order.

11.     The following table summarizes the categories of claims that the Debtors request authority to pay and the estimated prepetition amounts outstanding:

| Category | Description of Services Provided | Estimated Amount Outstanding as of Petition Date | Estimated Amount to Be Paid Within 35 Days |
|---|---|---|---|
| Patient Care and Safety Vendors | Suppliers of goods and services that are necessary to provide essential healthcare services and maintain safe medical facilities. | $400,000 | $300,000 |
| § 503(b)(9) Claimants[3] | Suppliers that provided goods to the Debtors that were received within 20 days before the Petition Date. | $1,000,000 | $800,000 |
| Lien Claimants | Suppliers of goods or services utilized by or provided to the Debtors that may assert mechanic's, possessory, or other similar liens. | $700,000 | $700,000 |
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business. | $32,760,000 | $20,290,000 |
| **Total amount of claims:** | | $34,860,000 | $22,090,000 |

## I.     Patient Care and Safety Vendors.

12.     As ambulatory surgery center operators and healthcare providers, the Debtors operate in one of the most heavily regulated and closely scrutinized industries in the country.  To operate and maintain its medical facilities, the Debtors rely on a steady flow of supplies and services, including medical supplies, medical equipment, and regular maintenance services.  The Debtors' ability to succeed in the healthcare space relies, among other things, on their business

---

[3]     Most 503(b)(9) Claimants could also be categorized as Patient Care and Safety Vendors, Lien Claimants, or Critical Vendors, but they are placed into this additional category to highlight that these suppliers provided goods within 20 days of the Petition Date.

relationships with the vendors that supply such goods and services (the "Patient Care and Safety Vendors").  In some cases, local, state, and/or federal law require that the Debtors maintain contracts with certain Patient Care and Safety Vendors, including those needed to comply with regulations applicable to ambulatory centers, hospital pharmacies, and laboratories.

13.     In the ordinary course of business, the Debtors incur obligations to their Patient Care and Safety Vendors for such services—the payment of which is necessary to ensure the health, safety, environmental, and regulatory compliance of the Company's operations.  A disruption in the supply of such goods and services could jeopardize the Debtors' ability to safely maintain and operate its medical facilities, compromising the Debtors' ability to maintain their high standards of patient care and safety.

14.     The Patient Care and Safety Vendors are distinguishable from other vendors that are critical to the Debtors' business in that the Patient Care and Safety Vendors have a direct, profound impact on the Debtors' ability to operate medical service facilities and meet regulatory requirements.  The extensive, comprehensive regulations and requirements to which the Debtors are subject can only be fulfilled through uninterrupted access to the essential goods and services provided by the Patient Care and Safety Vendors.

15.     Without the ability to continue payment of Patient Care and Safety Vendors' claims (the "Patient Care and Safety Claims"), the Debtors risk harming not only the going-concern value of their business, but the integrity of their facilities, the safety of doctors and staff, compliance with regulatory laws, and the quality of medical care provided.

16.     The Patient Care and Safety Vendors include those vendors who provide equipment, supplies, technology, products, and services that are mission-critical to the operation

of the Debtors' business, such as prescription drugs, medical implants, medical equipment and supplies, regulatory compliance, internal audits, payment processing, digital tools, and operations.

17.     In many instances, the Patient Care and Safety Vendors are the only vendors able to produce or deliver the products or services sufficient to meet the Debtors' operational needs.  If certain Patient Care and Safety Vendors refuse to provide products and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors.  This process could take several months, resulting in a detrimental impact to the Debtors' customer interface, brand messaging efforts, and general operational stability.  In some cases, there may be no true replacement if a relationship with a Patient Care and Safety Vendor falters.  Even where alternative vendors exist, the time and costs associated with switching from one vendor to another would likely be significant and detrimental to the Debtors' estates and to the quality of patient care.

18.     For the twelve months before the Petition Date, on average, the Debtors paid the Patient Care and Safety Vendors approximately $300,000 per month.  The Debtors estimate that, as of the Petition Date, approximately $400,000 is outstanding on account of Patient Care and Safety Claims, approximately $300,000 of which is due or will become due within the first thirty-five days of these chapter 11 cases.

19.     Any attempt by the Patient Care and Safety Vendors to refuse delivery of goods or to refuse to provide services on account of nonpayment of prepetition Patient Care and Safety Claims could increase the risk of harm to patients and employees at the Debtors' various ambulatory surgery centers, hospitals, and other medical facilities and result in significant liability or expense to the Debtors' estates.  The Debtors request authority to pay the Patient Care and Safety Claims as they become due and payable and to continue paying the Patient Care and Safety

Claims in the ordinary course of business.  The Debtors intend to pay prepetition Patient Care and

Safety Claims only where they believe, in their business judgment, that the benefits to their estates

from making such payments will exceed the costs.

**II.     503(b)(9) Claimants**

20.     The Debtors may have received certain inventory, goods, and/or materials from

various vendors (the "503(b)(9) Claimants") within the twenty days immediately preceding the

Petition Date, thereby giving rise to claims that are accorded administrative priority under section

503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  Many of the Debtors' relationships

with the 503(b)(9) Claimants are not governed by long-term contracts.  Instead, the Debtors obtain

much of their medical supplies and equipment from such claimants on an order-by-order or as

needed basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment

of its 503(b)(9) Claims.  Such refusal could negatively affect the Debtors' estates as the Debtors'

business depends on the steady flow of medical equipment and supplies to provide patient care.

21.     Certain 503(b)(9) Claimants supply goods or materials that are critical to the

Debtors' ongoing operations.  Even though the manufacture of certain goods, such as prescription

medicine or bespoke healthcare products, may be completed, the 503(b)(9) Claimants may refuse

to ship postpetition unless the Debtors pay some or all of the prepetition claims owing to such

vendors.  Any interruption in the flow of these goods, particularly concessions, would be highly

disruptive to the Debtors' operations and would be value-destructive for the Debtors' businesses.

22.     In light of these consequences, the Debtors believe that payment of the 503(b)(9)

Claimants is essential to avoid disruptions to the Debtors' operations.  The Debtors believe that all

of the 503(b)(9) Claims are also Patient Care and Safety Claims, Lien Claims, or Critical Vendors

(as defined below) and have been characterized as such for purposes of this motion.  However, to

the extent a 503(b)(9) Claim is not otherwise classified as Patient Care and Safety Claims or Lien

Claim, the Debtors seek authority to pay any undisputed 503(b)(9) Claims.  The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims (if any). Rather, the Debtors will pay the applicable 503(b)(9) Claims as they come due and in the ordinary course of business.

### III.    Lien Claimants

23.     The Debtors routinely do business with a number of vendors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (the "Lien Claimants").  These Lien Claimants perform various services for the Debtors, including the installation and repair of certain equipment in the Debtors' hospitals and patient care centers, maintenance and improvement of the Debtors' real property and facilities, manufacturing component parts necessary for the Debtors' operating and specialized medical equipment, informational technology services, repair, renovation, or construction of the facilities and property therein.

24.     The Debtors' medical facilities require specialized maintenance and repair services provided by third parties on a regular or *ad hoc* basis.  For example, the Debtors frequently engage third-party servicers to perform essential maintenance and repairs to the Debtors' elevators, plumbing, and other infrastructure items, all of which are important to the normal operations of properties.  Repairing defects in the Debtors' medical equipment, an essential part of the Debtors' operations, also requires the work of specialized third-party servicers.   Such specialized maintenance and repairs ensure the uninterrupted operations of the Debtors' facilities and that the Debtors continue to provide patient care in accordance with their high standards of service and safety for patients and employees.

25.     The Debtors regularly undertake expansion, development, renovation, and maintenance opportunities across their portfolio of ASCs, hospitals, and other medical facilities. Projects typically involve the use of mechanics, electricians, and other skilled labor.  Non-payment of the claims of Lien Claimants hired in connection therewith could lead to shortages of skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors.  Any of these events would affect the Debtors' anticipated costs and timetables for such projects.  The cost of a project may vary significantly from initial expectations, and the Debtors may have a limited amount of capital resources to fund cost overruns which, in turn, would delay the completion of the project until adequate funding is available.  Such delay would be value-destructive to the Debtors' estates and the Debtors' business.

26.     Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession or on the property they improved, as applicable, to secure payment of the charges or expenses incurred in connection with these prepetition obligations (the "Lien Claims").  In the event these claims remain unpaid, the Lien Claimants could attempt to assert liens or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession, and retention, of the Debtors' goods and supplies or enforcement of a mechanic's lien would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims.  Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

27.     For the twelve months before the Petition Date, on average, the Debtors paid the Lien Claimants approximately $310,000 per month.  The Debtors estimate that, as of the Petition

Date, approximately $700,000 is outstanding on account of Lien Claims, approximately $700,000 of which is due or will become due within the first thirty-five days of these chapter 11 cases.

28.     To continue using the Lien Claimants' services, the Debtors request authority to pay the prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business.  The Debtors seek authority to pay only those amounts of Lien Claims that the Debtors determine, in their sole discretion, to be necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain reliable, efficient, and smooth distribution systems, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

**IV.     Critical Vendors.**

29.     The Debtors are in the highly complex and heavily regulated business of providing essential healthcare to patients across the United States.  The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' ability to effectively manage the complex process by which patients are treated, from the initial point of scheduling appointments through the complex process by which patients and payors are billed and pay for the medical services provided by the Debtors.  The Debtors rely on products and services provided by certain vendors (the "Critical Vendors") that enable them to effectively manage this complex process.

30.     In light of these concerns, the Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify the Critical Vendors that supply the products and services most vital to the Debtors' go-forward operations.  To that end, the Debtors identified the Critical Vendors pursuant to the following criteria:

11

- which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue operations without disruption;

- the Debtors' ability to find timely alternative sources of supply that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

- the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- which suppliers would be prohibitively expensive or practically difficult to replace;

- whether the vendor or supplier is party to an executory contract with the Debtors;

- which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide;

- whether the vendor is currently refusing to supply the Debtors with goods or services or is refusing to do so without cash up front; and

- whether the vendor meeting the foregoing criteria is able or likely to refuse to provide product or services to the Debtors postpetition if its prepetition balances are not paid.

31.     The Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations or negatively impact patient care, with the need to limit the expenditure of estate resources.  In that regard, the Debtors undertook a lengthy process to ensure that the Critical Vendors truly represent those vendors that are most vital to the Debtors' ongoing operations.  Paying targeted prepetition claims of Critical Vendors (the "Critical Vendor Claims") benefits the Debtors' estates, both monetarily and operationally, by preserving liquidity and enabling the Debtors to operate smoothly during these chapter 11 cases.

32.     For the twelve months before the Petition Date, on average, the Debtors paid the Critical Vendors approximately $11 million per month.  The Debtors estimate that, as of the

Petition Date, approximately $32.1 million is outstanding on account of Critical Vendor Claims, approximately $20.3 million of which is due or will become due within the first thirty-five days of these chapter 11 cases.

33.     The Critical Vendors generally fall into three categories: (a) revenue cycle management vendors; (b) information technology and critical administrative services vendors; and (c) debt collection vendors.

34.     ***Revenue Cycle Management Critical Vendors.***  The Debtors require the services of certain Critical Vendors that provide revenue cycle management services (such Critical Vendors, the "RCM Vendors") to effectively operate their businesses.  Revenue cycle management is the process by which healthcare providers track patient care episodes from initial registration and appointment scheduling through the final payment by patients and payors (such as insurance providers, Medicare, or Medicaid) of a balance for medical services provided.  This process involves numerous parties and is highly complex.  The services provided by the RCM Vendors include collecting information from patients, such as insurance coverage, before the patient arrives for an appointment; coding medical procedures and diagnoses; determining the appropriate billable charges for medical services provided; collection of medical care provided by the Debtors' facilities, insurance identification chart abstraction; submitting claims to insurance companies; collecting and processing payments from patients; and collecting payments from third-party payors.

35.     Revenue cycle management is directly related to the Debtors' ability to generate revenue—without the RCM Vendors to help manage this process, the Debtors would be unable to bill and collect payments for services provided to patients.  The Debtors do not have the technology or personnel necessary to manage this complex process without the services provided by the RCM

Vendors.  Further, the RCM Vendors would be impossible to replace without causing significant disruption to the business—the RCM Vendors have longstanding relationships with the Debtors, are ingrained with the Debtors' technology and software, and have a deep understanding of the Debtors' complex business and how it operates.  Even where alternative vendors may exist, the time and costs associated with switching from an RCM Vendor to a new provider would likely be significant and detrimental to the Debtors' estates.

36.     If the RCM Vendors are not paid prepetition amounts, they may refuse to continue to providing services to the Debtors, endangering the Debtors' ability to generate revenue and irrevocably damaging the Debtors' relationships with patients and the various third parties involved in the revenue management cycle process, including insurers, physicians, and other healthcare partners.  As of the Petition Date, the Debtors estimate that approximately $7.2 million is outstanding on account of obligations to the RCM Vendors.

37.     ***Information Technology and Administrative Services Critical Vendors.*** The Debtors also rely on Critical Vendors for the provision of business-critical information technology systems, products, and administrative services.  For example, some of these Critical Vendors provide the Debtors with patient registration and scheduling platforms to manage the process of collecting insurance and other information from patients prior to appointments.  Other Critical Vendors provide the Debtors with the specialized information technology infrastructure absolutely necessary to the administration of the Debtors' day-to-day operational activities, including certain payroll, finance department, medical operations, and billing support functions.  Even a short interruption in the provision of any of these products or services could have potentially disastrous effects on the Debtors' business and daily operations, with compounding long-term effects on the Debtors' reputation and, in turn, the success of these chapter 11 cases.  Most of these Critical

14

Vendors are virtually irreplaceable due to the specialized nature of the products and services provided to the Debtors.  Even where alternative vendors may exist, the time and costs associated with switching from a Critical Vendor to a new provider would likely be significant and detrimental to the Debtors' estates due to the extensive development timeline required to produce replacement technologies.

38.     As of the Petition Date, the Debtors estimate that approximately $18.8 million is outstanding on account of obligations to informational technology and administrative services Critical Vendors.

39.     ***Debt Collection Critical Vendors.***  In the ordinary course of the Debtors' business, the Debtors provide medical care to patients and, through the revenue cycle management process described above, bill patients and payors for the related balances.  When the balances remain outstanding for an extended time, the Debtors turn to debt collection vendors to aid in collecting any outstanding balance due to the Debtors.  Because the Debtors provide care to millions of patients across the United States, there are thousands of account balances that remain unpaid and for which the Debtors need assistance in collecting.  The Debtors do not have the personnel or technology needed to handle the debt collection process without the provision of services by certain debt collection Critical Vendors.

40.     Patient account balances can remain unpaid for a variety of reasons, including that patients may move to a new address and not receive bills for the care received prior to moving. The Critical Vendors aid the Debtors in collecting unpaid balances from patients, which increases the Debtors' revenues.  Most of these Critical Vendors are virtually irreplaceable due to the specialized nature of the products and services provided to the Debtors—the process of billing and collecting payment for medical services is more complicated than in most industries, and the debt

collection Critical Vendors have specialized knowledge of this process which enables them to effectively collect on account of unpaid balances. Even where alternative vendors may exist, the time and costs associated with switching from a Critical Vendor to a new provider would likely be significant and detrimental to the Debtors' estates.

41.     As of the Petition Date, the Debtors estimate that approximately $4.9 million is outstanding on account of obligations to debt collection Critical Vendors.

42.     Ultimately, the Debtors believe that jeopardizing their relationships with any of the Critical Vendors and attempting to procure the products and services that Critical Vendors provide from replacement vendors, even if possible, would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of the products and services provided by the Critical Vendors would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on the Debtors' businesses and, in turn, these chapter 11 cases.

43.     The interruption of business with, or the absence of, the Critical Vendors would reduce the efficiency and success of the Debtors' operations. Any material interruption in the provision of the products and services provided by the Critical Vendors—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, patients, and market share. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.[4] To maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Debtors' business operations going forward, the Debtors request authority to pay the Critical Vendor Claims as they become due and to continue

---

[4]   Notwithstanding the relief requested here, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

paying the Critical Vendor Claims in the ordinary course of business, including on account of prepetition claims. The Debtors intend to pay the Critical Vendor Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

## Basis for Relief

**I.    The Court Should Authorize the Payment of the Trade Claims.**

44.    Courts have recognized that it is appropriate to authorize the payment of prepetition obligations, including payments to critical vendors, where necessary to protect and preserve the estate. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"). In granting such relief, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

45.    Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Under section 1107(a) of the Bankruptcy Code, a debtor in possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *See, e.g.*, *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Under section 105(a) of the Bankruptcy Code, "[t]he Court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

46.     No provision of the Bankruptcy Code expressly prohibits the postpetition payment of prepetition trade claims.  The above-referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

47.     Authorizing the Debtors to pay prepetition Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving the going concern value for the Debtors' business and maximizing the value of property available to satisfy creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 . . . preserving going concerns and maximizing property available to satisfy creditors").  Recognizing that payment of prepetition claims of certain essential suppliers and vendors is both critical to a debtor's ability to preserve going concerns and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking in this motion.  *See CoServ*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

**A.     The Court Should Authorize the Payment of Patient Care and Safety Claims.**

48.     The Debtors require a steady stream of goods and services from the Patient Care and Safety Vendors to maintain ordinary-course operations and to continue to provide high-quality care to patients.  Without the goods and services provided by the Patient Care and Safety Vendors, the Debtors could be forced to halt operations while they search for substitute vendors and service providers, which would immediately and adversely impact patient care and the value of the

18

Debtors' estates.  To avert this harm, the Court should authorize the Debtors to satisfy the Patient Care and Safety Claims as set forth herein.

**B.      The Court Should Authorize the Payment of 503(b)(9) Claimants.**

49.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within [twenty] days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan, unless they consented otherwise.  The timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").  The Debtors' ongoing ability to obtain medical equipment and other goods is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases, the Debtors could be denied access to the medical equipment and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

**C.      The Court Should Authorize the Payment of Lien Claims.**

50.     Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain mechanic's or possessory liens on the Debtors' goods or equipment in their possession in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally

applicable law that . . . permits perfection of an interest in property to be effective against an entity

that acquires right in such property before the date of perfection.").  The Debtors anticipate that

certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their

possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent

certain Lien Claimants have possession of the Debtors' equipment or other property, mere

possession or retention could disrupt the Debtors' operations.

51.     Paying the Lien Claimants should not impair unsecured creditor recoveries in these

chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of

the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured

creditor of the Debtors' estates.  In such instances, payment now only provides such party with

what they might be entitled to receive under a plan of reorganization, without any interest costs

that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit

from the seamless transition of the Debtors' operations into bankruptcy.

52.     Further, the Debtors require a steady provision of the services related to the Lien

Claimants to maintain operational stability.  Without the Lien Claimants, the Debtors could be

forced to unexpectedly halt operations while they search for substitute vendors and service

providers, thereby preventing the Debtors from capturing revenue, and more critically, maintaining

standards of care and service.  Any disruption to the Debtors' supply chain could result in a

significant loss of operational efficiency, which could irreparably harm the Debtors' business.

**D.      The Court Should Authorize the Payment of Critical Vendor Claims.**

53.     The Debtors require the provision of the goods and services provided by the Critical

Vendors to continue operating their businesses and maintain operational stability.  Without the

products and services provided by the Critical Vendors, the Debtors could be forced to

unexpectedly halt operations while they search for substitute vendors and service providers and

20

may have to forego existing favorable trade terms as a result of their haste to find new vendors, preventing the Debtors from capturing revenue. Critical Vendors Claims must be processed quickly and timely, as any delay in scheduled payment could risk disruption to the business. Any such disruption to the provision of goods and services provided by the Critical Vendors could jeopardize the Debtors' ability to provide care for their patients and pay for clinicians, significantly decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these chapter 11 cases.

## II.    Payment of the Trade Claims is in Furtherance of the Debtors' Fiduciary Duties under Sections 1107(a) and 1108 of the Bankruptcy Code.

54.    The Debtors, operating their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

55.    Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 498. The *CoServ* court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there

is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

56.     Payment of the Trade Claims meets each element of the *CoServ* court's standard. As described above, the failure to timely pay the Trade Claims could jeopardize patient well-being and diminish the value of the Debtors' estates.  The harm and economic disruption that would stem from the failure to timely pay the Trade Claims is grossly disproportionate to the amount of the prepetition claims that would have to be paid.  Finally, with respect to each of the classes of Trade Claims, the Debtors have determined that no practical or legal alternative to payment of the Trade Claimants and Trade Claims exists, so continued partnership with the Trade Claimants and Trade Claims is necessary to avoid significant diminution in value of the Debtors' estates.  Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code through payment of the Trade Claims.

## III.    The Court Should Confirm Outstanding Purchase Orders Have Administrative Expense Priority and Payment of Such Claims is Authorized.

57.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estates postpetition.[5]  Granting the relief sought with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief were not granted, and will not prejudice any other party in interest.

---

[5]     *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses).

58.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to assure suppliers of their administrative priority status.  The disruption to the continuous and timely flow of critical product and other goods would critically jeopardize the Debtors' ability to fill customer orders, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.   The Court should therefore confirm the administrative.

**IV.     Payment of the Trade Claims and the Relief Sought Herein is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.**

59.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors[,] and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." (citation omitted)).

60.     Section 105(a) of the Bankruptcy Code provides that a court "may issue any order process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  Courts apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the

Bankruptcy Code and further supports the relief requested herein.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").

61.     The doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11."  *In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("The payment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

62.     The provision of goods and services provided by the Trade Claimants is indispensable to the safe and economic operation of the Debtors' assets and provision of high-quality medical care to patients.  To ensure that the Debtors continue to provide high-quality care to patients and maintain safe medical facilities, it is imperative that the Debtors have the authority to pay all of the Trade Claimants if determined necessary to preserve the Debtors' operations, reputation, and the go-forward success of the Debtors' businesses.  The relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

**Emergency Consideration**

63.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Failure to receive the relief requested in this motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  The

Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

64.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be honored inadvertently.  Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions at the Debtors' request to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

65.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

### Reservation of Rights

66.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any

particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### <u>Notice</u>

67.     The Debtors will provide notice of this motion to the following:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the RCF Agent; (e) counsel to the Ad Hoc Group of First Lien AmSurg Lenders; (f) counsel to the AmSurg 2L Group; (g) counsel to the Envision Ad Hoc Group; (h) counsel to the Unsecured Notes Group; (i) counsel to the Consenting Sponsors; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; and

(n) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

The Debtors request that the Court enter the Interim Order and Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
May 15, 2023

/s/ Rebecca Blake Chaikin

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Vienna Anaya (TX Bar No. 24091225)
Javier Gonzalez (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          rchaikin@jw.com
                vanaya@jw.com
                jgonzalez@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          esassower@kirkland.com
                jsussberg@kirkland.com
                ngreenblatt@kirkland.com
                anne.wallice@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
John R. Luze (*pro hac vice* pending)
Annie L. Dreisbach (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com
                annie.dreisbach@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin

**<u>Certificate of Service</u>**

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin