**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENVISION HEALTHCARE CORPORATION, *et al.*,[1] | ) | Case No. 23-90342 (CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING THE**
**DEBTORS TO (A) CONTINUE THEIR PREPETITION INSURANCE**
**COVERAGE AND SATISFY PREPETITION OBLIGATIONS RELATED**
**THERETO, (B) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE**
**INSURANCE POLICIES, (C) CONTINUE TO PAY BROKERAGE FEES AND**
**CLAIMS ADMINISTRATION FEES, AND (D) MAINTAIN THE SURETY BOND**
**PROGRAM AND LETTERS OF CREDIT, AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 15, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on May 15, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision. The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:

**Relief Requested**

1.     The Debtors seek entry of an order, substantially in the attached form (the "Order"), (a) authorizing the Debtors to (i) continue their prepetition insurance coverage and satisfy prepetition obligations related thereto, (ii) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, (iii) pay prepetition obligations on account of and continue to pay Brokerage Fees or Claims Administration Fees on a postpetition basis in the ordinary course, and (iv) maintain the surety bond program and letters of credit, and (b) granting related relief.

**Jurisdiction and Venue**

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 363(b), 363(c), 503, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

_____

**Background**

5.      Envision Healthcare Corporation ("EVHC" and together with certain of its Debtor and non-Debtor affiliates and subsidiaries, "Envision" or the "Company") is a leading national medical group that works in collaboration with healthcare partners, payors, and others in the healthcare industry to ensure the delivery of high-quality, accessible, and affordable patient care.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their businesses, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declarations,[2] filed contemporaneously with this motion and incorporated by reference herein.

7.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[2]   Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in (a) the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "Keglevic First Day Declaration") and (b) the *Declaration of Dennis Stogsdill, Managing Director of Alvarez & Marsal North America, LLC, in Support of (I) the Debtors' First Day Motions and (II) the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "Stogsdill First Day Declaration," and together with the Keglevic First Day Declaration, the "First Day Declarations").

**The Insurance Policies and Related Payment Obligations**

8.      In the ordinary course of business, the Debtors maintain 72 insurance policies (collectively, the "Insurance Policies")[3] with 52 third party insurance carriers and two "captive" insurance providers (collectively, the "Insurance Carriers").  The Insurance Policies provide coverage for, among other things, losses related to the Debtors' real and personal property, professional and general liability, crime liability, kidnap and ransom liability, cyber liability, directors' and officers' liability, fiduciary liability, errors and omissions liability, automobile liability, workers' compensation, and employer and employment practices liability.  In addition, certain of the Insurance Policies provide layers of excess liability coverage.  A schedule of the Insurance Policies is attached to the Order as Exhibit A, which is incorporated herein by reference.

9.      To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance agreements.  In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7 (the "U.S. Trustee Guidelines").  It is particularly important to maintain comprehensive insurance in the current economic environment as the healthcare industry continues

---

[3]     The descriptions of the Insurance Policies set forth in this motion constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this motion.  Although Exhibit A is intended to be comprehensive, the Debtors may have inadvertently omitted Insurance Policies from Exhibit A. The Debtors request authority to honor existing Insurance Policies and renew Insurance Policies, as applicable, regardless of whether the Debtors inadvertently failed to include a particular Insurance Policy on Exhibit A, and any such omitted Insurance Policy is hereby included in the defined term "Insurance Policies" as used herein and in the Order.  In addition, the Debtors maintain numerous insurance policies with respect to, among other things, employee health, disability, stop-loss, and life insurance benefits.  These programs are described and relief is requested with respect to such programs in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion"), filed contemporaneously herewith.

to adjust to the impacts of the global COVID-19 pandemic and regulatory changes that reduce reimbursement rates, such as the No Surprises Act and Medicare Fee Schedule Changes.[4]  This relief is necessary to ensure uninterrupted coverage under the Insurance Policies.  Therefore, the Debtors seek authority to maintain the existing Insurance Policies and brokerage accounts, pay prepetition obligations (if any) related thereto upon entry of the Order, renew, amend, supplement, extend, or purchase new Insurance Policies, and maintain the Surety Bond Program and Letters of Credit on a postpetition basis in the ordinary course of business consistent with past practice.

## I.      Premium Payments.

10.      In the ordinary course of business, the Debtors, directly or through brokerage accounts, pay all premium obligations associated with the Insurance Policies (the "Premiums").  The Debtors paid an aggregate amount of approximately $148 million in Premiums in 2022, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions.  The Debtors pay the Premiums on various schedules—monthly, quarterly, annually, or otherwise—over the course of the policy period.  Typically, the Insurance Policies at issue are one to three years in length and renew at various times throughout the year.  Additionally, the Debtors are obligated to pay Premiums for extended reporting provisions to cover claims which may have been incurred but are not yet reported.

11.      The Debtors' Insurance Policies and the categories of insurance that they cover, as well as the carrier's name, policy number, and policy term date are listed on Exhibit A to the Order.

12.      As of the Petition Date, the Debtors believe that they owe $2.1 million on account of outstanding Premiums for the Insurance Policies.  The Debtors seek authority to pay any

---

[4]    Consolidated Appropriations Act, 2021, H.R. 133, 116th Cong. Division BB—Private Health Insurance and Public Health Provisions (2020); 42 C.F.R. §§ 403, 405, 410–11, 414–15, 423–25.

outstanding Premiums owed in connection with the Insurance Policies and to continue to honor their obligations under the Insurance Policies as they come due on a postpetition basis in the ordinary course of business and consistent with past practice.

## II.     Deductibles and Self-Insured Retentions.

13.     Certain of the Insurance Policies require the Debtors to pay a deductible (collectively, the "Deductibles").  Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs and indemnity payments up to the amount of the Deductible.  Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible.  Alternatively, certain of the Insurance Policies use self-insured retentions (collectively, the "SIRs") instead of Deductibles. If a claim is made under these policies, the Debtors must make payments in the first instance up to the limit of the SIR and, once the Debtors have made such payments, the carrier is obligated to cover remaining costs.  The Deductibles may range up to $250,000 subject to certain limitations and the SIRs range from $5,000 to $2.5 million.

14.     The Debtors believe there may be accrued but unpaid amounts pursuant to the Deductibles and SIRs.  The Debtors seek authority to continue to honor their obligations under the Deductibles or SIRs as they come due on a postpetition basis in the ordinary course of business.

## III.    Debtors' Captive Insurer and Risk Retention Group.

15.     The Debtors are the institutional member of Emergency Capital Management, a Risk Retention Group, LLC ("ECM RRG") and purchase medical professional liability and general liability coverage through ECM RRG, which is incorporated and domiciled in the state of Vermont.  ECM RRG is comprised of Debtors as the sole Class A Unit holder and insured professional corporations or other healthcare provider entities or individuals, the Class B Unit

holders, with whom the Debtors have contractual affiliations.  ECM RRG contracts directly with service providers, such as third-party administrators, managers, legal advisors, actuarial consultants, tax advisors, investment managers, and auditors, to manage and administer the medical professional liability and general liability policies for its members.  ECM RRG ensures adequate capitalization with cash sufficient to meet expected losses.  For these services, ECM RRG charges a premium to each entity that employs covered providers and an administrative fee equal to 10 percent of the premium.  For the 2023-2024 policy period, the Debtors pay an aggregate amount of approximately $91 million in monthly installments due on the last day of the preceding month (the "ECM RRG Fees").  As of the Petition Date, the Debtors do not believe they owe any amounts to ECM RRG on account of prepetition ECM RRG Fees, commissions, or any other prepetition obligations.  Nevertheless, out of an abundance of caution, the Debtors seek authority to honor any amounts owed to ECM RRG to ensure uninterrupted coverage under their Insurance Policies.

16.     Non-Debtor affiliate EMCA Insurance Company, Ltd. ("EMCA") is a wholly-owned subsidiary insurance provider and is subject to the local insurance laws and regulations of the Cayman Islands, where EMCA is incorporated and domiciled.  EMCA insures and likely will continue to insure Deductibles on the Debtors' cyber liability, property liability, workers compensation, and employment practices liability policies and is capitalized with cash sufficient to meet the projected amount of cash-outlay pursuant to such policies.  EMCA works with brokers, third-party administrators, and actuaries to evaluate, procure, and administer cost-efficient Insurance Policies, the costs of which are then allocated to and funded by the responsible insured Debtor entity (or entities).

17.     EMCA is currently in run-off for professional and general liability claims brought against the Envision Physician Services segment and AMSURG prior to April 1, 2021.[5] Nevertheless, the Debtors must continue to fund EMCA for settlement and expense amounts for claims incurred prior to April 1, 2021 (the "Claim Settlement Fees").  The Debtors also help EMCA maintain adequate collateralization to ensure EMCA remains in compliance with its regulatory capital requirements (the "Collateral Fees"). Out of an abundance of caution, the Debtors seek authority to honor any amounts owed to EMCA to ensure uninterrupted coverage under their Insurance Policies, and to continue to pay to EMCA the Claim Settlement Fees and Collateral Fees in the ordinary course of business on a postpetition basis, in a manner consistent with prepetition practice.

### IV.     Insurance Brokerage Fees.

18.     The Debtors obtain Insurance Policies through three main insurance brokers, Alliant Insurance Services, AON Risk Solutions, and Woodruff Sawyer (collectively, the "Insurance Brokers"), and through various local agencies.  The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage and with negotiating the prices and terms and conditions of the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates.  The Insurance Brokers collect fees for services rendered as part of the Premiums paid on the Insurance Policies (the "Brokerage Fees").  The Debtors pay the Insurance Brokers approximately $1.05 million per year in Brokerage Fees.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the

---

5       EMCA being in run-off means that there are no new premiums for past professional liability and general liability policy years because ECM RRG undertook such exposure in April 2021. Nonetheless, EMCA remains obligated to cover claims made prior to April 1, 2021, and thus must be able to have cash on hand to do so until all such claims are closed.

Brokerage Fees.  Out of an abundance of caution, the Debtors seek authority to pay any outstanding prepetition Brokerage Fees and to continue to honor any Brokerage Fees as they come due on a postpetition basis in the ordinary course of business.

**V.     Claims Administration**.

19.     GB Healthcare, a Division of Gallagher Basset Services, Inc. ("GB Healthcare), administers and pays certain professional and general liability claims related to the Insurance Policies on behalf of the Debtors.  Generally, if a claim is made against the Debtors, GB Healthcare will administer, settle, adjust, or otherwise handle the claim and make any payments in connection therewith.  The Debtors directly pay $2.75 million per year in four equal payments of $687,500 in January, April, July, and October for all amounts due on account of administering and managing such professional and general liability claims (the "GB Administration Fees").  The Debtors may enter into additional agreements with GB Healthcare for similar services and anticipate paying $67,500 in addition to the GB Administration Fees on account of the additional agreements.  The Debtors' affiliates ECM RRG and EMCA reimburse GB Healthcare, which directly pays vendors and claimants, for each such claim assigned and for all allocated loss adjustment expense, legal defense, and ultimate indemnity payments, if any, associated with each claim.  Because the reimbursement amounts are paid by the Debtors' affiliates, who receive premium payments from the Debtors, the Debtors typically do not directly make any payments to GB Healthcare besides on account of the GB Administration Fees.  In certain instances, however, the Debtors directly reimburse GB Healthcare and anticipate making payments to GB Healthcare on account of such reimbursement.  As of the Petition Date, the Debtors believe they owe approximately $4 million to GB Healthcare pursuant to the claims administration.

20.     The Debtors are required to manage claims under many of their Insurance Policies, including property claims, automobile liability claims, and workers' compensation claims, and others (the "Insurance Claims").  As part of this process, the Debtors have engaged Origami Risk ("Origami") to help develop a multifunctional platform to support their insurance, risk, and claims management. As of the Petition Date, the Debtors believe that they owe Origami approximately $16,000 for their services (the "Origami Fees" and, together with the GB Administration Fees, the "Claims Administration Fees").

21.     The Debtors believe that continuation of the foregoing are necessary to ensure that the Debtors can administer Insurance Claims on a postpetition basis.  Accordingly, the Debtors seek authority to pay any outstanding prepetition Claims Administration Fees and continue their prepetition claims management process on a postpetition basis in the ordinary course of business.

**VI.     Insurance Policy Audits**.

22.     Certain of the Insurance Policies, including workers' compensation policies, are subject to regular audits (the "Insurance Policy Audits"), which may result in an adjustment of the premiums owed on account thereof.  Insurance Policy Audits for prepetition premium payments will not conclude until after the Petition Date.  As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits, if any, is not known at this time. Accordingly, the Debtors seek the authority to pay any outstanding prepetition amounts owed on account of any Insurance Policy Audits and to continue to pay amounts owed on account of any Insurance Policy Audits as they come due in the ordinary course of business on a postpetition basis.

**VII.    Debtors' Surety Bonds and Letters of Credit**

23.    In the ordinary course of business, the Debtors maintain (i) 19 bonds that are required under certain state Medicaid programs, (ii) one appeal bond, and (iii) two bonds related to collection agencies (the "Surety Bonds" and such provision the "Surety Bond Program"). The Debtors obtain the Surety Bonds through AON Risk Solutions (the "Surety Broker") but do not pay any separate fees to the Surety Broker for these services apart from the Brokerage Fees.  As of the Petition Date, the Debtors have approximately 22 Surety Bonds totaling approximately $15.6 million, the premiums for which are approximately $118,000.  As of the Petition Date, the Debtors believe there are de minimis amounts outstanding on account of the Surety Bonds. A schedule of the Surety Bonds currently maintained by the Debtors is attached to the Order as Exhibit B and incorporated herein by reference.

24.    Some of the Insurance Policies and two of the Debtors' landlords require the Debtors to issue letters of credit (the "Letters of Credit") in the approximate aggregate amount of $90.9 million.  Credit Suisse, Morgan Stanley, Bank of America, and Citibank issued the Letters of Credit needed to maintain the Debtors' access to the Insurance Policies, and Credit Suisse issued the Letters of Credit required by the Debtors' landlords.

25.    To continue business operations during the reorganization process, the Debtors must be able to provide financial assurance to certain of the Insurance Carriers and landlords. This, in turn, requires the Debtors to maintain the Surety Bonds and Letters of Credit.  Accordingly, the Debtors seek authority to pay Surety Bond premiums as they come due, maintain and renew the Letters of Credit, renew or potentially acquire additional bonding capacity in the ordinary course of business, and execute other agreements, as needed.  Failing to provide, maintain, back, or timely replace the Surety Bonds and Letters of Credit will prevent the Debtors from, among other things,

complying with their federal law obligations, and consequently prevent them from undertaking essential functions related to their operations.

**Basis for Relief**

**I.      The Debtors Must Continue the Insurance Policies to Comply with the Bankruptcy Code and Other Applicable Laws**.

26.      The Debtors' existing Insurance Policies provide a comprehensive range of protection for the Debtors' business, liabilities, properties, and assets.  As such, it is essential that the Debtors' insurance coverage continues in full force and effect during the course of these chapter 11 cases.  Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  In addition, in many instances, the coverage provided under the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.

27.      Further, the U.S. Trustee Guidelines require that a debtor in possession under chapter 11 of the Bankruptcy Code maintain insurance and pay all Premiums as they come due. *See* U.S. Trustee Guidelines at III(A).  The U.S. Trustee Guidelines further require, absent an order of the court otherwise, a debtor in possession under chapter 11 of the Bankruptcy Code to maintain (if applicable) casualty insurance, workers' compensation insurance, and general liability insurance along with any other insurance customary in such debtor's business.  *Id.* at III(B). Accordingly, the relief requested herein is necessary to ensure that the Debtors comply with their obligations under the Bankruptcy Code, applicable law, and the U.S. Trustee Guidelines.

**II.      Renewing, Amending, Supplementing, Extending, Purchasing, or Entering Into New Insurance Policies, Paying Obligations Related to the Insurance Policies, and Maintaining the Surety Bond Program and Letters of Credit in the Ordinary Course of Business Is Warranted.**

28.      The Debtors believe that they have authority to pay their insurance obligations and renew, amend, supplement, extend, or purchase new Insurance Policies and maintain the Surety Bond Program and Letters of Credit in the ordinary course of business during these chapter 11 cases.  "If the business of the debtor is authorized to be operated under section . . . 1108 . . . and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c).  However, this motion seeks the relief set forth herein out of an abundance of caution in the event payment of these obligations and the administration of their Insurance Policies in a manner consistent with past practices are not considered ordinary course.

29.      Courts in the Fifth Circuit recognize that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), 503, 1107(a), and 1108 of the Bankruptcy Code support the payment of prepetition claims as provided herein.

30.      Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay its obligations where a sound business purpose exists for doing so.  *See In re Cont'l Air*

*Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ, L.L.C.*, 273 B.R. at 497).

31.     Here, the Insurance Policies, Surety Bond Program, and Letters of Credit are essential to the preservation of the value of the Debtors' businesses, properties, and assets as they protect the Debtors and other parties in interest from losses caused by natural disaster, business interruptions, or other unforeseen events.  Limiting the Debtors' exposure to these uncertain risks and managing related liabilities thereto will greatly facilitate the Debtors' ability to successfully administer these chapter 11 cases.  The Insurance Policies are an important part of the Debtors' operations, and healthcare organizations similar to the Debtors maintain similar insurance policies. Moreover, as noted above, certain Insurance Policies are required by statute or regulation.  The Debtors' failure to maintain, renew, or timely replace the existing Insurance Policies, Surety Bonds, and Letters of Credit may jeopardize the Debtors' ability to conduct their operations, provide care to their patients, and, ultimately, successfully reorganize.

32.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *CoServ, L.L.C.*, 273 B.R. at 492.  Necessity is demonstrated under section

105(a) of the Bankruptcy Code when, without dealing with the third party, the debtor risks harm

or the loss of economic advantage to the estate (or the debtor's going concern value) and there is

no practical or legal alternative by which the debtor can deal with the claimant other than by

payment of the claim. *Id.* at 498. The Court's power under section 105(a) of the Bankruptcy Code

to authorize payment of prepetition obligations has long been recognized as precedent within the

Fifth Circuit. *Id.* at 492-93.

33.     These standards are satisfied here. The nature of the Debtors' business makes it

essential for the Debtors to maintain their Insurance Policies, Surety Bonds, and Letters of Credit

on an ongoing and uninterrupted basis. The Debtors' failure to pay any Premiums, deductibles, or

related fees under the Insurance Policies, Surety Bonds, or Letters of Credit could result in one or

more of the carriers terminating or declining to renew their Insurance Policies or refusing to enter

into new insurance policies with the Debtors in the future. If any of the Insurance Policies lapse

without renewal, the Debtors could be exposed to substantial personal liability or other losses, to

the detriment of all parties in interest. It is in the best interests of the Debtors, their estates, and

stakeholders for the Debtors to have authority to maintain as well as revise, extend, supplement,

or change insurance coverage as necessary.

34.     In short, failure to maintain the Insurance Policies, Surety Bond Program, and

Letters of Credit could have a detrimental impact on the Debtors' business, operations, and the

value of their estates. Any interruption in insurance coverage would expose the Debtors to a

number of risks, including potential (a) direct liability for the payment of claims that otherwise

would have been covered under the Insurance Policies, (b) material costs and other losses that

otherwise would have been reimbursed, (c) inability to obtain similar insurance coverage on terms

as equally favorable as the present coverage, (d) higher costs for reestablishing lapsed Insurance

Policies or obtaining new insurance coverage, and (e) regulatory exposure in the event the Debtors are required to maintain certain insurance to continue their operations. If any of these situations arise, the Debtors and their advisors would be forced to address these matters, thus expending limited time and resources. Further, the continued retention of the Insurance Brokers and GB Healthcare allows the Debtors and their employees to focus on their core operational matters. The Debtors are not poised to bring the services provided by the Insurance Brokers or GB Healthcare in-house. If the Debtors fail to make timely payments to the Insurance Brokers or GB Healthcare, the Debtors may lose access to the Insurance Brokers' and GB Healthcare's valuable services, disrupting management to the detriment of all stakeholders. Therefore, the Debtors should be authorized to pay any prepetition obligations related to the Insurance Policies, Surety Bond Program, and Letters of Credit and to renew, supplement, purchase, or enter into new insurance coverage in the ordinary course of business on a postpetition basis consistent with past practice.

III.    **To the Extent the Court Determines that the Surety Bonds are a Secured Extension of Credit, Relief is Appropriate under Section 364 of the Bankruptcy Code.**

35.    Under section 364(c) of the Bankruptcy Code, a debtor may obtain unsecured credit in the ordinary course of business or obtain secured credit (a) with priority over administrative expenses, (b) secured by a lien on unencumbered estate assets, or (c) secured by a junior lien on previously encumbered assets. 11 U.S.C. § 364(c). To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Given the Debtors' current financial circumstances, the Debtors may not be able to obtain financial accommodations comparable to those under the Surety Bond Program on an unsecured basis or

administrative expense basis. To the extent a Surety Bond is deemed an extension of credit, section 364 of the Bankruptcy Code provides the Debtor ample authority to renew existing Surety Bonds and procure new ones, whether on an unsecured basis or, if necessary, on a secured basis.

36.     Continuing the Surety Bond Program is necessary to maintain the Debtors' current business operations. As described above, the Debtors are required to provide surety bonds or other forms of credit support to certain third parties, often governmental units or other public agencies, to secure the payment or performance of certain obligations. The Debtors therefore seek authority to furnish the providers of Surety Bonds with collateral or new forms of credit support with respect to the Debtors' existing Surety Bonds, Surety Bond renewals, or any new Surety Bonds.

**Emergency Consideration**

37.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Failure to receive the relief requested in this motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. The Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

38.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be honored inadvertently. Therefore, the Debtors request that the Court authorize and direct all applicable

17

financial institutions at the Debtors' request to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

39.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

## Reservation of Rights

40.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of

all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### **Notice**

41.     The Debtors will provide notice of this motion to the following:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the RCF Agent; (e) counsel to the Ad Hoc Group of First Lien AmSurg Lenders; (f) counsel to the AmSurg 2L Group; (g) counsel to the Envision Ad Hoc Group; (h) counsel to the Unsecured Notes Group; (i) counsel to the Consenting Sponsors; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business;  (n) the relevant insurance carriers, brokers, and claims administrators; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

The Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
May 15, 2023

*/s/ Vienna Anaya*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Rebecca Blake Chaikin (TX Bar No. 24133055) | Edward O. Sassower, P.C. |
| Vienna Anaya (TX Bar No. 24091225) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Javier Gonzalez (TX Bar No. 24119697) | Nicole L. Greenblatt, P.C. (*pro hac vice* pending) |
| 1401 McKinney Street, Suite 1900 | Anne G. Wallice (*pro hac vice* pending) |
| Houston, TX 77010 | 601 Lexington Avenue |
| Telephone:    (713) 752-4200 | New York, New York 10022 |
| Facsimile:    (713) 752-4221 | Telephone:    (212) 446-4800 |
| Email:    rchaikin@jw.com | Facsimile:    (212) 446-4900 |
|        vanaya@jw.com | Email:    esassower@kirkland.com |
|        jgonzalez@jw.com |        jsussberg@kirkland.com |
| |        ngreenblatt@kirkland.com |
| |        anne.wallice@kirkland.com |

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
John R. Luze (*pro hac vice* pending)
Annie L. Dreisbach (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    john.luze@kirkland.com
        annie.dreisbach@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Vienna Anaya*
Vienna Anaya


## **Certificate of Service**

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Vienna Anaya*
Vienna Anaya