**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENVISION HEALTHCARE CORPORATION, *et al.*, [1] | ) ) ) | Case No. 23-90342 (CML) |
|  | ) |  |
| Debtors. | ) ) | (Joint Administration Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION**
**FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,**
**AND RENEW LETTERS OF CREDIT, (B) GRANTING LIENS AND**
**PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE**
**STATUS AND ADEQUATE PROTECTION TO THE PREPETITION SECURED**
**PARTIES, (C) MODIFYING THE AUTOMATIC STAY, (D) SCHEDULING A**
**FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on May 15, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on May 15, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision. The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>", with those Debtors that are direct or indirect subsidiaries of AmSurg Holdco, LLC being the "<u>AmSurg Debtors</u>", and those Debtors that are direct or indirect subsidiaries of Envision Parent Holdings, Inc. and which are not AmSurg Debtors being the "<u>EVPS Debtors</u>") state as follows in support of this motion:[2]

### Relief Requested

1.      The Debtors seek entry of interim orders, substantially in the forms attached hereto (the "<u>EVPS Interim Order</u>" and "<u>AmSurg Interim Order</u>", respectively, and, together, the "<u>Interim Orders</u>"),[3] and final order(s) (the "<u>Final Orders</u>" and, together with the Interim Orders, the "<u>Orders</u>"):

      a.      authorizing the EVPS Debtors to effectuate the EVPS L/C Roll-Up and to renew the EVPS L/Cs in the ordinary course;

      b.      authorizing the incurrence and payment of fees, costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other obligations due or payable under the EVPS L/Cs following the EVPS L/C Roll-Up (collectively, the "<u>EVPS L/C Obligations</u>") as administrative expenses, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

      c.      authorizing the EVPS Debtors to use the EVPS Cash Collateral of the EVPS Secured Parties (as defined below);

---

[2]     The facts and circumstances supporting this Motion are set forth in (a) the *Declaration of Paul Keglevic, Chief Restructuring Officer of Envision Healthcare Corporation, in Support of the Debtors' Chapter 11 Petitions* (the "<u>Keglevic First Day Declaration</u>") and (b) the *Declaration of Dennis Stogsdill, Managing Director of Alvarez & Marsal North America, LLC, in Support of (I) the Debtors' First Day Motions and (II) the Debtors' Emergency Motion for Entry of an Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "<u>Stogsdill First Day Declaration</u>," and together with the Keglevic First Day Declaration, the "<u>First Day Declarations</u>"), filed contemporaneously on the date hereof (the "<u>Petition Date</u>") and incorporated by reference herein.

[3]     Capitalized term used but not defined herein shall have the meaning given to such terms in the Interim Orders or the First Day Declarations, as applicable.

d.  authorizing the AmSurg Debtors to use the AmSurg Cash Collateral (together with the EVPS Cash Collateral, the "Cash Collateral") of the Prepetition AmSurg Secured Parties;

e.  granting adequate protection from the EVPS Debtors to the EVPS Secured Parties (as defined below);

f.  granting adequate protection from the AmSurg Debtors to the Prepetition AmSurg Secured Parties (as defined below);

g.  scheduling a final hearing (the "Final Hearing"), if necessary, no later than 35 days after the Petition Date;

h.  modifying the automatic stay; and

i.  granting related relief.

## Jurisdiction and Venue

2.  The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

3.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.  The bases for the relief requested herein are sections 105, 361, 362, 363, 503, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule(s) 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Preliminary Statement

5.  The Debtors and their subsidiaries and affiliates have established a market-leading, diversified medical group that offers a wide variety of clinical services throughout the nation. During the months leading up to their chapter 11 filing, the Debtors have carefully managed their prepetition liquidity.  As a result, the Debtors have commenced these chapter 11 cases with

$655 million in cash on hand, which they project to be more than sufficient to pay the administrative costs of these chapter 11 cases and continue operations in the ordinary course for the duration of their chapter 11 cases, including funding of the amounts anticipated under the various first day motions.  The Debtors have negotiated a consensual arrangement for the continued use of cash collateral, as defined in section 363(a) of the Bankruptcy Code, with the Prepetition Secured Parties (which includes five separate secured lender groups), as described more fully herein.

6.     The Debtors do not seek access to debtor-in-possession financing.  As such, the Debtors' access to Cash Collateral during these chapter 11 cases is critical to their restructuring efforts.  Access to Cash Collateral will send a strong message to the Debtors' customers, vendors, employees, affiliated physicians, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally.  The Orders will give the Debtors the necessary funding and flexibility to continue the day-to-day operations of their businesses, maintain patient care, implement the restructuring transactions embodied in the RSAs, and bring these chapter 11 cases to a successful conclusion.  Inability to access Cash Collateral would threaten the Debtors' ability to provide clinical care, generate revenue, meet their existing trade obligations, and compensate employees.  Further, as described in the First Day Declarations, a cessation of the Debtors' access to their Cash Collateral would have severe implications for the Debtors' many patients.  Before arriving in chapter 11, the Debtors managed to negotiate a consensual arrangement for the continued use of Cash Collateral with the Prepetition Secured Parties (as defined below), as described more fully herein.

7.     Access to Cash Collateral on the terms set forth herein will provide the Debtors the best opportunity to maintain their current operations and implement a successful restructuring.  For

4

the reasons detailed herein and in the First Day Declarations, the Debtors believe that the relief proposed in the Orders will maximize the value of the Debtors' estates and reflects a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court approve the entry of the Orders.

**Concise Statement Pursuant to**
**Bankruptcy Rule 4001 and the Procedures for**
**Complex Chapter 11 Cases in the Southern District of Texas**

8.     The following chart contains a summary of the material terms of the Interim Orders, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").[4]

| Summary of Material Terms | | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral** <br><br> Bankruptcy Rule 4001(b)(1)(B)(i) | Citibank, N.A., as administrative and collateral agent (the "ABL Agent"), for the benefit of itself and the lenders and letter of credit issuers and swingline lenders party to the ABL Credit Agreement (as defined below) (collectively, the "ABL Lenders", and together with the ABL Agent, the "ABL Secured Parties"). <br><br> Ankura Trust Company, LLC (as successor to Credit Suisse AG, Cayman Islands Branch), as administrative and collateral agent (the "EVPS Term Loan Facility Agent") for the lenders (the "EVPS Term Loan Lenders" and, together with the EVPS Term Loan Facility Agent, the "EVPS Term Loan Facility Secured Parties") party to the EVPS Term Loan Facility. <br><br> Wilmington Savings Fund Society, FSB as administrative and collateral agent (the "Intercompany Loan Agent," and together with the ABL Agent and EVPS Term Loan Facility Agent, the "Prepetition EVPS Administrative Parties") for AmSurg, LLC (the "Intercompany Secured Party" and together with the ABL Secured Parties and the EVPS Term Loan Facility Secured Parties, the "EVPS Secured Parties") under the Intercompany Term Loans (as defined below). <br><br> Credit Suisse A.G., as administrative and collateral agent (the "AmSurg RCF Facility Agent") for the lenders (the "AmSurg RCF Lenders" and, together with the EVPS Term Loan Facility Agent, the "AmSurg RCF Secured Parties") party to the AmSurg RCF Facility. <br><br> Alter Domus (US) LLC, as administrative and collateral agent (the "AmSurg First Lien Credit Facility Agent") for the lenders (the "AmSurg First Lien Lenders" and, together with the AmSurg First Lien Credit Facility | Ex. A ¶ 5(a)-(c); <br> Ex. B ¶ 5(a)-(c). |

---

[4]     The summaries contained in this Motion are qualified in their entirety by the provisions of the Orders. To the extent anything in this Motion is inconsistent with the Orders, the terms of the Orders shall control.

5

| Summary of Material Terms | | Location |
|---|---|---|
| | Agent, the "<u>AmSurg First Lien Secured Parties</u>") party to the AmSurg First Lien Credit Facilities.<br><br>Wilmington Savings Fund Society, FSB, as administrative and collateral agent (the "<u>AmSurg Second Lien Term Loan Facility Agent</u>", and, together with the AmSurg RCF Facility Agent, and AmSurg First Lien Credit Facility Agent, the "<u>Prepetition AmSurg Administrative Parties</u>" and together with the Prepetition EVPS Administrative Parties, the "<u>Prepetition Administrative Parties</u>") for the lenders (the "<u>AmSurg Second Lien Term Loan Lenders</u>" and, together with the AmSurg Second Lien Term Loan Facility Agent, the "<u>AmSurg Second Lien Term Loan Facility Secured Parties</u>", and, together with the AmSurg RCF Secured Parties, and the AmSurg First Lien Secured Parties, the "<u>Prepetition AmSurg Secured Parties</u>" and, together with the EVPS Secured Parties, the "<u>Prepetition Secured Parties</u>") party to the AmSurg Second Lien Term Loan Facility. | |
| **EVPS Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The use of proceeds of the Prepetition EVPS Collateral (including EVPS Cash Collateral) by the EVPS Debtors is authorized and approved, in each case, solely in the manner and for the purposes expressly permitted under the EVPS Interim Order, including the Approved Budget (subject to Permitted Variances), including, without limitation:<br><br>(a) to permit the orderly continuation of the operation of their businesses;<br><br>(b) to pay the costs, fees, and expenses of administration of these Chapter 11 Cases and claims and amounts approved by this Court in the "first" and "second" day orders or as required under the Bankruptcy Code in accordance with the Approved Budget (subject to Permitted Variances);<br><br>(c) for general corporate and working capital purposes in accordance with the Approved Budget (subject to Permitted Variances);<br><br>(d) to pay adequate protection payments to the extent set forth herein, in accordance with the Approved Budget and subject to Permitted Variances; and<br><br>(e) to fund the Carve Out in accordance with the EVPS Interim Order. | <u>Ex. A</u> ¶ 8. |
| **AmSurg Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | As a condition to providing their consent to use AmSurg Cash Collateral, each of the AmSurg Secured Parties require, and the AmSurg Debtors have agreed, that the AmSurg Cash Collateral will be used solely for the purposes permitted in and in accordance with the terms of the Approved Budget (subject to Permitted Budget Variances) and the EVPS Interim Order, including, without limitation,<br><br>(a) to pay the costs of administration of the Chapter 11 Cases of the AmSurg Debtors and claims or amounts related to the AmSurg Debtors approved by this Court in the "first" and "second" day orders reasonably acceptable to the Required Consenting AmSurg Lenders,<br><br>(b) for the AmSurg Debtors' general corporate and working capital purposes, in accordance with the Approved Budget and subject to Permitted Budget Variances,<br><br>(c) to pay adequate protection payments in the AmSurg Interim Order, and<br><br>(d) to fund the Carve Out in accordance with the AmSurg Interim Order. | <u>Ex. B</u> ¶ 8 |
| **EVPS Budget** | The EVPS Debtors' use of the EVPS Cash Collateral is subject to the Budget attached as <u>Annex 1</u> to the EVPS Interim Order. | <u>Ex. A</u> ¶ 24(a) |

| Summary of Material Terms | | Location |
|---|---|---|
| Bankruptcy Rule 4001(b)(1)(B)(ii) | | |
| **AmSurg Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The AmSurg Debtors' use of the AmSurg Cash Collateral is subject to the Budget attached as <u>Annex 1</u> to the AmSurg Interim Order. | <u>Ex. B</u><br>¶ 23(a) |
| **EVPS Termination Date/Remedies**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii);<br><br>Complex Case Procedures, § I.23.e | *Termination Date:*<br><br>The Debtors' right to use the Cash Collateral pursuant to the EVPS Interim Order shall terminate (the date of any such termination, the "<u>Termination Date</u>") without further notice or court proceeding on the earliest to occur of<br><br>(a) the occurrence of the effective date of any plan of reorganization confirmed in these Chapter 11 Cases,<br><br>(b) the date on which all or substantially all of the assets of the EVPS Debtors are sold in a sale under any chapter 11 plan or pursuant to section 363 of the Bankruptcy Code, or<br><br>(c) the day that is six months after the Petition Date, which may be extended by up to two 3-month extensions, in each case, subject to (i) the prior written consent of the ABL Agent (acting at the direction of the Required ABL Lenders), (ii) the indefeasible payment in full in cash of a 0.50% extension fee to the ABL Agent (for the benefit of the ABL Secured Parties), (iii) receipt of updated Cash Collateral projections through the applicable extended period, (iv) absence of any Termination Event having occurred and continuing, (iv) the EVPS Debtors being in compliance with all terms and conditions set forth in EVPS Interim Order.<br><br>*Remedies:*<br><br>Upon the expiration of the Remedies Notice Period, the ABL Secured Parties and EVPS Term Loan Secured Parties shall be permitted to exercise all remedies set forth in the EVPS Interim Order, in the ABL Credit Documents and EVPS Term Loan Credit Documents and in the Prepetition EVPS Intercreditor Agreements, and as otherwise available at law or in equity, subject to the limitations detailed in the EVPS Interim Order; *provided* that the ABL Agent, the EVPS Term Loan Facility Agent, or the Required Consenting EVPS Term Loan Lenders, as applicable, shall first file a motion with the Court seeking relief from the automatic stay to exercise such remedies. | <u>Ex. A</u><br>¶¶ 52, 53(a)-(b) |
| **AmSurg Termination Date/Remedies**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii);<br><br>Complex Case Procedures, § I.23.e | *Termination Date:*<br><br>Subject to paragraph 54 of the AmSurg Interim Order, the Debtors' right to use AmSurg Cash Collateral pursuant to the AmSurg Interim Order shall terminate without further notice or court proceeding on the Termination Date, unless waived in writing by the Required Consenting AmSurg Lenders.<br><br>*Remedies:*<br><br>Without further order from the Court and without the need for filing any motion for relief from the automatic stay or any other pleading, immediately upon the AmSurg Cash Collateral Termination Date by any of the AmSurg Administrative Parties (in the case of the AmSurg RCF Agent, acting at the direction of the Required Revolving Lenders) or the Required Consenting AmSurg Lenders to the AmSurg Debtors, any Official Committee formed with respect to the AmSurg Debtors, and the U.S. Trustee of the occurrence | <u>Ex. B</u><br>¶¶ 51-52 |

| Summary of Material Terms | | Location |
|---|---|---|
| | of a Termination Event, as applicable, subject to the limitations and waivers contained in the AmSurg Interim Order. | |
| **EVPS Termination Events**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii);<br><br>Complex Case Procedures, § I.23.e | The events described in <u>Annex 2</u> to <u>Exhibit A</u> to the EVPS Interim Order in clauses (a) through (q) are collectively referred to as the "<u>EVPS Termination Events</u>." | <u>Ex. 2</u> of <u>Ex. A</u> |
| **AmSurg Termination Events**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii);<br><br>Complex Case Procedures, § I.23.e | The events set forth in <u>Annex 2</u> to <u>Exhibit B</u> to the AmSurg Interim Order in clauses (a) through (u) are collectively referred to as the "<u>AmSurg Termination Events</u>." | <u>Ex. 2</u> of <u>Ex. B</u> |
| **Adequate Protection of EVPS Secured Parties**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The adequate protection provided to the EVPS Secured Parties shall be in accordance with the EVPS Interim Order. | <u>Ex. A</u> ¶¶ 22-26 |
| **Adequate Protection of AmSurg Secured Parties**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The adequate protection provided to the AmSurg Secured Parties shall be in accordance with the AmSurg Interim Order. | <u>Ex. B</u> ¶¶ 22-24 |
| **Carve Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Orders provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and any Committee appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, and a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Orders. | <u>Ex. A</u> ¶¶ 27-32; <u>Ex. B</u> ¶¶ 25-30 |
| **Modification of Automatic Stay**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The stay under section 362 of the Bankruptcy Code is modified to permit the Debtors and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Orders and the appliable Final Orders, if any, and to deliver any notices of termination described below and as further set forth in the Interim Orders. | <u>Ex. A</u> ¶ 35; <u>Ex. B</u> ¶ 32 |
| **Stipulations and Agreements of the Debtors**<br><br>Complex Case Procedures, § I.23.i | The Interim Orders contain certain stipulations by the EVPS Debtors and AmSurg Debtors, among other things, to:<br>• the aggregate amount of the claims held by the EVPS Secured Parties and AmSurg Secured Parties as of the Petition Date;<br>• the validity, perfection, enforceability, and priority of the Prepetition EVPS Liens and Prepetition AmSurg Liens (each as defined in the applicable Interim Order) on their respective Prepetition Collateral; and<br>• not challenge or seek to avoid the validity, enforceability, priority, or perfection of the Prepetition EVPS Obligations and Prepetition AmSurg Obligations (each as defined in the applicable Interim Orders) or the Prepetition EVPS Liens or Prepetition AmSurg Liens (each as defined in the applicable Interim Orders). | <u>Ex. A</u> ¶ 5; <u>Ex. B</u> ¶ 5 |

| Summary of Material Terms | | Location |
|---|---|---|
| **Binding Effect of the Debtors' Stipulations on Third Parties**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii); Complex case Procedures, § I.23.i | The Debtors' stipulations, admissions, agreements and releases contained in the applicable Interim Orders, including, without limitation, in paragraph E of the Findings of Fact and Conclusions of Law of the applicable Interim Orders, shall be binding upon the Debtors, their estates, and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.<br><br>The Debtors' stipulations, admissions, agreements and releases contained in the applicable Interim Orders, including, without limitation, in paragraph E of the Findings of Fact and Conclusions of Law of the applicable Interim Orders, shall be binding upon all other parties in interest, including, without limitation, any Committee or other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances, subject to the Challenge Period provisions, as detailed in the applicable Interim Orders. | <u>Ex. A</u>, Recitals; <u>Ex. B</u>, Recitals |
| **EVPS 506(c) Waiver**<br><br>Complex Case Procedures, § I.23.i. | *Limitation on Charging Expenses Against Collateral.* As a material inducement and in exchange for (a) the EVPS Secured Parties' agreement (or deemed agreement) to subordinate their Prepetition EVPS Liens to the Carve Out and the EVPS L/C Liens and (b) the EVPS Secured Parties' consent (or deemed consent) to the use of their Cash Collateral, in each case, in accordance with the terms and conditions of this Interim Order, except to the extent of the Carve Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases, shall be charged against or recovered from their respective Prepetition EVPS Collateral (including Cash Collateral) pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law, without the respective prior written consent of the ABL Agent (Acting at the direction of the Required ABL Lenders) and Ad Hoc First Lien Group (email shall suffice), and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition EVPS Administrative Parties or any lender, and nothing in this Interim Order shall be deemed to be a consent by the Prepetition EVPS Administrative Parties to any charge, lien, assessment, or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise; *provided* that the foregoing waiver shall be without prejudice to any provisions of the EVPS Final Order. | <u>Ex. A</u> ¶ 11 |
| **AmSurg 506(c) Waiver**<br><br>Complex Case Procedures, § I.23.i. | *Limitation on Charging Expenses Against Collateral.* As a material inducement and in exchange for (a) the AmSurg Secured Parties' agreement to subordinate their respective Prepetition AmSurg Liens to the Carve Out and (b) the AmSurg Secured Parties' consent (or deemed consent) to the use of the AmSurg Cash Collateral, in each case, in accordance with the terms and conditions of the EVPS Interim Order, except to the extent of the Carve Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases (as defined herein), shall be charged against or recovered from the Prepetition AmSurg Collateral (including AmSurg Cash Collateral) or the AmSurg Adequate Protection Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of each AmSurg Administrative Party that holds a lien on the relevant asset (email shall suffice), and no such consent shall be implied from any other action, inaction, or acquiescence by any of the AmSurg Administrative Parties or other AmSurg Secured Parties; provided that the foregoing waiver shall be without prejudice to any | <u>Ex. B</u> ¶ 11 |

| Summary of Material Terms | | Location |
|---|---|---|
| | provisions of the EVPS Final Order with respect to costs or expenses incurred following the entry of such EVPS Final Order. | |
| **Provisions Affecting Consideration of the Equities of the Case under Section 552(b)(1)** <br><br> Bankruptcy Rule 4001(c)(I)(B)(i) | Except to the extent of the Carve Out, in no event shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or their Prepetition Secured Obligations and all proceeds shall be received and applied in accordance with the Prepetition Debt Documents, as applicable.   The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any kind of the Prepetition Collateral; *provided* that the foregoing waiver shall be without prejudice to any provisions of the applicable Final Order. | Ex. A ¶ 12; Ex. B ¶ 12 |

## **Statement Regarding Significant Provisions**

9.     The Interim Orders and the Final Orders, as applicable: (a) authorize the EVPS L/C Roll-Up; (b) grant superpriority administrative expense claims to the EVPS Secured Parties and AmSurg Secured Parties subject only to the Carve Out; (c) bind the EVPS Debtors and AmSurg Debtors and all parties in interest with respect to the validity, perfection, or amount of the EVPS Secured Parties' or AmSurg Secured Parties' liens or debt, or the waiver of the EVPs Debtors' or AmSurg Debtors' claims against the EVPS Secured Parties or AmSurg Secured Parties (each subject to certain challenge rights); (d) waive the Debtors' rights under section 506(c) of the Bankruptcy Code; (e) subject to entry of the Final Orders, grants the EVPS Secured Parties and AmSurg Secured Parties liens on the proceeds of the EVPS Debtors' and AmSurg Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code; and (f) grant adequate protection and liens to the EVPS Secured Parties and AmSurg Secured Parties.

10.     In light of the foregoing, the EVPS Debtors and AmSurg Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the applicable Interim Orders should be approved.

## The Debtors' Prepetition Indebtedness

**I.      The Debtors' Prepetition Capital Structure.**

11.      As described in greater detail below, the Debtors' capital structure is the product of the 2022 liability management transactions, which created two distinct debt silos.  As of the Petition Date, the Debtors had approximately $7.5 billion in aggregate principal amount of funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure:

| Facility | Maturity | Book Value + Accrued Interest (as of 5/14/23) *(MM)* |
|---|---|---|
| **Envision** | | |
| ABL Facility | 10/11/2023 | $440 |
| Envision First Out Term Loan | 03/31/2027 | $302 |
| Envision Second Out Term Loan | 03/31/2027 | $1,959 |
| Envision Third Out Term Loan | 03/31/2027 | $648 |
| Envision Fourth Out Term Loan B | 10/11/2025 | $167 |
| Envision Fourth Out Incremental Term Loan | 10/11/2025 | $4 |
| **Total Secured Debt (excluding Intercompany Loans)** | | **$3,522** |
| Senior Notes | 10/15/2026 | $987 |
| **Total Envision Debt (excluding Intercompany Loans)** | | **$4,508** |
| | | |
| **AmSurg, LLC** | | |
| AmSurg Revolving Credit Facility | 07/20/2026 | $301 |
| AmSurg First Lien Term Loan | 04/29/2027 | $1,358 |
| AmSurg Second Lien Term Loan | 04/29/2028 | $1,493 |
| **Total AmSurg, LLC Debt** | | **$3,152** |
| **Total Consolidated Debt (excluding Intercompany Loans)** | | **$7,660** |
| | | |
| **Intercompany Loans** | | |
| Long-Term Intercompany Notes | Various | $848 |
| Short-Term Intercompany Notes | 04/27/2024 | $983 |

**A.      The EVHC Facilities**

**1.      The ABL Facility.**

12.      On October 11, 2018, Envision Healthcare Corporation, as borrower, Enterprise Intermediate Holdings Inc., as a guarantor, and certain other subsidiaries of Envision Healthcare Corporation, as guarantors, entered into that certain credit agreement (the "ABL Credit

Agreement") with Citibank, N.A. as administrative agent, collateral agent, lender, letter of credit issuer, and swingline lender, and the lender parties thereto, providing for a five-year asset-based revolving credit facility with aggregate borrowing capacity of up to $550.0 million (the "ABL Facility" and, together with the Envision Term Loan Facility, the "Envision Credit Facilities"), subject to borrowing base availability, which includes letter of credit ("L/C") and swingline sub-facilities.  Subject to certain terms and conditions, Envision is entitled to request additional revolving credit commitments under the ABL Facility, which share in the borrowing base, so long as the aggregate amount of ABL Facility commitments does not exceed $1.0 billion.  The current balance of the ABL facility is $439.2 million, excluding approximately $90.8 million in undrawn issued letters of credit.  The ABL Facility matures on October 11, 2023.

13.    The ABL Facility is subject to the same guarantees and security as the Envision Term Loan Facility, except that the obligations under the ABL Facility are secured on a first-priority basis with respect to the ABL Priority Collateral and on a second lien basis with respect to all other collateral securing the Envision Term Loan Facility.

**2.    Envision First Lien Credit Facilities**

14.    On October 11, 2018, Envision Healthcare Corporation, as borrower, Enterprise Intermediate Holdings, Inc., as a guarantor, and certain other subsidiaries of Envision Healthcare Corporation, as guarantors, entered into that certain credit agreement (the "Envision First Lien Credit Agreement") with Credit Suisse AG, as administrative agent and collateral agent, and the lender parties thereto, providing for a senior secured revolving credit facility in an aggregate principal amount of $300 million (the "Envision Revolving Credit Facility") and a senior secured term loan facility in an aggregate principal amount of $5.45 billion (the "Envision Term Loan Facility" and the loans extended thereunder, the "Envision Term Loans").  On April 27, 2020,

Envision Healthcare Corporation incurred approximately $394.8 million of incremental term loans under the Envision Term Loan Facility (the "2020 Incremental Term Loan").

15.     On July 22, 2022 (as part of the liability management transactions), the Envision Term Loan Facility was amended into four separate tranches of term loans (such amendment, the "Term Loan Facility Amendment").  The "first out" tranche consists of new money term loans in the aggregate principal amount of $300 million.   The "second out" and "third out" tranches (collectively, together with the "first out" tranche, the "Extended Term Loans") consist of converted Envision Term Loans participating in the transaction.  Envision Term Loans converting into the "second out" tranche converted at a 17% discount to par, and loans converting into the "third out" tranche converted at par.  The remaining term loans under the Envision Term Loan Facility that did not convert are "fourth out" in right of payment.  In connection with entry into the AmSurg Revolving Credit Facility (defined below) on July 20, 2022, the Company repaid all amounts outstanding and terminated all commitments under the Envision Revolving Credit Facility.

16.     Following the Term Loan Facility Amendment, Envision used proceeds of incremental debt under the AmSurg First Lien Term Loans (as defined below) to repurchase $589 million of the Envision Term Loans under the "second out," "third out" and "fourth out" tranches (the "Additional Repurchases") at a blended 58% discount.  Such repurchased Envision Term Loans were subsequently cancelled.  As of May 14, 2023, the principal amounts outstanding under the "first out" tranche, the "second out" tranche, the "third out" tranche, and the "fourth out" tranche were $298 million, $1.94 billion, $641 million, and $170 million, respectively.   The Extended Term Loans mature on March 31, 2027, and the "fourth out" term loans mature on October 11, 2025.

17.     Envision's obligations under the Envision Term Loan Facility are guaranteed by Enterprise Intermediate Holdings Inc. ("Holdings") and by each of Envision's direct and indirect wholly-owned material domestic restricted subsidiaries, *other than* those who guarantee the AmSurg Facilities (as defined below) (such guarantors of the AmSurg Facilities, collectively, the "AmSurg Entities") and subject to certain customary exceptions.  Envision's obligations and the related guarantees under the Envision Term Loan Facility are secured by a perfected first-priority security interest in substantially all tangible and intangible assets and capital stock of or owned by Envision or by any guarantor, in each case subject to permitted liens and certain customary exceptions.

### 3.     Intercompany Term Loans

18.     Pursuant to that certain Credit Agreement dated April 29, 2022, among Enterprise Intermediate Holdings Inc., as holdings, Envision Healthcare Corporation, as borrower, AmSurg, LLC, as lender, and Wilmington Savings Fund Society, FSB, as the administrative agent and collateral agent (the "Intercompany Credit Agreement"), AmSurg, LLC extended approximately $1.32 billion in term loans, consisting of approximately $821 million in short-term loans (the "Short-Term Intercompany Loans") and approximately $500 million in long-term loans (the "Long-Term Intercompany Loans" and, together with the Short-Term Intercompany Loans, the "Intercompany Term Loans") to Envision Healthcare Corporation.  Additionally, Envision Healthcare Corporation incurred approximately $30.9 million of long-term loans to repurchase approximately $46.8 million of Term Loans.  Subsequently, Envision Healthcare Corporation used the proceeds of the Intercompany Term Loans to repurchase approximately $589 million of Envision Term Loans pursuant to open market purchases negotiated with existing Envision Term Loan lenders.

19.     The Intercompany Term Loans bear cash interest at a rate of SOFR plus 5.5% per annum, or PIK interest of 11.0% per annum.  The Short-Term Intercompany Loans mature on April 27, 2024, and the Long-Term Intercompany Loans mature on April 29, 2028.  As of May 14, 2023, approximately $983 million of Short-Term Intercompany Loans remain outstanding and approximately $848 million of Long-Term Intercompany Loans remain outstanding.

### 4.     The Senior Notes

20.     On October 11, 2018, EVHC as the issuer issued $1.225 billion aggregate principal amount of 8.75% senior unsecured notes due 2026 (the "Senior Notes"), which mature on October 15, 2026.  The Senior Notes are unsecured obligations of EVHC and are guaranteed by EVHC's existing and subsequently acquired or organized wholly owned domestic subsidiaries to the extent such subsidiary guarantees the Envision Credit Facilities or certain capital markets indebtedness.  The Senior Notes are pari passu in right of payment with all the existing and future senior unsecured debt of the Company, senior to all future subordinated debt of the Company, and are effectively subordinated to all of the Company's secured debt, including the Envision Credit Facilities, to the extent of the collateral securing such secured debt.  Interest on the Senior Notes accrues at the rate of 8.75% per annum and is payable semi-annually in arrears on April 15 and October 15, beginning on April 15, 2019.

21.     In April 2020, the Company exchanged approximately $199 million of Senior Notes for 2020 Incremental Term Loans, reducing the Senior Notes outstanding from approximately $1.225 billion to approximately $1.026 billion.

B.      **The AmSurg Facilities**

1.      **AmSurg Revolving Credit Facility**

22.     On July 20, 2022, AmSurg, LLC, as borrower, AmSurg Holdco, LLC, as a guarantor, and certain other subsidiaries of AmSurg, LLC, as guarantors, entered into a super senior secured revolving credit facility in the aggregate principal amount of $300.0 million (the "AmSurg Revolving Credit Facility").  The current balance of the AmSurg Revolving Credit Facility is $301 million.  The AmSurg Revolving Credit Facility will mature on July 20, 2026.

23.     The AmSurg Revolving Credit Facility is guaranteed by AmSurg Holdco, LLC and all of its existing and subsequently acquired or organized direct or indirect subsidiaries, other than ASCs and subject to additional customary exclusions.  Further, the AmSurg Revolving Credit Facility is secured by a perfected security interest in substantially all assets of AmSurg, LLC and the guarantors from time to time, subject to customary exceptions.

2.      **AmSurg First Lien Term Loan**

24.     On April 29, 2022, AmSurg, LLC, as borrower, AmSurg Holdco, LLC, as a guarantor and certain other subsidiaries of AmSurg, LLC, as guarantors, entered into the AmSurg First Lien Credit Facilities consisting of a senior secured term loan facility in the aggregate principal amount of $1.1 billion (the "AmSurg First Lien Term Loan") and a committed incremental delayed draw senior secured term loan facility in an aggregate principal amount of $200 million (the "AmSurg First Lien Incremental Loan Facility" and, together with the AmSurg First Lien Term Loan, the "AmSurg First Lien Credit Facilities").  The AmSurg First Lien Credit Facilities also provided for the option of incremental term loans, subject to certain conditions.  In connection with the Additional Repurchases, AmSurg used all remaining incremental term loan capacity and issued an additional $250 million of borrowings under the AmSurg First Lien Term

Loan.   The current balance of the AmSurg First Lien Credit Facilities is approximately $1,358 million.  The AmSurg First Lien Credit Facilities mature on April 29, 2027.

25.     The AmSurg First Lien Credit Facilities are guaranteed by each entity that guarantees the AmSurg Revolving Credit Facility and are secured by a perfected security interest in all assets subject to a perfected security interest securing the AmSurg Revolving Credit Facility. The perfected security interest with respect to the AmSurg First Lien Credit Facilities is subordinated to the perfected security interest with respect to the AmSurg Revolving Credit Facility pursuant to an intercreditor agreement, which provides for payment subordination of the AmSurg First Lien Facilities relative to the AmSurg Revolving Credit Facility.

26.     To provide security for the new financing, as part of the 2022 liability management transactions, the AmSurg Entities were designated as "Unrestricted Subsidiaries" under the Envision First Lien Credit Facilities, the ABL Facility, and the Senior Notes Indenture (the "Designation").  Upon the Designation, (a) the AmSurg Entities were each automatically released from all obligations under, and liens granted under, the Envision First Lien Credit Facilities, the ABL Facility, and the Senior Notes Indenture, and (b) the Envision parties to the AmSurg First Lien Credit Facilities (*i.e.*, Envision Healthcare Corporation, Enterprise Intermediate Holdings Inc., and their direct and indirect subsidiaries *other than* the AmSurg Entities) were automatically released from all obligations under, and liens granted in connection with the AmSurg First Lien Credit Facilities.

### 3.     AmSurg Second Lien Term Loan

27.     On April 29, 2022, AmSurg, LLC, as borrower, AmSurg Holdco, LLC, as a guarantor, and certain other subsidiaries of AmSurg, LLC, as guarantors, entered into a senior secured term loan facility in the aggregate principal amount of approximately $1.3 billion (the "AmSurg Second Lien Term Loan" and, together with the AmSurg Revolving Credit Facility and

the AmSurg First Lien Credit Facilities, the "AmSurg Facilities").  In connection with entry into the AmSurg Second Lien Term Loan, the Company repurchased approximately $1.5 billion principal amount of the outstanding Term Loan Facility, approximately $326 million principal amount of the outstanding 2020 Term Loans and approximately $87 million principal amount of the Senior Notes from certain lenders and holders (collectively, together with the entry into the AmSurg First Lien Credit Facilities, the "April 2022 Financing Transactions").  Additionally, $46.8 million of Term Loans were exchanged into $30.9 million of the AmSurg First Lien Credit Facility.  The current balance on the AmSurg Second Lien Term Loan is approximately $1,493 million.  The AmSurg Second Lien Term Loan matures on April 28, 2028.

28.     The AmSurg Second Lien Term Loan is guaranteed by each entity that guarantees the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities and is secured by a perfected security interest in all assets subject to a perfected security interest securing the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities.  The perfected security interest with respect to the AmSurg Second Lien Term Loan is subordinated to the perfected security interest with respect to the AmSurg Revolving Credit Facility and the AmSurg First Lien Credit Facilities pursuant to an intercreditor agreement, which provides for lien subordination of the AmSurg Second Lien Term Loan relative to the AmSurg Revolving Credit Facility but not and the AmSurg First Lien Credit Facilities.

## II.     The Debtors' Need to Use Cash Collateral

29.     The Debtors use cash on hand and cash flow from operations to fund their working capital needs, capital expenditures, and for other general corporate purposes.  An inability to use these funds during these chapter 11 cases would impair the Debtors' business operations and potentially endanger patient care.  Without access to Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm.

30.     A significant portion of the Prepetition Collateral includes interests in the holding companies for non-debtor physician-operated entities (including real property and personal property related thereto) on which the Prepetition Secured Parties have liens, including the distributions provided to the Debtors from those properties and the proceeds generated from the services provided by the Debtors directly.  The Debtors' business model is predicated upon their ability to efficiently manage their operations, including by providing regular payments to affiliated physicians, employees, vendors, and other service providers.  Thus, the orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the Prepetition Collateral into Cash Collateral and use it in their operations.  Moreover, the EVPS Restructuring Support Agreement and AmSurg Restructuring Support Agreements each contain milestones for entry of the applicable Interim Orders.

31.     The Debtors also rely on the encumbered cash generated from their operations to fund working capital, capital expenditures, and for other general corporate purposes.  The Debtors will need this operating revenue to satisfy obligations that are essential for the continued management, operation, and preservation of the Debtors' businesses and to transition their operations in an orderly manner to a chapter 11 environment.  The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of these cases.

32.     The EVPS Debtors and AmSurg Debtors, with the assistance of their advisors, have developed separate 13-week cash flow forecasts and Budgets for the use of Cash Collateral during the interim period.  The EVPS Debtors and AmSurg Debtors believe that the Budgets establish that the EVPS Debtors and AmSurg Debtors will have adequate liquidity during the interim period. The Budgets contains line items for each category of cash flows anticipated to be received or

disbursed during the time period for which each Budget is prepared.  The EVPS Debtors and AmSurg Debtors believe that the Budgets include all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Budgets.

33.     In sum, without the immediate relief requested by this motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm.  Access to Cash Collateral will ensure the Debtors have sufficient funds to maintain their high standard for patient care, preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases throughout the period that the Debtors expect will be necessary to implement and effectuate their restructuring as provided for in the RSA.

**<u>Basis for Relief</u>**

**I.      The Debtors Should Be Authorized to Use the Cash Collateral.**

34.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[5] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

---

[5]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.  11 U.S.C. § 363(a).

35.     Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the applicable Interim Order. Therefore, the Debtors respectfully submit that they have satisfied the standards of section 363(c)(2) of the Bankruptcy Code.

36.     As described herein and in the First Day Declarations, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry into the chapter 11 cases.  The Debtors believe use of Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition Secured Parties, and that the Orders should be approved.

**II.     The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral Is Appropriate.**

37.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case by case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re First South Sav. Ass'n.*, 820 F.2d 700, 710 (5th Cir. 1987) ("[W]ith respect to adequate protection: 'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'") (quoting *In re Becker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*,

Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).   Courts generally have found that using cash collateral to preserve the value of the secured creditors' collateral is a form of adequate protection in itself.   *See, e.g.*, *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

38.     As described herein, and as set forth in the applicable Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of safeguards to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay:  adequate protection liens and claims under section 507(b) of the Bankruptcy Code; payment of professional fees and expenses; and continued access to information and financial reporting.  Notably, the Prepetition Secured Parties are not receiving payment in cash of any postpetition interest.  The Debtors submit that these proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from diminution in value to the Cash Collateral.

39.     In light of the foregoing, the Debtors further submit—and the Prepetition Secured Parties agree—that the proposed Adequate Protection Obligations to be provided for the benefit

of the Prepetition Secured Parties are fair, reasonable, and appropriate.[6]   Thus, the Debtors'

provision of the Adequate Protection Obligations is not only necessary to protect against

diminution in value, as required by sections 363(c)(2) and 363(e) of the Bankruptcy Code, but is

fair and appropriate under the circumstances of the chapter 11 cases to ensure the Debtors are able

to continue using the Cash Collateral, subject to the terms and limitations set forth in the applicable

Interim Order, for the benefit of all parties in interest and their estates.

### III.   The Debtors Should Be Authorized to Enter Into the EVPS L/C Roll-Up.

40.   The EVPS Debtors' access to sufficient working capital, liquidity, and letters of

credit through the use of Cash Collateral and other Prepetition EVPS Collateral and the EVPS L/C

Roll-Up is necessary and vital to preserve and maintain the going concern values of the EVPS

Debtors.   The EVPS Prepetition ABL Lenders and Letter of Credit Issuers would not otherwise

consent to the use of their Cash Collateral or the renewal of the EVPS L/Cs without the EVPS L/C

Roll-Up. The EVPS L/C Roll-Up shall be authorized as compensation for, in consideration for,

and solely on account of, the agreement of the Prepetition ABL Secured Parties to permit use of

their Cash Collateral and to renew the EVPS L/Cs.  The EVPS L/C Roll-Up will benefit the EVPS

Debtors and their estates because it will enable the EVPS Debtors to maintain access to necessary

Cash Collateral and letters of credit critical to administering these Chapter 11 Cases and funding

their operations.  The Debtors therefore seek authorization that, upon entry of the EVPS Interim

Order, all EVPS Prepetition ABL Obligations under or relating to outstanding EVPS L/Cs shall be

converted into EVPS L/C Superpriority Claims secured by the EVPS L/C Liens.  Absent the ability

to continue to use Cash Collateral subject to the terms set forth in the EVPS Debtors, the EVPS

---

[6]   Pursuant to the Interim Orders, nothing in the Interim Orders shall prejudice, limit or otherwise impair the rights
of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert the
interests of any of the Prepetition Secured Parties.

Debtors, their estates, their creditors and other parties in interest will be seriously and irreparably harmed.

41.     The Court should authorize the EVPS Debtors, as an exercise of their sound business judgment, to enter into the EVPS L/C Roll-Up.  Considerable deference should be given to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

42.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."   *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

43.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen*

*McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

44.     Further, courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).   The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

**IV.     The Debtors Should Be Authorized to Pay the Fees Required by the ABL Agent under the Fee Letter.**

45.     The Debtors have agreed, subject to Court approval, to pay certain fees to the ABL Agent, including a structuring fee to the ABL Agent.   As set forth in the Stogsdill Declaration, these fees were the subject of arm's-length and good-faith negotiations between the Debtors and the ABL Lenders, are integral components of the overall terms pertaining to the consensual usage of cash collateral and were required as consideration for their consent to the use of the EVPS Cash Collateral.   The fees and expenses agreed to and set forth in a Fee Letter are reasonable and within market practice for cases of this size and type and the Court should authorize the Debtors to pay the fees and expenses provided under the Fee Letter in connection with the use of the EVPS Cash Collateral.

**V.      The Scope of the Carve Out Is Appropriate.**

46.     The proposed adequate protection is subject to the Carve Out contained in the Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors and a statutory committee.

**VI.     The Automatic Stay Should Be Modified on a Limited Basis.**

47.     The proposed Interim Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to permit the Debtors and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the applicable Interim Order and the applicable Final Order and to deliver any notices of termination described below and as further set forth in the applicable Interim Orders.  The Interim Orders further provides that the automatic stay shall be modified and vacated to the extent necessary to permit the Prepetition Secured Parties to take the remedial actions specified in the applicable Interim Order upon the occurrence of the Termination Date.

48.     The Debtors have determined, in an exercise of their business judgment that such stay modification is appropriate under the circumstances, in the context of a negotiated, consensual

cash collateral order.  Further, stay modifications of this kind are ordinary, and are reasonable and fair under the circumstances of these chapter 11 cases.

## VII.    Interim Relief Should Be Granted.

49.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).    Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n motion by the debtors, a hearing . . . will routinely be conducted within three business days to consider . . . cash collateral use."  Complex Case Procedures, § I.20.

50.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Orders authorizing the Debtors, from and after entry of the Interim Orders until the Final Hearing, if any, to access Cash Collateral as needed and on the terms provided in the proposed Interim Orders.  The Debtors require such access prior to the Final Hearing and entry of the Final Order for the various reasons discussed herein, including to ensure they have the necessary liquidity to continue operating, to pay their administrative expenses, to implement the relief requested in the Debtors' other "first day" motions, and to consummate the restructuring contemplated by the RSA.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in

interest, pending the Final Hearing.  In addition, the Interim Budget establishes that the Debtors'

use of Cash Collateral will not prejudice the Prepetition Secured Parties.

51.     In light of the foregoing, the Debtors submit that they have satisfied the

requirements of Bankruptcy Rule 4001(b) and (c) to support immediate access to Cash Collateral

pending the entry of the Final Order, and respectfully request that the Court grant the relief

requested herein and authorize the immediate use of the Cash Collateral pursuant to the terms and

conditions set forth in the applicable Interim Order.

## Request for Final Hearing

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date for the Final Hearing, if necessary, and fix the time and date prior to the Final

Hearing for parties to file objections to this Motion.

## Emergency Consideration

53.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one

days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable

harm."  The Debtors request emergency consideration of this motion.  The relief requested herein

is essential to the Debtors' ability to operate their businesses in the ordinary course, preserve

going concern value, and maximize such value of their estates for the benefit of all stakeholders.

Failure to receive such relief during the first twenty-one days of these chapter 11 cases would

severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors have

satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that

the Court approve the relief requested in this motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

54.     The Debtors request that the Court enter an order providing that notice of the relief

requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to

exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

## Notice

55.     The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the RCF Agent; (e) counsel to the Ad Hoc Group of First Lien AmSurg Lenders; (f) counsel to the AmSurg 2L Group; (g) counsel to the Envision Ad Hoc Group; (h) counsel to the Unsecured Notes Group; (i) counsel to the Consenting Sponsors; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d). No other or further notice is needed in light of the nature of the relief requested.

WHEREFORE, the Debtors respectfully request that the Court enter the interim orders

granting the relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

Houston, Texas
May 15, 2023

/s/ Rebecca Blake Chaikin

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Vienna Anaya (TX Bar No. 24091225)
Javier Gonzalez (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:        rchaikin@jw.com
        vanaya@jw.com
        jgonzalez@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Anne G. Wallice (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        esassower@kirkland.com
        jsussberg@kirkland.com
        ngreenblatt@kirkland.com
        anne.wallice@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
John R. Luze (*pro hac vice* pending)
Annie L. Dreisbach (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        john.luze@kirkland.com
        annie.dreisbach@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin

**<u>Certificate of Service</u>**

I certify that on May 15, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin